**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: TEXT MESSAGING** | ) | **Case No. 08 C 7082** |
| **ANTITRUST LITIGATION** | ) | **MDL No. 1997** |
| ---------------------------------------------------------- | ) | |
| | ) | |
| **THIS ORDER APPLIES TO:** | ) | |
| **ALL ACTIONS** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY,  District Judge:

Plaintiffs have filed this suit on behalf of all those who purchased text messaging services on a fee-per-message basis from defendants or their predecessors, subsidiaries, or affiliates from January 1, 2005 to the present.  Plaintiffs allege that defendants, the four national wireless communications service providers, entered into and implemented a "continuing contract, combination, and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services sold in the United States" in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  Compl. ¶ 1.  Defendants have moved to dismiss plaintiffs' consolidated complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiffs have not alleged facts sufficient to state a claim that defendants entered into an unlawful conspiracy.  For the reasons stated below, the Court grants defendants' motion.

### Plaintiffs' Allegations

The Court takes the following facts from the allegations in plaintiffs' amended consolidated complaint.

The defendants in this case are Sprint/Nextel, Verizon, AT&T, and T-Mobile. They are the four national providers of wireless services in the United States. Collectively, they control more than ninety percent of the U.S. market for text messaging services.

Text messaging involves the use of cellular telephones to send and receive short messages, generally limited to 160 characters. Defendants transmit text messages on existing cellular network connections. Because the size of the messages is small, it costs defendants very little – a fraction of one cent – to transmit an individual text message. In 2008, defendants transmitted 2.5 trillion text messages for almost 263 million wireless subscribers in the United States. An estimated 3.3 trillion text messages will be sent in 2009.

Consumers have two choices when purchasing text messages. They may pay on a per-message basis, or they may purchase a bundled plan, which, depending on the plan, includes either a set allotment or an unlimited number of text messages. Most cellular subscribers purchase text messaging plans. It is estimated, however, that between two and ten percent of text messages sent and received in the U.S. are purchased on a per-message basis, either because the customer has not purchased a bundled plan or because she has exceeded her plan's allotments. The total revenue from text messages purchased on a per-message basis in the U.S. in 2008 is estimated to be $10 billion.

Text messaging was first introduced in the U.S. by AT&T in 2002. In the years after text messaging's introduction and prior to the start of the alleged conspiracy, defendants charged disparate prices for individual text messages purchased on a per-

2

message basis, often resulting in lower costs to consumers.

Beginning in 2005, however, defendants began charging the same prices for text messages purchased on a per-message basis:

• as of the second quarter of 2006, prior to the start of the alleged conspiracy, all four defendants charged ten cents for individual text messages purchased on a per-message basis;

• In the fourth quarter of 2006, Sprint-Nextel raised its price for individual text messages to fifteen cents. In the first and second quarters of 2007, AT&T, Verizon, and T-Mobile also raised their per-message text messaging rates from ten cents to fifteen cents.

• In late 2007, Sprint-Nextel raised its per-message rates again, from fifteen to twenty cents. AT&T and Verizon followed suit in the first quarter of 2008, and T-Mobile matched that price in the third quarter of 2008.

During this same period, defendants' prices for other wireless services, such as voice calling and data transmission, decreased.

Plaintiffs allege that the per-message price for text messages reflects a substantial mark-up over the per-unit cost of transmitting text messages. They also allege that as per-message prices for text messaging were increasing, defendants' cost of transmitting text messages decreased. During this same time period, defendants' capacity to send and receive text messages increased, and defendants have the infrastructure to transmit many more text messages than they currently send.

Plaintiffs allege that, absent collusion, per-unit prices for text messages should have decreased as defendants' costs decreased. Instead, all four companies

increased their prices in the same way – from ten to fifteen cents, then from fifteen to twenty cents – around the same time. Plaintiffs assert that this is highly unusual conduct and a departure from what occurred as a result of what they allege was active competition for per-unit text messaging customers prior to 2005. According to plaintiffs, defendants' lockstep price increases could only have resulted from a price-fixing conspiracy. Plaintiffs allege alternatively that Sprint-Nextel's two five-cent price increases constituted "offers" to the other three defendants to engage in price-fixing, which plaintiffs allege the other defendants "accepted" when they raised their prices by the same amounts.

