# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| _____ ) | |
| IN RE TEXT MESSAGING ) | No. 08 C 7082 |
| ANTITRUST LITIGATION ) | |
| _____ ) | MDL No. 1997 |
| ) | |
| THIS DOCUMENT RELATES TO: ) | Judge Matthew F. Kennelly |
| ALL ACTIONS ) | |
| _____ ) | |

## DEFENDANTS' MEMORADUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND CONDUCT LIMITED DISCOVERY

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ...................................................................................................................... 3

I.     THE PROPOSED SECOND AMENDED COMPLAINT FAILS TO STATE A
       CLAIM ..................................................................................................................... 3

II.    PLAINTIFFS' REQUEST FOR DISCOVERY IS CONTRARY TO LAW ................... 10

       A. Discovery Cannot Be Used to Explore Whether a Viable Claim Can Be Pleaded ............ 11

       B. Plaintiffs Have Provided No Reason To Consider Any Potential Exceptions to
          the Rule ............................................................................................................. 14

CONCLUSION .................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page**

**Cases:**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................................2, 11, 12

*Bissesseur v. Indiana Univ. Bd. of Trustees*, 581 F3d 599 (7th Cir. 2009) ...................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................2, 5, 8, 9, 11, 12, 15

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000) .................................................................................................5

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478 (1st Cir. 1988) ..................................7

*Coalition for ICANN Transparency v. Verisign, Inc.*, 567 F.3d 1084 (9th Cir. 2009) ........................................................................................................13

*Consolidated Metal Prods., Inc. v. American Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988) .................................................................................................7

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1 (1st Cir. 2004) .............................................................................................14

*Ferrer v. Chevron*, 484 F.3d 776 (5th Cir. 2007) ...................................................12, 14

*First Commercial Trust Co. v. Colt's Mfg. Co.*, 77 F.3d 1081 (8th Cir. 1997) ...........................12

*In re Celexa and Lexapro Prods. Liab. Litig.*, MDL Docket No. 1736, 2008 WL 2906713 (E.D. Mo. July 24, 2008) .............................................................................2

*In re Digital Music*, 592 F. Supp. 2d 435 (S.D.N.Y. 2008) ................................................8

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) .................................................5

*In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ......................................................................................12, 13, 14

*In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007) ...........................5

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) ...........................................................................................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ......................................................................................................12, 13

*In re Travel Agent Commission Antitrust Litig.*, No. 1:03-CV-30000, 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) ............................................................5

*Kaylor v. Fields*, 661 F.2d 1177 (8th Cir. 1981)............................................................12

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ...................................5, 13

*Migdal v. Rowe-Price-Fleming Int'l, Inc.*, 248 F.3d 321 (1st Cir. 2001) .....................12

*Mitchell v. McNeil*, 487 F.3d 374 (6th Cir. 2007)........................................................12

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993)............................................................................................................6

*Ranke v. Sanofi-Synthelabo, Inc.*, 436 F.3d 197 (3d Cir. 2006) ..................................12

*Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37 (7th Cir. 1992) ....................................................................................................................1, 5

*Rock River Commc'ns, Inc. v. Universal Music Group, Inc.*, No. 08-CV-635, 2009 WL 3841874 (C.D. Cal. Nov. 16, 2009)..............................................................13

*Smart v. Local 702 Int'l Broth. of Elec. Workers*, 562 F.3d 798 (7th Cir. 2009) ...........3

*Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir. Unit B 1982) ......................................................................................................................5

*Starr v. Sony BMG Music Entertainment*, No. 08-5637-cv, 2010 WL 99346 (2d Cir. Jan. 13, 2010)..................................................................................2, 8, 9, 10

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ..................5


**Statutes and Rules:**

15 U.S.C. § 1312............................................................................................................12

Fed. R. Civ. P. 26(b)(1)..................................................................................................11


**Other Materials:**

Amy Schatz & Thomas Catan, *Justice Ends Probe of Texting Rates*, Wall Street Journal B6 (Jan. 15, 2010) ...................................................................................10

iv

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs seek leave to file a further amended complaint as well as "leave to conduct limited discovery from the CTIA" to "assist [them] with amending the Complaint."  Pl. Mot. ¶ 6 (Dkt. # 131).  The Court should deny the motion in its entirety.

*First*, the minor changes that plaintiffs have made to the proposed Second Amended Complaint ("SAC") fail to address the deficiencies that led the Court to grant defendants' motion to dismiss.  Plaintiffs claim that the proposed SAC differs from the previous complaint in two respects.  It would "clarify that the alleged conspiracy began when all Defendants agreed" to charge $0.10 per text message.  Pl. Mem. 1 (Dkt. # 133); *see* Mot. Exh. A ¶¶ 4, 5, 75-79 (Dkt. # 133-1).  And it would "add allegations concerning Defendants' coordinated activities through the CTIA . . . and the Wireless Internet Caucus."  Pl. Mem. 1; *see* Mot. Exh. A ¶¶ 11, 12, 103-10, 112.

