UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE TEXT MESSAGING ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) | No. 08 C 7082 MDL No. 1997 Judge Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO: ALL ACTIONS |  |  |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE
TO FILE A SECOND AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT AND CONDUCT LIMITED DISCOVERY**

In their Opposition, Defendants do not even attempt to rebut Plaintiffs' basic argument that a motion for leave to amend a complaint should be freely given in the absence of "undue delay, bad faith, or dilatory motive . . . [or] undue prejudice to the opposing party." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Having raised no issues on these fronts, Defendants base their Opposition entirely upon the alleged futility of the amendment. While claiming that Plaintiffs' additional and clarified allegations are not consequential, Defendants consistently and significantly mischaracterize both the facts alleged and the law to be applied.

**I. PLAINTIFFS' PROPOSED AMENDMENT IS NOT FUTILE.**

In considering a motion for leave to file an amended complaint after dismissal of the original complaint, one district court recently noted that even where "the court is not necessarily convinced that plaintiffs' additional allegations will ultimately stand the test of substantive scrutiny, it is convinced that there is at a minimum a possibility that plaintiffs might amend their complaint in such a way as to overcome the deficiencies highlighted by the court in its order granting the motion to dismiss. *In re Online DVD Rental Antitrust Litig.*, 09-cv-02163, 2010 WL 363327, at *1 (N.D. Cal. Jan. 29, 2010). Plaintiffs' instant amendments similarly overcome

this threshold by adding substantive allegations that directly address the deficiencies stressed by the Court in its Order on the motion to dismiss.

### A. Allegations Pertaining to Uniform and Sequential Pricing

Defendants complain that Plaintiffs' clarification that the conspiracy began when Defendants agreed to uniformly charge an unprecedented common per-unit price of ten cents for text messaging services is "not new." (Defs.' Mem. in Opp. to Pls.' Mot. for Leave to File a Second Am. Compl. and Conduct Limited Discovery ("Def. Opp."), Dkt. No. 135, at 3.) The veracity of this observation is beside the point.

The Court apparently understood Plaintiffs to have previously alleged that "prior to the start of the alleged conspiracy, all four defendants charged ten cents for individual text messages purchased on a per-message basis." (Memorandum Opinion and Order, Dkt. No. 130, at 3.) Thus, Plaintiffs seek to clarify that prior to 2006, Defendants actively competed for per-unit text messaging services and charged distinct prices. (Mem. in Supp. of Pls.' Mot. for Leave to File a Second Am. Consol. Class Action Compl. and Conduct Limited Discovery ("Pl. Memo."), Dkt. No. 133, at 9.) Between 2005 and 2006, however, Defendants departed from this competitive behavior and instituted a uniform pricing structure, first at ten cents, then at fifteen cents, and ultimately at twenty cents. (*Id.* at 10.)[1] Consequently, Defendants' unusual convergence at ten cents constituted a cognizable "marked shift in behavior," *see In re Graphics Processing Units*

---

[1] Defendants argue that Plaintiffs' allegations are inconsistent because Plaintiffs do not allege that Alltel increased its per-unit price to twenty cents with the other Defendants after it initially agreed to price its text messaging services at ten cents and then fifteen cents in accordance with the conspiracy. (Def. Opp. at 4, 5 n.1.) Despite Plaintiffs' best efforts, data detailing Alltel's per-unit pricing after it increased to fifteen cents in conformance with the conspiracy could not be located. As such, Plaintiffs cannot confirm that Alltel increased its price to twenty cents after its initial increase to fifteen cents because the pertinent data is exclusively in Defendants' control. Plaintiffs do know, however, that Verizon announced its intent to acquire Alltel in mid-2008.

