# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE TEXT MESSAGING | ) | |
| ANTITRUST LITIGATION | ) | |
| _____ | ) | No. 08 CV 7082 |
| | ) | MDL No. 1997 |
| | ) | Judge Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT SPRINT NEXTEL CORPORATION TO PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendant Sprint Nextel Corporation ("Sprint"), through undersigned counsel, hereby answers Plaintiffs' Second Amended Consolidated Class Action Complaint ("Complaint") as follows. Any allegation that is not expressly admitted shall be deemed denied. Moreover, to the extent that the headings set forth in the Complaint may be construed as allegations requiring a response, Sprint denies all such allegations.

### Paragraph No. 1.

This is an antitrust action charging Defendants with entering into and implementing a continuing contract, combination, and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services sold in the United States.

**ANSWER:** Sprint admits that this is an antitrust action in which Plaintiffs have asserted the allegations that are set forth in Paragraph 1. Sprint denies that Defendants entered into or implemented a continuing contract, combination, or conspiracy to fix, raise, maintain or stabilize prices for Text Messaging Services sold in the United States.

### Paragraph No. 2.

Plaintiffs bring this action on behalf of themselves and all persons or entities who purchased Text Messaging Services based on a fee per text message in the United States directly from Defendants or

their predecessors, subsidiaries, or affiliates during the period from
January 1, 2005 through the present.

**ANSWER:** Sprint admits that Plaintiffs are seeking to bring this action on behalf of the

persons or entities described in Paragraph 2.

### Paragraph No. 3.

Defendants control more than 90% of the market for Text
Messaging Services. It costs a fraction of a penny for Defendants
to transmit a text message because these messages involve very
little data and are transmitted on existing cellular network
connections. Because the per-unit cost of text messages is very
low, reduced pricing would be an easy and affordable way for any
one of the Defendants to distinguish itself from its competitors.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 3.

### Paragraph No. 4.

That is, in fact, what the Defendants traditionally did. In the 3rd
Quarter of 2003, for example, while Nextel (the predecessor to
Defendant Sprint Nextel) and Cingular (the predecessor to
Defendant AT&T) were charging their customers ten cents per
text, Defendant T-Mobile charged only five cents. Alltel (later
acquired by Defendant Verizon) vacillated between five, eight, and
ten cents. At the same time, Verizon followed a unique pricing
model, charging disparate fees of two cents for incoming messages
and ten cents for outgoing messages. When Nextel increased its
per-text rate to fifteen cents in the following quarter (the 4th
Quarter of 2003), the other Defendants stood firm, with Cingular
and Alltel still charging only ten cents per text, T-Mobile still
charging only five cents per-unit, and Verizon continuing to follow
the unique pricing structure described above. Each continued to
impose their independent charges for more than a year, with no
changes until 2005. Then in the 1st Quarter of 2005, Sprint Nextel
dropped its charge to ten cents per text, while Alltel increased its
per-unit charge to eight cents.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 4 as they pertain to Sprint or

Nextel. Sprint denies the allegations pertaining to other Defendants because Sprint lacks

knowledge or information sufficient to form a belief as to the truth of such allegations. To the

extent that Paragraph 4 contains additional allegations requiring response, Sprint denies all such allegations.

### Paragraph No. 5.

The conspiracy began after this unsuccessful attempt to increase prices independently. In 2005 and 2006, the Defendants agreed to adopt a uniform and unprecedented common per-unit price of ten cents for text messaging services. With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile and Alltel increased their per-unit rates to ten cents and Verizon joined them by abandoning its unique pricing model in favor of charging an identical ten cents per-unit for all incoming and outgoing messages.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 5.

### Paragraph No. 6.

This was followed by more lockstep price increases. Sprint Nextel Corporation increased its per text message price by 50% (from ten to fifteen cents) in the 4th Quarter of 2006, and immediately thereafter, in the 1st and 2nd Quarters of 2007, the remaining Defendants increased prices by the same exact amount (from ten to fifteen cents).

**ANSWER:** Sprint admits that in 4Q2006 Sprint increased its price for certain kinds of text messages purchased by persons who did not subscribe to a bundled text messaging plan (hereinafter, "pay as you go text messages") from ten cents per message to fifteen cents. Sprint denies that in 4Q2006 Sprint increased its price for every kind of pay as you go text message from ten cents to fifteen cents. Sprint denies the other allegations set forth in Paragraph 6 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 7.

Once again, in the 4th Quarter of 2007, Sprint Nextel Corporation increased its per text message price by 33.33% (from fifteen to twenty cents), and immediately thereafter, in the 1st and 3rd Quarters of 2008, the remaining Defendants increased prices by the

same exact amount (from fifteen to twenty cents). Not one Defendant attempted to attract additional customers by charging even a penny less per text message.

**ANSWER:** Sprint admits that in 4Q2007 Sprint increased its price for certain kinds of pay as you go text messages from fifteen cents per message to twenty cents. Sprint denies that in 4Q2007 Sprint increased its price for every kind of pay as you go text message from fifteen cents to twenty cents. Sprint denies the other allegations set forth in Paragraph 7 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 8.

Such marked shifts in behavior, where there are "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason," support the existence of a conspiracy. *Standard Iron Works v. ArcelorMittal*, 639 F.Supp.2d 877, 900 (N.D. Ill. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 n.4 (2007)).

**ANSWER:** The allegations set forth in Paragraph 8 constitute a legal conclusion to which no response is required. To the extent that a response is required, Sprint denies these allegations.

### Paragraph No. 9.

During the period from 2005 through 2008, as the cost to transmit a text message decreased by 65%, each Defendant first aligned its per-unit price at ten cents, and subsequently increased its per-unit prices by 100% in two identical price increases, to the same exact penny in similar time frames.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 9 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

## Paragraph No. 10.

Text message pricing naturally lends itself to collusion because it is a uniquely homogenous form of wireless communication and because per-unit text message prices can easily be severed from other service charges. Defendants' current per-unit text message prices are also available on the Internet. Further, each Defendant belongs to the CTIA – The Wireless Association and the Groupe Speciale Mobile Association, which provided Defendants with multiple opportunities to collude regarding pricing data from before 2005 to date.

**ANSWER:** Sprint admits that Sprint's current prices for pay as you go text messages are

available on the Internet. Sprint also admits that Sprint belongs to the CTIA. Sprint denies the

other allegations set forth in Paragraph 10 as they pertain to Sprint. Sprint denies the allegations

pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore denies such allegations.

## Paragraph No. 11.

The CTIA was one vehicle for conducting the conspiratorial activity, as revealed in several CTIA press releases and public documents. The CTIA created the Wireless Internet Caucus ("WIC") Leadership Council consisting of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[1] The purpose of the WIC Leadership Council was to create "industry-wide approach[es]" to "messaging" and billing." Unlike run-of-the-mill annual meetings conducted by various trade associations, the WIC Leadership Council entailed committee meetings narrowly focused on text messaging delivery and pricing, and included the participation of Defendants' high-level executives.

**ANSWER:** Sprint admits that the CTIA created the Wireless Internet Caucus ("WIC")

Leadership Council. Sprint further admits that the WIC Leadership Council has, from time to

---

[1] Feb. 26, 2002 CTIA Press Release, *CTIA Convenes Wireless Internet Caucus Leadership Council; Introducing "A New Day" of Wireless Internet Industry Development*, available at http://investor.infospaceinc.com/releasedetail.cfm?ReleaseID=166787.

time, included representatives from Sprint PCS and other telecommunications firms.  Sprint

denies the other allegations set forth in Paragraph 11.

### Paragraph No. 12.

> The WIC Leadership Council also attempted to "create industry-wide solutions through 'co-opetition' with each other,"[2] and focused on"build[ing] a shared future in which we can all look forward to profiting together"[3] by placing the interests of the industry above and before the individual companies' individual interests.[4]

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 12.

