## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE TEXT MESSAGING ANTITRUST LITIGATION | No. 08 C 7082 MDL No. 1997 Judge Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | JURY TRIAL DEMANDED |

### ANSWER OF DEFENDANT CELLCO PARTNERSHIP, D/B/A VERIZON WIRELESS TO THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendant Cellco Partnership, d/b/a Verizon Wireless (hereinafter "Verizon Wireless"), hereby answers the Second Amended Consolidated Complaint ("Second Amended Complaint") as follows:

### NATURE OF THE ACTION

1.      This is an antitrust action charging Defendants with entering into and implementing a continuing contract, combination, and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services sold in the United States.

Answer:  Verizon Wireless admits that plaintiffs seek to bring this action as an antitrust action charging Defendants with entering into and implementing a continuing contract, combination, and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services sold in the United States, but denies that this action may be properly brought as such.

2.      Plaintiffs bring this action on behalf of themselves and all persons or entities who purchased Text Messaging Services based on a fee per text message in the United States directly from Defendants or their predecessors, subsidiaries, or affiliates during the period from January 1, 2005 through the present.

Answer:  Verizon Wireless admits that plaintiffs seek to bring this action on behalf of themselves and all persons or entities who purchased Text Messaging Services based on a fee per

text message in the United States directly from Defendants or their predecessors, subsidiaries, or affiliates during the period from January 1, 2005 through the present, but denies that this action may be properly brought as such.

3.      Defendants control more than 90% of the market for Text Messaging Services. It costs a fraction of a penny for Defendants to transmit a text message because these messages involve very little data and are transmitted on existing cellular network connections. Because the per-unit cost of text messages is very low, reduced pricing would be an easy and affordable way for any one of the Defendants to distinguish itself from its competitors.

Answer:  Verizon Wireless lacks sufficient information to determine whether more than 90% of domestic text messages are originated or terminated on the Defendants' networks. Verizon Wireless denies the remaining allegations of paragraph 3 of the Second Amended Complaint.

4.      That is, in fact, what the Defendants traditionally did. In the 3rd Quarter of 2003, for example, while Nextel (the predecessor to Defendant Sprint Nextel) and Cingular (the predecessor to Defendant AT&T) were charging their customers ten cents per text, Defendant T-Mobile charged only five cents. Alltel (later acquired by Defendant Verizon) vacillated between five, eight, and ten cents. At the same time, Verizon followed a unique pricing model, charging disparate fees of two cents for incoming messages and ten cents for outgoing messages. When Nextel increased its per-text rate to fifteen cents in the following quarter (the 4th Quarter of 2003), the other Defendants stood firm, with Cingular and Alltel still charging only ten cents per text, T-Mobile still charging only five cents per-unit, and Verizon continuing to follow the unique pricing structure described above. Each continued to impose their independent charges for more than a year, with no changes until 2005. Then in the 1st Quarter of 2005, Sprint Nextel dropped its charge to ten cents per text, while Alltel increased its per-unit charge to eight cents.

Answer:  Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 4 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing by Defendants, but denies that the description is complete or accurate.

5.      The conspiracy began after this unsuccessful attempt to increase prices independently. In 2005 and 2006, the Defendants agreed to adopt a uniform and unprecedented common per-unit price of ten cents for text messaging services. With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile

and Alltel increased their per-unit rates to ten cents and Verizon joined them by abandoning its unique pricing model in favor of charging an identical ten cents per-unit for all incoming and outgoing messages.

Answer:  Verizon Wireless denies any conspiracy involving Verizon Wireless.  Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 5 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing by Defendants, but denies that the description is complete or accurate.

6.     This was followed by more lockstep price increases. Sprint Nextel Corporation increased its per text message price by 50% (from ten to fifteen cents) in the 4th Quarter of 2006, and immediately thereafter, in the 1st and 2nd Quarters of 2007, the remaining Defendants increased prices by the same exact amount (from ten to fifteen cents).

Answer:  Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 6 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing used by Defendants, but denies that the description is complete or accurate.  Verizon Wireless further admits that it increased its per text message price from ten cents to fifteen cents in March 2007.

7.     Once again, in the 4th Quarter of 2007, Sprint Nextel Corporation increased its per text message price by 33.33% (from fifteen to twenty cents), and immediately thereafter, in the 1st and 3rd Quarters of 2008, the remaining Defendants increased prices by the same exact amount (from fifteen to twenty cents). Not one Defendant attempted to attract additional customers by charging even a penny less per text message.

Answer:  Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 7 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing used by Defendants, but denies that the description is complete or accurate.  Verizon

3

Wireless further admits that it increased its per text message price from fifteen cents to twenty cents in March 2008.

8.      Such marked shifts in behavior, where there are "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason," support the existence of a conspiracy. *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 n.4 (2007)).

Answer:  Paragraph 8 of the Second Amended Complaint sets forth conclusions of law to which no response is necessary.  To the extent that a response is necessary, Verizon Wireless denies the allegations of paragraph 8 of the Second Amended Complaint.

9.      During the period from 2005 through 2008, as the cost to transmit a text message decreased by 65%, each Defendant first aligned its per-unit price at ten cents, and subsequently increased its per-unit prices by 100% in two identical price increases, to the same exact penny in similar time frames.

Answer:  Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 9 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof.

10.     Text message pricing naturally lends itself to collusion because it is a uniquely homogenous form of wireless communication and because per-unit text message prices can easily be severed from other service charges. Defendants' current per-unit text message prices are also available on the Internet. Further, each Defendant belongs to the CTIA – The Wireless Association and the Groupe Speciale Mobile Association, which provided Defendants with multiple opportunities to collude regarding pricing data from before 2005 to date.

Answer:   Verizon Wireless denies any collusion on the part of Verizon Wireless. Verizon Wireless admits that its current per-unit text message prices are available on the Internet and that Verizon Wireless belongs to the CTIA, but denies the remaining allegations of paragraph 10 of the Second Amended Complaint.

11.     The CTIA was one vehicle for conducting the conspiratorial activity, as revealed in several CTIA press releases and public documents. The CTIA created the Wireless Internet Caucus ("WIC") Leadership Council consisting of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[1] The purpose of the WIC Leadership Council was to create "industry-wide approach[es]" to "messaging" and billing." Unlike run-of-the-mill annual meetings conducted by various trade associations, the WIC Leadership Council entailed committee meetings narrowly focused on text messaging delivery and pricing, and included the participation of Defendants' high-level executives.

Answer:   Verizon Wireless denies the CTIA was a vehicle for conspiratorial activity.

Verizon Wireless admits that the CTIA created the Wireless Internet Caucus ("WIC").  Verizon

Wireless further admits that the WIC Leadership Council has, from time to time, included

representatives from Verizon Wireless.  Verizon Wireless lacks knowledge sufficient to form a

belief as to the truth of the remaining allegations of paragraph 11 of the Second Amended

Complaint, and therefore generally denies the same and demands strict proof thereof.  Paragraph

11 of the Second Amended Complaint also quotes press releases and printed materials, to which

Verizon Wireless hereby refers for a complete and accurate description thereof.

12.     The WIC Leadership Council also attempted to "create industry-wide solutions through '**co-opetition**' with each other,"[2] and focused on "build[ing] a shared future in which we can all look forward to **profiting together**"[3] by placing the interests of the industry above and before the individual companies' individual interests.[4]

Answer:   Verizon Wireless denies the allegations of paragraph 12 of the Second

Amended Complaint.