Plaintiffs also allege that defendants are all members of CTIA-The Wireless Association (CTIA), a trade organization based in Washington, D.C., and The Groupe Speciale Mobile Association (GMSA), an international trade group of cellular providers. Plaintiffs allege that in early 2002, shortly after text messaging was introduced in the U.S., the defendants, via the CTIA, negotiated an agreement that allows each carrier's text messaging service to communicate with the other defendants' services. Because of this agreement, consumers can send text messages to any cellular phone user, regardless of the recipient's wireless service provider. Defendants have met regularly via CTIA's biannual conventions since 2002. Plaintiffs allege that these conventions and other trade association meetings have provided defendants with the opportunity to conspire to fix prices for text messages purchased on a per-message basis.

CTIA also collects data on the wireless industry, and it has a "Wireless Internet Caucus," whose leadership council meets quarterly and includes members from all four defendant companies. Sprint-Nextel announced its two five-cent increases in the price

4

of individual text messages within one month after the mid-year meetings of the leadership council.  Plaintiffs cite this as further evidence of a conspiracy.

CTIA also established and controls the Common Short Code Association (CSCA), an organization that promotes the sale of Common Short Codes (CSCs). CSCs are five- or six-digit numeric codes to which text messages can be addressed from a wireless device.  Wireless phone users can use CSCs to (among other things) cast votes in reality show contests, receive information about products and services from vendors or advertisers, and receive mobile updates about their favorite sports teams.  Plaintiffs allege that defendants stand to gain substantial revenue from the increased use of CSCs, from both the higher volume of text messages sent and received and the fees defendants collect from businesses and advertisers that wish to use CSCs to reach their customers.  Plaintiffs allege that defendants have collusively used the CSCA to expand the use of text messaging services by encouraging the development of CSC applications that are highly appealing to consumers and then have collusively capitalized on this expanded market by controlling the pricing of text messaging services.

Finally, plaintiffs allege that the market for text messaging services is conducive to collusion.  The wireless services market is heavily concentrated; there are high barriers to entry; and text messaging services are homogeneous, with no discernable differences among the form or appearance of the text messaging services offered by the defendants.  Plaintiffs allege that these structural factors facilitate collusion among defendants and prevent new competitors from entering the market to undercut artificially high prices on individual text messages.

Plaintiffs contend that these facts, taken together, support a reasonable inference that defendants conspired to raise and fix prices on single text messages purchased on a per-message basis in violation of section 1 of the Sherman Act. Plaintiffs allege that they and other class members have been injured by defendants' conduct because they are unable to purchase text messages on a per-message basis except at prices higher than they would have to pay in the absence of defendants' unlawful conduct.

## Discussion

### 1.     Standard of review on a motion to dismiss

When considering a motion to dismiss a complaint, the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Newell Operating Co. v. Int'l Union of United Auto., Aerospace, and Agr. Implement Workers of Am.*, 532 F.3d 583, 587 (7th Cir. 2008).  Though rule 8(a)(2) does not require a complaint to include "detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  Plausibility requires "enough facts to raise a reasonable expectation that discovery will reveal evidence" of defendants' liability.  *Id*. at 556.

The Seventh Circuit recently noted that "the height of the pleading requirement is

relative to circumstances." *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009). In complex cases like the antitrust action at issue here, in which discovery will be complicated, time-consuming, and expensive, "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Twombly*, 550 U.S. at 557-58 (internal citations omitted).

**2.      Application of standard of review to Sherman Act § 1 claims**

Section 1 of the Sherman Act prohibits only those restraints of trade "effected by a contract, combination, or conspiracy." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775 (1984). Horizontal price-fixing of the sort alleged here is a *per se* violation of § 1. *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006). But because "without more, parallel conduct does not suggest conspiracy," *Twombly*, 550 U.S. at 557, "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Id.* at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 US 537, 540 (1954)).

Plaintiffs acknowledge that their allegations of parallel pricing "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 558. At the pleading stage, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice"; a claim must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. This "does not impose a probability

requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id.*

 At the pleading stage, of course, a plaintiff need not, and typically cannot, present all the evidence that he would need to prove a conspiracy at summary judgment or trial.  *Twombly* did not supplant the notice-pleading regime of the Federal Rules 8(a)(2) but rather held "the need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief."  *Id.* at 557 (citing Fed. R. Civ. P. 8(a)(2)).  This "'plausibility standard' is not akin to a probability requirement, but it asks for more than a sheer possibility that the defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct 1937, 1949 (2009).