The Court's reasons for granting the prior motion to dismiss apply just as strongly to the proposed SAC.  The defendants' alleged arrival at a uniform $0.10 price is not a new allegation.  To the contrary, that was alleged in the prior complaint, and the Court rightly concluded that, "in a concentrated industry," no agreement is needed "'to bring about this kind of follow-the-leader effect.'"  Mem. Op. 15  (Dkt. # 130) (quoting *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 53 (7th Cir. 1992)).  Further, all the alleged price changes in the SAC, like those in the earlier complaints, "can hardly be characterized as 'complex'" or "'historically unprecedented'"; likewise, "one cannot say that there is 'no other discernable reason'" for the alleged pricing.  *Id.* at 16.  As for the new allegations regarding the trade association, plaintiffs still "make no allegations about particular meetings at which they contend any of the defendants reached an agreement," *id.* at 11; they still "offer no statements by any of

the defendants suggesting the presence of an agreement," *id.* at 12; and, to the extent they add detail about the activities of the trade association, neither the timing nor the substance of those activities has any connection to the supposed conspiracy.  As for *Starr v. Sony BMG Music Entertainment*, No. 08-5637-cv, 2010 WL 99346 (2d Cir. Jan. 13, 2010) – which plaintiffs submitted by letter dated January 14, 2010 – the Second Circuit's decision that the complaint in that case gave rise to a reasonable inference of conspiracy based on entirely dissimilar facts does nothing to undermine this Court's conclusion that the complaint at issue here falls squarely on the other side of the line.

*Second*, the Court should not authorize discovery in the absence of a legally sufficient complaint.  The Federal Rules do not authorize discovery to allow would-be plaintiffs lacking a viable claim to rummage about in the hope that they might uncover one.  Particularly in circumstances like these – where the Court has already determined that plaintiffs' first amended complaint failed to state a claim, where plaintiffs require leave of the Court even to file a further amended complaint, and where the proposed amended complaint is but superficially changed from the version already found insufficient – it would clash with *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) to "unlock the doors of discovery" before plaintiffs have satisfied Rule 8's standard.  *Iqbal*, 129 S. Ct. at 1951.  And plaintiffs have utterly failed to justify any exception to the rule, given the innocuous nature of the materials they have proffered to the Court and the absence of any specific factual allegation that their discovery is intended to bolster.

2

**ARGUMENT**

## I.   THE PROPOSED SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM

Plaintiffs' initial amended complaint sought to "support an inference of agreement" by (1) alleging that defendants had "opportunities to collude through trade organizations"; (2) noting defendants' supposed "failure to deny any price-fixing conspiracy in responding to Congressional inquiries"; (3) arguing that "economic factors show[ed] that the structure of the text messaging market is prone to collusion and that price increases were contrary to common economic experience and against defendants' interest"; and (4) claiming that alleged "parallel price increases" were "'historically unprecedented.'"  Mem. Op. 10-11.  Applying the pleading standards of *Iqbal* and *Twombly* and settled principles of antitrust law, this Court explained why these allegations, considered "as a whole and in combination," *id.* at 11 (internal quotation marks omitted), failed to state a claim.  *See id.* at 9-22.  The proposed SAC purports only to elaborate modestly on the first and last of these factors without changing the basis for the complaint. Because the additional allegations fail to address the deficiencies that led the Court to dismiss the prior complaint, the Court should deny the motion for leave to file.  *See*, *e.g.*, *Smart v. Local 702 Int'l Broth. of Elec. Workers*, 562 F.3d 798, 811 (7th Cir. 2009) (leave to amend should be denied when amendment would be futile).

1.   Plaintiffs first seek to "clarify when the alleged conspiracy began."  Pl. Mem. 9. In particular, plaintiffs claim that "the conspiracy began when Defendants agreed to uniformly charge an unprecedented common per-unit price of ten cents" for single-use text messages."  *Id.* Plaintiffs also want to "clarify" that "prior to the conspiracy, Defendants did not all charge the same amount."  *Id.*  But these factual allegations are not new.  Just 16 days before the October

2009 argument on defendants' motion to dismiss, plaintiffs filed an amended complaint to add allegations about defendants' pre-2006 pricing, saying they were intended "[t]o bolster their contention that [uniform pricing] was historically unprecedented and resulted from an agreement." Mem. Op. 15-16.  The demonstrative exhibit plaintiffs used at argument (submitted with their October 13, 2009, letter to the Court) showed virtually all of the price changes that plaintiffs allege now.  Thus, plaintiffs ask to for leave to file an amended complaint to make factual allegations that the Court has already considered.

In any event, nothing calls into question the Court's conclusion that the alleged pattern of price changes is fully consistent with unilateral, self-interested conduct.  According to the SAC, AT&T independently set a single-use text-messaging fee of $0.10 before the conspiracy began; Sprint-Nextel (the nation's third-largest carrier) adopted the same price – also unilaterally – in early 2005.  *See* Mot. Exh. A ¶¶ 78, 79.  The complaint then alleges that T-Mobile followed their lead at "the beginning of  2006 . . . as part of the alleged conspiracy," Pl. Mem. 9; Mot. Exh. A ¶ 75; that Alltel first *decreased* its price in early 2005 (from $0.10 to $0.05), then increased it to $0.08 in early 2006, and then increased it to $0.10 in October 2006, *see* Pl. Mem. 9-10; Mot. Exh. A ¶ 76; and that Verizon maintained "independent pricing" – "charging ten cents for its outgoing text messages . . . but charging only two cents for incoming messages" until "agreeing to set its prices for both . . . at ten cents as part of the conspiracy *towards the end of 2006*." Mot. Exh. A ¶ 77 (emphasis added).