*Antitrust Litig. ("GPU II")*, 540 F. Supp. 2d 1085, 1094 (N.D. Cal. 2007), and demonstrated a "distinct difference[ ] in Defendants' behavior before and during the alleged conspiracy," *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009).[2]

If the Court understood Defendants as having arrived at the ten-cent per-unit price independently, then evidence of subsequent sequential increases to fifteen cents and twenty cents would not necessarily provide for an inference that those subsequent increases represented a "marked shift in behavior."[3] If, on the other hand, as Plaintiffs now clarify, Defendants' convergence at ten cents was part of the conspiracy, then Defendants' uniform pricing behavior was "historically unprecedented" and plausibly suggestive of conspiracy. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also In re Potash Antitrust Litig.*, MDL No. 1996, 2009 WL 3583107, at *20 (N.D. Ill. Nov. 3, 2009) (noting that a "change in [defendants'] behavior could support an inference of conspiracy").

Defendants continue to insist that the unprecedented and uniform pricing behavior is nonetheless equally consistent with follow-the-leader interdependence and that Defendants "acted in their own best interests" in raising prices by identical amounts in lock-step fashion.

---

[2] Defendants seem to misunderstand Plaintiffs' allegation that the conspiracy began "at least as early as January 1, 2005," claiming that this assertion is somehow inconsistent with Defendants' subsequent pricing. (Def. Opp. at 5 n.1.) Since all of the Defendants moved to a uniform ten-cent price by 2006, and such collusive price increases take time to propose, announce and implement, it is entirely plausible that the conspiracy began prior to the actual price changes, possibly as early as 2005.

[3] Defendants claim that "a pattern [of sequential price increases] does nothing to support an inference of conspiracy. (Def. Opp. at 6 n.3.) This assertion is illogical in the context of a cognizable departure from previously competitive pricing. As the Court noted at oral argument, and Plaintiffs pointed out in their brief, *Bell Atlantic*'s observation that "historically unprecedented changes in pricing structure" by multiple competitors suggest a conspiracy does not apply solely to changes made at the exact same time. (Pl. Memo. at 11.) As such, a pattern of historically unusual price increases occurring in tandem on several occasions does support an inference of a plausible conspiracy when considered in totality with all other allegations.

(Def. Op. at 4-6.) The Second Circuit's recent decision in *Starr v. Sony BMG Music Entertainment*, No. 08-5637-cv, 2010 WL 99346 (2d Cir. Jan. 13, 2010), is instructive on this point. In *Starr*, as here, the defendants contended "that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that 'tend[ ] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" *Id.* at *7 (citation omitted). The court forcefully rejected this argument, noting that "a plaintiff must present evidence that tends to exclude the possibility of independent action" ***only*** for purposes of summary judgment. *Id.* (emphasis added). In contrast, "to survive a motion to dismiss, plaintiffs need only [allege] 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Id.* (*citing Bell Atlantic*, 550 U.S. at 556, and 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 307d1 (3d ed. 2007) ("The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.")).

The proposed amendment provides the Court and Defendants with precisely the additional "factual matter (***taken as true***) to suggest that an agreement was made." *Bell Atlantic*, 550 U.S. at 556 (emphasis added). "In reviewing a proposed amendment for futility, the court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion to dismiss." *See, e.g.*, *Chen v. Mayflower Transit, Inc.*, 159 F. Supp. 2d 1112, 1113 (N.D. Ill. 2001). As such, Plaintiffs are under no obligation to present evidence at this stage excluding "the possibility of independent action," *Starr*, 2010 WL 99346, at *7, and Defendants' anomalous uniform pricing

strategy cannot be dismissed as mere follow-the-leader conduct. Therefore, the amendment is far from futile.[4]

### B. Allegations Pertaining to Exchanges of Information

Defendants similarly question the value of Plaintiffs' new allegations concerning Defendants' exchanges of text message pricing information and opportunities to conspire through the CTIA and the Wireless Internet Caucus ("WIC"). (*See* Def. Opp. at 6.) Defendants insist that Plaintiffs' allegations address "mere participation in a trade group," "still 'make no allegations about particular meetings at which they contend any of the defendants reached an agreement,'" and "offer no statements by any of the defendants suggesting the presence of an agreement." (*Id.* at 1-2, 6 (citations omitted).) This is inaccurate both as a matter of law and fact.