### Paragraph No. 13.

> It is implausible to think that each Defendant was able to independently arrive at the same exact price increase to the same exact penny within similar time frames considering the extensive exchanges of information engaged in by Defendants pertinent to messaging revenue, billing, and delivery.  Each Defendant has millions of customer accounts and operates nationwide.  Each price increase required each Defendant to undertake comprehensive software and other changes to nationwide accounting and billing systems.  Each Defendant had to change or adjust print, television, radio and internet advertising and marketing campaigns that are nationwide in scope.  Each Defendant had to prepare for and roll out training materials for sales associates and retail store locations and customer service representatives around the nation, if not the globe.  Despite the comprehensive and multi-faceted efforts necessary for each Defendant to implement its price increase, they each were somehow able to implement the same exact price increase to the same exact penny within similar timeframes not once, but twice.

**ANSWER:**     Sprint admits that it has millions of customer accounts and operates nationwide.

Sprint denies the other allegations in Paragraph 13 as they pertain to Sprint.  Sprint denies the

---

[2]   March 5, 2003 CTIA Press Release, *Wireless Internet Caucus to Expand*, available at http://www.ctia.org/media/press/body.cfm/prid/1228.

[3]   The Wireless Internet Caucus (WIC) of CTIA-The Wireless Association™ Presents The WIC Manifesto, at 2.

[4]   Feb. 26, 2002 CTIA Press Release, *supra*.

allegations pertaining to other Defendants because Sprint lacks knowledge or information

sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 14.

> When Congress subpoenaed Defendants concerning the economically irrational price increases for per-unit text message services, Defendants largely refrained from addressing their per-unit prices, focusing instead on text message service plans, and failed to deny that their per-text message prices were the result of collusion.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 14 as they pertain to Sprint.

Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or

information sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 15.

> As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the proposed class have paid Defendants higher prices for Text Messaging Services than they would have paid absent Defendants' antitrust conduct.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 15.

### Paragraph No. 16.

> "Class Period" means the period from January 1, 2005 through the present.

**ANSWER:**    The allegations set forth in Paragraph 16 consist of a definition to which no

response is required.  To the extent that a response is required, Sprint admits that Plaintiffs

purport to define the "Class Period" as January 1, 2005 to the date on which the Complaint was

filed.

**Paragraph No. 17.**

"Person" means any individual, partnership, corporation, association, or other business or legal entity.

**ANSWER:** The allegations set forth in Paragraph 17 consist of a definition to which no response is required. To the extent that a response is required, Sprint admits that Plaintiffs purport to define "Person" as described in this Paragraph.

**Paragraph No. 18.**

"Text Messaging Services" or "Texting" means the use of a cellular telephone to exchange brief messages with other mobile phones over cellular networks, and may include inter alia person-to-person messaging and message interaction with automated systems to order products and services for mobile phones or to participate in contests.

**ANSWER:** The allegations set forth in Paragraph 18 are definitions to which no response is required. To the extent that a response is required, Sprint admits that Plaintiffs purport to define "Text Messaging Services" and "Texting" as described in this Paragraph.

**Paragraph No. 19.**

Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover injunctive relief, treble damages, and costs of suit, including attorneys' and expert fees and costs, as a result of Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:** The allegations set forth in Paragraph 19 are legal conclusions to which no response is required. To the extent that a response is required, Sprint admits that Plaintiffs purport to bring this action under Sections 4 and 16 of the Clayton Act and seeks the relief described therein. Sprint denies the remaining allegations set forth in Paragraph 19.

## Paragraph No. 20.

> This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

**ANSWER:**     The allegations set forth in Paragraph 20 are legal conclusions to which no response is required.  To the extent that a response is required, Sprint admits that the Court has subject matter jurisdiction over this action.

## Paragraph No. 21.

> This court has personal jurisdiction over each Defendant because, inter alia, each:  (a) transacted business throughout the United States, including in this District; (b) provided, sold and delivered substantial Text Messaging Services throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER:**     The allegations set forth in Paragraph 21 are legal conclusions to which no response is required.  To the extent that a response is required, Sprint admits that the Court has personal jurisdiction over Sprint.  Sprint denies the other allegations set forth in Paragraph 21 as they pertain to Sprint.  Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 22.

Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period each Defendant resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

**ANSWER:** The allegations set forth in Paragraph 22 are legal conclusions to which no response is required. To the extent that a response is required, Sprint admits that venue is proper as to Sprint in this District. Sprint denies the other allegations set forth in Paragraph 22 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 23.

Venue is also proper in this District because this action was transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

**ANSWER:** The allegation set forth in Paragraph 23 is a legal conclusion to which no response is required. To the extent that a response is required, Sprint admits that venue is proper as to Sprint in this District. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

### Paragraph No. 24.

Aircraft Check Services Company is an Illinois corporation that purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24. Sprint therefore denies the allegations set forth in Paragraph 24.

**Paragraph No. 25.**

Nicholas Iltsopoulos is a resident of Titusvile, Florida who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25. Sprint therefore denies the allegations set forth in Paragraph 25.

**Paragraph No. 26.**

David Keefer is a resident of Wantagh, New York who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26. Sprint therefore denies the allegations set forth in Paragraph 26.

**Paragraph No. 27.**

Kevin Konkel is a resident of South Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27. Sprint therefore denies the allegations set forth in Paragraph 27.

**Paragraph No. 28.**

Jim Morris is a resident of Athens, Alabama who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 28. Sprint therefore denies the allegations set forth in Paragraph 28.

11

## Paragraph No. 29.

Premiere Investment Consulting is a resident of Cudahy, Wisconsin that purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29. Sprint therefore denies the allegations set forth in Paragraph 29.

## Paragraph No. 30.

Melissa Leigh Randolph is a resident of West Palm Beach, Florida who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 30. Sprint therefore denies the allegations set forth in Paragraph 30.

## Paragraph No. 31.

Elizabeth Smith is a resident of Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 31. Sprint therefore denies the allegations set forth in Paragraph 31.

### Paragraph No. 32.

> Defendant Verizon Wireless ("Verizon") is a joint venture of Verizon Communications (55%) and Vodafone Group PLC (45%) with its principal place of business in Basking Ridge, New Jersey. By subscribers, Verizon Wireless owns and operates the largest United States wireless telecommunications network with approximately 87 million United States subscribers and an annual revenue of approximately $44 billion in 2007.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as the truth of

the allegations set forth in Paragraph 32. Sprint therefore denies the allegations set forth in

Paragraph 32.

### Paragraph No. 33.

> On or about January 9, 2009, Verizon Wireless acquired Alltel Wireless, the fifth largest United States provider of wireless services, for approximately $28.1 billion.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as the truth of

the allegations set forth in Paragraph 33. Sprint therefore denies the allegations set forth in

Paragraph 33.

### Paragraph No. 34.

> Verizon Communications and Verizon Wireless are referred to in this complaint collectively as "Verizon."

**ANSWER:**    The allegations set forth in Paragraph 34 are definitions to which no response is

required. To the extent that a response is required, Sprint admits that Plaintiffs purport to define

"Verizon" as set forth in this Paragraph.

### Paragraph No. 35.

Defendant AT&T Mobility L.L.C. ("AT&T Mobility" or "AT&T") is a Delaware corporation with its principal place of business at 5565 Glenridge Connector, Atlanta, Georgia 30342. It is the second largest United States provider of wireless services with approximately 78 million subscribers and 2007 revenues of approximately $43 billion.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as the truth of the allegations set forth in Paragraph 35. Sprint therefore denies the allegations set forth in Paragraph 35.

### Paragraph No. 36.

Defendant Sprint Nextel Corporation is a public corporation with its principal place of business at 650 Sprint Parkway, HL-5A STX, Overland Park, Kansas 66251. It is the third largest United States provider of wireless services with approximately 49 million subscribers.