13.     It is implausible to think that each Defendant was able to independently arrive at the same exact price increase to the same exact penny within similar time frames considering the

---

[1] Feb. 26, 2002 CTIA Press Release, *CTIA Convenes Wireless Internet Caucus Leadership Council; Introducing "A New Day" of Wireless Internet Industry Development*, available at
http://investor.infospaceinc.com/releasedetail.cfm?ReleaseID=166787.
[2] March 5, 2003 CTIA Press Release, *Wireless Internet Caucus to Expand*, available at
http://www.ctia.org/media/press/body.cfm/prid/1228.
[3] The Wireless Internet Caucus (WIC) of CTIA-The Wireless Association[TM] Presents The WIC Manifesto, at 2.
[4] Feb. 26, 2002 CTIA Press Release, *supra*.

extensive exchanges of information engaged in by Defendants pertinent to messaging revenue, billing, and delivery. Each Defendant has millions of customer accounts and operates nationwide. Each price increase required each Defendant to undertake comprehensive software and other changes to nationwide accounting and billing systems. Each Defendant had to change or adjust print, television, radio and internet advertising and marketing campaigns that are nationwide in scope. Each Defendant had to prepare for and roll out training materials for sales associates and retail store locations and customer service representatives around the nation, if not the globe. Despite the comprehensive and multi-faceted efforts necessary for each Defendant to implement its price increase, they each were somehow able to implement the same exact price increase to the same exact penny within similar timeframes not once, but twice.

Answer:  Verizon Wireless denies the allegations of paragraph 13 of the Second Amended Complaint, except admits that Defendants have millions of customer accounts and operate nationwide.

14.     When Congress subpoenaed Defendants concerning the economically irrational price increases for per-unit text message services, Defendants largely refrained from addressing their per-unit prices, focusing instead on text message service plans, and failed to deny that their per-text message prices were the result of collusion.

Answer:  Verizon Wireless denies the allegations of paragraph 14 of the Second Amended Complaint.

15.     As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the proposed class have paid Defendants higher prices for Text Messaging Services than they would have paid absent Defendants' antitrust conduct.

Answer:  Verizon Wireless denies the allegations of paragraph 15 of the Second Amended Complaint.

## DEFINITIONS

16.     "Class Period" means the period from January 1, 2005 through the present.

Answer:  Paragraph 16 sets forth conclusions of law to which no response is necessary. To the extent a response is deemed necessary, Verizon Wireless denies the allegations of paragraph 16 of the Second Amended Complaint.

17.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

Answer:  Paragraph 17 sets forth conclusions of law to which no response is necessary.

To the extent a response is deemed necessary, Verizon Wireless denies the allegations of

paragraph 17 of the Second Amended Complaint.

18.     "Text Messaging Services" or "Texting" means the use of a cellular telephone to exchange brief messages with other mobile phones over cellular networks, and may include *inter alia* person-to-person messaging and message interaction with automated systems to order products and services for mobile phones or to participate in contests.

Answer:  Paragraph 18 sets forth conclusions of law to which no response is necessary.

To the extent a response is deemed necessary, Verizon Wireless denies the allegations of

paragraph 18 of the Second Amended Complaint.

## JURISDICTION & VENUE

19.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover injunctive relief, treble damages, and costs of suit, including attorneys' and expert fees and costs, as a result of Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

Answer:  Paragraph 19 sets forth conclusions of law to which no response is necessary.

To the extent a response is deemed necessary, Verizon Wireless denies the allegations of

paragraph 19 of the Second Amended Complaint.

20.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

Answer:  Paragraph 20 sets forth conclusions of law to which no response is necessary.

To the extent a response is deemed necessary, Verizon Wireless denies the allegations of

paragraph 20 of the Second Amended Complaint.

21.     This court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business throughout the United States, including in this District; (b) provided, sold and delivered substantial Text Messaging Services throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

Answer:  Paragraph 21 of the Second Amended Complaint sets forth conclusions of law as to which no response is necessary.  To the extent a response is deemed necessary, Verizon Wireless denies the allegations of paragraph 21 of the Second Amended Complaint, except admits that Verizon Wireless transacts business in this district.

22.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period each Defendant resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

Answer:  Paragraph 22 of the Second Amended Complaint sets forth conclusions of law as to which no response is necessary.  To the extent a response is deemed necessary, Verizon Wireless denies the allegations of paragraph 22 of the Second Amended Complaint, except admits that Verizon Wireless transacts business in this district and that consequently venue is proper as to Verizon Wireless.

23.     Venue is also proper in this District because this action was transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

Answer:  Paragraph 23 of the Second Amended Complaint sets forth conclusions of law as to which no response is necessary.  To the extent a response is deemed necessary, Verizon Wireless admits the allegations of paragraph 23 of the Second Amended Complaint.

## PLAINTIFFS

24.     Aircraft Check Services Company is an Illinois corporation that purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

<u>Answer</u>:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 24 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

25.     Nicholas Iltsopoulos is a resident of Titusvile, Florida who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

<u>Answer</u>:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 25 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

26.     David Keefer is a resident of Wantagh, New York who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

<u>Answer</u>:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 26 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

27.     Kevin Konkel is a resident of South Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

<u>Answer</u>:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 27 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

28.     Jim Morris is a resident of Athens, Alabama who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 28 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

29.     Premiere Investment Consulting is a resident of Cudahy, Wisconsin that purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 29 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

30.     Melissa Leigh Randolph is a resident of West Palm Beach, Florida who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 30 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

31.     Elizabeth Smith is a resident of Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 31 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

## **DEFENDANTS**

32.     Defendant Verizon Wireless ("Verizon") is a joint venture of Verizon Communications (55%) and Vodafone Group PLC (45%) with its principal place of business in Basking Ridge, New Jersey. By subscribers, Verizon Wireless owns and operates the largest United States wireless telecommunications network with approximately 87 million United States subscribers and an annual revenue of approximately $44 billion in 2007.

Answer: Verizon Wireless admits the allegations of paragraph 32 of the Second Amended Complaint, except that Cellco Partnership d/b/a Verizon Wireless is a partnership of subsidiaries of Verizon Communications and Vodafone.

33.    On or about January 9, 2009, Verizon Wireless acquired Alltel Wireless, the fifth largest United States provider of wireless services, for approximately $28.1 billion.

Answer: Verizon Wireless admits the allegations of paragraph 33 of the Second Amended Complaint.

34.    Verizon Communications and Verizon Wireless are referred to in this complaint collectively as "Verizon."

Answer: Paragraph 34 sets forth a characterization to which no response is necessary. To the extent a response is deemed necessary, Verizon Wireless denies the allegations of paragraph 34 of the Second Amended Complaint.

35.    Defendant AT&T Mobility L.L.C. ("AT&T Mobility" or "AT&T") is a Delaware corporation with its principal place of business at 5565 Glenridge Connector, Atlanta, Georgia 30342. It is the second largest United States provider of wireless services with approximately 78 million subscribers and 2007 revenues of approximately $43 billion.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 35 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

36.    Defendant Sprint Nextel Corporation is a public corporation with its principal place of business at 650 Sprint Parkway, HL-5A STX, Overland Park, Kansas 66251. It is the third largest United States provider of wireless services with approximately 49 million subscribers.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 36 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

37.     Defendant T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006. It is the fourth largest United States provider of wireless services with approximately 33 million subscribers.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 37 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

38.     Each of the named Defendants sold Text Messaging Services in the United States directly or through its affiliates and/or subsidiaries after January 1, 2005.

Answer:  Verizon Wireless admits that Verizon Wireless sold Text Messaging Services in the United States directly or through its affiliates and/or subsidiaries after January 1, 2005. Verizon Wireless lacks knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 38 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

39.     Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

Answer:  Verizon Wireless denies the allegations of paragraph 39 of the Second Amended Complaint.

## CO-CONSPIRATORS

40.     Various others, presently unknown to Plaintiffs, participated as co-conspirators in the violations alleged in this complaint and performed acts and made statements in furtherance thereof.

Answer:  Verizon Wireless denies the allegations of paragraph 40 of the Second Amended Complaint.

41.     The acts charged in this complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees,

or representatives while actively engaged in the management of each Defendant's business or affairs.

Answer: Verizon Wireless denies the allegations of paragraph 41 of the Second Amended Complaint.

## CLASS ACTION ALLEGATIONS

42. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2) and (b)(3) on behalf of themselves and the following Class:

> All persons and entities who paid a per-message price for Text Messaging Services in the United States directly to one or more of the Defendants or their affiliates or subsidiaries at any time from January 1, 2005 to the present. The Class excludes government entities, Defendants, and Defendants' parents, affiliates, subsidiaries, officers and directors.