Though the Court must "accept as true all of the allegations contained in a complaint," this "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949.  Further, though a court still must draw "all reasonable inferences in favor of the plaintiff," *Michalowicz v. Vill. of Bedford Park,* 528 F.3d 530, 534 (7th Cir. 2008), "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S. Ct. at 1950.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* at 1949.

Given the current state of the law of pleading, at least in the context of antitrust case involving complex facts and very time-consuming discovery, it appears that: (1) a plaintiff must allege a "plausible" conspiracy to fix prices; (2) an allegation of conspiracy that rests on conduct "merely consistent with" an agreement does not rise to the level of plausibility; and (3) allegations of conspiracy that do not rise to the level of plausibility do not give rise to a reasonable inference of a conspiracy that a court must draw in the plaintiff's favor.

**3.    Parallel actions**

Plaintiffs allege two episodes of parallel pricing activity by defendants. The first was the 2006 move by Sprint-Nextel to raise single-message text messaging rates from ten to fifteen cents, which Verizon, AT&T, and T-Mobile followed within eight months. The second was the 2007 price change, again led by Sprint-Nextel, from fifteen to twenty cents, which Verizon, AT&T, and T-Mobile matched within ten months. The defendants' parallel actions were spread out over several months; defendants refer to them as "sequential" rather than "simultaneous." Defs.' Mot. at 1. For purposes of this motion, however, the Court will accept that these acts sufficiently identify "parallel conduct."

**4.    Inference of agreement**

Even "conscious parallelism," however, is "not in itself unlawful" under the Sherman Act. *Twombly,* 550 U.S. at 553-54. A viable antitrust price-fixing claim requires an agreement among the defendants. The Court therefore turns to the plaintiffs' other allegations to determine whether they offer "enough factual matter

(taken as true) to suggest that an agreement was made." *Id.* at 556.

Plaintiffs do not allege in their complaint that there was an express agreement among the defendants, and they offer no "specific time, place, or person involved in the alleged conspirac[y]." *Id.* at 565 n.10. As in *Twombly*, the plaintiffs in this case do make scattered references throughout their complaint to "defendants' collusive behavior" (Compl. ¶ 81) and state that the defendants "acted in concert" (*id.* ¶¶ 119 and 123). *See In re Travel Agent Comm'n Antitrust Litigation*, 583 F.3d 896, 905 (6th Cir. 2009). These statements, however, are, "on fair reading . . . merely legal conclusions resting on the prior allegations," and thus they are not entitled to an assumption of truth. *Twombly*, 550 U.S. at 564.

According to the Seventh Circuit, "it is generally believed . . . that an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act." *In re High Fructose Corn Syrup Antitrust Litig*, 295 F.3d 651, 654 (7th Cir. 2002). This would require a plaintiff to prove "that there was an actual, manifest agreement not to compete." *Id.* at 661. *Twombly*, though, allows for the possibility of a "tacit" agreement, *see Twombly*, 550 U.S. at 553, so the Court proceeds to evaluate the plaintiffs' pleadings to determine whether they support an inference of either a tacit or express agreement.

Plaintiffs allege several facts that they say support an inference of agreement sufficient to state a claim under section 1. These are: defendants' opportunities to collude through trade organizations; defendants' failure to deny any price-fixing conspiracy in responding to Congressional inquires into the matter; economic factors

showing that the structure of the text messaging market is prone to collusion and that price increases were contrary to common economic experience and against defendants' interest; and the "historically unprecedented" nature of the parallel price increases.

Plaintiffs argue, correctly, that the Court must avoid compartmentalizing plaintiffs' allegations but rather consider the allegations "as a whole and in combination." *High Fructose Corn Syrup,* 295 F.3d at 661. Practicality, however, demands that the Court discuss plaintiffs' allegations individually before it can evaluate them together.

      *a.*      *Participation in trade organizations*

A substantial portion of the plaintiffs' complaint describes the various trade organizations in which defendants participate, including the CTIA, the GMSA, the Wireless Internet Caucus leadership council, and the CSCA. Plaintiffs note that these organizations collect and distribute data about the wireless industry, which is available to defendants. Plaintiffs further cite the organizations' annual conferences, quarterly meetings, and regular phone calls, plus defendants' leadership roles in these organizations, as demonstrating defendants' "opportunity to conspire to set pricing for Text Messaging Services." Compl. ¶ 101.