Plaintiffs argue that this alignment – along with later increases in single-use fees to $0.15 and then to $0.20 (an increase *not* alleged to have been made by at least one of the supposed conspirators, Alltel) – "are intended to illustrate a marked shift in behavior." Pl. Mem. 10 (internal quotation marks omitted).  But, as this Court already concluded, the allegations

4

illustrate no such thing.  Rather, such allegations of gradual convergence towards a uniform price – with many supposed conspirators allegedly adopting and abandoning various pricing strategies along the way – does not at all suggest any prior agreement.[1]  As this Court held, "'a firm . . . has reason to decide (individually) to copy an industry leader . . . .  One does not need an agreement to bring about this kind of follow-the-leader effect.'"  Mem. Op. 15 (quoting *Reserve Supply*, 971 F.2d at 53).[2]

Nor can it be said that any of the alleged price movements is either "'complex'" or "'historically unprecedented,'" let alone, "'made at the very same time by multiple competitors.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557 n.4).  Each of the pricing changes – affecting a single fee – is simple.  Throughout the period leading up to the "conspiracy," carriers experimented with various single-use messaging fees; there was never a "historically unprecedented" change in that pattern.  At no time did multiple competitors adopt a new price

---

[1] If anything, the more detailed allegations of the proposed SAC highlight the internal inconsistencies of plaintiffs' allegations, further undermining the inference they seek to draw. Plaintiffs allege that the conspiracy began "at least as early as January 1, 2005," Mot. Exh. A ¶ 147; yet, after that date, Alltel allegedly *dropped* its single-use text messaging fee; T-Mobile allegedly maintained its $0.05 fee for more than a year; and Verizon maintained its "independent pricing" for nearly two years.  For nearly a year after the conspiracy supposedly began, *no carrier* increased its single-use text messaging fee.  Moreover, while the complaint now alleges that Alltel increased its single-use fee, first to $0.10 and then to $0.15, pursuant to the alleged conspiracy, Alltel *never* increased its fee to $0.20 prior to its acquisition by Verizon in early 2009 – *after* all the other supposed co-conspirators had done so.

[2] There are numerous cases holding that follow-the-leader pricing cannot support an inference of conspiracy.  *See* Def. Mem. 14-16 (Dkt. # 68-2) (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc); *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 494 (5th Cir. Unit B 1982); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962-63 (N.D. Cal. 2007); *In re Travel Agent Commission Antitrust Litig.*, No. 1:03-CV-30000, 2007 WL 3171675, at *9 (N.D. Ohio Oct. 29, 2007).

"at the very same time"; to the contrary, the allegations reveal that each of the carriers followed its own path to the allegedly uniform price.  There is nothing about that pattern that suggests that the carriers agreed to any price change in advance.[3]

Likewise, the new allegations do nothing to call into question this Court's conclusion that defendants "acted in their own best interests" when they adopted each of the alleged pricing changes.  *Id*. at 21.  All of the reasons why defendants would have been motivated to adopt the alleged price changes unilaterally – which appear on the face of the complaint's allegations – continue to apply.  *See id.* at 19-22.

2.        The new allegations in the SAC related to the CTIA and the Wireless Internet Caucus ("WIC") likewise do nothing to remedy the inadequacies of the prior complaint.  As this Court held, mere participation in a trade group – which allegedly provides an "'opportunity to conspire, . . . will not sustain an inference that a conspiracy has taken place.'"  Mem. Op. 13 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 n.15 (3d Cir. 1993)).  What was critically absent in the prior complaint – allegations that support an inference that the trade group activities were instrumental in the formation or implementation of any conspiracy, or any public statements in the trade-group context that betrays the existence of an agreement – is absent still.  *See id*. at 11-12.

Plaintiffs emphasize various statements from CTIA press releases and other public statements which, they argue, "support the plausibility of the conspiracy," Pl. Mem. 5, including references to "'co-opetition,' 'profiting together,' and developing a 'common approach to . . .

---

[3] Plaintiffs argue that pricing changes need not occur at the same time "because if that were the rule, . . . only stupid conspirators [would] get punished."  Pl. Mem. 11 (internal quotation marks omitted).  No one is arguing that a pattern of sequential price changes excludes the possibility of conspiracy.  The point is, rather, that such a pattern does nothing to support an inference of conspiracy.

message delivery mechanisms, interconnection, billing and settlement," *id*. at 8.  Neither the

timing nor the substance of the documents that plaintiffs cite adds any "heft" to their allegations.