Legally, Plaintiffs need not "identify the specific time, place, or person related to each conspiracy allegation" to survive a motion to dismiss; Plaintiffs' additional allegations sufficiently plead Defendants' coordination. *Starr*, 2010 WL 99346, at *7. In *Starr*, the Second Circuit clarified *Bell Atlantic*'s observation that "had the claim of agreement . . . not rested on the parallel conduct described in the complaint," "'references to an agreement . . . would [not] have given the notice required by Rule 8 [because] the pleadings mentioned no specific time, place, or

---

[4] Plaintiffs also note that *Bell Atlantic* was a unique case, where defendants' market allocation and parallel conduct had existed for years while local monopolies for telephone services were legal, and thus did not suggest new concerted action. 550 U.S. at 557. In fact, the Supreme Court explicitly stated that "a showing of parallel business behavior is admissible circumstantial evidence *from which the fact finder may infer agreement*." *Id.* at 553 (internal quotations and citations omitted) (emphasis added). As the concurring opinion in *Starr* further observed, "[t]he fact that an allegation of parallel conduct was held insufficient [in *Bell Atlantic*] to require a *directed verdict* in the plaintiff's favor is hardly a basis for ruling that such an allegation is insufficient to survive a motion to dismiss for failure to state a claim on which relief may be granted." 2010 WL 99346, at *10 (Newman, J., concurring) (emphasis added).

5

person involved in the alleged conspiracies.'" *Id.* at *8 (*quoting Bell Atlantic*, 550 U.S. at 565 n.10). Where a claim of conspiracy does, however, rely upon "the parallel conduct described in the complaint . . . plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation." *Id.*; *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009) (holding that plaintiffs need not identify at pleading stage "who attended these meetings, what was discussed at them, or how they purportedly related to the conspiracy other than providing an opportunity for the parties to talk to one another") (citation omitted).

Here, Plaintiffs' allegations of conspiratorial conduct rest upon unprecedented and highly coordinated parallel pricing behavior (s*ee* Pl. Memo. at 2-3), obviating the need for detailed allegations concerning particular meetings at which particular Defendants entered into the conspiracy. It is enough that Plaintiffs' amendments "support[s] an inference that the trade group activities were instrumental in the formation or implementation of [a] conspiracy," and Defendants' contentions to the contrary are unfounded. (Def. Opp. at 6.) This Court previously held that plaintiffs "take their allegations even further towards the plausibility threshold" by alleging that the defendants "routinely held meetings . . . which provided opportunities to conspire and exchange highly sensitive competitive information, including pricing, capacity utilization, and other important prospective market information." *Potash*, 2009 WL 3583107, at *21 (internal quotations and citations omitted). As detailed in Plaintiffs' Memorandum, the proposed amendments establish that the CTIA and the WIC consisted of many of Defendants' senior executives, met regularly, exchanged considerable pricing, billing, and network capacity information specific to text messaging, and proffered a variety of CTIA statements and documents suggestive of collusion and conspiracy. (*See* Pl. Memo. at 4-6, 8-9.)

6

Plaintiffs allege not only that Defendants met frequently, but also that at such meetings, Defendants discussed topics such as 'co-opetition,' 'profiting together,' and developing a 'common approach to . . . message delivery mechanisms, interconnection, billing and settlement.'" (Pl. Memo. at 8.) Defendants nonetheless contend that these references occurred "long before the alleged conspiracy," and must therefore be irrelevant. (Def. Opp. at 6-7.) Defendants, however, fail to dispute that some Defendants removed class-period-related information and press releases from the internet archive services, making it impossible for Plaintiffs to locate more recent information. (*See* Pl. Memo. at 3-4.) What has essentially been Defendants' spoliation of potential evidence should not be treated as an inference against Plaintiffs. *See* 75A Am. Jur. 2d Trial § 1100 (2009) (providing that the presumption in an instance of spoliation is "that the evidence would have been unfavorable to the party who controlled the evidence."). Under these circumstances, the inference can be drawn that similar statements suggestive of conspiracy would emerge from subsequent press releases and documents issued by the CTIA and the WIC.