**ANSWER:** Sprint admits that it is a publicly traded company, and that its principal place of business is located in Overland Park, Kansas. Sprint denies that the address of its principal place of business is accurately set forth in Paragraph 36. Sprint admits that it is the third largest provider of wireless services in the United States with approximately 49 million subscribers.

### Paragraph No. 37.

Defendant T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006. It is the fourth largest United States provider of wireless services with approximately 33 million subscribers.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as the truth of the allegations set forth in Paragraph 37. Sprint therefore denies the allegations set forth in Paragraph 37.

### Paragraph No. 38.

Each of the named Defendants sold Text Messaging Services in the United States directly or through its affiliates and/or subsidiaries after January 1, 2005.

**ANSWER:**     Sprint admits the allegations set forth in Paragraph 38.

### Paragraph No. 39.

Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 39.

### Paragraph No. 40.

Various others, presently unknown to Plaintiffs, participated as co-conspirators in the violations alleged in this complaint and performed acts and made statements in furtherance thereof.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 40.

### Paragraph No. 41.

The acts charged in this complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 41.

**Paragraph No. 42.**

Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2) and (b)(3) on behalf of themselves and the following Class:

All persons and entities who paid a per-message price for Text Messaging Services in the United States directly to one or more of the Defendants or their affiliates or subsidiaries at any time from January 1, 2005 to the present. The Class excludes government entities, Defendants, and Defendants' parents, affiliates, subsidiaries, officers and directors.

**ANSWER:** Paragraph 42 sets forth a putative class definition to which no response is required. To the extent that a response is required, Sprint admits that Plaintiffs purport to bring this action on behalf of the class set forth in Paragraph 42. Sprint denies that this action may be maintained as a class action.

**Paragraph No. 43.**

Plaintiffs do not know the exact number of Class members because that information is within the exclusive control of Defendants, but believe that there are many millions geographically dispersed throughout the United States, such that joinder of all members would be impracticable.

**ANSWER:** The allegation in Paragraph 43 that the joinder of all class members would be impracticable is a legal conclusion to which no response is required. Sprint lacks knowledge or information sufficient to form a belief as to the truth of the other allegations set forth in Paragraph 43. Sprint therefore denies these allegations.

**Paragraph No. 44.**

The identities of Class members can be readily determined from records maintained by Defendants and their agents.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of allegations set forth in Paragraph 44. Sprint therefore denies the allegations set forth in Paragraph 44.

**Paragraph No. 45.**

Questions of law or fact common to Class members exist and predominate over any questions affecting individual members of the Class, and include:

a.       Whether Defendants engaged in a contract, combination or conspiracy to raise, fix, stabilize or maintain the per-message price for Text Messaging Services in the United States;

b.       Whether each Defendant engaged in the contract, combination or conspiracy, and if so, to what extent;

c.       Whether the contract, combination or conspiracy violates Section 1 of the Sherman Act;

d.       Whether there were any additional co-conspirators to the contract, combination or conspiracy, and if so, their identities;

e.       The duration and extent of the contract, combination or conspiracy;

f.       Whether the conduct of Defendants and their co-conspirators caused the per-message price of Text Messaging Services to be artificially inflated to anti-competitive levels;

g.       Whether Plaintiffs and Class members were injured by the conduct of Defendants and their co-conspirators;

h.       The appropriate classwide measure of damages; and

i.       Whether Plaintiffs and the Class are entitled to injunctive relief.

**ANSWER:**    Paragraph 45 sets forth a legal conclusion to which no response is required.  To the extent that a response is required, Sprint denies the allegations set forth in Paragraph 45.

### Paragraph No. 46.

Plaintiffs have claims that are typical of the claims of the Class, have no interests adverse to or in conflict with the Class, and will fairly and adequately protect the interests of the Class.

**ANSWER:**     Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 46. Sprint therefore denies the allegations set forth in Paragraph 46.

### Paragraph No. 47.

Plaintiffs have retained counsel who are experienced in antitrust class actions, have significant knowledge about the antitrust laws, have performed considerable work in identifying and investigating the potential claims in this action, and have committed significant resources to representing the Class.

**ANSWER:**     Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 47. Sprint therefore denies the allegations set forth in Paragraph 47.

### Paragraph No. 48.

Separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

**ANSWER:**     Paragraph 48 sets forth a legal conclusion to which no response is required. To the extent that a response is required, Sprint denies the allegations of Paragraph 48.

### Paragraph No. 49.

Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate for the Class as a whole.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 49.

**Paragraph No. 50.**

Prosecuting the case as a class action is superior to any other methods for fair and efficient adjudication of the controversy because class members have no interest in individually controlling the prosecution of separate actions, as individual prosecutions would be uneconomic, would impose heavy burdens on the parties and the courts, and would create a risk of inconsistent adjudications. In addition, all litigation concerning this controversy already has been centralized in this forum, and it is unlikely that there will be any significant difficulties in managing this case as a class action.

**ANSWER:**    Sprint admits that all litigation concerning this controversy has been centralized in this forum. Sprint denies the other allegations set forth in Paragraph 50.

**Paragraph No. 51.**

During the Class Period, Defendants and their co-conspirators sold a substantial amount of Text Messaging Services within the continuous and uninterrupted flow of interstate and foreign commerce, and as intended, their actions substantially affected that commerce.

**ANSWER:**    Sprint admits that during the putative Class Period, Defendants sold Text Messaging Services in interstate commerce. The allegation that these Text Messaging Services were within the continuous and uninterrupted flow of interstate and foreign commerce is a legal conclusion to which no response is required. Sprint denies the other allegations set forth in Paragraph 51.

**Paragraph No. 52.**

The wireless telephone industry has undergone consolidation in the past four years, with the number of major national competitors declining from six to four.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 52.

**Paragraph No. 53.**

Defendants are the four largest wireless telecommunications companies in the United States, and with more than 225 million

19

subscribers, they control more than 90 percent of the Text Messaging Services sold in the United States.

**ANSWER:**     Sprint admits that Defendants are the four largest wireless telecommunications companies in the United States.  Sprint denies the other allegations set forth in Paragraph 53.

### Paragraph No. 54.

Thus, together, Defendants have great power in the market for Text Messaging Services and are capable of combining to increase the market price for those services to supra-competitive levels.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 54.

### Paragraph No. 55.

Text messaging involves the use of cellular telephone equipment to send and receive short messages, generally limited to 160 characters per message.

**ANSWER:**     Sprint admits the allegations set forth in Paragraph 55.

### Paragraph No. 56.

Text messaging constitutes a relevant market, and there are no good substitutes for text messaging.

**ANSWER:**     Sprint denies the allegations in Paragraph 56.

### Paragraph No. 57.

Customers sent 363 billion text messages in 2007, resulting in annual text messaging revenues of about $23.2 billion.

**ANSWER:**     Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 57.  Sprint therefore denies the allegations set forth in Paragraph 57.

### Paragraph No. 58.

By 2008, Defendants transmitted 2.5 trillion text messages for almost 263 million wireless subscribers in the United States, representing 84% of the total population of the United States.

**ANSWER:**  Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58.  Sprint therefore denies the allegations sent forth in Paragraph 58.

### Paragraph No. 59.

It is estimated that 3.3 trillion text messages will be sent in 2009.

**ANSWER:**  Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59.  Sprint therefore denies the allegations set forth in Paragraph 59.

### Paragraph No. 60.

AT&T has estimated that approximately two percent of the text messages sent and received on its system were purchased on a per-message basis, while approximately ten percent of T-Mobile's customers' text messaging is conducted on a per-message basis

**ANSWER:**  Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60.  Sprint therefore denies the allegations set forth in Paragraph 60.

### Paragraph No. 61.

Assuming that at least two percent of the 2.5 trillion text messages that were sent and received in 2008 were purchased on a per-message basis, resulting in 50 billion text messages being sent and received at twenty cents each, Defendants' joint per-text-message revenue for the year 2008 alone would have been $10 billion.