Answer: Verizon Wireless admits that plaintiffs bring this action under the rules described in paragraph 42 of the Second Amended Complaint, and otherwise denies the allegations of this paragraph.

43. Plaintiffs do not know the exact number of Class members because that information is within the exclusive control of Defendants, but believe that there are many millions geographically dispersed throughout the United States, such that joinder of all members would be impracticable.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 43 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

44. The identities of Class members can be readily determined from records maintained by Defendants and their agents.

<u>Answer</u>:  Verizon Wireless admits that Verizon Wireless maintains records of customers from January 1, 2005 to the present, and denies the remaining allegations of paragraph 44 of the Second Amended Complaint.

45.     Questions of law or fact common to Class members exist and predominate over any questions affecting individual members of the Class, and include:

a.     Whether Defendants engaged in a contract, combination or conspiracy to raise, fix, stabilize or maintain the per-message price for Text Messaging Services in the United States;

b.     Whether each Defendant engaged in the contract, combination or conspiracy, and if so, to what extent;

c.     Whether the contract, combination or conspiracy violates Section 1 of the Sherman Act;

d.     Whether there were any additional co-conspirators to the contract, combination or conspiracy, and if so, their identities;

e.     The duration and extent of the contract, combination or conspiracy;

f.     Whether the conduct of Defendants and their co-conspirators caused the per-message price of Text Messaging Services to be artificially inflated to anti-competitive levels;

g.     Whether Plaintiffs and Class members were injured by the conduct of Defendants and their co-conspirators;

h.     The appropriate classwide measure of damages; and

i.     Whether Plaintiffs and the Class are entitled to injunctive relief.

<u>Answer</u>:  Paragraph 45 of the Second Amended Complaint sets forth conclusions of law as to which no response is necessary.  To the extent that a response is deemed necessary, Verizon Wireless denies the allegations of this paragraph.

46.     Plaintiffs have claims that are typical of the claims of the Class, have no interests adverse to or in conflict with the Class, and will fairly and adequately protect the interests of the Class.

Answer:  Paragraph 46 of the Second Amended Complaint sets forth conclusions of law

as to which no response is necessary.  To the extent that a response is deemed necessary, Verizon

Wireless denies the allegations of this paragraph.

47.     Plaintiffs have retained counsel who are experienced in antitrust class actions, have significant knowledge about the antitrust laws, have performed considerable work in identifying and investigating the potential claims in this action, and have committed significant resources to representing the Class.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of

the allegations of paragraph 47 of the Second Amended Complaint, and therefore generally

denies the same and demands strict proof thereof.

48.     Separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

Answer:  Paragraph 48 of the Second Amended Complaint sets forth conclusions of law

as to which no response is necessary.  To the extent that a response is deemed necessary, Verizon

Wireless denies the allegations of this paragraph.

49.     Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate for the Class as a whole.

Answer:  Paragraph 49 of the Second Amended Complaint sets forth conclusions of law

as to which no response is necessary.  To the extent that a response is deemed necessary, Verizon

Wireless denies the allegations of this paragraph.

50.     Prosecuting the case as a class action is superior to any other methods for fair and efficient adjudication of the controversy because class members have no interest in individually controlling the prosecution of separate actions, as individual prosecutions would be uneconomic, would impose heavy burdens on the parties and the courts, and would create a risk of inconsistent adjudications. In addition, all litigation concerning this controversy already has been centralized in this forum, and it is unlikely that there will be any significant difficulties in managing this case as a class action.

Answer: Paragraph 50 of the Second Amended Complaint sets forth conclusions of law as to which no response is necessary. To the extent that a response is deemed necessary, Verizon Wireless denies the allegations of this paragraph.

## TRADE AND COMMERCE

51. During the Class Period, Defendants and their co-conspirators sold a substantial amount of Text Messaging Services within the continuous and uninterrupted flow of interstate and foreign commerce, and as intended, their actions substantially affected that commerce.

Answer: Paragraph 51 of the Second Amended Complaint sets forth conclusions of law as to which no response is necessary. To the extent that a response is deemed necessary, Verizon Wireless denies the allegations of this paragraph, except Verizon Wireless admits that during the putative Class Period, it sold Text Messaging Services in interstate commerce.

52. The wireless telephone industry has undergone consolidation in the past four years, with the number of major national competitors declining from six to four.

Answer: Verizon Wireless denies the allegations of paragraph 52 of the Second Amended Complaint.

53. Defendants are the four largest wireless telecommunications companies in the United States, and with more than 225 million subscribers, they control more than 90 percent of the Text Messaging Services sold in the United States.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 53 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

54. Thus, together, Defendants have great power in the market for Text Messaging Services and are capable of combining to increase the market price for those services to supra-competitive levels.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 54 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

## TEXT MESSAGE SERVICES AND COSTS

55.     Text messaging involves the use of cellular telephone equipment to send and receive short messages, generally limited to 160 characters per message.

Answer:  Verizon Wireless admits the allegations of paragraph 55 of the Second Amended Complaint.

56.     Text messaging constitutes a relevant market, and there are no good substitutes for text messaging.

Answer:  Paragraph 56 sets forth conclusions of law to which no response is necessary. To the extent a response is deemed necessary, Verizon Wireless denies the allegations of paragraph 56 of the Second Amended Complaint.

57.     Customers sent 363 billion text messages in 2007, resulting in annual text messaging revenues of about $23.2 billion.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 57 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

58.     By 2008, Defendants transmitted 2.5 trillion text messages for almost 263 million wireless subscribers in the United States, representing 84% of the total population of the United States.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 58 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

59.     It is estimated that 3.3 trillion text messages will be sent in 2009.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 59 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

60.     AT&T has estimated that approximately two percent of the text messages sent and received on its system were purchased on a per-message basis, while approximately ten percent of T-Mobile's customers' text messaging is conducted on a per-message basis.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 60 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

61.     Assuming that at least two percent of the 2.5 trillion text messages that were sent and received in 2008 were purchased on a per-message basis, resulting in 50 billion text messages being sent and received at twenty cents each, Defendants' joint per-text-message revenue for the year 2008 alone would have been $10 billion.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 61 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

62.     While some subscribers purchase text messaging plans that allow them to send or receive a set or unlimited number of text messages for a flat monthly fee, many others pay an individual fee for each text message.

Answer:  Verizon Wireless admits that some Verizon Wireless subscribers purchase text messaging plans that allow them to send or receive a set or unlimited number of text messages for a flat monthly fee.  Verizon Wireless further admits that some Verizon Wireless subscribers pay an individual fee for each text message.  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the remaining allegations of paragraph 62 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

63.     Defendants charge fees not only for outgoing messages, but also for incoming messages received by the subscriber, resulting in a fee being paid to a Defendant twice for each message – once when the message is sent, and once when it is received.

Answer:  Verizon Wireless admits that Verizon Wireless charges certain subscribers fees for outgoing and incoming text messages, and denies the remaining allegations of paragraph 63 of the Second Amended Complaint.

64.     Text message files are exponentially smaller than voicemail, e-mail and music download files, and it thus costs exponentially less to transmit them.

Answer:  Verizon Wireless admits that text message files generally are smaller than voicemail, e-mail and music download files, and denies the remaining allegations of paragraph 64 of the Second Amended Complaint.

65.     For example, 600 text messages contain less data than one minute of a telephone call, making each text messaging file almost insignificant in the world of transmitting electronic data.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 65 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

66.     Defendants' cost to deliver an individual text message is close to zero because it is transmitted on an existing connection between a cell phone and the cell phone system.

Answer:  Verizon Wireless denies the allegations of paragraph 66 of the Second Amended Complaint.

67.     Despite these minimal costs, carriers charge huge mark-ups and enjoy high profit margins on Text Messaging Services. According to technology news source CNET News: "One can easily assume that the mark-up on a text message *is several thousands times* what it actually costs carriers to transmit this little bit of data." (Emphasis added.)

Answer: Verizon Wireless denies the allegations of paragraph 67 of the Second Amended Complaint and refers to the quoted news source for a complete and accurate description thereof.