Notably, however, plaintiffs offer no specifics that "identif[y] the parties, purpose, and approximate dates of a plausible conspiracy." *Hoeft v. Dommisse*, 2009 WL 2562749, at *2 (7th Cir. Aug. 20, 2009). They make no allegations about particular meetings at which they contend any of the defendants reached an agreement. They do not allege any "details about the structure and content of these meetings" or "the types of employees who attended the meetings." *In re TFT-LCD (Flat Panel) Antitrust Litig.,*

11

599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009). They offer no statements by any of the defendants suggesting the presence of an agreement. *See, e.g. High Fructose Corn Syrup*, 295 F.3d at 662; *see also, Standard Iron Works v. ArcelorMittal,* 639 F. Supp. 2d 877, 885-86 (N.D. Ill. 2009). Nor do they give any indication of the terms of the alleged agreement. *See, e.g. In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F. Supp. 2d 363, 371-72 (M.D. Pa. 2008); *see also, Wanachek Mink Ranch v. Alaska Brokerage Int'l, Inc.*, No. C06-089RSM*, 2009 WL 1342676, at *3 (W.D. Wash. May 5, 2009).

Plaintiffs allege that Sprint-Nextel raised its prices from ten to fifteen cents approximately a month after the CTIA's 2006 mid-year meeting, and from fifteen to twenty cents approximately a month after CTIA's 2007 mid-year meeting, and that "other Defendants followed shortly thereafter." Compl. ¶ 101. They stop short, however, of alleging that the defendants reached an agreement at those meetings. Even reading the complaint broadly, an inference that Sprint-Nextel's actions taken "approximately a month" after a meeting resulted from an agreement undertaken at that meeting would be unreasonable given the current state of the law regarding pleading in cases of this type. This is particularly true because, by plaintiffs' time line, the other defendants did not match the price increases until six to ten months later (presumably after a different biannual meeting).[1]

---

[1]Plaintiffs have submitted as supplemental authority a decision in which Kidge Ruben Castillo denied a motion to dismiss, finding that the plaintiffs in an antitrust had satisfied the *Twombly* pleading standard. *In re Potash Antitrust Litig.*, --- F. Supp. 2d ----, No. 08 C 6910, 2009 WL 3583107 (N.D. Ill. Nov. 3, 2009). In *Potash*, plaintiffs alleged that defendants' executives met on a specific date and that three defendants almost simultaneously shut down plants to cut production within a month of that meeting. The court found that this, combined with plaintiffs' other substantial factual allegations, supported the allegation an agreement was
(continued...)

An "opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 n.15 (3rd Cir. 1993). Participation in "points of contact or relationships for promotion of mutual interest" (like a trade organization) does not, without more, support an inference of conspiracy. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 468-469 (7th Cir. 1981). The Court thus proceeds to analyze the additional factors which plaintiffs plead in support of an inference of conspiracy.

b.    *Congressional investigation*

Plaintiffs allege that on September 9, 2009, the chairman of the Senate Antitrust Subcommittee sent a letter to the defendants inquiring into their increases in prices for text messages purchased on a per-message basis. Compl. ¶ 86. Plaintiffs attached the letter to their complaint. The letter noted that such increases were "hardly consistent with vigorous price competition" and asked defendants to reply to several questions about the pricing of text messaging services. Because, however, the letter made no direct allegation of price fixing, the Court cannot infer an agreement to fix prices from defendants' failure to deny such an allegation.

c.    *Economic factors*

When, as in this case, the non-economic factors supporting the contention that defendants agreed not to compete is "suggestive rather than conclusive," *High Fructose Corn Syrup*, 295 F.3d at 655, "economic evidence suggesting that defendants were not

---

[1](...continued)
reached. The more vague and widely-spaced allegations in plaintiffs' complaint here do not give rise to the same inference.

in fact competing [is] important." *Id.* Such economic evidence can be divided into two sub-types: "evidence that the structure of the market was such as to make secret price fixing feasible; . . . and evidence that market behaved in a noncompetitive matter." *Id.*

Plaintiffs allege both of these types of economic evidence. First, they assert that the structure of the text messaging market makes it prone to price-fixing. The wireless communications industry is heavily concentrated, and defendants control ninety percent of the U.S. text messaging market. Compl. ¶ 124. The defendants are the only large national wireless carriers, and extremely high barriers to entry prevent new entrants. *Id.* ¶ 125. Plaintiffs also contend that text messaging as a product lends itself to collusion because it is homogenous; consumers cannot perceive any differences in the text messaging services offered by the various defendants. *Id.* ¶ 126. Taking these allegations as true, the plaintiffs have sufficiently alleged facts that suggest that the wireless services market is an interdependent, concentrated industry where price-fixing is "feasible." *High Fructose Corn Syrup*, 295 F.3d at 655.