*Twombly*, 550 U.S. at 557.  The three quoted statements were made in 2002 and 2003 – long

before the alleged conspiracy began and even longer before any of the price increases that are the

subject of the complaint.  The statements relate not to any common activity related to end-user

pricing, but instead to the development of "convergent technical architecture," "common core

business systems," and "required business models" to facilitate "a large and robust market at the

convergence of wireless and Internet technologies."  Mot. Exh. E at 1, 2, 3 (Dkt. # 133-5).  The

development of technical and trade standards is "a legitimate and beneficial function of trade

associations."  *Consolidated Metal Prods., Inc. v. American Petroleum Inst.*, 846 F.2d 284, 293-

94 (5th Cir. 1988); *see also Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 487 (1st

Cir. 1988) (Breyer, J.); Mem. Op. 21 & n.3.  And the necessity for such joint activity is

particularly clear where, as here, one purpose of the activity is to facilitate communications

services between technically divergent networks.  *See, e.g.*, Mot. Exh. F at 2 (Dkt. # 133-6)

(explaining that "collective evolution of [fixed and mobile] platforms to support emerging

applications and services is a crucial next step"); Mot. Exh. G at 2 (Dkt. # 133-7) (blog entry

discussing "GSM/CDMA MMS interoperability").  Moreover, while there are references to

carrier revenues and inter-carrier settlements (*i.e.*, payments for jointly provided services), we

found *no* reference in any of the documents to end-user pricing.[4]

---

[4] Plaintiffs claim that the organization's recent decision to stop tracking revenues associated with
messaging (both text and multimedia) is suggestive, but as the document illustrates, the trade
organization has tracked different categories of services and revenues at different times.  *See*
Exh. H at 27 (Dkt. # 133-8) ("We eliminated multiple revenue questions.").  Plaintiffs do not
explain how the decision, in 2009, to stop tracking messaging *revenues* supports an inference of
any agreement on pricing.

The additional detail concerning the content of and participants in various meetings serves to undermine, rather than bolster, the plausibility of the claim that the WIC could serve as a vehicle for conspiracy.  None of the meetings of the WIC was limited to carriers; each provided a forum open to various industry participants – including equipment vendors, software designers, and content providers.  *See, e.g.*, Mot. Exh. C (Dkt. # 133-3) (noting participation of 15 non-carrier representatives in WIC Leadership Council); Mot. Exh. D (Dkt. # 133-4) (noting expansion of WIC Leadership Council to include additional non-carrier participants).  Given the participation of many third parties, the trade association meetings do not provide any meaningful opportunity for clandestine agreement.

**3.**     The recent Second Circuit decision in *Starr* – which the plaintiffs submitted as supplemental support for their motion – does not support the argument that plaintiffs' proposed SAC states a claim, because the complaint in that case included allegations of coordinated conduct and specific factual allegations "'that raise[d] a suggestion of a preceding agreement, not merely parallel conduct,'" – *Starr*, 2010 WL 99346, at *6 (quoting *Twombly*, 550 U.S. at 557) – allegations that have no counterpart here.  Indeed, that complaint highlights the insufficiencies of the one at issue here.

In *Starr*, plaintiffs alleged that several major record companies had conspired to fix the price of music sold over the Internet ("Internet Music") and to impose "unreasonably restrictive terms in the purchase and use of Internet Music," *id*. at *3 – in part to prevent Internet Music sales from undermining the prices the companies were able to charge for CDs, *see In re Digital Music*, 592 F. Supp. 2d 435, 437 (S.D.N.Y. 2008).  At the center of the conspiracy were two joint ventures – MusicNet and pressplay – which sold the music of the major record labels over the Internet.  Each of the defendants signed distribution agreements with one or the other

8

venture, "both of which charged unreasonably high prices" and "required consumers to agree to unpopular [licensing] terms." *Starr*, 2010 WL 99346, at *1, *6. "[W]hen defendants began to sell Internet Music through entities they did not own or control, they maintained the same unreasonably high prices and [licensing] terms." *Id.* at *6. Defendants also negotiated "most favored nation" or "MFN" agreements with distributors – which guaranteed that each defendant would obtain at least as high a price as its competitors – "to enforce a wholesale price floor." *Id.* And defendants simultaneously raised the wholesale price of their music in May 2005 – an increase "enforced by MFNs." *Id.*

The Second Circuit pointed to a series of seven factors – all but one of them absent here – that "'that raise[d] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). As here, plaintiffs alleged a concentrated market, *see id.*, but there the similarity ends.

- Plaintiffs there alleged that the product offered by the joint ventures was unattractive, such that only agreement among the defendants to prevent the creation of more attractive alternatives could "render the enterprises profitable." *Id.* Here, by contrast, plaintiffs acknowledge that defendants offer – in competition with one another – alternative package plans for customers that use text messaging more than occasionally. *See* Mem. Op. at 18 ("Defendants offer[] a variety of packages, and plaintiffs do not allege price-fixing with regard to those packages."); *see also id.* at 20  n.2.

- One of plaintiff's executives stated that the joint venture was "formed expressly as an effort to stop the 'continuing devaluation of music,'" *Starr*, 2010 WL 99346, at *6; there is no comparable public statement here. *See* Mem. Op. 12 (noting that plaintiffs "offer no statements by any of the defendants suggesting the presence of an agreement").

- The defendants in *Starr* attempted to hide the existence of MFN agreements "because they knew they would attract antitrust scrutiny," 2010 WL 99346, at *7; no such furtive conduct is alleged here.