Moreover, Defendants are incorrect in claiming that Plaintiffs "offer no statements by any of the defendants suggesting the presence of an agreement." (Def. Opp. at 1-2.) Defendants control the CTIA, through their role in six officer positions of the CTIA and their membership in the Leadership Council of the WIC. (*See* Second Amended Consolidated Class Action Complaint ("Compl."), Dkt. No. 133-1, ¶¶ 93-103.) Therefore, the statements by CTIA executives should be imputed directly to Defendants.

Defendants further assert that the CTIA's role in the "development of technical and trade standards" and the participation by non-Defendants in some CTIA meetings somehow precluded "any meaningful opportunity for clandestine agreement." (Def. Opp. at 7-8.) This position is

7

illogical, as the mere presence of other participants would not interfere with Defendants' ability to meet and discuss the conspiracy. In reality, these meetings provided a regular forum for exchanging vital information pertinent to text message pricing and served as an "opportunity and means to develop and/or further their alleged collusive scheme." *Flash Memory*, 643 F. Supp. 2d at 1148 (*citing Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001)). It is commonly accepted that "a high level of interfirm communications can serve to bolster the inference of a conspiracy drawn from parallel acts," such as the ones alleged here. *See, e.g.*, *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2004 WL 594396, at *7 (S.D.N.Y. Mar. 23, 2004) (internal quotations omitted); *In re Medical X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 218-20 (E.D.N.Y. 1996). Defendants offer no reason to believe that the regular and extensive exchanges of text message pricing and revenue information was even marginally related to developing convergent technical architecture, greatly minimizing the "possibility that the defendants acted independently in setting their prices." *Medical X-Ray*, 946 F. Supp. at 220; *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Call. 2008) ("the exchange of price information alone can be 'sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act'") (*quoting United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969)).

Finally, Defendants briefly mention that the CTIA WIC Leadership Council's decision to stop tracking text messaging revenues immediately after the filing of this suit does not support an inference of a conspiracy. It is well established that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). When considered in concert with the CTIA's prior refusal to divulge historic text messaging data to

Plaintiffs by citing "antitrust reasons," (*see* Pl. Memo. at 4), and Plaintiffs' other allegations, the CTIA's continuous monitoring and sharing of text revenue and pricing information was on its own supportive of collusive behavior, as "it tend[ed] to facilitate the policing of price conspiracies." *Todd*, 275 F.3d at 213. The CTIA's sudden cessation of such monitoring further suggests an attempt to obfuscate its role in promoting Defendants' conspiracy. As such, the amendment is not futile.

### C. Applicability of the Second Circuit's Decision in *Starr*

Defendants also attempt to distinguish *Starr* by claiming that the allegations in that matter "have no counterpart here." (Def. Opp. at 8.) Aside from *Starr*'s legal consequence in interpreting the evolving *Bell Atlantic* standard, Defendants' failure to acknowledge the similarities with the instant case is unfortunate.

The Second Circuit based its decision to vacate the district court's dismissal upon several factors, including the fact that, as here, the *Starr* defendants engaged in parallel pricing, controlled over 80% of the relevant market, and acted contrary to their own self-interest. 2010 WL 99346, at *6-7. To distinguish *Starr*, Defendants first claim that "the product offered [in *Starr*] was unattractive, such that only agreement among the defendants . . . could 'render the enterprises profitable.'" (Def. Opp. at 9) (citation omitted). Similarly here, Defendants found that charging solely per individual text message was less desirable due to the unpredictability of such use, yet Defendants nonetheless wanted to maintain the service because they continued to earn revenue in the billions of dollars from overcharges on bulk plans or infrequent per-unit text message users who would never purchase a bulk plan. (*See* Compl. ¶¶ 60-61.) Had Defendants wished to drive their customers to sign up for more attractive bulk messaging plans, they could have provided incentives or raised their per-unit prices by numerous varying amounts. Yet after

9

witnessing Sprint Nextel's failure to raise the per-unit price independently (Compl. ¶ 79), Defendants possessed every incentive to conspire to render the per-unit enterprises more profitable, *see Starr*, 2010 WL 99346, at *6. Defendants decided to converge their per-unit fee at ten cents, and then to increase their fee in tandem by identical amounts on two distinct occasions.