**ANSWER:**  Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 61.  Sprint therefore denies the allegations set forth in Paragraph 61.

**Paragraph No. 62.**

> While some subscribers purchase text messaging plans that allow
> them to send or receive a set or unlimited number of text messages
> for a flat monthly fee, many others pay an individual fee for each
> text message.

**ANSWER:**     Sprint admits that some Sprint subscribers purchase text messaging plans that

allow them to send or receive a set or unlimited number of text messages for a flat monthly fee.

Sprint admits that some Sprint subscribers pay an individual fee for each text message.  Sprint

lacks knowledge or information sufficient to form a belief as to the truth of the other allegations

set forth in Paragraph 62.  Sprint therefore denies those allegations.

**Paragraph No. 63.**

> Defendants charge fees not only for outgoing messages, but also
> for incoming messages received by the subscriber, resulting in a
> fee being paid to a Defendant twice for each message – once when
> the message is sent, and once when it is received.

**ANSWER:**     Sprint admits that it charges Sprint subscribers that purchase text messages on a

pay as you go basis a fee for both incoming and outgoing text messages.  Sprint denies the other

allegations that are set forth in Paragraph 63.  Sprint denies the allegations pertaining to other

Defendants set forth in Paragraph 63 because Sprint lacks knowledge or information sufficient to

form a belief as to the truth of those allegations.

**Paragraph No. 64.**

> Text message files are exponentially smaller than voicemail, e-
> mail and music download files, and it thus costs exponentially less
> to transmit them.

**ANSWER:**     Sprint admits that text messaging files are generally smaller than voicemail, email

and music download files.  Sprint denies the other allegations set forth in Paragraph 64.

### Paragraph No. 65.

For example, 600 text messages contain less data than one minute of a telephone call, making each text messaging file almost insignificant in the world of transmitting electronic data.

**ANSWER:**     Sprint denies the allegation that 600 text messages contain less data than one minute of a telephone call because Sprint lacks knowledge or information sufficient to form a belief as to the truth of this allegation.  Sprint denies the other allegations set forth in Paragraph 65.

### Paragraph No. 66.

Defendants' cost to deliver an individual text message is close to zero because it is transmitted on an existing connection between a cell phone and the cell phone system.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 66.

### Paragraph No. 67.

Despite these minimal costs, carriers charge huge mark-ups and enjoy high profit margins on Text Messaging Services.  According to technology news source CNET News: "One can easily assume that the mark-up on a text message is several thousands times what it actually costs carriers to transmit this little bit of data." (Emphasis added.)

**ANSWER:**     Sprint denies the allegations set forth in the first sentence of Paragraph 67 as they pertain to Sprint.  Sprint denies the other allegations set forth in Paragraph 67 because Sprint lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 68.

The benefits of competition are lower prices and better services, and with competition, per-unit prices should be closely related to and follow per-unit costs.

**ANSWER:**     Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68.  Sprint therefore denies the allegations set forth in Paragraph 68.

### Paragraph No. 69.

Theoretically and historically, as per-unit costs for an item substantially decrease, per unit prices for such item substantially decrease.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in Paragraph 69. Sprint therefore denies the allegations set forth in

Paragraph 69.

### Paragraph No. 70.

Between 2005 and late 2006 or early 2007, each Defendant's per-unit costs associated with text messages substantially decreased— by approximately 50%.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in Paragraph 70. Sprint therefore denies the allegations set forth in

Paragraph 70.

### Paragraph No. 71.

Absent collusion, Defendants' per-unit prices for text messages should have substantially decreased as well.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 71.

### Paragraph No. 72.

Defendants already had the infrastructure to transmit many more text messages than they were transmitting (and presently do transmit). Because the supply of text messages was considerably greater than consumers' demand for them, Defendants' prices for text messaging should have decreased. Increasing prices during a period of oversupply is one of the leading indicators of a conspiracy.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 72.

### Paragraph No. 73.

From 2005 to early 2007, the price of other wireless services provided by Defendants decreased. In fact, the same infrastructure that enables Defendants to transmit text messages enables them to

24

> transmit other wireless services. The factors that govern the decreasing costs of text messaging also govern the decreasing costs of those other wireless services. Defendants' prices for text messaging should have decreased between 2005 and late 2006 or early 2007.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 73 as they pertain to Sprint.

Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or

information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 74.

> However, Defendants' per-unit prices for text messages did not decrease over this period. In fact, no Defendant's price for per-unit text messaging decreased at all.

**ANSWER:** Sprint admits that the price Sprint charged for pay as you go text messaging did

not decrease during 2005 to 2007. Sprint denies the allegations pertaining to other Defendants

because Sprint lacks knowledge or information sufficient to form a belief as to the truth of those

allegations.

### Paragraph No. 75.

> Prior to the conspiracy, Defendants actively competed for per-unit text messaging services and charged distinct prices. T-Mobile charged five cents for both outgoing and incoming text messages up through April 2006, when it raised its price to ten cents as part of the alleged conspiracy.

**ANSWER:** Sprint admits that Defendants actively compete and charge distinct prices. Sprint

denies the other allegations set forth in Paragraph 75.

### Paragraph No. 76.

Alltel (later Verizon), in contrast, changed its per-unit pricing on several occasions, charging ten cents until the middle of 2005, then dropping its fee to five cents until the end of 2005, subsequently raising its fee to eight cents in January 2006, and finally reaching the ten cent agreed price in October 2006.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 76. Sprint therefore denies the allegations set forth in Paragraph 76.

### Paragraph No. 77.

Verizon, which previously followed a unique pricing model, charged ten cents for its outgoing text messages up through the start of the conspiracy period, but charged only two cents for incoming messages. Verizon persisted in this independent pricing until agreeing to set its prices for both incoming and outgoing messages at ten cents as part of the conspiracy towards the end of 2006.

**ANSWER:** Sprint denies that there was a conspiracy as alleged in Paragraph 77. Sprint lacks knowledge or information sufficient to form a belief as to the truth of the other allegations set forth in Paragraph 77. Sprint therefore denies those allegations as well.

### Paragraph No. 78.

Cingular (later AT&T) never departed from its original price of ten cents, until such time as all Defendants raised their prices as part of the conspiracy.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 78.

### Paragraph No. 79.

Importantly, before the conspiracy, Nextel (now Sprint Nextel) first tried to increase the per-unit price from ten to fifteen cents in the 4th Quarter of 2003. The other wireless providers refused to follow Nextel's lead, and stood firm at their individual prices. In this competitive environment, Nextel was forced to return its per-text rate to the earlier ten cents in the 1st Quarter of 2005.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 79.

26

### Paragraph No. 80.

The conspiracy began after this unsuccessful attempt to increase prices independently. In 2005 and 2006, the Defendants agreed to uniformly charge an unprecedented common per-unit price of ten cents for text messaging services. With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile, Alltel, and Verizon joined them in charging an identical ten cents per-unit for all incoming and outgoing messages. Each Defendant engaged in the highly unusual conduct of aligning their per unit text messaging prices and then increasing them by identical amounts.

**ANSWER:**    Sprint denies the allegations set forth in paragraph 80.

### Paragraph No. 81.

Indeed, each and every Defendant engaged in the exact same, highly anomalous behavior of doubling its per-unit text messaging prices in a span of barely over a year.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 81.

### Paragraph No. 82.

Specifically, by the end of 2006, as part of the conspiracy, each Defendant had aligned their per-unit fee at ten cents per each text message sent or received. In late 2006 and early 2007, each Defendant increased its per-message fee by 50%, from ten to fifteen cents as outlined in the following chart:

| Defendant | Price Increase from 10¢ to 15¢ |
|---|---|
| Sprint Nextel | 4th Q 2006 |
| Alltel | 4th Q 2006 |
| AT&T | 1st Q 2007 |
| Verizon Wireless | 1st Q 2007 |
| T-Mobile USA | 2nd Q 2007 |

**ANSWER:**    Sprint admits that in 4Q2006 it increased its fee for certain kinds of pay as you go text messages from ten cents per message to fifteen cents. Sprint denies that in 4Q2006 it increased its fee for all kinds of pay as you go text messages from ten cents per message to fifteen cents. Sprint denies the other allegations set forth in Paragraph 82 as they pertain to

27

Sprint.  Sprint denies the allegations pertaining to other Defendants because Sprint lacks

knowledge or information sufficient to form a belief as to the truth of these allegations.