68. The benefits of competition are lower prices and better services, and with competition, per-unit prices should be closely related to and follow per-unit costs.

Answer: Verizon Wireless admits that competition often brings about lower prices and better services and otherwise denies the allegations of paragraph 68.

69. Theoretically and historically, as per-unit costs for an item substantially decrease, per unit prices for such item substantially decrease.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 70 of the Second Amended Complaint, and therefore generally denies the same.

70. Between 2005 and late 2006 or early 2007, each Defendant's per-unit costs associated with text messages substantially decreased—by approximately 50%.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 70 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

71. Absent collusion, Defendants' per-unit prices for text messages should have substantially decreased as well.

Answer: Verizon Wireless denies the allegations of paragraph 71 of the Second Amended Complaint.

72. Defendants already had the infrastructure to transmit many more text messages than they were transmitting (and presently do transmit). Because the supply of text messages was considerably greater than consumers' demand for them, Defendants' prices for text messaging should have decreased. Increasing prices during a period of oversupply is one of the leading indicators of a conspiracy.

Answer:  Verizon Wireless denies the allegations of paragraph 72 of the Second Amended Complaint.

73.    From 2005 to early 2007, the price of other wireless services provided by Defendants *decreased*. In fact, the same infrastructure that enables Defendants to transmit text messages enables them to transmit other wireless services. The factors that govern the decreasing costs of text messaging also govern the decreasing costs of those other wireless services. Defendants' prices for text messaging should have decreased between 2005 and late 2006 or early 2007.

Answer:  Verizon Wireless admits that wireless service prices have decreased as have average text message prices, but denies the remaining allegations of paragraph 73 of the Second Amended Complaint.

74.    However, Defendants' per-unit prices for text messages did not decrease over this period. In fact, no Defendant's price for per-unit text messaging decreased at all.

Answer:  Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 74 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing by Defendants, but denies that the description is complete or accurate.

75.    Prior to the conspiracy, Defendants actively competed for per-unit text messaging services and charged distinct prices. T-Mobile charged five cents for both outgoing and incoming text messages up through April 2006, when it raised its price to ten cents as part of the alleged conspiracy.

Answer:  Verizon Wireless denies any conspiracy involving Verizon Wireless.  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 75 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

76.     Alltel (later Verizon), in contrast, changed its per-unit pricing on several occasions, charging ten cents until the middle of 2005, then dropping its fee to five cents until the end of 2005, subsequently raising its fee to eight cents in January 2006, and finally reaching the ten cent agreed price in October 2006.

Answer:  Verizon Wireless admits that paragraph 76 of the Second Amended Complaint purports to describe pricing used by Alltel, later Verizon Wireless, but denies that the description is complete or accurate.

77.     Verizon, which previously followed a unique pricing model, charged ten cents for its outgoing text messages up through the start of the conspiracy period, but charged only two cents for incoming messages. Verizon persisted in this independent pricing until agreeing to set its prices for both incoming and outgoing messages at ten cents as part of the conspiracy towards the end of 2006.

Answer:  Verizon Wireless denies any conspiracy involving Verizon Wireless.  Verizon Wireless admits that paragraph 77 of the Second Amended Complaint purports to describe pricing by Verizon Wireless, but denies that the description is complete or accurate.

78.     Cingular (later AT&T) never departed from its original price of ten cents, until such time as all Defendants raised their prices as part of the conspiracy.

Answer:  Verizon Wireless denies any conspiracy involving Verizon Wireless.  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 78 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

79.     Importantly, before the conspiracy, Nextel (now Sprint Nextel) first tried to increase the per-unit price from ten to fifteen cents in the 4th Quarter of 2003. The other wireless providers refused to follow Nextel's lead, and stood firm at their individual prices. In this competitive environment, Nextel was forced to return its per-text rate to the earlier ten cents in the 1st Quarter of 2005.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 79 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

80.    The conspiracy began after this unsuccessful attempt to increase prices independently. In 2005 and 2006, the Defendants agreed to uniformly charge an unprecedented common per-unit price of ten cents for text messaging services. With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile, Alltel, and Verizon joined them in charging an identical ten cents per-unit for all incoming and outgoing messages. Each Defendant engaged in the highly unusual conduct of aligning their per unit text messaging prices and then increasing them by identical amounts.

Answer:    Verizon Wireless denies the allegations of paragraph 80 of the Second Amended Complaint.

81.    Indeed, each and every Defendant engaged in the exact same, highly anomalous behavior of doubling its per-unit text messaging prices in a span of barely over a year.

Answer: Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 81 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof.

82.    Specifically, by the end of 2006, as part of the conspiracy, each Defendant had aligned their per-unit fee at ten cents per each text message sent or received. In late 2006 and early 2007, each Defendant increased its per-message fee by 50%, from ten to fifteen cents as outlined in the following chart:

| Defendant | Price Increase from 10¢ to 15¢ |
|---|---|
| Sprint Nextel | 4th Q 2006 |
| Alltel | 4th Q 2006 |
| AT&T | 1st Q 2007 |
| Verizon Wireless | 1st Q 2007 |
| T-Mobile USA | 2nd Q 2007 |

Answer: Verizon Wireless denies any conspiracy involving Verizon Wireless. Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of

paragraph 82 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing used by Defendants, but denies that the description is complete or accurate. Verizon Wireless further admits that it increased pricing for per-text messaging services from ten cents to fifteen cents in March 2007.

83.     During 2007 and early 2008, the amount of text messages sent by each Defendant's customers greatly increased.

Answer:  Verizon Wireless admits that the number of text messages sent by Verizon Wireless subscribers increased between 2007 and 2008, and denies the remaining allegations of paragraph 83 of the Second Amended Complaint.

84.     During this same period, the per-unit costs of text messages of each Defendant continued to decrease substantially, by at least 35%, and each Defendant's available supply to transmit text messages still far exceeded usage and demand. Also, during that period, each Defendant decreased its per-unit prices for other wireless services.

Answer:  Lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 84 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

85.     Moreover, each Defendant selected the exact same, extremely substantial 33.33% increase in its prices. Specifically, each Defendant increased its per-message fee from fifteen cents to twenty cents as outlined below:[5]

---

[5] Verizon acquired Alltel prior to the increase from ten to fifteen cents, and is therefore not included in the chart.

| Defendant | Price Increase from 15¢ to 20¢ |
|---|---|
| Sprint Nextel | 4th Q 2007 |
| AT&T | 1st Q 2008 |
| Verizon Wireless | 1st Q 2008 |
| T-Mobile USA | 3rd Q 2008 |

Answer: Verizon Wireless lacks sufficient knowledge to form a belief as to the truth of the allegations of paragraph 85 of the Second Amended Complaint, and therefore generally denies same and demands strict proof thereof, except admits that the paragraph purports to describe pricing used by Defendants, but denies that the description is complete or accurate. Verizon Wireless further admits that it increased pricing for per-text messaging services from fifteen cents to twenty cents in March 2008.

86. Sprint Nextel was the ringleader in all price increases subsequent to the alignment of all per-unit prices at ten cents. In contrast to the independent conduct after Nextel first tried to increase its rates in 2003, the other Defendants adopted Sprint Nextel's per-text price increases in this instance as part of the conspiracy. Verizon and AT&T did so immediately, in the very next quarter for both increases, and T-Mobile ultimately cooperated and adopted the increase.

Answer: Verizon Wireless denies the allegations of paragraph 86 of the Second Amended Complaint.

87. Compared to historical experience, economic theory, Defendants' own contemporaneous pricing of comparable products, Defendants' excess supply, and Defendants' low costs, the prices of text messaging services should have decreased substantially between 2005 and 2008. Moreover, the alignment and uniform increases evidenced above were a stark departure from Defendants' independent and competitive pricing practices in the preceding time period.

Answer: Verizon Wireless denies the allegations of paragraph 87 of the Second Amended Complaint.

88. However, Defendants' collusive behavior subsequently caused a 100% increase in per-unit text messaging prices paid by Plaintiffs at the same times that each Defendant's comparable costs decreased by approximately 65%, Defendants' supply exceeded demand, and the prices of Defendants' related products decreased.