Plaintiffs also allege that the text messaging market "behaved in a noncompetitive manner." *Id.* Specifically, plaintiffs allege, first, that contrary to expected behavior in a competitive market and against defendants' economic interests, defendants engaged in parallel pricing, and no defendant took advantage of the opportunity to gain more customers by offering lower per-message text messaging rates. Second, they allege that this kind of parallel pricing was historically unprecedented. Third, they allege that defendants' costs for text messaging decreased and their capacity for sending messages increased during the period of price increases.

These allegations, however, do not support a reasonable inference of an agreement.

*I.      Failure to compete on price of single text messages*

Plaintiffs' primary factual allegation of non-competitive behavior is their allegation of parallel pricing by the defendants. Plaintiffs note that "not one Defendant attempted to attract additional customers by charging even a penny less per text message." Compl. ¶ 5. They also assert that "because the per unit cost of text messages is very low, distinct pricing would be an easy and affordable way for any one of the Defendants to distinguish itself from its competitors." *Id.* ¶ 3. Plaintiffs maintain that this kind of pricing is inconsistent with competitive behavior and thus must result from an agreement to fix prices.

Though it may be true that defendants could attempt to compete for customers based on per-message text messaging rates, it does not follow that their failure to do so results from an agreement. On the contrary, in a concentrated industry like the wireless services industry, "a firm . . . has reason to decide (individually) to copy an industry leader . . . . One does not need an agreement to bring about this kind of follow-the-leader effect." *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 53 (7th Cir. 1992).

*ii.     "Historically unprecedented" changes in pricing structure*

Plaintiffs allege that the parallel price increases for per-message text messaging services represent "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason.'" Compl. ¶ 6 (quoting *Twombly*, 550 U.S. at 557 n.4)*.* To bolster their contention that this was historically unprecedented and resulted from an

15

agreement, plaintiffs describe a 2003 increase in text messaging prices by Sprint-Nextel, which the other providers did not match, and which Sprint-Nextel ultimately rolled back.

Plaintiffs' use of the "historically unprecedented" language is not an accident:  it is one of the few examples *Twombly* offers of the sort of conduct that may give rise to an inference of conspiracy.  In the factual context of the present case, however, plaintiffs' invocation of this language is closer to a "threadbare recital[] of the elements of a cause of action, supported by mere conclusory statements" than it is to a statement of facts tending to support an inference of conspiracy.  *Iqbal,* 129 S. Ct. at 1949.  Two five-cent price increases can hardly be characterized as "complex," or even as "historically unprecedented" – by the plaintiffs' own time line, the defendants had arrived at a common per-message price of ten cents *before* the alleged conspiracy began.  Compl. ¶ 74.  Further, it would be difficult to characterize changes occurring over an eleven-month period (the time from Sprint-Nextel's price increase to twenty cents to the time when T-Mobile matched that price) as occurring "at the very same time."  *Twombly*, 550 U.S. at 557 n.4.

Finally, as discussed in greater detail below, one cannot say that there is "no other discernable reason" for the cited price increases or for the fact that Sprint-Nextel's price increases succeeded here where before they had failed.   Text messaging is a relatively new form of wireless communication, available in the United States only since 2002.  The market for this kind of wireless communication has grown substantially in the seven years since it was introduced.  Compl. ¶¶ 53-57, 92-100.  Sprint-Nextel's unsuccessful 2003 attempt to raise per-message prices, at a time when the technology

was new and a higher per-message price might have caused consumers to avoid even trying out text messaging, does not suggest that a successful price increase several years later must have resulted from an agreement. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 908.