- The *Starr* plaintiffs alleged that independent Internet Music sites charged much lower prices than defendants, *see id.*; there are no comparable allegations here.

9

- The *Starr* "defendants' price-fixing is the subject of pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice," *id.*; here, as reported, the Department of Justice initiated an investigation at the request of Senator Kohl and closed it after finding no violation.  Amy Schatz & Thomas Catan, *Justice Ends Probe of Texting Rates*, Wall Street Journal B6 (Jan. 15, 2010).

- Finally, the *Starr* defendants allegedly raised wholesale prices simultaneously in May 2005 "even though earlier that year defendants' costs of providing Internet Music had decreased substantially."  2010 WL 99346, at *7.  Here, plaintiffs did not allege any simultaneous price increase, and, as this Court noted in discussing the complaint's allegations of excess capacity, "prices for [wireless services] . . . *have* decreased as capacity has increased."  Mem. Op. 19.

Even more fundamentally, the alleged marketplace consequences in *Starr* were starkly different.  While the alleged effect of the conduct alleged in *Starr* was to suppress output by keeping prices for all digital music (including both Internet Music and CDs) high, here the output of text messaging services has exploded while effective prices have dropped.  Far from supporting any inference of conspiracy, that pro-competitive outcome suggests that "defendants' conduct 'was not only compatible with, but indeed was more likely explained by, lawful unchoreographed free-market behavior.'"  *Id*. at 20 (quoting *Iqbal*, 129 S. Ct. at 1950).

## II.   PLAINTIFFS' REQUEST FOR DISCOVERY IS CONTRARY TO LAW

Because the proposed SAC, like the first Amended Complaint, fails to state a claim, the Court should deny plaintiffs' request for discovery.  The Federal Rules do not authorize discovery for the purpose of hopeful investigation of a potential claim.  To the contrary, the Federal Rules of Civil Procedure and the Supreme Court have made clear that the price of discovery in a private civil action is the ability to make allegations that are sufficiently specific and plausible to state a claim.  Since they are unable to make such allegations, plaintiffs are not entitled to discovery of any sort.

10

### A.      Discovery Cannot Be Used to Explore Whether a Viable Claim Can Be Pleaded

The Supreme Court and the Seventh Circuit have made clear that "before discovery may commence," a plaintiff must file a complaint that satisfies Rule 8's standards, that is, a complaint "contain[ing] sufficient factual detail" to state a claim. *Bissesseur v. Indiana Univ. Bd. of Trustees*, 581 F3d 599, 603 (7th Cir. 2009) (affirming dismissal of complaint despite plaintiff's argument that "the exact details" of his claim would "become clear during discovery"; citing *Twombly* ). A legally sufficient complaint is the only key that may "unlock the doors of discovery" into the merits of a plaintiff's claim. *Iqbal*, 129 S. Ct. at 1950. We have found no case – and plaintiffs cite none – in which a court authorized discovery for the purpose of investigating potential claims in the absence of a viable complaint.

That principle is solidly grounded on the letter of the Federal Rules and the holdings of *Twombly* and *Iqbal*. Rule 26 authorizes discovery "relevant to any party's claim or defense" or "the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). Where a plaintiff has failed to state a claim, there is no "claim" to which discovery could be relevant, nor is there any "subject matter involved" in an "action" that lacks legal basis. The rules nowhere authorize discovery into *potential* claims or subject matter that *might be* involved in the action. The government has authority to issue a Civil Investigative Demand. *See*, *e.g.*, 15 U.S.C. § 1312. Private plaintiffs do not. "[W]hen the allegations in a complaint . . . could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal quotation marks omitted). Furthermore, "the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery

11

process." *Iqbal*, 129 S. Ct. at 1953; *see also Twombly*, 550 U.S. at 546 ("It is no answer to say

that a claim just shy of plausible entitlement can be weeded out early in the discovery process.").

Where a plaintiff's "complaint is deficient under Rule 8, *he is not entitled to discovery, cabined*

*or otherwise.*" *Iqbal*, 129 S. Ct. at 1954 (emphasis added).[5]

　　*In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007)

("*GPU*") and *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 599 F. Supp. 2d 1179 (N.D. Cal.

2009) are consistent with this basic limitation and illustrate that it need not interfere with the

efficient management of litigation.  *See* Mem. Op. 22 n.4.  In *GPU*, plaintiffs were allowed to

*proceed* with certain claims; they were given leave to amend to replead other claims that had

been dismissed or to ask for limited discovery first.  *See* 540 F. Supp. 2d at 1090 (noting that the

court had "declined to dismiss plaintiffs' claims for unjust enrichment" and that "[c]ertain claims

under some state consumer-protection laws . . . were allowed to go forward").  In that situation,

the suggestion that plaintiffs could undertake limited discovery – authorized under Rule 26(b)(1)

based on the pendency of claims – before attempting to amend was a sensible case-management

device to help to forestall an amendment later in the course of litigation that might alter the scope