Defendants next repeat their suggestion that Plaintiffs failed to offer a public statement suggesting the presence of an agreement. (Def. Opp. at 9.) In reality, Plaintiffs provided several examples of public statements by the leadership of the CTIA and the WIC Leadership Council – both Defendant-controlled entities, comprised of high-level executives from each of the Defendants – suggesting, *inter alia*, that Defendants engaged in "co-opetition" on the pricing and delivery of text messaging services with the mutual goal of "profiting together." (Pl. Memo. at 4-6.) Additionally, just as the defendants in *Starr* "attempted to hide the existence of MFN agreements 'because they knew they would attract antitrust scrutiny,'" (Def. Opp. at 9), so did Defendants remove pricing information from internet archive services, cease the tracking and sharing of revenue information by the CTIA upon the filing of this suit, delete post-conspiracy text message meeting and agenda information, and prevent the CTIA from providing historic rate information "for antitrust reasons," (Pl. Memo. at 4-6).

Defendants also contend that *Starr* is distinguishable because the defendants there were the subject of investigations by the New York State Attorney General and the Department of Justice, whereas the Department of Justice stopped its investigation into Defendants' conduct

here.[5] (Def. Opp. at 10.) Although Defendants now argue that the pendency of a government investigation into collusive behavior should factor into the instant analysis, they previously stated that "the allegation that a government investigation has been or may be initiated 'carries no weight in pleading an antitrust conspiracy claim.'" (Defs.' Mem. of Law in Supp. of their Mot. to Dismiss, Dkt. No. 123, at 23) (citation omitted). Under Defendants' own analysis, the presence or absence of government investigations should not affect *Starr*'s application to the instant situation.[6]

The Seventh Circuit has emphasized the importance of private litigation even where government agencies give a pass to potentially anticompetitive activity. *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999). "Congress made private enforcement 'an integral part of the congressional plan for protecting competition,'" and the complex and multi-faceted decision by an agency not to pursue a matter does not deserve deference from the court in ruling upon the plausibility of a conspiracy. *Id.* (*quoting California v. Am. Stores Co.*, 495 U.S. 271, 284-85 (1990)); *see also Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381

---

[5] Importantly, Defendants erroneously state that the Department of Justice ended its investigation "after finding no violation." (Def. Opp. at 10.) This statement is unsupported by the article Defendants cite, which offered that the government merely "has no plans to take action on the issue." Amy Schatz & Thomas Catan, *Justice Ends Probe of Texting Rates*, Wall Street Journal B6 (Jan. 15, 2010). The government's decision not to pursue the investigation may be based on facts similar to *In re Digital Music Antitrust Litigation*, where the defendants "mask[ed] their anticompetitive conduct" and used "sham rules to convince the United States Department of Justice to drop the investigation it launched in 2001." 592 F. Supp. 2d 435, 438 (S.D.N.Y. 2008) (citations omitted), *vacated*, *Starr*, 2010 WL 99346. Defendants further fail to mention that "government regulators are still looking into other competitive issues involving the wireless phone industry." Schatz & Catan Article, *supra*. The Department of Justice may simply be pursuing the "low-hanging fruit."

[6] *Starr* itself noted that "even if we could consider [ ] evidence [of a government investigation] on a motion to dismiss, defendants cite no case to support the proposition that a civil antitrust complaint must be dismissed because a criminal investigation undertaken by the Department of Justice found no evidence of conspiracy." 2010 WL 99346, at *8.