### Paragraph No. 83.

> During 2007 and early 2008, the amount of text messages sent by
> each Defendant's customers greatly increased.

**ANSWER:**     Sprint admits that the amount of text messages sent by Sprint customers increased

in 2007 and 2008.  Sprint denies the allegations pertaining to other Defendants because Sprint

lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 84.

> During this same period, the per-unit costs of text messages of
> each Defendant continued to decrease substantially, by at least
> 35%, and each Defendant's available supply to transmit text
> messages still far exceeded usage and demand.  Also, during that
> period, each Defendant decreased its per-unit prices for other
> wireless services.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 84 as they pertain to Sprint.

Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or

information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 85.

> Moreover, each Defendant selected the exact same, extremely
> substantial 33.33% increase in its prices.  Specifically, each

28

Defendant increased its per-message fee from fifteen cents to twenty cents as outlined below:[5]

| Defendant | Price Increase from 15¢ to 20¢ |
|---|---|
| Sprint Nextel | 4th Q 2007 |
| AT&T | 1st Q 2008 |
| Verizon Wireless | 1st Q 2008 |
| T-Mobile USA | 2nd Q 2008 |

**ANSWER:**    Sprint admits that in 4Q2007 Sprint increased its price for certain kinds of pay as you go text messages from fifteen cents per message to twenty cents. Sprint denies that in 4Q2007 Sprint increased its price for every kind of pay as you go text message from fifteen cents to twenty cents. Sprint denies the other allegations set forth in Paragraph 85 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 86.

Sprint Nextel was the ringleader in all price increases subsequent to the alignment of all per-unit prices at ten cents. In contrast to the independent conduct after Nextel first tried to increase its rates in 2003, the other Defendants adopted Sprint Nextel's per-text price increases in this instance as part of the conspiracy. Verizon and AT&T did so immediately, in the very next quarter for both increases, and T-Mobile ultimately cooperated and adopted the increase.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 86.

### Paragraph No. 87.

Compared to historical experience, economic theory, Defendants' own contemporaneous pricing of comparable products, Defendants' excess supply, and Defendants' low costs, the prices of text messaging services should have decreased substantially between 2005 and 2008. Moreover, the alignment and uniform increases evidenced above were a stark departure from

---

[5]  Verizon acquired Alltel prior to the increase from ten to fifteen cents, and is therefore not included in the chart.

Defendants' independent and competitive pricing practices in the preceding time period.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 87.

### Paragraph No. 88.

However, Defendants' collusive behavior subsequently caused a 100% increase in per-unit text messaging prices paid by Plaintiffs at the same times that each Defendant's comparable costs decreased by approximately 65%, Defendants' supply exceeded demand, and the prices of Defendants' related products decreased.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 88.

### Paragraph No. 89.

Text messaging per-unit pricing lends itself to collusion in many ways. This is, in part, because text messaging is a uniquely homogeneous form of wireless communication. The per-text-message price can easily be severed from other service charges, separately observed, and openly communicated among Defendants. Defendants, in fact, did systematically engage in a highly unusual degree of communication with one another and shared information during 2005 – 2008. See infra. Defendants' prices for text messaging are even available on the Internet.

**ANSWER:**    Sprint admits that its current prices for pay as you go text messaging are available

on the internet. Sprint denies the other allegations set forth in Paragraph 89.

### Paragraph No. 90.

Given the circumstances hereinafter and previously alleged, the dramatic, identical rise in the price of text messaging must have resulted from a price fixing conspiracy among the Defendants.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 90.

### Paragraph No. 91.

In the alternative, under the circumstances hereinafter and previously alleged, Defendant Sprint-Nextel Corp.'s astonishing price increases constituted offers to the other Defendants to avoid engaging in competition and to extract supra-competitive prices many thousand times each Defendant's costs for text messaging services. The other Defendants accepted Sprint-Nextel's offers when they implemented identical price increases shortly thereafter,

30

thereby consummating illegal agreements among suppliers representing 90% of the text message market to raise and maintain prices.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 91.

### Paragraph No. 92.

Under these circumstances, Defendants' pattern of offers and acceptances in and of itself constitutes a price fixing conspiracy.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 92.

### Paragraph No. 93.

CTIA-The Wireless Association ("CTIA") is a trade organization based in Washington, D.C. that claims to be an "international association for the wireless telecommunications industry, dedicated to expanding the wireless frontier."

**ANSWER:**     Sprint admits that the CTIA is a trade organization based in Washington, D.C.

Sprint lacks knowledge or information sufficient to form a belief as to the truth of the other

allegations set forth in Paragraph 93. Sprint therefore denies these allegations.

### Paragraph No. 94.

Defendants are currently members of the CTIA. Defendants have met regularly through the CTIA's biannual conventions since 2002.

**ANSWER:**     Sprint admits that it is currently a member of the CTIA. Sprint denies the other

allegations set forth in Paragraph 94 because it lacks knowledge or information sufficient to form

a belief as to the truth of these allegations.

### Paragraph No. 95.

In 2001, AT&T launched the first inter-carrier text messaging service, which allowed users to send text messages to customers of other carriers.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 95. Sprint therefore denies the allegations set forth in Paragraph 95.

### Paragraph No. 96.

Following on the heels of AT&T's launch, Defendants AT&T, Sprint Nextel and Verizon met through the CTIA on numerous occasions to discuss pricing and text messaging.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 96.

### Paragraph No. 97.

For example, shortly thereafter, in early 2002, under CTIA's guidance, the six major national carriers, including Defendants, announced that they had reached agreement on allowing each carrier's service for text messaging to communicate with the others' service.

**ANSWER:** Sprint admits that telecommunications firms have worked to enable inter-carrier messaging between each firm's text messaging services. Sprint denies the other allegations set forth in Paragraph 97.

### Paragraph No. 98.

Based on its orchestration of the interoperability agreements in 2002, CTIA has been and remains the driving force behind organizing Defendants and exchanging information about text messaging in the United States.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 98.

### Paragraph No. 99.

In announcing the interoperability agreements and potential massive revenue to carriers, CTIA President and CEO Tom Wheeler was quoted as saying, "Text messages have not only

given consumers a brand new way to communicate, it has also
given wireless companies around the globe an important new
revenue stream.  Last year, the revenue generated by text messages
was greater than Hollywood's combined box office receipts,
according to the Mobile Data Association in the U.K."

**ANSWER:**   Sprint lacks knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in Paragraph 99.  Sprint therefore denies the allegations set forth in

Paragraph 99.

## Paragraph No. 100.

The CTIA has expressed concerns that its collection of data could
contribute to anti-competitive endeavors, but it has nonetheless
continued to track competitive data, and has in fact increased its
collection of information on texting.

**ANSWER:**   Sprint denies the allegations set forth in Paragraph 100.

## Paragraph No. 101.

The CTIA created a Wireless Internet Caucus ("WIC"), which is a
"core community of CTIA member companies dedicated to
growing a large and robust market at the convergence of wireless
and Internet technologies, products and services" and that "seek[s]
to build a shared vision of this market and an action plan to enable
its rapid growth."

**ANSWER:**   Sprint admits that the CTIA created a Wireless Internet Caucus that includes

certain CTIA member companies.  Sprint lacks knowledge or information sufficient to form a

belief as to the truth of the other allegations set forth in Paragraph 101.  Sprint therefore denies

these allegations.