Answer: Verizon Wireless denies the allegations of paragraph 88 of the Second Amended Complaint.

89. Text messaging per-unit pricing lends itself to collusion in many ways. This is, in part, because text messaging is a uniquely homogeneous form of wireless communication. The per-text-message price can easily be severed from other service charges, separately observed, and openly communicated among Defendants. Defendants, in fact, did systematically engage in a highly unusual degree of communication with one another and shared information during 2005 – 2008. *See infra*. Defendants' prices for text messaging are even available on the Internet.

Answer: Verizon Wireless denies any collusion involving Verizon Wireless. Verizon Wireless denies the allegations of paragraph 89 of the Second Amended Complaint, except admits that the Defendants do publicly announce text message pricing to inform their customers and admits that Verizon Wireless's text messaging prices are available on the Internet.

90. Given the circumstances hereinafter and previously alleged, the dramatic, identical rise in the price of text messaging must have resulted from a price fixing conspiracy among the Defendants.

Answer: Verizon Wireless denies the allegations of paragraph 90 of the Second Amended Complaint.

91. In the alternative, under the circumstances hereinafter and previously alleged, Defendant Sprint-Nextel Corp.'s astonishing price increases constituted offers to the other Defendants to avoid engaging in competition and to extract supra-competitive prices many thousand times each Defendant's costs for text messaging services. The other Defendants accepted Sprint-Nextel's offers when they implemented identical price increases shortly thereafter, thereby consummating illegal agreements among suppliers representing 90% of the text message market to raise and maintain prices.

Answer: Verizon Wireless denies the allegations of paragraph 91 of the Second Amended Complaint.

92. Under these circumstances, Defendants' pattern of offers and acceptances in and of itself constitutes a price fixing conspiracy.

Answer:    Verizon Wireless denies the allegations of paragraph 92 of the Second Amended Complaint.

## OPPORTUNITY TO CONSPIRE THROUGH TRADE ORGANIZATIONS

93.    CTIA-The Wireless Association ("CTIA") is a trade organization based in Washington, D.C. that claims to be an "international association for the wireless telecommunications industry, dedicated to expanding the wireless frontier."

Answer:    Verizon Wireless admits that CTIA-The Wireless Association is a trade organization based in Washington, D.C.  Verizon Wireless lacks sufficient knowledge as to the truth of the remaining allegations of paragraph 93 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

94.    Defendants are currently members of the CTIA. Defendants have met regularly through the CTIA's biannual conventions since 2002.

Answer:    Verizon Wireless admits that Verizon Wireless is currently a member of the CTIA, and admits that Verizon Wireless has attended the CTIA's biannual conventions since 2002.  Verizon Wireless lacks sufficient knowledge as to the truth of the remaining allegations of paragraph 94 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

95.    In 2001, AT&T launched the first inter-carrier text messaging service, which allowed users to send text messages to customers of other carriers.

Answer:    Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 95 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

96.    Following on the heels of AT&T's launch, Defendants AT&T, Sprint Nextel and Verizon met through the CTIA on numerous occasions to discuss pricing and text messaging.

Answer: Verizon Wireless denies the allegations of paragraph 96 of the Second Amended Complaint.

97.     For example, shortly thereafter, in early 2002, under CTIA's guidance, the six major national carriers, including Defendants, announced that they had reached agreement on allowing each carrier's service for text messaging to communicate with the others' service.

Answer: Verizon Wireless admits that in early 2002 Verizon Wireless and the other Defendants adopted a common standard for technical interoperability that enabled each carrier's text messaging service to communicate with the others' service, and denies the remaining allegations of paragraph 97 of the Second Amended Complaint.

98.     Based on its orchestration of the interoperability agreements in 2002, CTIA has been and remains the driving force behind organizing Defendants and exchanging information about text messaging in the United States.

Answer: Verizon Wireless denies the allegations of paragraph 98 of the Second Amended Complaint.

99.     In announcing the interoperability agreements and potential massive revenue to carriers, CTIA President and CEO Tom Wheeler was quoted as saying, "Text messages have not only given consumers a brand new way to communicate, it has also given wireless companies around the globe an important new revenue stream. Last year, the revenue generated by text messages was greater than Hollywood's combined box office receipts, according to the Mobile Data Association in the U.K."

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 99 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

100.     The CTIA has expressed concerns that its collection of data could contribute to anti-competitive endeavors, but it has nonetheless continued to track competitive data, and has in fact increased its collection of information on texting.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 100 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

101.    The CTIA created a Wireless Internet Caucus ("WIC"), which is a "core community of CTIA member companies dedicated to growing a large and robust market at the convergence of wireless and Internet technologies, products and services" and that "seek[s] to build a shared vision of this market and an action plan to enable its rapid growth."

Answer: Verizon Wireless admits that it is a member of the WIC, and lacks knowledge sufficient to form a belief as to the truth of the remaining allegations of paragraph 101 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

102.    In February 26, 2002, the CTIA convened the WIC Leadership Council, which "comprises a critical mass of key industry decision makers who work together to create a shared market vision and unified approach to solving problems and challenges faced collectively growing the wireless data marketplace." The Leadership Council was tasked with "launching an *industry-wide* initiative to address the hurdles that face the U.S. market in wireless data. . . ."[6]

Answer: Verizon Wireless admits that it is a member of the WIC, and lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 102 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

103.    The WIC Leadership Council consisted of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[7] Participants in the WIC Leadership Council meetings included: Jim Straight, Vice President Wireless Data & Internet Services, Verizon Wireless; John Quzdepski, VP & GM, Sprintpcs.com, Sprint PCS; Andrew Willett, VP, Multimedia Services, AT&T Wireless Services; Carlton Hill, Executive Director Internet Service, Cingular Wireless; Greg Santoro, Vice President, Internet and Wireless Services, Nextel; and Michael Cote, VP Wireless Data Sales & Operations, VoiceStream Wireless [later renamed T-Mobile].

---

[6] Feb. 26, 2002 CTIA Press Release, *supra*.
[7] *Id.*

Answer:  Verizon Wireless admits that it is a member of the WIC, and lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 103 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

104.    The Leadership Council's inaugural meeting in February 2002 was a day-long event in which "executives of the U.S. wireless data industry began mapping out the course for the delivery of high-quality wireless data services," and discussed impediments to success in a variety of areas, including "messaging" services, interoperability, and "billing."[8]

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 104 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

105.    The CTIA's Vice President of Wireless Internet Development noted that because of the crucial moment in the development of the wireless data marketplace, "[t]he WIC Leadership Council members' efforts to create *industry-wide solutions through 'co-opetition' with each other*, can have a dramatic influence on the pace of that development."[9]

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 105 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

106.    The CTIA further emphasized that "[a]ll ships rise [together] . . . . What's best for one company is not always best for the industry. The time has come to *serve the industry first*."[10]

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 106 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

107.    The WIC Leadership Council convenes "bi-annual, face-to-face meetings . . . while conducting quarterly conference calls to keep apprised of the progress made."[11]

---

[8] *Id.*
[9] March 5, 2003 CTIA Press Release, *supra* (emphasis added).
[10] Feb. 26, 2002 CTIA Press Release, *supra* (emphasis added).
[11] *Id.*

Additionally, the Leadership Council prepared and disseminated thorough presentations providing detailed information regarding text messaging revenue, pricing, billing, and delivery. The data in these presentations was provided directly by Defendants. The WIC and its Leadership Council have operated throughout the class period.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 107 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

108.    The WIC also published the "WIC Manifesto," providing for a "commitment to work together to build a shared vision for the industry, and an action roadmap to make that vision a reality." The WIC Manifesto stated that the companies participating in the WIC would "work together to enlist the support and alignment of all key stakeholders in order to implement [win-win] solutions."[12]

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 108 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

109.    The purpose of such joint efforts through the WIC was "to build a shared future in which we can all look forward to *profiting together*."[13]

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 109 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

110.    As part of the Manifesto, the WIC specifically established the "Messaging Action Team," led by one of Nextel's executives. The Messaging Action Team devoted itself to "support a common approach to . . . message delivery mechanisms, interconnection, billing and settlement." The Messaging Action Team was further designed to "propose billing principles for message transfer between 'message service providers.'"