On the contrary, plaintiffs cite the "obvious alternative explanation" in their own complaint: as text messaging became more popular, defendants sought to encourage consumers to purchase text messaging services as part of a bundled plan. Compl. ¶ 123. By increasing the per-message price for text messages and encouraging subscribers to increase their usage of text messages through initiatives like the development of CSCs, providers could create an incentive for subscribers to purchase bundled plans to avoid the wildly varied (and sometimes wildly expensive) bills that could result from per-message pricing.

       *iv.    Decreasing costs and overcapacity.*

Plaintiffs allege that the cost of transmitting individual text messages decreased during the same period when the defendants were raising individual text message prices. Even if the Court assumes, as plaintiffs allege, that defendants' pricing for individual text messages resulted in revenues that were "*several thousand times* what it actually costs" to transmit a text message, Compl. ¶ 63 (emphasis in original), plaintiffs have "done nothing more than assert that profits were extraordinary . . . not . . . that they were beyond those afforded by a competitive market." *Reserve Supply*, 971 F.2d at 51. Where, as here, the fixed costs associated with an industry are high, Compl. ¶ 125, self-interested producers might attempt to charge higher than marginal cost prices

for their products in order to recover some of their fixed costs.  *See High Fructose Corn Syrup*, 295 F.3d at 658.  Defendants, if they observed that consumers did not bolt from Sprint-Nextel and to their services in the face of 2006 and 2007's increased per-message text messaging rates, would not need an agreement to be persuaded that their interests would be served by following suit.  This is the "bald conscious parallelism" that is typical of interdependent industries.  *See In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 444 (S.D.N.Y. 2008).

Plaintiffs also argue that defendants' capacity to send text messages exceeded demand during the relevant period, and that price increases in a time of excess capacity support an inference of conspiracy.  This argument is misplaced.  The cases plaintiffs cite for this proposition involve manufacturers of tangible physical products such as computer chips, steel, and corn syrup.  In such markets, where pricing is on a per-unit basis, economic theory suggests that the price of the individual unit of the good should be driven down by excess supply.  Compl. ¶ 65; *High Fructose Corn Syrup*, 295 F.3d at 658.  With text messaging, by contrast, a consumer's primary mode for realizing lower prices for text messaging services is to purchase a bulk package, not to obtain a lower price per individual message.  Compl. ¶¶ 119-23.  Defendants encourage this by offering a variety of packages, and plaintiffs do not allege price-fixing with regard to those packages.  *Id.*

Furthermore, the "capacity" to which plaintiffs refer is, as plaintiffs describe it elsewhere in their complaint, the same infrastructure through which defendants transmit not just text messages but voice communications and data services such as Internet browsing.  Compl. ¶¶ 3, 51, 62 & 69.  Text messages are very small compared to voice

mail, e-mail, music files, and other types of data that defendants transfer for subscribers – so much smaller that each text messaging file is "almost insignificant in the world of transmitting electronic data."  Compl. ¶¶ 60-61.

The Court cannot infer a conspiracy based on plaintiffs' "excess capacity" contention because text messaging uses the same transmission mechanisms as other wireless services that require substantially more capacity.  Plaintiffs have offered nothing to suggest that the defendants' overall capacity for all wireless transmissions exceeds demand to any significant extent.  Further, plaintiffs note that defendants' prices for related products (such as data transmission, voice mail, and downloading music files) *have* decreased as capacity has increased.  Compl. ¶ 69.  Given all these circumstances, the economic theory that leads one to assume that the per-unit price of steel or corn syrup or widgets should decrease in times of oversupply is inapplicable in the present context.

**5.      Alternative explanations for defendants' behavior**

In considering whether a plaintiff's factual allegations, considered as a whole, support a reasonable inference of conspiracy violative of the Sherman Act, *Twombly* instructs courts to consider the plausibility of "the suggestions raised by this conduct when viewed in light of common economic experience."  *Twombly*, 550 U.S. at 565.   As the Supreme Court's decision in *Iqbal* clarified to some extent, "the plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that the defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949.  Facts that "are merely consistent with" a defendant's liability "stop[] short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id.* If there is a "obvious alternative explanation" for defendants' conduct, such that it was likely explained by "routine market conduct," and "there was no need for joint encouragement," then a plaintiff's claim has not been "nudged . . . across the line from conceivable to plausible," and it is subject to dismissal. *Twombly*, 550 U.S. at 566-67, 570.