---

[5] This is consistent with extensive pre-*Iqbal* authority as well.  *See*, *e.g.*, *Mitchell v. McNeil*, 487
F.3d 374, 379 (6th Cir. 2007) ("The very purpose of Fed. R. Civ. P. 12(b)(6) is to enable
defendants to challenge the legal sufficiency of complaints without subjecting themselves to
discovery.") (internal quotation marks omitted); *Ferrer v. Chevron*, 484 F.3d 776, 782-83 (5th
Cir. 2007) (noting that "a 12(b)(6) inquiry focuses on the allegations in the pleadings, not
whether a plaintiff actually has sufficient evidence to succeed on the merits," and denying
plaintiffs' request for discovery to "bolster their claims"); *Ranke v. Sanofi-Synthelabo, Inc*., 436
F.3d 197, 204 (3d Cir. 2006) (rejecting party's attempt to use discovery to "conduct a fishing
expedition in order to find a cause of action"); *Migdal v. Rowe-Price-Fleming Int'l, Inc*., 248
F.3d 321, 326 (1st Cir. 2001) (noting that the pleading requirements of Rule 8 "serve[] to prevent
costly discovery on claims with no underlying factual or legal basis"); *First Commercial Trust
Co. v. Colt's Mfg. Co*., 77 F.3d 1081, 1083 n.4 (8th Cir. 1997) (noting that "[l]itigants . . . have no
right to discovery in the absence of a plausible legal theory"); *Kaylor v. Fields*, 661 F.2d 1177,
1184 (8th Cir. 1981) (noting that "[d]iscovery . . . is not a device to enable a plaintiff to make a
case when his complaint has failed to state a claim").

of the litigation.[6]  And in *TFT-LCD*, the court denied defendants' motion to dismiss amended

complaints (after having largely upheld the sufficiency of the prior versions); discovery was

authorized based on the legal sufficiency of the complaints.  *See* 599 F. Supp. 2d at 1185 ("the

complaints sufficiently allege anticompetitive conduct during the 1996-2001 time period").

Plaintiffs cite no authority to justify the argument that discovery may be granted to allow

a plaintiff to find facts to flesh out an otherwise inadequate complaint.  In *Kendall*, 518 F.3d

1042, and *Coalition for ICANN Transparency v. Verisign, Inc*., 567 F.3d 1084, 1087 (9th Cir.

2009), the court of appeals simply described the course of litigation before the district court; it

made no comment on the reasons for discovery or its propriety.  In *In re Static Random Access

Memory (SRAM) Antitrust Litig*., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008), the district court

largely granted a motion to stay discovery pending a motion to dismiss (which was ultimately

denied), with narrow exceptions.  It did not grant discovery for the purpose of remedying any

factual deficiency.  *Rock River Commc'ns, Inc. v. Universal Music Group, Inc.*, No. 08-CV-635,

2009 WL 3841874, at *1 (C.D. Cal. Nov. 16, 2009), and *In re Celexa and Lexapro Prods. Liab.

Litig.,* MDL Docket No. 1736, 2008 WL 2906713, at *1 (E.D. Mo. July 24, 2008), are simply

not on point:  in *Rock River*, the original motion to dismiss was denied and the case decided on

summary judgment; in *Celexa*, discovery was allowed into factual issues implicated by a

preemption defense.  Such discovery – like discovery that is permitted to address a challenge to a

court's personal jurisdiction – provides no authority for the quasi-investigative discovery that

plaintiffs seek here.

---

[6] In fact, there is no indication that plaintiffs took any such discovery.

**B.    Plaintiffs Have Provided No Reason To Consider Any Potential Exceptions to the Rule**

Even if the categorical rule against the use of discovery to investigate potential claims in the absence of a legally sufficient complaint admits of exceptions – and we have not discovered any – no such exception should be considered here where plaintiffs have failed to offer any concrete foundation for the discovery they seek.  The mere "possibility that rummaging through [a party's] files would produce evidence of some wholly unknown violation" is never a sufficient basis for allowing discovery.  *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 9 (1st Cir. 2004); *see also Ferrer*, 484 F.3d at 782-83 (rejecting plaintiff's request for discovery following dismissal for failure to state a claim, where the plaintiff's request did "not so much as hint . . . that they might learn through discovery" facts sufficient to state a valid claim); *GPU*, 540 F. Supp. 2d at 1100-01 (rejecting discovery request where the plaintiffs "fail[ed] to explain what information they could find that would address the flaws in their pleadings").

Plaintiffs have not proffered any specific discovery requests, instead suggesting that they will propound broad request for more information of the kind they already have – that is, information "from the CTIA regarding Defendants' prior and ongoing meetings and discussions . . . pertaining to text messaging, including, but not limited to, agendas, memoranda, minutes, manifestos, and agreements reached."  Pl. Mem. 13.  They have not tied their request to any "particular meetings at which they contend any of the defendants reached an agreement" or to any "statements by any of the defendants suggesting the presence of an agreement."  Mem. Op. 11-12.  To the contrary, the materials that plaintiffs have proffered in support of their request are innocuous on their face and do not support any "reasonably founded hope that the [discovery] process will reveal relevant evidence."  *Twombly*, 550 U.S. at 559 (internal quotation marks

14

omitted).  If discovery is available in this case, it is hard to see how any trade association could avoid discovery based on similarly flimsy accusations – severely burdening pro-competitive conduct and defendants' First Amendment right to free association.[7]

Plaintiffs have asked for the power to demand the private records of a legitimate trade association, merely in the hope that something may turn up.  This "Mr. Micawber's optimism," *Twombly*, 550 U.S. at 562, is never justification for imposing the burdens of discovery.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion should be denied.