U.S. 311, 318 (1965) ("Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."). Accordingly, many cases proceed and are successful on the merits in the absence of a government investigation.[7]

Finally, Defendants ignore the stark pricing resemblance between this case and *Starr*, where the defendants raised prices "'even though . . . costs of providing Internet Music had decreased substantially.'" (Def. Opp. at 10.) (*citing Starr*, 2010 WL 99346, at *7). Similar to *Starr*, Plaintiffs allege that Defendants, after first converging at ten cents per-unit as part of the conspiracy, increased their prices in tandem on two separate occasions by identical amounts. (Pl. Memo. at 3.) At the same time, because Defendants utilized the same infrastructure for both messaging and other wireless services, the costs of providing text messaging decreased substantially. (Compl. ¶¶ 72-73.) As Plaintiffs previously noted (Pl. Memo. at 11), and Defendants now concede (Def. Opp. at 6 n.3), pricing changes need not occur at the same time to raise plausible suspicions of a conspiracy. As in *Starr*, Defendants' unprecedented pricing behavior rises to this level of plausibility.

Although no two cases are factually identical, in light of the similarity between *Starr* and this case, the Court should similarly find that the Complaint properly alleges claims of coordinated price-fixing and grant the instant Motion.

---

[7] *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, MDL No. 1409, 2009 WL 3415155, at *12 (S.D.N.Y. Oct. 22, 2009) ("Plaintiffs did not have the benefit of a Government investigation"); *Stop & Shop Supermarket Co. v. SmithKline Beacham Corp.*, No. Civ.A. 03-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005) (noting absence of prior government investigation); *Matter of Superior Bev./Glass Container Consol. Pretrial*, 133 F.R.D. 119, 128 (N.D. Ill. 1990) (noting that Department of Justice "began an investigation into possible price fixing," but "[t]hat investigation was ultimately terminated without any further action.").

## II. PLAINTIFFS' REQUEST FOR DISCOVERY IS APPROPRIATE.

Defendants' argument that no discovery should be permitted is entirely indefensible. At first, Defendants innocuously state that "'before discovery may commence,' a plaintiff must file a complaint that satisfies Rule 8's standards, that is, a complaint 'contain[ing] sufficient factual detail' to state a claim." (Def. Opp. at 11) (citation omitted). Contrary to Defendants' unjustified assumption, Plaintiffs' Complaint contains sufficient factual detail, if true, to state a viable claim for relief, satisfying this low threshold. Regardless of this significant disagreement, Defendants nevertheless create a framework – unsupported by case law – where discovery is never permitted prior to the denial of a motion to dismiss. (*Id.*)

This position, however, has been squarely rejected by the courts as neither *Bell Atlantic* nor *Iqbal* provide any support for Defendants' request to prevent all discovery. That *Bell Atlantic* does not provide a basis for prohibiting discovery was best explained by the court in *Flash Memory*:

> *Twombly* does not erect an automatic, blanket prohibition on any and all discovery before an antitrust plaintiff's complaint survives a motion to dismiss. While the *Twombly* court was certainly concerned with the expense of discovery in antitrust cases, its resolution of this concern was to require plaintiffs to plead non-conclusory, factual allegations giving rise to a plausible claim or claims for relief. The Court did not hold, implicitly or otherwise, that discovery in antitrust actions is stayed or abated until after a complaint survives a Rule 12(b)(6) challenge.

2008 WL 62278, at *3 (citations and internal quotation marks omitted). The court added that "[s]uch a reading of that opinion is overbroad and unpersuasive." *Id.*

Other courts similarly reject Defendants' unfounded position on thwarting discovery. Although barring discovery based on the circumstances in that case, the court in *In re Graphics Processing Units Antitrust Litigation* (*GPU I*), MDL No. 1826, 2007 WL 2127577 (N.D. Cal. July 24, 2007), cited by Defendants, flatly rejected the contention that "*Twombly* stands for the proposition that antitrust plaintiffs cannot subject defendants to *any* discovery until the Court

determines that the plaintiffs have articulated a plausible entitlement to relief." *Id.* at *4 (citation and internal quotations omitted). The court concluded that such an argument "upends the Supreme Court's holding; [*Bell Atlantic*] used concerns about the breadth and expense of antitrust discovery to identify pleading standards for complaints, it did not use pleading standards to find a reason to foreclose all discovery." *Id.* Similarly, the court in *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007), held that "*Twombly* does not . . . require plaintiffs to prove their allegations before discovery." *Id.* at *5 (denying motion to dismiss).