## Paragraph No. 102.

In February 26, 2002, the CTIA convened the WIC Leadership
Council, which "comprises a critical mass of key industry decision
makers who work together to create a shared market vision and
unified approach to solving problems and challenges faced
collectively growing the wireless data marketplace."  The
Leadership Council was tasked with "launching an industry-wide

initiative to address the hurdles that face the U.S. market in wireless data. . . ."[6]

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 102. Sprint therefore denies the allegations set forth in Paragraph 102.

## Paragraph No. 103.

The WIC Leadership Council consisted of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[7] Participants in the WIC Leadership Council meetings included: Jim Straight, Vice President Wireless Data & Internet Services, Verizon Wireless; John Quzdepski, VP & GM, Sprintpcs.com, Sprint PCS; Andrew Willett, VP, Multimedia Services, AT&T Wireless Services; Carlton Hill, Executive Director Internet Service, Cingular Wireless; Greg Santoro, Vice President, Internet and Wireless Services, Nextel; and Michael Cote, VP Wireless Data Sales & Operations, VoiceStream Wireless [later renamed T-Mobile].

**ANSWER:** Sprint admits that it has participated in WIC Leadership Council Meetings. Sprint lacks knowledge or information sufficient to form a belief as to the truth of the other allegations set forth in Paragraph 103. Sprint therefore denies these allegations.

---

[6] Feb. 26, 2002 CTIA Press Release, *supra*.

[7] *Id.*

### Paragraph No. 104.

The Leadership Council's inaugural meeting in February 2002 was a day-long event in which "executives of the U.S. wireless data industry began mapping out the course for the delivery of high-quality wireless data services," and discussed impediments to success in a variety of areas, including "messaging" services, interoperability, and "billing."[8]

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 104.  Sprint therefore denies the allegations set forth in Paragraph 104.

### Paragraph No. 105.

The CTIA's Vice President of Wireless Internet Development noted that because of the crucial moment in the development of the wireless data marketplace, "[t]he WIC Leadership Council members' efforts to create industry-wide solutions through 'co-opetition' with each other, can have a dramatic influence on the pace of that development."[9]

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 105.  Sprint therefore denies the allegations set forth in Paragraph 105.

### Paragraph No. 106.

The CTIA further emphasized that "[a]ll ships rise [together] . . . . What's best for one company is not always best for the industry. The time has come to serve the industry first."[10]

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 106.  Sprint therefore denies the allegations set forth in Paragraph 106.

---

[8]  *Id.*

[9]  March 5, 2003 CTIA Press Release, *supra* (emphasis added).

[10]  Feb. 26, 2002 CTIA Press Release, *supra* (emphasis added).

### Paragraph No. 107.

The WIC Leadership Council convenes "bi-annual, face-to-face meetings . . . while conducting quarterly conference calls to keep apprised of the progress made."11 Additionally, the Leadership Council prepared and disseminated thorough presentations providing detailed information regarding text messaging revenue, pricing, billing, and delivery. The data in these presentations was provided directly by Defendants. The WIC and its Leadership Council have operated throughout the class period.[11]

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 107. Sprint therefore denies the allegations set forth in Paragraph 107.

### Paragraph No. 108.

The WIC also published the "WIC Manifesto," providing for a "commitment to work together to build a shared vision for the industry, and an action roadmap to make that vision a reality." The WIC Manifesto stated that the companies participating in the WIC would "work together to enlist the support and alignment of all key stakeholders in order to implement [win-win] solutions."[12]

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 108. Sprint therefore denies the allegations set forth in Paragraph 108.

---

[11] *Id.*

[12] WIC Manifesto, *supra*, at 1-2.

36

## Paragraph No. 109.

The purpose of such joint efforts through the WIC was "to build a shared future in which we can all look forward to profiting together."[13]

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 109. Sprint therefore denies the allegations set forth in Paragraph 109.

## Paragraph No. 110.

As part of the Manifesto, the WIC specifically established the "Messaging Action Team," led by one of Nextel's executives. The Messaging Action Team devoted itself to "support a common approach to . . . message delivery mechanisms, interconnection, billing and settlement." The Messaging Action Team was further designed to "propose billing principles for message transfer between 'message service providers.'"

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 110. Sprint therefore denies the allegations set forth in Paragraph 110.

## Paragraph No. 111.

The CTIA also formed a Mobile Advertising Metrics Action Team comprised of wireless carriers that work together to agree to minimum standards for reporting metrics, targeting information, advertising inventory and consumer privacy, and to monitor the progress of other industry organizations and collaborate where appropriate.

**ANSWER:** Sprint lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 111. Sprint therefore denies the allegations set forth in Paragraph 111.

---

[13] *Id.* (emphasis added).

**Paragraph No. 112.**

During the variety of CTIA and Messaging Action Team meetings and conversations, Defendants had numerous opportunities to conspire to set pricing for Text Messaging Services. Sprint Nextel announced a per-unit text message price increase within approximately a month after the mid-year meeting in 2006, and again within approximately a month after the mid-year meeting in 2007, and as described above, the other Defendants followed shortly thereafter with identical price increases.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 112.

**Paragraph No. 113.**

The CTIA, of which Defendants are members, established and controls the Common Short Code Association (CSCA). Defendants, working together through the CTIA, collusively use the CSCA to expand the market for texting services, control the prices for texting services, and generate further demand for texting services at the excessive prices established by the Defendants.

**ANSWER:** Sprint denies the allegations set forth in Paragraph 113.

**Paragraph No. 114.**

Common Short Codes ("CSCs") are five-digit or six-digit numeric codes to which text messages can be addressed from a wireless device. They are easy to remember, compatible across all participating carriers, and can be leased by anyone interested in interacting with over 200 million wireless consumers.

**ANSWER:** Sprint admits that Common Short Codes are numeric codes to which text messages can be addressed. Sprint denies that Common Short Codes are always five or six digits. Sprint lacks knowledge or information sufficient to form a belief as to the other allegations set forth in Paragraph 114. Sprint therefore denies these allegations.

## Paragraph No. 115.

Wireless subscribers send text messages to Short Codes to access a wide variety of mobile content for delivery to their wireless devices, such as sweepstakes, tele-voting campaigns, mobile coupons, other promotions, and a wide range of additional interactive wireless services.

**ANSWER:**    Sprint admits the allegations set forth in Paragraph 115.

## Paragraph No. 116.

Marketers of consumer products and services, as well as business and enterprise customers, are currently using Short Codes to directly interact with and attract various audiences, as Short Codes provide an unprecedented opportunity to engage customers anytime, anywhere.

**ANSWER:**    Sprint denies that Common Short Codes provide an unprecedented opportunity to

engage customers.  Sprint admits the other allegations set forth in Paragraph 116.

## Paragraph No. 117.

According to the CSCA, "The potential is enormous.  Common Short Codes will enable the continued growth of text messaging and provide a platform upon which new technologies will be able to flourish.  Market developments like picture messaging (or MMS) and the continued evolution of Instant Messaging into the wireless medium make text messaging one of the most exciting, yet simple, breakthroughs, since the advent of the telephone itself!"

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the

allegations set forth in Paragraph 117.  Sprint therefore denies the allegations set forth in

Paragraph 117.

## Paragraph No. 118.

The CSCA leases the Short Codes to advertisers, which then negotiate agreements with each carrier to carry their Short Codes.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 118.

### Paragraph No. 119.

The CSCA admits that its control of the Short Codes is a substantial benefit: "Wireless Service Providers benefits: Drives up text messaging usage and revenues because more applications will be funded."

**ANSWER:**     Sprint lacks knowledge or information sufficient to form a belief as to the

allegations set forth in Paragraph 119.  Sprint therefore denies the allegations set forth in

Paragraph 119.

### Paragraph No. 120.

Through the CSCA, CTIA has created the "shared vision" of the WIC by going beyond the bounds of a trade organization into the business of generating and driving profits for its members, including its core members, the named Defendants.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 120.