---

[12] WIC Manifesto, *supra*, at 1-2.
[13] *Id*. (emphasis added).

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 110 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

111.    The CTIA also formed a Mobile Advertising Metrics Action Team comprised of wireless carriers that work together to agree to minimum standards for reporting metrics, targeting information, advertising inventory and consumer privacy, and to monitor the progress of other industry organizations and collaborate where appropriate.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 111 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

112.    During the variety of CTIA and Messaging Action Team meetings and conversations, Defendants had numerous opportunities to conspire to set pricing for Text Messaging Services. Sprint Nextel announced a per-unit text message price increase within approximately a month after the mid-year meeting in 2006, and again within approximately a month after the mid-year meeting in 2007, and as described above, the other Defendants followed shortly thereafter with identical price increases.

Answer: Verizon Wireless denies the allegations of paragraph 112 of the Second Amended Complaint.

## ADDITIONAL JOINT CONDUCT

113.    The CTIA, of which Defendants are members, established and controls the Common Short Code Association (CSCA). Defendants, working together through the CTIA, collusively use the CSCA to expand the market for texting services, control the prices for texting services, and generate further demand for texting services at the excessive prices established by the Defendants.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 113 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof. Verizon Wireless denies the allegations in the second sentence of paragraph 113 of the Second Amended Complaint.

114.    Common Short Codes ("CSCs") are five-digit or six-digit numeric codes to which text messages can be addressed from a wireless device. They are easy to remember, compatible across all participating carriers, and can be leased by anyone interested in interacting with over 200 million wireless consumers.

Answer:  Verizon Wireless admits that Common Short Codes are numeric codes to which

text messages can be addressed from a wireless device.  Verizon Wireless lacks knowledge

sufficient to form a belief as to the truth of the remaining allegations of paragraph 114 of the

Second Amended Complaint, and therefore generally denies the same and demands strict proof

thereof.

115.    Wireless subscribers send text messages to Short Codes to access a wide variety of mobile content for delivery to their wireless devices, such as sweepstakes, tele-voting campaigns, mobile coupons, other promotions, and a wide range of additional interactive wireless services.

Answer:   Verizon Wireless admits the allegations of paragraph 115 of the Second

Amended Complaint.

116.    Marketers of consumer products and services, as well as business and enterprise customers, are currently using Short Codes to directly interact with and attract various audiences, as Short Codes provide an unprecedented opportunity to engage customers anytime, anywhere.

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of

the allegations of paragraph 116 of the Second Amended Complaint, and therefore generally

denies the same and demands strict proof thereof.

117.    According to the CSCA, "The potential is enormous. Common Short Codes will enable the continued growth of text messaging and provide a platform upon which new technologies will be able to flourish. Market developments like picture messaging (or MMS) and the continued evolution of Instant Messaging into the wireless medium make text messaging one of the most exciting, yet simple, breakthroughs, since the advent of the telephone itself!"

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 117 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

118.    The CSCA leases the Short Codes to advertisers, which then negotiate agreements with each carrier to carry their Short Codes.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 118 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

119.    The CSCA admits that its control of the Short Codes is a substantial benefit: "Wireless Service Providers benefits: Drives up text messaging usage and revenues because more applications will be funded."

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 119 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

120.    Through the CSCA, CTIA has created the "shared vision" of the WIC by going beyond the bounds of a trade organization into the business of generating and driving profits for its members, including its core members, the named Defendants.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 120 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

121.    Short Codes earn money for the Defendants in a number of ways: the Defendants' trade association consortium charges a set fee for the establishment and leasing of Short Codes; then the lessee of the Short Code pays each carrier for the right to carry its codes; and consumers are then charged for using the Short Code, sometimes in multiple ways.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 121 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

122. For example, Major League Baseball has leased the Short Code 65246 "MLBGO" at http://mobile.mlb.com/web, which provides the subscriber with sports alerts, Ringtones, and wallpaper. One of the options offered is "Team Alerts" where, for $3.99 "plus standard messaging fees," a subscriber can "stay connected" to his or her favorite team. The fan receives fifteen to twenty alerts per week, including game summaries, home runs, lead changes, breaking news, and video highlights. Major League Baseball says "To avoid high carrier data charges, an unlimited data plan is strongly recommended." Defendants receive a share of the monthly fee for alert systems and their charges for the services, and for these types of services and revenues, they need a large group of subscribing customers with unlimited data plans.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 122 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

123. The Groupe Speciale Mobile Association ("GSMA") is a worldwide trade group of cellular providers that boasts membership of 750 mobile networks across 219 countries that collectively serve more than 3.4 billion customers totaling 85% of the world's mobile phone users.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 123 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

124. One of the GSMA member-only databases includes information such as effective price per minute, total billed for SMS events, and number of SMS messages per user per month.

Answer: Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 124 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

125.     GSMA recently completed its annual "Mobile World Congress" that was attended by at least leaders from AT&T and Verizon Communication.

Answer:  Verizon Wireless admits that Verizon Wireless attended the "Mobile World Congress," and denies the remaining allegations of paragraph 125 of the Second Amended Complaint.

126.     One of the break-out sessions at that "Congress" pertained to "Pricing Strategies for the Unlimited Generation."

Answer:  Verizon Wireless lacks knowledge sufficient to form a belief as to the truth of the allegations of paragraph 126 of the Second Amended Complaint, and therefore generally denies the same and demands strict proof thereof.

127.     Through CTIA and GSMA, the defendants have a forum in which to interact, access relevant utilization and pricing data, and participate in committees to lobby governmental entities, which furthers their collusive efforts.

Answer:  Verizon Wireless denies the allegations of paragraph 127 of the Second Amended Complaint.

128.     The revenues of Defendants are dependent on encouraging individual users to use and become reliant upon high amounts of data.

Answer:  Verizon Wireless denies the allegations of paragraph 128 of the Second Amended Complaint.

129.     Defendants, individually and acting in concert, have adopted uniform and unreasonably high charges for text messaging in order to encourage their customers to purchase other services.

Answer:  Verizon Wireless denies the allegations of paragraph 129 of the Second Amended Complaint.

130.   Defendants stand to earn significant fees from the use of Short Codes, and if they are to fulfill their potential as a revenue driver, customers need to have unlimited text messaging and related data plans.

Answer:   Verizon Wireless denies the allegations of paragraph 130 of the Second Amended Complaint.

131.   The larger the group of potential customers equipped with unlimited plans, the more fees Defendants can demand for the right to carry their short codes.

Answer:   Verizon Wireless denies the allegations of paragraph 131 of the Second Amended Complaint.

132.   Consequently, it is necessary for Defendants to enroll as many customers as possible in unlimited data plans.

Answer:   Verizon Wireless denies the allegations of paragraph 132 of the Second Amended Complaint.

133.   Defendants, acting jointly, in concert, and individually, also have adopted high single text only plans in order to encourage and force their texting customers to purchase unlimited data plans and other bundled services that the individual consumers may not want, need, or be able to afford.

Answer:   Verizon Wireless Denies the allegations of paragraph 133 of the Second Amended Complaint.

## CONGRESSIONAL INVESTIGATION

134.   On September 9, 2008, the Senate Antitrust Subcommittee sent a letter to Defendants, questioning the basis for the huge increases in the pay-per-use text messaging price.

Answer:   Verizon Wireless admits that on September 9, 2008, the Senate Antitrust Subcommittee sent a letter to it and other wireless carriers regarding pay-per-use text message pricing, but states that Plaintiffs' characterization of the letter is argumentative and Verizon Wireless refers to the letter itself for a complete and accurate description thereof.  Except as

expressly admitted, Verizon Wireless denies the allegations of paragraph 134 of the Second Amended Complaint.

135.    The Senate Subcommittee expressed concern about the increases being made at nearly the same time, in identical amounts, when price increases did not appear to be justified by increases in costs, and concluded that "[t]his conduct is hardly consistent with the vigorous price competition we hope to see in a competitive marketplace."