Plaintiffs themselves identify several reasons why defendants' conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal,* 129 S. Ct. at 1950. In the years since text messaging was first introduced in the U.S., use of the technology has increased exponentially, and it is expected that 3.3 trillion text messages will be sent in this country in 2009. Compl. ¶ 55. As the Court has noted, according to plaintiffs' complaint, most users of text messaging do not purchase text messages on an individual basis but instead buy bundled plans that come with a pre-determined or unlimited number of text messages. *Id.* ¶ 58. Defendants charge high prices for single-message texts to encourage users to purchase these bulk plans. *Id*. ¶¶ 119, 123.[2]

The increased use of bulk and unlimited text messaging plans also expands the number of potential users of CSCs, from which defendants stand to realize substantial revenue. Compl. ¶¶ 107, 109, 111. Advertisers and businesses use CSCs to communicate regularly with customers through frequent text messages. This approach uses too many messages and transmits too much data to appeal to a customer that pays for text messaging on a per-message basis, but it is potentially very appealing to

---

[2] Plaintiffs do not allege that defendants do not compete on pricing for these bundled or unlimited plans.

those customers who purchase unlimited plans.  *Id.* ¶¶ 118-22.  Defendants earn

revenue from the leasing of CSCs to advertisers and businesses, so they stand to gain

financially if more people use these services, which they are more likely to do if they

purchase bulk or unlimited text messaging plans.[3]

Furthermore, as plaintiffs note in their complaint, defendants do compete in

pricing of other wireless services, including voice calling, data plans, and bundled text

messaging packages.  Plaintiffs allege that during the period of the alleged conspiracy,

prices on these related products decreased.  Compl. ¶ 81.  Plaintiffs argue that

competition in other products gives rise to an inference that non-competition on single-

message pricing must result from a conspiracy, but the Court disagrees.  This behavior

is "not only compatible with, but indeed [is] more likely explained by lawful,

unchoreographed free-market behavior."  *Iqbal*, 129 S. Ct. at 1950.

The far more likely inference from Sprint-Nextel's price "leadership" is that it

raised per-message prices to push more subscribers to purchase bundled calling and

texting plans.  The other defendants then acted in their own best interests and raised

their rates to that same level to recoup profits they were not realizing on other products

on which there was active price competition.  The defendant companies had self-

interested reasons to follow Sprint-Nextel's lead, and thus in the present circumstances,

the court cannot reasonably infer an agreement not to compete from this "follow the

---

[3]The fact that defendants, working together, have established policies governing the use of CSCs does nothing more than establish the existence of a joint venture from which all defendants stand to gain.  The Court declines to draw a negative inference from allegations of "information sharing that result from defendants' participation in a concededly legal industry trade group."  *In re Digital Music*, 592 F. Supp. 2d at 443.

leader effect." *Reserve Supply*, 971 F.2d at 53.

**6.      Summary**

Taken together, plaintiffs' factual allegations do not give rise to more than the "mere possibility" of an agreement, which is insufficient to state a claim for conspiracy under the Sherman Act. *See Iqbal*, 129 S. Ct. at 1950. Plaintiffs contend that they have alleged non-competitive behavior. Though this behavior possibly could result from an agreement, it is more likely the result of independent decision-making in defendants' unilateral best interests. In the wireless communications industry, price competition is fierce for voice calling, data services, and bundled plans. Most consumers purchase test messaging services on a bundled or unlimited basis. Defendants charge consumers steep penalties for early termination of service contracts. Given these factors, parallel pricing in this single, relatively narrow part of the field in which they compete does not support a reasonable inference of an agreement not to compete.[4] In short, plaintiffs have failed to allege plausibly that defendants' conduct was anything other than "merely parallel conduct that could just as well be independent action." *Twombly,* 550 U.S. at 558.

**Conclusion**

For the reasons stated above, the Court grants defendants' motion to dismiss [docket no. 66 ]. The Court will convert this to a final judgment of dismissal with

---

[4]The Court notes that plaintiffs have not asked to conduct limited discovery that might enable them to obtain otherwise unavailable facts to support the proposition that the defendants had a meeting or meetings at which they entered into an agreement. *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007); *see also, In re TFT-LCD (Flat Panel) Antitrust Litig.,* 599 F. Supp. 2d 1179 (N.D. Cal. 2009).

prejudice unless plaintiffs seek leave to file, by January 8, 2010, an amended complaint stating a viable claim for relief.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 10, 2009