---

[7] *See Twombly*, 550 U.S. at 567 n.12 ("If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.").

Dated: January 25, 2010

Respectfully submitted,

| | |
|---|---|
| CELLCO PARTNERSHIP, D/B/A VERIZON WIRELESS | AT&T MOBILITY LLC |
| | |
| /s/ Dan K. Webb | /s/ John W. Treece  (by permission) |
| Dan K. Webb | David W. Carpenter |
| Thomas J. Frederick | John W. Treece |
| Dana E. Schaffner | Adrienne Banks Pitts |
| WINSTON & STRAWN LLP | SIDLEY AUSTIN LLP |
| 35 West Wacker Drive | One South Dearborn Street |
| Chicago, IL 60601 | Chicago , IL 60603 |
| Telephone:    (312) 558-5600 | Telephone:    (312) 853-7000 |
| Email:  dwebb@winston.com | Email:  dcarpenter@sidley.com |
| Email:  tfrederick@winston.com | Email:  jtreece@sidley.com |
| Email:  dschaffner@winston.com | Email:  apitts@sidley.com |
| | |
| Michael K. Kellogg | *Counsel for AT&T Mobility LLC* |
| Aaron M. Panner | |
| KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C. | |
| 1615 M Street, NW | |
| Suite 400 | |
| Washington, DC 20036 | |
| Telephone:    (202) 326-7900 | |
| Facsimile:    (202) 326-7999 | |
| Email:  apanner@khhte.com | |
| | |
| John Thorne | |
| Robert H. Griffen | |
| VERIZON COMMUNICATIONS INC. | |
| 1320 N. Courthouse Road | |
| Arlington, VA  22201 | |
| (703) 351-3900 | |
| Email:  john.thorne@verizon.com | |
| Email:  robert.h.griffen@verizon.com | |
| | |
| *Counsel for Defendant Cellco Partnership, d/b/a Verizon Wireless* | |

| T-MOBILE USA | SPRINT NEXTEL CORPORATION |
|---|---|
| /s/ Christopher B. Hockett (by permission)<br>Christopher B. Hockett<br>Stephanie E. L. McCleery<br>DAVIS POLK & WARDWELL<br>1600 El Camino Real<br>Menlo Park , CA 94025<br>Telephone:    (650) 752-2009<br>Email: chris.hockett@davispolk.com<br>Email: stephanie.mccleery@davispolk.com<br><br>Charles H. R. Peters<br>Paula J. Morency<br>Lawrence Harris Heftman<br>SCHIFF HARDIN LLP<br>6600 Sears Tower<br>Chicago , IL 60606<br>Telephone:    (312) 258-5500<br>Email: cpeters@schiffhardin.com<br>Email: pmorency@schiffhardin.com<br>Email: lheftman@schiffhardin.com<br><br>*Counsel for T-Mobile USA* | /s/ Dane H. Butswinkas (by permission)<br>Dane H. Butswinkas<br>R. Hackney Wiegmann<br>John E. Schmidtlein<br>Jason T. Wright<br>WILLIAMS & CONNOLLY LLP<br>725 12th Street, NW<br>Washington , DC 20005<br>Telephone:    (202)434-5110<br>Email:  dbutswinkas@wc.com<br>Email:  hwiegmann@wc.com<br>Email:  jschmidtlein@wc.com<br>Email:  jtwright@wc.com<br><br>Frederic R. Klein<br>Brian David Fagel<br>GOLDBERG, KOHN, BELL, BLACK,<br>ROSENBLOOM & MORITZ, LTD.<br>55 East Monroe Street #3300<br>Chicago , IL 60603<br>Telephone:    (312)201-4000<br>Email: frederic.klein@goldbergkohn.com<br>Email: brian.fagel@goldbergkohn.com<br><br>*Counsel for Sprint Nextel Corporation* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 25th day of January, 2010, a true copy of the foregoing

Defendants' Memorandum in Opposition to Plaintiffs' Motion for Leave to File a Second

Amended Complaint and Conduct Limited Discovery was served via the Court's ECF system on

the following:

**Scott E Poynter**
Emerson Poynter LLP
500 President Clinton Avenue
Suite 305
Little Rock, AR 72201
(501) 907-2555

**Ronnie Penton**
Law Office of Ronnie G. Penton
209 Hoppen Place
Bogalusa, LA 70427
(985) 732-5651

**Richard J. Kilsheimer**
Kaplan, Kilsheimer & Fox LLP
805 Third Avenue
New York, NY 10022
(212) 687-1980

**Richard Lyle Coffman**
The Coffman Law Firm
505 Orleans St.
Suite 505
Beaumont, TX 77701
(409) 833-7700
Fax: (866) 835-8250
Email: rc@cofflaw.com

**Matthew E Van Tine**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400
Fax: (312) 676-2676
Email: mvantine@millerlawllc.com