Moreover, Defendants' bases for rejecting Plaintiffs' Motion to conduct limited discovery are unfounded. Plaintiffs never requested and do not now request "discovery into *potential* claims or subject matter that *might* be involved in the action," as Defendants grumble. (*See* Def. Opp. at 11 (emphasis in original).) Both the "potential" and actual antitrust conspiracy claims are clearly expressed in the Complaint, as is the subject matter involved in the action, namely Defendants' conspiracy to fix and raise prices for per-unit text messaging services.

Plaintiffs also do not request discovery "to find facts to flesh out an otherwise inadequate complaint." (*See* Def. Opp. at 13.) Plaintiffs' proposed amendments already provide far more than "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As Plaintiffs explained in their initial Memorandum on this Motion, "[b]ecause a considerable portion of Defendants' archived documents has been deleted from the Internet at least partially at the Defendants' request, Plaintiffs seek limited discovery to buttress the current allegations," consistent with this Court's decision on the motion to dismiss the earlier complaint. (Pl. Memo. at 13.) Contrary to Defendants' bluster about an allegedly "broad request" for discovery, Plaintiffs only request limited discovery from the CTIA regarding

Defendants' prior and ongoing meetings and discussions – either through the CTIA or separately. (*Id.*)  Furthermore, if the documents and information provided by Defendants to the Department of Justice in its investigation of the conspiracy allegedly convinced the government of Defendants' innocence as Defendants insist (Def. Opp. at 10), Defendants should hold no objection to producing such already segregated documents.  Both sets of information could be provided to Plaintiffs at minimum expense and without burdening "pro-competitive conduct and [D]efendants' First Amendment right to free association."  (*See id.* at 15.)

Given that "in antitrust cases . . . proof is largely in the hands of the alleged conspirators, dismissal prior to giving the plaintiff *ample* opportunity for discovery should be granted very sparingly."  *Hosp. Bldg. Co. v. Trustees of the Rex Hosp.*, 425 U.S. 738, 746 (1976) (internal quotations and citations omitted) (emphasis added).  Where, as here, evidence has been hidden, there is true justification for allowing limited focused discovery.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted.

Dated: February 8, 2010

Respectfully submitted,

  /s/ Mary Jane Fait
Mary Jane Fait
John Tangren
Michael D. Yanovsky
**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLC**
55 W. Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone:  (312) 984-0000
Facsimile:  (312) 984-0001

*Plaintiffs' Liaison Counsel*

15

Marvin A. Miller
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, Illinois  60603
Telephone:  (312) 332-3400
Facsimile:  (312) 676-2676

Christopher Lovell
**LOVELL STEWART HALEBIAN, LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:  (212) 608-1900
Facsimile:  (212) 719-4677

Joe R. Whatley Jr.
**WHATLEY DRAKE & KALLAS**
1540 Broadway, 37th Floor
New York, New York 10036
Telephone:  (212) 447-7070
Facsimile:  (212) 447-7077

Daniel E. Becnel, Jr.
**BECNEL LAW FIRM, LLC**
P.O. Drawer H
106 West Seventh Street
Reserve, Louisiana  70084
Telephone:  (985) 536-1186
Facsimile:  (985) 536-6445

Richard Kilsheimer
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, New York  10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

Dianne M. Nast
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, Pennsylvania  17601
Telephone:  (717) 892-3000
Facsimile:  (717) 892-1200

Bryan Clobes
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Telephone: (215) 864-2800
Facsimile: (215) 864-2810

Robert M. Foote
**FOOTE, MEYERS, MIELKE &
 FLOWERS, LLC**
28 North First Street, Suite 2
Geneva, Illinois 60134
Telephone: (630) 232-6333
Facsimile: **(**630) 845-8982

Fred. T. Isquith
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Plaintiffs' Steering Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February 2010, a true copy of the foregoing document was served via the Court's ECF system on all filing users.

                                                                      /s/ Mary Jane Fait