### Paragraph No. 121.

Short Codes earn money for the Defendants in a number of ways: the Defendants' trade association consortium charges a set fee for the establishment and leasing of Short Codes; then the lessee of the Short Code pays each carrier for the right to carry its codes; and consumers are then charged for using the Short Code, sometimes in multiple ways.

**ANSWER:**     Sprint admits that a trade association consortium charges a set fee for the

establishment and leasing of Short Codes.  Sprint denies the other allegations set forth in

Paragraph 121.

### Paragraph No. 122.

For example, Major League Baseball has leased the Short Code 65246 "MLBGO" at http://mobile.mlb.com/web, which provides the subscriber with sports alerts, Ringtones, and wallpaper.  One of the options offered is "Team Alerts" where, for $3.99 "plus standard messaging fees," a subscriber can "stay connected" to his or her favorite team.  The fan receives fifteen to twenty alerts per week, including game summaries, home runs, lead changes, breaking news, and video highlights.  Major League Baseball says

"To avoid high carrier data charges, an unlimited data plan is strongly recommended." Defendants receive a share of the monthly fee for alert systems and their charges for the services, and for these types of services and revenues, they need a large group of subscribing customers with unlimited data plans.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 122. Sprint therefore denies the allegations set forth in Paragraph 122.

### Paragraph No. 123.

The Groupe Speciale Mobile Association ("GSMA") is a worldwide trade group of cellular providers that boasts membership of 750 mobile networks across 219 countries that collectively serve more than 3.4 billion customers totaling 85% of the world's mobile phone users.

**ANSWER:**    Sprint admits that the GSMA is a worldwide trade group that includes cellular providers as members. Sprint lacks knowledge or information sufficient to form a belief as to the other allegations set forth in Paragraph 123. Sprint therefore denies these allegations.

### Paragraph No. 124.

One of the GSMA member-only databases includes information such as effective price per minute, total billed for SMS events, and number of SMS messages per user per month.

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 124. Sprint therefore denies the allegations set forth in Paragraph 124.

### Paragraph No. 125.

GSMA recently completed its annual "Mobile World Congress" that was attended by at least leaders from AT&T and Verizon Communication.

**ANSWER:**    Sprint admits that the GSMA recently completed its annual Mobile World Congress.  Sprint lacks knowledge or information sufficient to form a belief as to the other allegations set forth in Paragraph 125.  Sprint therefore denies these allegations.

### Paragraph No. 126.

One of the break-out sessions at that "Congress" pertained to "Pricing Strategies for the Unlimited Generation."

**ANSWER:**    Sprint lacks knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 126.  Sprint therefore denies  the allegations set forth in Paragraph 126.

### Paragraph No. 127.

Through CTIA and GSMA, the defendants have a forum in which to interact, access relevant utilization and pricing data, and participate in committees to lobby governmental entities, which furthers their collusive efforts.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 127.

### Paragraph No. 128.

The revenues of Defendants are dependent on encouraging individual users to use and become reliant upon high amounts of data.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 128.

### Paragraph No. 129.

Defendants, individually and acting in concert, have adopted uniform and unreasonably high charges for text messaging in order to encourage their customers to purchase other services.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 129.

**Paragraph No. 130.**

Defendants stand to earn significant fees from the use of Short Codes, and if they are to fulfill their potential as a revenue driver, customers need to have unlimited text messaging and related data plans.

**ANSWER:**     Sprint admits that it earns fees from the use of Short Codes. Sprint denies the other allegations set forth in Paragraph 130 as they pertain to Sprint. The allegations regarding other Defendants are denied because Sprint lacks knowledge or information sufficient to form a belief as to those allegations.

**Paragraph No. 131.**

The larger the group of potential customers equipped with unlimited plans, the more fees Defendants can demand for the right to carry their short codes.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 131.

**Paragraph No. 132.**

Consequently, it is necessary for Defendants to enroll as many customers as possible in unlimited data plans.

**ANSWER:**     Sprint admits that it attempts to enroll customers in unlimited data plans. Sprint denies the other allegations set forth in Paragraph 132.

**Paragraph No. 133.**

Defendants, acting jointly, in concert, and individually, also have adopted high single text only plans in order to encourage and force their texting customers to purchase unlimited data plans and other bundled services that the individual consumers may not want, need, or be able to afford.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 133.

## Paragraph No. 134.

On September 9, 2008, the Senate Antitrust Subcommittee sent a letter to Defendants, questioning the basis for the huge increases in the pay-per-use text messaging price.

**ANSWER:** Sprint admits that on September 9, 2008, Sprint received a letter from the Senate Antitrust Subcommittee regarding increases in the price for pay-per-use text messaging. Sprint denies the other allegations set forth in Paragraph 134 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

## Paragraph No. 135.

The Senate Subcommittee expressed concern about the increases being made at nearly the same time, in identical amounts, when price increases did not appear to be justified by increases in costs, and concluded that "[t]his conduct is hardly consistent with the vigorous price competition we hope to see in a competitive marketplace."

**ANSWER:** Sprint admits that the September 9, 2009 letter to Sprint from the Senate Antitrust Subcommittee inquired about price increases for pay-per-use text messaging. Sprint denies the other allegations set forth in Paragraph 135 as they pertain to Sprint. Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

## Paragraph No. 136.

The Senate Subcommittee also requested that each Defendant:

a.      explain the cost, technical or other factors that justify a 100% increase in the cost of Text Messaging Services from 2005 to 2008;

b.      provide data on the use of Text Messaging Services from 2005 to 2008;

c.      provide a comparison of prices charged for Text Messaging Services as compared to other services offered by the company

44

such as prices per minute for voice calling, prices for sending emails, and prices charged for data services such as internet access over wireless devices from 2005 to the present; and

d.      state whether the company's Text Messaging Services pricing structure differs in any significant respect from the pricing of the company's three main competitors.

**ANSWER:**      Sprint admits the allegations set forth in Paragraph 136 as they pertain to Sprint.

Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or

information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 137.

In response, Defendants provided limited and biased information on the prices for their package plans, including their text message package plans, but failed to (a) specifically address why they increased their per-message prices for text messaging or (b) deny that those increases were the result of collusion.

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 137 as they pertain to Sprint.

Sprint denies the allegations pertaining to other Defendants because Sprint lacks knowledge or

information sufficient to form a belief as to the truth of those allegations.

### Paragraph No. 138.

The wireless telephone-provider industry is marked by certain structural and other characteristics that make price fixing feasible, including the heavy concentration of the market share among Defendants.

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 138.

### Paragraph No. 139.

Price fixing is relatively easy to maintain in a market such as that for Text Messaging Services, which has extremely high barriers to entry because of the high cost of infrastructures, creating a situation where there is virtually no chance that a new competitor will enter the market to challenge artificially high prices.

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 139.

**Paragraph No. 140.**

Collusion among competitors in this market is also easy because Text Messaging Services are homogenous, with no discernable difference between the Text Messaging Services provided by one market participant over another.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 140.

**Paragraph No. 141.**

Defendants have colluded on the inclusion of other terms in their cellular and text messaging contracts, in relation to early termination fees and mandatory arbitration clauses, leaving consumers with no choice but to accept these terms or forego purchasing cellular and text messaging services.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 141.

**Paragraph No. 142.**

Defendants require that Plaintiffs and other Class Members agree to contracts which require wireless users to arbitrate disputes with service providers and to waive their right to class arbitration. These common waivers are indicative of additional collusive, anticompetitive conduct and are specifically designed to facilitate Defendants' conspiracy.

**ANSWER:**     Sprint admits that at least some putative Class Members agreed to contracts that required wireless users to arbitrate disputes with service providers and waive their right to class arbitration. Sprint denies the other allegations set forth in Paragraph 142.