Answer:  Verizon Wireless admits that the Senate Subcommittee letter contained the quoted language, but states that Plaintiffs' characterization of the letter is argumentative and Verizon Wireless refers to the letter itself for a complete and accurate description thereof. Except as expressly admitted, Verizon Wireless denies the allegations of paragraph 135 of the Second Amended Complaint.

136.    The Senate Subcommittee also requested that each Defendant:

a.    explain the cost, technical or other factors that justify a 100% increase in the cost of Text Messaging Services from 2005 to 2008;

b.    provide data on the use of Text Messaging Services from 2005 to 2008;

c.    provide a comparison of prices charged for Text Messaging Services as compared to other services offered by the company such as prices per minute for voice calling, prices for sending emails, and prices charged for data services such as internet access over wireless devices from 2005 to the present; and

d.    state whether the company's Text Messaging Services pricing structure differs in any significant respect from the pricing of the company's three main competitors.

Answer:  Verizon Wireless admits that the Senate Subcommittee letter contained certain requests, but states that Plaintiffs' characterization of the letter is argumentative and Verizon Wireless refers to the letter itself for a complete and accurate description thereof.  Except as expressly admitted, Verizon Wireless denies the allegations of paragraph 136 of the Second Amended Complaint.

137.     In response, Defendants provided limited and biased information on the prices for their package plans, including their text message package plans, but failed to (a) specifically address why they increased their per-message prices for text messaging or (b) deny that those increases were the result of collusion.

Answer:    Verizon Wireless denies the allegations of paragraph 137 of the Second

Amended Complaint.

## STRUCTURAL FACTORS FACILITATE COLLUSION

138.     The wireless telephone-provider industry is marked by certain structural and other characteristics that make price fixing feasible, including the heavy concentration of the market share among Defendants.

Answer:    Verizon Wireless denies the allegations of paragraph 138 of the Second

Amended Complaint.

139.     Price fixing is relatively easy to maintain in a market such as that for Text Messaging Services, which has extremely high barriers to entry because of the high cost of infrastructures, creating a situation where there is virtually no chance that a new competitor will enter the market to challenge artificially high prices.

Answer:    Verizon Wireless denies the allegations of paragraph 139 of the Second

Amended Complaint.

140.     Collusion among competitors in this market is also easy because Text Messaging Services are homogenous, with no discernable difference between the Text Messaging Services provided by one market participant over another.

Answer:    Verizon Wireless denies the allegations of paragraph 140 of the Second

Amended Complaint.

141.     Defendants have colluded on the inclusion of other terms in their cellular and text messaging contracts, in relation to early termination fees and mandatory arbitration clauses, leaving consumers with no choice but to accept these terms or forego purchasing cellular and text messaging services.

Answer: Verizon Wireless denies the allegations of paragraph 141 of the Second Amended Complaint.

## COMMON CLASS ARBITRATION WAIVERS

142. Defendants require that Plaintiffs and other Class Members agree to contracts which require wireless users to arbitrate disputes with service providers and to waive their right to class arbitration. These common waivers are indicative of additional collusive, anticompetitive conduct and are specifically designed to facilitate Defendants' conspiracy.

Answer: Verizon Wireless denies the allegations of paragraph 142 of the Second Amended Complaint, except admits that Verizon Wireless's subscribers agree to service contracts.

143. As Defendants know, due to the high cost of litigation and the comparatively small injury an individual user suffers from their conspiracy, it is only economically feasible for the individual to seek redress by joining a class action. Common class arbitration waivers constitute an attempt by Defendants to insulate themselves from legal challenge on a class-wide basis, enabling them to reap substantial profits from the collective injury they impose on users.

Answer: Verizon Wireless denies the allegations of paragraph 143 of the Second Amended Complaint.

144. Plaintiffs and other Class Members who have submitted to class arbitration waivers have done so because it is extremely difficult to function in the current economic and social climate without Text Messaging and wireless services. In addition, such Plaintiffs and other Class Members have no bargaining power, do not understand the consequences of a class arbitration waiver, and may be unsophisticated. For the foregoing reasons, the class arbitration waiver is a classic contract of adhesion and is unconscionable and unenforceable.

Answer: Verizon Wireless denies the allegations of paragraph 144 of the Second Amended Complaint.

145. Moreover, Defendants acknowledge that these class arbitration waivers are of questionable validity, as their contracts make provisions for what will happen when a court determines that the waivers are unenforceable or void. Under those circumstances, the contracts state that the overarching agreement to arbitrate is itself void. As the class arbitration waivers at issue are unenforceable, and as the overarching agreements to arbitrate are consequently void

pursuant to contract, Plaintiffs have properly brought this litigation in this Court on behalf of themselves and the Class.

_Answer_:   Verizon Wireless denies the allegations of paragraph 145 of the Second Amended Complaint.

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

146.    Plaintiffs re-allege paragraphs 1 through 145 as if fully restated herein.

_Answer_:  Verizon Wireless incorporates its responses to paragraphs 1 through 145 of the Second Amended Complaint as if fully set forth herein.

147.    Beginning at least as early as January 1, 2005 (the exact date being unknown to Plaintiffs) and continuing until the present, Defendants and their co-conspirators engaged in a contract, combination and conspiracy to artificially raise, fix, maintain and/or stabilize pricing for Text Messaging Services in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

_Answer_:   Verizon Wireless denies the allegations of paragraph 147 of the Second Amended Complaint.

148.    Defendants entered into illicit agreements to increase prices of Text Messaging Services at some point prior to and during the period around July–December 2006 (for the increase implemented in Q4 2006–Q2 2007) and again at some point prior to and during the period around July–December 2007 (for the increase implemented in Q4 2007–Q3 2008).

_Answer_:   Verizon Wireless denies the allegations of paragraph 148 of the Second Amended Complaint.

149.    For the purpose of formulating and carrying out the contract, combination and conspiracy, Defendants and their co-conspirators did those things which they conspired to do, as alleged above.

_Answer_:   Verizon Wireless denies the allegations of paragraph 149 of the Second Amended Complaint.

150.    The contract, combination and conspiracy alleged had the following effects, among others:

      a.      purchasers of Text Messaging Services have been and continue to be deprived of the benefit of free and open competition;

      b.      the per text message price has been and continues to be fixed, raised, maintained and stabilized at artificially high and non-competitive levels; and

      c.      competition between and among Defendants and other co-conspirators in the sale of Text Messaging Services has been and continues to be unreasonably restrained.

Answer:    Verizon Wireless denies the allegations of paragraph 150 of the Second Amended Complaint.

151.    Plaintiffs and the other Class members have been injured in their business and property by being unable to purchase text messages on a per-message basis, except at a price higher than otherwise would have been paid in the absence of Defendants' unlawful contract, combination and conspiracy.

Answer:    Verizon Wireless denies the allegations of paragraph 151 of the Second Amended Complaint.

152.    The contract, combination, and conspiracy is continuing, and will continue unless the injunctive relief prayed for herein is granted.

Answer:    Verizon Wireless denies the allegations of paragraph 152 of the Second Amended Complaint.

153.    Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

Answer:    Verizon Wireless denies the allegations of paragraph 153 of the Second Amended Complaint.

## **PRAYER FOR RELIEF**

To the extent that an answer is required, Verizon Wireless denies the allegations set forth in the "WHEREFORE" paragraph following paragraph 153 of the Complaint and the seven

lettered paragraphs that follows it and denies that plaintiffs are entitled to any relief requested therein, or any relief whatsoever.

## **AFFIRMATIVE DEFENSES**

### First Affirmative Defense

The Second Amended Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

The claims are barred, in whole or in part, because plaintiffs have not been damaged by any act or failure to act of Verizon Wireless.

### Third Affirmative Defense

The claims are barred, in whole or in part, because plaintiffs did not suffer any antitrust injury.

### Fourth Affirmative Defense

The claims are barred, in whole or in part, because Verizon Wireless's conduct constitutes permissible competitive activity.

### Fifth Affirmative Defense

The claims are barred, in whole or in part, by the doctrines of waiver, estoppel and/or accord and satisfaction.