**Mary Jane Fait**
Wolf, Haldenstein, Adler, Freeman & Herz
LLC (Chicago)
55 West Monroe Street
Suite 1111
Chicago, IL 60603
(312) 984-0000
Email: fait@whafh.com

**Marvin Alan Miller**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400
Fax: (312) 676-2676
Email: Mmiller@millerlawllc.com

**Kevin B Love**
Criden & Love, P.A.
7301 SW 143 Street
Suite 515
South Miami, FL 33143
(305) 357-9000
Email: klove@cridenlove.com

**John W. Treece**
**Adrienne Banks Pitts**
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
Email: jtreece@sidley.com
Email: apitts@sidley.com

**Dianne M Nast**
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000

**David W Zoll**
Zoll Kranz & Borgess LLC
6620 West Central Avenue
Suite 200
Toledo, OH 43617
(419) 841-9623

**Daniel E. Becnel , Jr.**
Becnel Law Firm, LLC (Reserve)
106 W. Seventh St.
P. O. Drawer H
Reserve, LA 70084
(985) 536-1186
Email: dbecnel@becnellaw.com

**Christopher Lovell**
Lovell Stewart Halebian, LLP
500 Fifth Avenue
Floor 58
New York, NY 10110
(212) 608-1900

**Frederic R. Klein**
Goldberg, Kohn, Bell, Black, Rosenbloom &
   Moritz, Ltd.
55 East Monroe Street #3300
Chicago, IL 60603
(312)201-4000
Email: frederic.klein@goldbergkohn.com

**Dennis C. Sweet , III**
Williams Grubbs
158 East Pascagoula Street
Jackson, MS 39201
(601) 965-8700

**David P Germaine**
Vanek, Vickers & Masini, P.C.
225 W. Washington
18th Floor
Chicago, IL 60606
(312) 224-1500
Email: dgermaine@vaneklaw.com

**Dane H. Butswinkas**
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005
(202) 434-5110

**Christopher B. Hockett**
**Stephanie E. L. McCleery**
Davis Polk & Wardwell
1600 El Camino Real
Menlo Park, CA 94025
(650) 752-2009
Email: chris.hockett@dpw.com
Email: stephanie.lockwood@dpw.com

**Camilo K. Salas , III**
Salas & Co LC
650 Poydras Street
Suite 1660
New Orleans, LA 70130
504-799-3080

**Brian David Fagel**
Goldberg, Kohn, Bell, Black, Rosenbloom &
Moritz, Ltd.
55 East Monroe Street #3300
Chicago, IL 60603
(312)201-4000
Email: brian.fagel@goldbergkohn.com

**Reginald Terrell**
The Terrell Law Group
223 25th Street
Richmond, CA 94804
(510) 237-9700
Email: reggiet2@aol.com

**John E Tangren**
Wolf Haldenstein Adler Freeman & Herz LLC
55 West Monroe Street
Suite 1111
Chicago, IL 60603
(312) 984-0000
Email: tangren@whafh.com

**Charles F. Barrett**
Barrett & Associates P.A.
6518 Hwy. 100
Suite 210
Nashville, TN 37205
(615) 515-3393
Email: cb@barrettandassociates.net

**Bryan L. Clobes**
Cafferty Faucher, LLP
1717 Arch Street
Suite 3610
Philadelphia, PA 19103
(215) 864-2800
Email: bclobes@caffertyfaucher.com

**Lori Ann Fanning**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400
Fax: (312) 676-2676
Email: LFanning@MillerLawLLC.com

**Joe R. Whatley , Jr.**
Whatley Drake & Kallas LLC
1540 Broadway
37th Floor
New York, NY 10036
(212) 447 7070
Email: jwhatley@wdklaw.com

**Jonathan B. Andry**
The Andry Law Firm
610 Baronne Street
New Orleans, LA 70113
(504) 586-8899
Fax: (504) 586-8933
Email: johnandry@yahoo.com

**Alltel Corp.**
One Allied Drive
Little Rock, AR 72202

**T-Mobile International AG**
Landgrabenweg 151
53227 Bonn
Germany

**Vodafone Group PLC**
Vodafone House
The Connections
Newbury
Berkshire
RG142FN England

**Charles H. R. Peters**
**Lawrence Harris Heftman**
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
(312) 258-5500
Email: cpeters@schiffhardin.com
Email: lheftman@schiffhardin.com

**Scott Wm Weinstein**
Morgan & Morgan, P.A.
P. O. Box 9504
Fort Myers, FL 33906
(239) 433-6880
Email: sweinstein@forthepeople.com

**Verizon Wireless**
One Verizon Way
Basking Ridge, NJ 07920

**William Tucker Brown**
Whatley Drake & Kallas, LLC
1000 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
(205) 328-9576
Email: tbrown@wdklaw.com

**Frank H Tomlinson**
15 North 21st Street, Suite 302
Birmingham, AL 35203
(205) 326-6626
Fax: (205) 328-2889
Email: htomlinson@bellsouth.com

**Robert W. Bishop**
Bishop & Associates, PSC
6520 Glenridge Park
Suite 6
Louisville, KY 40222-9998
(502) 425-2600
Fax: (502)-425-9115
Email: firm@bishoplegal.net

/s/ Dana E. Schaffner