**Paragraph No. 143.**

As Defendants know, due to the high cost of litigation and the comparatively small injury an individual user suffers from their conspiracy, it is only economically feasible for the individual to seek redress by joining a class action. Common class arbitration waivers constitute an attempt by Defendants to insulate themselves from legal challenge on a class-wide basis, enabling them to reap substantial profits from the collective injury they impose on users.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 143.

46

## Paragraph No. 144.

Plaintiffs and other Class Members who have submitted to class arbitration waivers have done so because it is extremely difficult to function in the current economic and social climate without Text Messaging and wireless services. In addition, such Plaintiffs and other Class Members have no bargaining power, do not understand the consequences of a class arbitration waiver, and may be unsophisticated. For the foregoing reasons, the class arbitration waiver is a classic contract of adhesion and is unconscionable and unenforceable.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 144.

## Paragraph No. 145.

Moreover, Defendants acknowledge that these class arbitration waivers are of questionable validity, as their contracts make provisions for what will happen when a court determines that the waivers are unenforceable or void. Under those circumstances, the contracts state that the overarching agreement to arbitrate is itself void. As the class arbitration waivers at issue are unenforceable, and as the overarching agreements to arbitrate are consequently void pursuant to contract, Plaintiffs have properly brought this litigation in this Court on behalf of themselves and the Class.

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 145.

## Paragraph No. 146.

Plaintiffs re-allege Paragraphs 1 through 145 as if fully restated herein.

**ANSWER:**    Sprint restates its answers to Paragraphs 1 through 145 as if fully set forth herein.

## Paragraph No. 147.

Beginning at least as early as January 1, 2005 (the exact date being unknown to Plaintiffs) and continuing until the present, Defendants and their co-conspirators engaged in a contract, combination and conspiracy to artificially raise, fix, maintain and/or stabilize pricing for Text Messaging Services in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**    Sprint denies the allegations set forth in Paragraph 147.

### Paragraph No. 148.

Defendants entered into illicit agreements to increase prices of Text Messaging Services at some point prior to and during the period around July–December 2006 (for the increase implemented in Q4 2006–Q2 2007) and again at some point prior to and during the period around July–December 2007 (for the increase implemented in Q4 2007–Q3 2008).

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 148.

### Paragraph No. 149.

For the purpose of formulating and carrying out the contract, combination and conspiracy, Defendants and their co-conspirators did those things which they conspired to do, as alleged above.

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 149.

### Paragraph No. 150.

The contract, combination and conspiracy alleged had the following effects, among others:

a.      purchasers of Text Messaging Services have been and continue to be deprived of the benefit of free and open competition;

b.      the per text message price has been and continues to be fixed, raised, maintained and stabilized at artificially high and non-competitive levels; and

c.      competition between and among Defendants and other co-conspirators in the sale of Text Messaging Services has been and continues to be unreasonably restrained.

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 150.

### Paragraph No. 151.

Plaintiffs and the other Class members have been injured in their business and property by being unable to purchase text messages on a per-message basis, except at a price higher than otherwise would have been paid in the absence of Defendants' unlawful contract, combination and conspiracy.

**ANSWER:**      Sprint denies the allegations set forth in Paragraph 151.

### Paragraph No. 152.

The contract, combination, and conspiracy is continuing, and will continue unless the injunctive relief prayed for herein is granted.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 152.

### Paragraph No. 153.

Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:**     Sprint denies the allegations set forth in Paragraph 153.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.  That the Court determine that the Sherman Act claim may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  That the Court adjudge and decree that Defendants engaged in an unlawful contract, combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. ¶ 1);

C.  That the Court adjudge and decree that each of the Defendants, its subsidiaries, successors, transferees, assigns, and respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from directly or indirectly continuing, maintaining or renewing the contract, combination and conspiracy alleged herein, and from engaging in any other contract, combination and conspiracy, agreement, understanding or concert of action having a similar purpose or effect;

D.  That Plaintiffs and the other Class Members recover threefold the damages that each sustained;

E.  That Plaintiffs and the other Class Members recover the costs of the suit, including reasonable attorneys' and expert fees and costs;

F.  That Plaintiffs and the other Class Members be awarded pre-judgment and post-judgment interest at the highest legal rate from

and after the date of service of the initial complaints to the extent provided by law; and

G.  That the Court grant such other, further or different relief as may be just.

**ANSWER:**  Sprint denies that Plaintiffs are entitled to any of the relief requested in this section.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all issues so triable.

**ANSWER:**  No response is required to Plaintiffs' demand for a trial by jury.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

Plaintiffs and the putative class have suffered no injury or damages as a result of the conduct alleged herein.

### THIRD DEFENSE

Plaintiffs' claims and those of the putative class are barred by the First Amendment to the United States Constitution and/or the *Noerr Pennington* doctrine.

### FOURTH DEFENSE

Plaintiffs' claims and those of the putative class are barred, in whole or in part, by the doctrines of unclean hands and/or in pari delicto.

### FIFTH DEFENSE

Plaintiffs' claims and those of the putative class are barred, in whole or in part, by the doctrines of waiver and estoppel.

## SEVENTH DEFENSE

Plaintiffs and the putative class have not suffered antitrust injury.

## EIGHTH DEFENSE

Plaintiffs and the putative class lack standing and/or antitrust standing to bring some or all claims.

## NINTH DEFENSE

Plaintiffs and the putative class have failed to mitigate any alleged losses or damages.

## TENTH DEFENSE

Plaintiffs' claims and those of the putative class are barred, in whole or in part, because their alleged damages, if any, are too remote and/or speculative to allow recovery and because determining whether, or to what extent, Plaintiffs and the putative class were damaged is impossible.

## ELEVENTH DEFENSE

Plaintiffs' claims and those of the putative class are barred, in whole or in part, by the applicable statute of limitations.

## TWELFTH DEFENSE

Claims of certain Plaintiffs and putative class members are barred, in whole or in part, by their failure to arbitrate pursuant to applicable provisions in their service agreements.

## THIRTEENTH DEFENSE

Sprint incorporates any and all defenses asserted by any other Defendant to the extent they are not inconsistent with Sprint's defenses.

\* \* \*

Sprint reserves the right to amend and/or supplement the averments of its Answer to assert any and all pertinent defenses ascertained through further investigation and discovery in this action.  Sprint will rely on all defenses that may become available during discovery or trial.

\* \* \*

WHEREFORE, Sprint prays that the Court determine and adjudge:

a.      that this suit cannot be maintained as a class action;

b.      that the Complaint be dismissed on the merits and judgment entered with prejudice for Defendants;

c.      that Plaintiffs take nothing by the Complaint;

d.      that Sprint be awarded its costs, disbursements, attorneys' fees, and expenses incurred herein; and

e.      that Sprint be awarded such other and further relief as the Court may deem proper.

Dated:  June 4, 2010                              Respectfully submitted,

                                                            SPRINT NEXTEL CORPORATION

                                                                /s/ Dane H.  Butswinkas

                                                            Dane H.  Butswinkas
                                                            R.  Hackney Wiegmann
                                                            John E.  Schmidtlein
                                                            Jason T.  Wright
                                                            WILLIAMS & CONNOLLY LLP
                                                            725 12th Street, NW
                                                            Washington, DC 20005
                                                            Telephone: (202) 434-5000
                                                            Email: dbutswinkas@wc.com
                                                            Email: hwiegmann@wc.com
                                                            Email: jschmidtlein@wc.com
                                                            Email: jtwright@wc.com

Frederic R.  Klein
GOLDBERG KOHN LTD.
55 East Monroe Street #3300
Chicago, IL 60603
Telephone: (312) 201-4000
Email: frederic.klein@goldbergkohn.com

Counsel for Sprint Nextel Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of June 2010, I caused to be served, via the Court's
ECF system, a true and correct copy of the foregoing Answer and Affirmative Defenses of
Defendant Sprint Nextel Corporation to Plaintiffs' Second Amended Consolidated Class Action
Complaint on all counsel of record registered through that system to receive electronic filings in
this case.


        /s/ Frederic R. Klein