### Sixth Affirmative Defense

The claims are barred, in whole or in part, because plaintiffs failed to mitigate any alleged losses or damages.

Seventh Affirmative Defense

The claims are barred, in whole or in part, because some plaintiffs may be subject to arbitration provisions in their service agreements.

Eighth Affirmative Defenses

Verizon Wireless adopts by reference any applicable defense pleaded by any other Defendant not expressly set forth herein.

Ninth Affirmative Defense

Verizon Wireless hereby gives notice that it intends to rely upon such other defenses as may become available by law, pursuant to statute, or that may become evident during the discovery proceedings of this case, and hereby reserves the right to amend its Answer to include such defenses.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Verizon Wireless demands a trial by jury for all issues so triable.

Dated: June 4, 2010                          Respectfully submitted,

                                             CELLCO PARTNERSHIP, D/B/A
                                             VERIZON WIRELESS

                                             /s/ Dan K. Webb
                                             Dan K. Webb
                                             Thomas J. Frederick
                                             Dana E. Schaffner
                                             WINSTON & STRAWN LLP
                                             35 West Wacker Drive
                                             Chicago, IL 60601
                                             Telephone:     (312) 558-5600
                                             Email:  dwebb@winston.com
                                             Email:  tfrederick@winston.com
                                             Email:  dschaffner@winston.com

                                             John Thorne
                                             Robert H. Griffen

VERIZON COMMUNICATIONS INC.
1320 N. Courthouse Road
Arlington, VA 22201
(703) 351-3900
Email: john.thorne@verizon.com
Email: robert.h.griffen@verizon.com

Michael K. Kellogg
Aaron M. Panner
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, NW
Suite 400
Washington, DC 20036
Telephone:     (202) 326-7900
Facsimile:      (202) 326-7999
Email: mkellogg@khte.com
Email: apanner@khhte.com

*Counsel for Defendant Cellco
Partnership, d/b/a Verizon Wireless*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 4th day of June, 2010, a true copy of the foregoing Answer of

Defendant Cellco Partnership D/B/A to the Second Amended Consolidated Class Action

Complaint was served via the Court's ECF system on the following:

**Scott E Poynter**
Emerson Poynter LLP
500 President Clinton Avenue
Suite 305
Little Rock, AR 72201
(501) 907-2555

**Ronnie Penton**
Law Office of Ronnie G. Penton
209 Hoppen Place
Bogalusa, LA 70427
(985) 732-5651

**Richard J. Kilsheimer**
Kaplan, Kilsheimer & Fox LLP
805 Third Avenue
New York, NY 10022
(212) 687-1980

**Richard Lyle Coffman**
The Coffman Law Firm
505 Orleans St.
Suite 505
Beaumont, TX 77701
(409) 833-7700
Fax: (866) 835-8250
Email: rc@cofflaw.com

**Matthew E Van Tine**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400
Fax: (312) 676-2676
Email: mvantine@millerlawllc.com

**Mary Jane Fait**
Wolf, Haldenstein, Adler, Freeman & Herz
LLC (Chicago)
55 West Monroe Street
Suite 1111
Chicago, IL 60603
(312) 984-0000
Email: fait@whafh.com

**Marvin Alan Miller**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400
Fax: (312) 676-2676
Email: Mmiller@millerlawllc.com

**Kevin B Love**
Criden & Love, P.A.
7301 SW 143 Street
Suite 515
South Miami, FL 33143
(305) 357-9000
Email: klove@cridenlove.com

46

**John W. Treece**
**Adrienne Banks Pitts**
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
Email: jtreece@sidley.com
Email: apitts@sidley.com

**Dianne M Nast**
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000

**David W Zoll**
Zoll Kranz & Borgess LLC
6620 West Central Avenue
Suite 200
Toledo, OH 43617
(419) 841-9623

**Daniel E. Becnel , Jr.**
Becnel Law Firm, LLC (Reserve)
106 W. Seventh St.
P. O. Drawer H
Reserve, LA 70084
(985) 536-1186
Email: dbecnel@becnellaw.com

**Christopher Lovell**
Lovell Stewart Halebian, LLP
500 Fifth Avenue
Floor 58
New York, NY 10110
(212) 608-1900

**Frederic R. Klein**
Goldberg, Kohn, Bell, Black, Rosenbloom &
   Moritz, Ltd.
55 East Monroe Street #3300
Chicago, IL 60603
(312)201-4000
Email: frederic.klein@goldbergkohn.com

**Dennis C. Sweet , III**
Williams Grubbs
158 East Pascagoula Street
Jackson, MS 39201
(601) 965-8700

**David P Germaine**
Vanek, Vickers & Masini, P.C.
225 W. Washington
18th Floor
Chicago, IL 60606
(312) 224-1500
Email: dgermaine@vaneklaw.com

**Dane H. Butswinkas**
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005
(202) 434-5110

**Christopher B. Hockett**
**Stephanie E. L. McCleery**
Davis Polk & Wardwell
1600 El Camino Real
Menlo Park, CA 94025
(650) 752-2009
Email: chris.hockett@dpw.com
Email: stephanie.lockwood@dpw.com

**Camilo K. Salas , III**
Salas & Co LC
650 Poydras Street
Suite 1660
New Orleans, LA 70130
504-799-3080

**Bryan L. Clobes**
Cafferty Faucher, LLP
1717 Arch Street
Suite 3610
Philadelphia, PA 19103
(215) 864-2800
Email: bclobes@caffertyfaucher.com

**Brian David Fagel**
Goldberg, Kohn, Bell, Black, Rosenbloom &
Moritz, Ltd.
55 East Monroe Street #3300
Chicago, IL 60603
(312)201-4000
Email: brian.fagel@goldbergkohn.com

**Lori Ann Fanning**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
(312) 332-3400
Fax: (312) 676-2676
Email: LFanning@MillerLawLLC.com

**Reginald Terrell**
The Terrell Law Group
223 25th Street
Richmond, CA 94804
(510) 237-9700
Email: reggiet2@aol.com

**Joe R. Whatley , Jr.**
Whatley Drake & Kallas LLC
1540 Broadway
37th Floor
New York, NY 10036
(212) 447 7070
Email: jwhatley@wdklaw.com

**John E Tangren**
Wolf Haldenstein Adler Freeman & Herz LLC
55 West Monroe Street
Suite 1111
Chicago, IL 60603
(312) 984-0000
Email: tangren@whafh.com

**Jonathan B. Andry**
The Andry Law Firm
610 Baronne Street
New Orleans, LA 70113
(504) 586-8899
Fax: (504) 586-8933
Email: johnandry@yahoo.com

**Charles F. Barrett**
Barrett & Associates P.A.
6518 Hwy. 100
Suite 210
Nashville, TN 37205
(615) 515-3393
Email: cb@barrettandassociates.net

**Alltel Corp.**
One Allied Drive
Little Rock, AR 72202

**T-Mobile International AG**
Landgrabenweg 151
53227 Bonn
Germany

**Vodafone Group PLC**
Vodafone House
The Connections
Newbury
Berkshire
RG142FN England

**Charles H. R. Peters**
**Lawrence Harris Heftman**
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
(312) 258-5500
Email: cpeters@schiffhardin.com
Email: lheftman@schiffhardin.com

**Scott Wm Weinstein**
Morgan & Morgan, P.A.
P. O. Box 9504
Fort Myers, FL 33906
(239) 433-6880
Email: sweinstein@forthepeople.com

**Verizon Wireless**
One Verizon Way
Basking Ridge, NJ 07920

**William Tucker Brown**
Whatley Drake & Kallas, LLC
1000 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
(205) 328-9576
Email: tbrown@wdklaw.com

**Frank H Tomlinson**
15 North 21st Street, Suite 302
Birmingham, AL 35203
(205) 326-6626
Fax: (205) 328-2889
Email: htomlinson@bellsouth.com

**Robert W. Bishop**
Bishop & Associates, PSC
6520 Glenridge Park
Suite 6
Louisville, KY 40222-9998
(502) 425-2600
Fax: (502)-425-9115
Email: firm@bishoplegal.net

/s/ Dana E. Schaffner_____