**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE TEXT MESSAGING | ) | |
| ANTITRUST LITIGATION | ) | **No. 08 C 7082** |
| _____ ) | | **MDL No. 1997** |
| | ) | **Judge Matthew F. Kennelly** |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| _____ ) | | |

**ANSWER OF DEFENDANT AT&T MOBILITY LLC**
**TO PLAINTIFFS' SECOND AMENDED CONSOLIDATED**
**CLASS ACTION COMPLAINT**

Defendant AT&T Mobility LLC (hereinafter, "AT&T Mobility"), by its undersigned attorneys, hereby answers Plaintiffs' Second Amended Consolidated Class Action Complaint (the "Complaint"). Any allegation not expressly admitted is denied. AT&T Mobility states as follows:

## NATURE OF THE ACTION

1. This is an antitrust action charging Defendants with entering into and implementing a continuing contract, combination, and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services sold in the United States.

**ANSWER:** Paragraph 1 purports to characterize the Complaint and thus no response from AT&T Mobility is required. To the extent that a response is required, AT&T Mobility admits that the Complaint purports to assert claims against the Defendants under the federal antitrust laws, but denies that the Complaint states a claim and denies the material allegations of the Complaint.

2. Plaintiffs bring this action on behalf of themselves and all persons or entities who purchased Text Messaging Services based on a fee per text message in the United States directly from Defendants or their predecessors, subsidiaries, or affiliates during the period from January 1, 2005 through the present.

**ANSWER:** Paragraph 2 purports to characterize this action and thus requires no response. To the extent a response is required, AT&T Mobility admits that Plaintiffs purport to bring this action on behalf of themselves and all persons or entities who purchased Text Messaging Services based on a fee per text message in the United States directly from Defendants or their predecessors, subsidiaries, or affiliates during the period from January 1, 2005 through the present. AT&T Mobility denies that Plaintiffs may bring this action on behalf of such other persons, denies that the Complaint states a claim, denies the material allegations of the Complaint, and denies the remaining allegations of Paragraph 2.

3. Defendants control more than 90% of the market for Text Messaging Services. It costs a fraction of a penny for Defendants to transmit a text-message because these messages involve very little data and are transmitted on existing cellular network connections. Because the per-unit cost of text messages is very low, reduced pricing would be an easy and affordable way for any one of the Defendants to distinguish itself from its competitors.

**ANSWER:** To the extent that the allegations of Paragraph 3 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations, and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 3.

4. That is, in fact, what the Defendants traditionally did. In the 3rd Quarter of 2003, for example, while Nextel (the predecessor to Defendant Sprint Nextel) and Cingular (the predecessor to Defendant AT&T) were charging their customers ten cents per text, Defendant T-Mobile charged only five cents. At the same time, Verizon followed a unique pricing model, charging disparate fees of two cents for incoming messages and ten cents for outgoing messages. When Nextel increased its per-text rate to fifteen cents in the following quarter (the 4th Quarter of 2003), the other Defendants stood firm, with Cingular and Alltel still charging only ten cents per text, T-Mobile still charging only five cents per unit, and Verizon continuing to follow the unique pricing structure described above. Each continued to impose their independent charges for more than a year, with no changes until 2005. Then in the 1st Quarter of 2005, Sprint Nextel dropped its charge to ten cents per text, while Alltel increased its per-unit charge to eight cents.

**ANSWER:** To the extent that the allegations of Paragraph 4 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to

form a belief as to the truth of those allegations, and therefore denies them. AT&T Mobility admits that Cingular Wireless LLC was the predecessor to AT&T Mobility. AT&T Mobility denies the remaining allegations of Paragraph 4.

5.     The conspiracy began after the unsuccessful attempt to increase prices independently. In 2005 and 2006, the Defendants agreed to adopt a uniform and unprecedented common per-unit price of ten cents for text-messaging services. With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile and Alltel increased their per-unit rates to ten cents and Verizon joined them by abandoning its unique pricing model in favor of charging an identical ten cents per-unit for all incoming and outgoing messages.

**ANSWER:**     AT&T Mobility denies the allegations in the first two sentences of Paragraph 5. To the extent the allegations of Paragraph 5 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 5.

6.     This was followed by more lockstep price increases. Sprint Nextel Corporation increased its per text message price by 50% (from ten to fifteen cents) in the 4th Quarter of 2006, and immediately thereafter, in the 1st and 2nd Quarters of 2007, the remaining Defendants increased prices by the same exact amount (from ten to fifteen cents).

**ANSWER**:     AT&T Mobility admits that it increased certain pay-per-use text message prices from ten to fifteen cents in January 2007. AT&T Mobility denies the characterization of "the 1st and 2nd Quarters of 2007" as "immediately thereafter" in relation to the "4th Quarter of 2006." To the extent the allegations of Paragraph 6 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 6.

7.      Once again, in the 4th Quarter of 2007, Sprint Nextel Corporation increased its per text message price by 33.33% (from fifteen to twenty cents), and immediately thereafter, in the 1st and 3rd Quarters of 2008, the remaining Defendants increased prices by the same exact amount (from fifteen to twenty cents).   Not one Defendant attempted to attract additional customers by charging even a penny less per text message.

**ANSWER:**    AT&T Mobility admits that it increased certain pay-per-use text message prices from fifteen to twenty cents in March 2008.  AT&T Mobility denies the characterization of "the 1st and 3rd Quarters of 2008" as "immediately thereafter" in relation to the "4th Quarter of 2007."   To the extent the allegations of Paragraph 7 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.   AT&T Mobility denies the remaining allegations of Paragraph 7.

8.      Such marked shifts in behavior, where there are "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason," support the existence of a conspiracy.  *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d  877, 900 (N.D. Ill. 2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 n.4 (2007)).

**ANSWER:**    The allegations of Paragraph 8 purport to state a legal conclusion to which an answer is neither required nor appropriate.   To the extent an answer is required, AT&T Mobility denies the allegations of Paragraph 8.

9.      During the period from 2005 through 2008, as the cost to transmit a text message decreased by 65%, each Defendant first aligned its per-unit price at ten cents, and subsequently increased its per-unit prices by 100% in two identical price increases, to the same exact penny in similar time frames.

**ANSWER:**    AT&T Mobility admits that it increased certain pay-per-use text message prices from ten to fifteen cents in January 2007 and from fifteen to twenty cents in March 2008.   To the extent the allegations of Paragraph 9 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the

4

truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 9.

10. Text message pricing naturally lends itself to collusion because it is a uniquely homogenous form of wireless communication and because per-unit text message prices can easily be severed from other service charges. Defendants' current per-unit text message prices are also available on the Internet. Further, each Defendant belongs to the CTIA – The Wireless Association and the Groupe Speciale Mobile Association, which provided Defendants with multiple opportunities to collude regarding pricing data from before 2005 to date.

**ANSWER:** AT&T Mobility denies the allegations in the first sentence of Paragraph 10. AT&T Mobility admits that certain of its text messaging pricing is available on the Internet, and admits that it (or one of its subsidiaries or affiliates) is a member of the CTIA – The Wireless Association and the GSM Association. To the extent the allegations of Paragraph 10 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 10.

11. The CTIA was one vehicle for conducting the conspiratorial activity, as revealed in several CTIA press releases and public documents. The CTIA created the Wireless Internet Caucus ("WIC") Leadership Council consisting of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[1] The purpose of the WIC Leadership Council was to create "industry-wide approach[es]" to "messaging" and billing." Unlike run-of-the-mill annual meetings conducted by various trade associations, the WIC Leadership Council entailed committee meetings narrowly focused on text messaging delivery and pricing, and included the participation of Defendants' high-level executives.

**ANSWER:** AT&T Mobility denies the allegations in the first sentence of Paragraph 11 and denies the alleged "conspiratorial activity." AT&T Mobility admits that certain employees of AT&T Mobility (or its affiliates, subsidiaries, or predecessor entities, or the

---

[1] Feb. 26, 2002 CTIA Press Release, *CTIA Convenes Wireless Internet Caucus Leadership Council; Introducing "A New Day" of Wireless Internet Industry Development*,
available at http://investor.infospaceinc.com/releasedetail.cfm?ReleaseID=166787.

affiliates or subsidiaries of its predecessor entities) have attended some WIC meetings. To the extent the allegations of Paragraph 11 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 11.

12.     The WIC Leadership Council also attempted to "create industry-wide solutions through **'co-opetition'** with each other,"[2] and focused on "build[ing] a shared future in which we can all look forward to **profiting together**"[3] by placing the interests of the industry above and before the individual companies' individual interests.[4]

**ANSWER:**     To the extent the allegations of Paragraph 12 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 12.

13.     It is implausible to think that each Defendant was able to independently arrive at the same exact price increase to the same exact penny within similar time frames considering the extensive exchanges of information engaged in by Defendants pertinent to messaging revenue, billing, and delivery. Each Defendant has millions of customer accounts and operates nationwide. Each price increase required each Defendant to undertake comprehensive software and other changes to nationwide accounting and billing systems. Each Defendant had to change or adjust print, television, radio and internet advertising and marketing campaigns that are nationwide in scope. Each Defendant had to prepare for and roll out training materials for sales associates and retail store locations and customer service representatives around the nation, if not the globe. Despite the comprehensive and multi-faceted efforts necessary for each Defendant to implement its price increase, they each were somehow able to implement the same exact price increase to the same exact penny within similar timeframes not once, but twice.

**ANSWER:**     AT&T Mobility denies the allegations in the first sentence of Paragraph 13. To the extent the allegations of Paragraph 13 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the

---

[2] March 5, 2003 CTIA Press Release, *Wireless Internet Caucus to Expand*, available at http://www.ctia.org/media/press/body.cfm/prid/1228.
[3] The Wireless Internet Caucus (WIC) of CTIA-The Wireless Association™ Presents the WIC Manifesto, at 2.
[4] Feb. 26, 2002 CTIA Press Release, *supra*.

truth of those allegations and therefore denies them.  AT&T Mobility admits that its customers

number in the millions, that a change in pricing for any of its services requires some changes to

its billing systems and may (or may not) require some changes to its advertising, marketing and

sales training.  AT&T Mobility denies the remaining allegations of Paragraph 13.

14.     When Congress subpoenaed Defendants concerning the economically irrational
price increases for per-unit text message services, Defendants largely refrained from addressing
their per-unit prices, focusing instead on text message service plans, and failed to deny that their
per-text message prices were the result of collusion.

**ANSWER:**     To the extent the allegations of Paragraph 14 relate to persons or entities

other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the

remaining allegations of Paragraph 14.

15.     As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the
proposed class have paid Defendants higher prices for Text Messaging Services than they would
have paid absent Defendants' antitrust conduct.

**ANSWER:**     AT&T Mobility denies the allegations of Paragraph 15.

## DEFINITIONS

16.     "Class Period" means the period from January 1, 2005 through the present.

**ANSWER:**     Paragraph 16 is a definition, not an allegation, and no response from

AT&T Mobility is required.  To the extent a response is required, AT&T Mobility admits that

Plaintiffs purport to define "Class Period" as set forth in Paragraph 16, but denies that this

definition describes any period relevant to this case.

17.     "Person" means any individual, partnership, corporation, association, or other
business or legal entity.

**ANSWER:**     Paragraph 17 is a definition, not an allegation, and no response from AT&T Mobility is required.  To the extent a response is required, AT&T Mobility admits that Plaintiffs purport to define "Person" as set forth in Paragraph 17.

18.     "Text Messaging Services" or "Texting" means the use of a cellular telephone to exchange brief messages with other mobile phones over cellular networks, and may include *inter alia* person-to-person messaging and message interaction with automated systems to order products and services for mobile phones or to participate in contests.

**ANSWER:**     Paragraph 18 is a definition, not an allegation, and no response from AT&T Mobility is required.  To the extent a response is required, AT&T Mobility admits that Plaintiffs purport to define "Text Messaging Services" or "Texting" as set forth in Paragraph 18, but denies that Plaintiffs' definitions are relevant to this case.

## JURISDICTION & VENUE

19.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover injunctive relief, treble damages, and costs of suit, including attorneys' and expert fees and costs, as a result of Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER**:     The allegations of Paragraph 19 purport to state a legal conclusion to which an answer is neither required nor appropriate.  To the extent an answer is required, AT&T Mobility admits that Plaintiffs purport to bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), but denies that the Complaint states a claim or that this action may be maintained under those statutes.  AT&T Mobility admits that Plaintiffs claim to seek certain remedies as set forth in Paragraph 19, but denies that Plaintiffs are entitled to them.  AT&T Mobility denies the remaining allegations of Paragraph 19.

20.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

**ANSWER:** The allegations of Paragraph 20 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility admits that Plaintiffs purport to bring this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), but denies that the Complaint states a claim or that this action may be maintained under those statutes.

21. This court has personal jurisdiction over each Defendant because, *inter alia,* each: (a) transacted business throughout the United States, including in this District; (b) provided, sold and delivered substantial Text Messaging Services throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER:** The allegations of Paragraph 21 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility admits that it (a) has transacted business in the United States, including the Northern District of Illinois; (b) has sold text messaging services in the United States, including the Northern District of Illinois; (c) has had substantial contacts with the United States, including the Northern District of Illinois. To the extent the allegations of Paragraph 21 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 21.

22. Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period each Defendant resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

**ANSWER:** The allegations of Paragraph 22 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T

Mobility admits that it has transacted business in this district, and that it can be found and/or has agents in this District. To the extent the allegations of Paragraph 22 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 22.

23. Venue is also proper in this District because this action was transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

**ANSWER:** The allegations of Paragraph 23 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility admits that cases making substantially the same allegations as made in this action were transferred to this district by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. Section 1407(a). AT&T Mobility denies the remaining allegations of Paragraph 23.

## PLAINTIFFS

24. Aircraft Check Services Company is an Illinois corporation that purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 24, and therefore denies them.

25. Nicholas Iltsopoulos is a resident of Titusville, Florida who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 25, and therefore denies them.

26. David Keefer is a resident of Wantagh, New York who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 26, and therefore denies them.

27.     Kevin Konkel is a resident of South Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 27, and therefore denies them.

28.     Jim Morris is a resident of Athens, Alabama who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 28, and therefore denies them.

29.     Premiere Investment Consulting is a resident of Cudahy, Wisconsin that purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 29, and therefore denies them.

30.     Melissa Leigh Randolph is a resident of West Palm Beach, Florida who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 30, and therefore denies them.

31.     Elizabeth Smith is a resident of Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Defendants after January 1, 2005.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 31, and therefore denies them.

## DEFENDANTS

32.     Defendant Verizon Wireless ("Verizon") is a joint venture of Verizon Communications (55%) and Vodafone Group PLC (45%) with its principal place of business in Basking Ridge, New Jersey.  By subscribers, Verizon Wireless owns and operates the largest United States wireless telecommunications network with approximately 87 million United States subscribers and an annual revenue of approximately $44 billion in 2007.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 32, and therefore denies them.

33.     On or about January 9, 2009, Verizon Wireless acquired Alltel Wireless, the fifth largest United States provider of wireless services, for approximately $28.1 billion.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 33, and therefore denies them.

34.     Verizon Communications and Verizon Wireless are referred to in this complaint collectively as "Verizon."

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 34, and therefore denies them.

35.     Defendant AT&T Mobility L.L.C. ("AT&T Mobility" or "AT&T") is a Delaware corporation with its principal place of business at 5565 Glenridge Connector, Atlanta, Georgia 30342.  It is the second largest United States provider of wireless services with approximately 78 million subscribers and 2007 revenues of approximately $43 billion.

**ANSWER:**     AT&T Mobility admits that it is a Delaware limited liability corporation, but denies the remaining allegations set forth in the first sentence of Paragraph 35.  AT&T Mobility admits that it is a large wireless telecommunications company in the United States.  To the extent the allegations of Paragraph 35 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 35.

36.     Defendant Sprint Nextel Corporation is a public corporation with its principal place of business at 650 Sprint Parkway, HL-5A STX, Overland Park, Kansas 66251. It is the third largest United States provider of wireless services with approximately 49 million subscribers.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 36, and therefore denies them.

37.     Defendant T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006. It is the fourth largest United States provider of wireless services with approximately 33 million subscribers.

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 37, and therefore denies them.

38.     Each of the named Defendants sold Text Messaging Services in the United States directly or through its affiliates and/or subsidiaries after January 1, 2005.

**ANSWER:**     AT&T Mobility admits that it sold text messaging services in the United States, directly or through its affiliates and/or subsidiaries, after January 1, 2005. To the extent the allegations of Paragraph 38 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.

39.     Each defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

**ANSWER:**     AT&T Mobility denies the allegations of Paragraph 39.

## CO-CONSPIRATORS

40.     Various others, presently unknown to Plaintiffs, participated as co-conspirators in the violations alleged in this complaint and performed acts and made statements in furtherance thereof.

**ANSWER:**     To the extent the allegations of Paragraph 40 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

13

belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the allegations of Paragraph 40.

41. The acts charged in this complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

ANSWER: AT&T Mobility denies the allegations of Paragraph 41.

## CLASS ACTION ALLEGATIONS

42. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2) and (b)(3) on behalf of themselves and the following Class:

> All persons and entities who paid a per-message price for Text Messaging Services in the United States directly to one or more of the Defendants or their affiliates or subsidiaries at any time from January 1, 2005 to the present. The Class excludes government entities, Defendants, and Defendants' parents, affiliates, subsidiaries, officers and directors.

ANSWER: AT&T Mobility admits that Plaintiffs purport to bring this case as a class action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2) and (b)(3) on behalf of themselves and the putative class defined in Paragraph 42, but denies that the Complaint states a claim and denies that this action can be brought by the putative class under any of those rules. AT&T Mobility denies the remaining allegations of Paragraph 42.

43. Plaintiffs do not know the exact number of Class members because that information is within the exclusive control of Defendants, but believe that there are many millions geographically dispersed throughout the United States, such that joinder of all members would be impracticable.

ANSWER: Because the allegations of Paragraph 43 describe Plaintiffs' knowledge and beliefs, no response from AT&T Mobility is required. To the extent a response is required, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of

those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of

Paragraph 43.

44. The identities of Class members can be readily determined from records maintained by Defendants and their agents.

**ANSWER:** To the extent the allegations of Paragraph 44 relate to persons or entities

other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the

allegations of Paragraph 44.

45. Questions of law or fact common to Class members exist and predominate over any questions affecting individual members of the Class, and include:

    a.    Whether Defendants engaged in a contract, combination or conspiracy to raise, fix, stabilize or maintain the per-message price for Text Messaging Services in the United States;

    b.    Whether each Defendant engaged in the contract, combination or conspiracy, and if so, to which extent;

    c.    Whether the contract, combination or conspiracy violates Section 1 of the Sherman Act;

    d.    Whether there were any additional co-conspirators to the contract, combination or conspiracy, and if so, their identities;

    e.    The duration and extent of the contract, combination or conspiracy;

    f.    Whether the conduct of Defendants and their co-conspirators caused the per-message price of Text Messaging Services to be artificially inflated to anti-competitive levels;

    g.    Whether Plaintiffs and Class members were injured by the conduct of Defendants and their co-conspirators;

    h.    The appropriate class wide measure of damages; and

    i.    Whether Plaintiffs and the Class are entitled to injunctive relief.

**ANSWER:** The allegations of Paragraph 45 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility denies the allegations of Paragraph 45, including the allegations of sub-sections "a" through "i" of Paragraph 45.

46. Plaintiffs have claims that are typical of the claims of the Class, have no interests adverse to or in conflict with the Class, and will fairly and adequately protect the interests of the Class.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 46, and therefore denies them.

47. Plaintiffs have retained counsel who are experienced in antitrust class actions, have significant knowledge about the antitrust laws, have performed considerable work in identifying and investigating the potential claims in this action, and have committed significant resources to representing the Class.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 47, and therefore denies them.

48. Separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

**ANSWER:** The allegations of Paragraph 48 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility denies the allegations of Paragraph 48.

49. Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate for the Class as a whole.

**ANSWER:** The allegations of Paragraph 49 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility denies the allegations, and further, to the extent the allegations of Paragraph 49 relate to

16

persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 49.

50.     Prosecuting the case as a class action is superior to any other methods for fair and efficient adjudication of the controversy because class members have no interest in individually controlling the prosecution of separate actions, as individual prosecutions would be uneconomic, would impose heavy burdens on the parties and the courts, and would create a risk of inconsistent adjudications. In addition, all litigation concerning this controversy already has been centralized in this forum, and it is unlikely that there will be any significant difficulties in managing this case as a class action.

**ANSWER:**     The first sentence of Paragraph 50 purports to state a legal conclusion to which an answer is neither required nor appropriate. To the extent a response is required, AT&T Mobility denies the allegations of Paragraph 50.

## TRADE AND COMMERCE

51.     During the Class Period, Defendants and their co-conspirators sold a substantial amount of Text Messaging Services within the continuous and uninterrupted flow of interstate and foreign commerce, and as intended, their actions substantially affected that commerce.

**ANSWER:**     AT&T Mobility admits that it sells Text Messaging Service, as defined, in interstate and foreign commerce. To the extent the allegations of Paragraph 51 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 51.

52.     The wireless telephone industry has undergone consolidation in the past four years, with the number of major national competitors declining from six to four.

**ANSWER:**     AT&T Mobility admits that in the four years prior to the filing of the Complaint, there has been some consolidation in the U.S. wireless telephone industry. To the extent the allegations of Paragraph 52 relate to persons or entities other than AT&T Mobility,

AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 52.

53.     Defendants are the four largest wireless telecommunications companies in the United States, and with more than 225 million subscribers, they control more than 90 percent of the Text Messaging Services sold in the United States.

**ANSWER:**    AT&T Mobility admits that it is a large wireless telecommunications company in the United States.  To the extent the allegations of Paragraph 53 relate to persons or entities other than AT&T Mobility, or to the number of all defendants' customers or their aggregate share of an undefined market, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 53.

54.     Thus, together, Defendants have great power in the market for Text Messaging Services and are capable of combining to increase the market price for those services to supra-competitive levels.

**ANSWER:**    To the extent the allegations of Paragraph 54 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 54 and specifically denies that it has "combined" or is "capable of combining" to increase the market price for Text Messaging Services.

## **TEXT MESSAGE SERVICES AND COSTS**

55.     Text messaging involves the use of cellular telephone equipment to send and receive short messages, generally limited to 160 characters per message.

**ANSWER:** AT&T Mobility admits that text messaging involves the use of cellular telephone equipment to send and receive messages, generally limited to 160 characters per message.

56. Text messaging constitutes a relevant market, and there are no good substitutes for text messaging.

**ANSWER:** The allegations of Paragraph 56 purport to state a legal conclusion to which an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility denies the allegations of Paragraph 56.

57. Customers sent 363 billion text messages in 2007, resulting in annual text messaging revenues of about $23.2 billion.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 57 and therefore denies them.

58. By 2008, Defendants transmitted 2.5 trillion text messages for almost 263 million wireless subscribers in the United States, representing 84% of the total population of the United States.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 58 and therefore denies them.

59. It is estimated that 3.3 trillion text messages will be sent in 2009.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 59 and therefore denies them.

60. AT&T has estimated that approximately two percent of the text messages sent and received on its system were purchased on a per-message basis, while approximately ten percent of T-Mobile's customers' text messaging is conducted on a per-message basis.

**ANSWER:** To the extent the allegations of Paragraph 60 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them. AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 60 and therefore denies them.

61. Assuming that at least two percent of the 2.5 trillion text messages that were sent and received in 2008 were purchased on a per-message basis, resulting in 50 billion text messages being sent and received at twenty cents each, Defendants' joint per-text-message revenue for the year 2008 alone would have been $10 billion.

**ANSWER:** Paragraph 61 purports to present an arithmetic calculation based on a number of stated assumptions, to which response is neither required nor appropriate. To the extent a response is required, AT&T Mobility states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 61 and therefore denies them, and further, to the extent the allegations of Paragraph 61 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 61.

62. While some subscribers purchase text messaging plans that allow them to send or receive a set or unlimited number of text messages for a flat monthly fee, many others pay an individual fee for each text message.

**ANSWER:** AT&T Mobility admits that some of its subscribers purchase text messaging plans that allow them to send or receive a set or unlimited number of text messages for a flat monthly fee, and that some of its subscribers pay an individual fee for each text message. To the extent the allegations of Paragraph 62 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 62.

63.     Defendants charge fees not only for outgoing messages, but also for incoming messages received by the subscriber, resulting in a fee being paid to a Defendant twice for each message -- one when the message is sent, and once when it is received.

**ANSWER:**    AT&T Mobility admits that it has sometimes charged fees for both outgoing and incoming text messages.  To the extent the allegations of Paragraph 63 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 63.

64.     Text message files are exponentially smaller than voicemail, email and music download files, and it thus costs exponentially less to transmit them.

**ANSWER**:    AT&T Mobility admits that text message files are generally smaller than voicemail, email, and music download files and less costly to transmit.  To the extent the allegations of Paragraph 64 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 64 and therefore denies them.

65.     For example, 600 text messages contain less data than one minute of a telephone call, making each text messaging file almost insignificant in the world of transmitting electronic data.

**ANSWER:**    AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 65 and therefore denies them.

66.     Defendants' cost to deliver an individual text message is close to zero because it is transmitted on an existing connection between a cell phone and the cell phone system.

**ANSWER:** To the extent the allegations of Paragraph 66 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 66.

67. Despite these minimal costs, carriers charge huge mark-ups and enjoy high profit margins on Text Messaging Services. According to technology news source CNET News: "One can easily assume that the mark-up on a text message *is several thousands times* what it actually costs carriers to transmit this little bit of data." (Emphasis added.)

**ANSWER:** To the extent the allegations of Paragraph 67 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 67.

68. The benefits of competition are lower prices and better services, and with competition, per-unit prices should be closely related to and follow per-unit costs.

**ANSWER:** Paragraph 68 purports to state general, hypothetical economic principles in ambiguous, undefined terms, and so a response is neither required nor appropriate. If and to the extent a response is required, AT&T Mobility denies the allegations of Paragraph 68, in part because different economic models and assumptions result in different economic conclusions.

69. Theoretically and historically, as per-unit costs for an item substantially decrease, per unit prices for such item substantially decrease.

**ANSWER:** Paragraph 69 purports to state general, hypothetical economic principles in ambiguous and undefined terms, and so a response is neither required nor appropriate. If and to the extent a response is required, AT&T Mobility denies the allegations of Paragraph 69, in part because different economic models and assumptions result in different economic conclusions.

70.     Between 2005 and late 2006 or early 2007, each Defendant's per-unit costs associated with text-messaging substantially decreased—by approximately 50%.

**ANSWER:**     To the extent the allegations of Paragraph 70 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  Because Paragraph 70 does not define the accounting terms it uses, AT&T Mobility lacks knowledge and information sufficient to form a belief about the truth of the allegations of Paragraph 70 and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 70.

71.     Absent collusion, Defendants' per-unit prices for text messages should have substantially decreased as well.

**ANSWER:**     AT&T Mobility denies the allegations of Paragraph 71.

72.     Defendants already had the infrastructure to transmit many more text messages than they were transmitting (and presently do transmit).  Because the supply of text messages was considerably greater than consumers' demand for them, Defendants' prices for text messaging should have decreased.  Increasing prices during a period of oversupply is one of the leading indicators of conspiracy.

**ANSWER:**     The second and third sentences of Paragraph 72 purport to state general, economic principles in ambiguous and undefined terms, and so a response is neither required nor appropriate.  To the extent a response is required to those sentences, AT&T Mobility denies the allegations therein made.  To the extent the allegations of Paragraph 72 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 72.

73.     From 2005 to early 2007, the price of other wireless services provided by Defendants *decreased*.  In fact, the same infrastructure that enables Defendants to transmit text messages enables them to transmit other wireless services.  The factors that govern the decreasing costs of text messaging also govern the decreasing costs of those other wireless

services.  Defendants' prices for text messaging should have decreased between 2005 and late 2006 or early 2007.

**ANSWER:**    To the extent the allegations of Paragraph 73 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that text message services are provided using certain physical infrastructure that is also used to provide other kinds of voice and data services, and that the prices of certain wireless services decreased from 2005 to 2007.  AT&T Mobility denies the remaining allegations of Paragraph 73.

74.    However, Defendants' per-unit prices for text-messages did not decrease over this period.  In fact, no Defendant's price for per-unit text messaging decreased at all.

**ANSWER:**    To the extent the allegations of Paragraph 74 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that certain of its single-use text messaging prices did not decrease from 2005 to 2007.  AT&T Mobility denies the remaining allegations of Paragraph 74.

75.    Prior to the conspiracy, Defendants actively competed for per-unit text messaging services and charged distinct prices.  T-Mobile charged five cents for both outgoing and incoming text messages up through April 2006, when it raised its price to ten cents as part of the alleged conspiracy.

**ANSWER:**    To the extent the allegations of Paragraph 75 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that at all times it has actively competed for customers on the basis of price and service and has charged independently-determined, distinct prices for its services.  AT&T Mobility denies the remaining allegations of Paragraph 75.

76.     Alltel (later Verizon), in contrast, changed its per-unit pricing on several occasions, charging ten cents until the middle of 2005, then dropping its fee to five cents until the end of 2005, subsequently raising its fee to eight cents in January 2006, and finally reaching the ten cent agreed price in October 2006.

**ANSWER:**     To the extent the allegations of Paragraph 76 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 76.

77.     Verizon, which previously followed a unique pricing model, charged ten cents for its outgoing text messages up through the start of the conspiracy period, but charged only two cents for incoming messages.  Verizon persisted in this independent pricing until agreeing to set its prices for both incoming and outgoing messages at ten cents as part of the conspiracy towards the end of 2006.

**ANSWER:**     To the extent the allegations of Paragraph 77 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 77.

78.     Cingular (later AT&T) never departed from its original price of ten cents, until such time as all Defendants raised their prices as part of the conspiracy.

**ANSWER:**     AT&T Mobility denies the allegations of Paragraph 78.

79.     Importantly, before the conspiracy, Nextel (now Sprint Nextel) first tried to increase the per-unit price from ten to fifteen cents in the 4th Quarter of 2003.  The other wireless providers refused to follow Nextel's lead, and stood firm at their individual prices.  In this competitive environment, Nextel was forced to return its per-text rate to the earlier ten cents in the 1st Quarter of 2005.

**ANSWER:**     To the extent the allegations of Paragraph 79 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 79.

80. The conspiracy began after this unsuccessful attempt to increase prices independently. In 2005 and 2006, the Defendants agreed to uniformly charge an unprecedented common per-unit price of ten cents for text messaging services. With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile, Alltel, and Verizon joined them in charging an identical ten cents per-unit for all incoming and outgoing messages. Each Defendant engaged in the highly unusual conduct of aligning their per unit text messaging prices and then increasing them by identical amounts.

**ANSWER:** To the extent the allegations of Paragraph 80 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 80.

81. Indeed, each and every Defendant engaged in the exact same, highly anomalous behavior of doubling its per-unit text messaging prices in a span of barely over a year.

**ANSWER:** To the extent the allegations of Paragraph 81 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 81.

82. Specifically, by the end of 2006, as part of the conspiracy, each Defendant had aligned their per-unit fee at ten cents per each text message sent or received. In late 2006 and early 2007, each Defendant increased its per-message fee by 50%, from ten to fifteen cents as outlined in the following chart:

| Defendant | Price Increase from 10¢ to 15¢ |
|---|---|
| Sprint Nextel | 4th Q 2006 |
| Alltel | 4th Q 2006 |
| AT&T | 1st Q 2007 |
| Verizon Wireless | 1st Q 2007 |
| T-Mobile USA | 2nd Q 2007 |

**ANSWER:**     To the extent the allegations of Paragraph 82 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that it increased certain of its text-messaging prices from $0.10 to $0.15 in January 2007.  AT&T Mobility denies the remaining allegations of Paragraph 82.

83.     During 2007 and early 2008, the amount of text messages sent by each Defendant's customers greatly increased.

**ANSWER:**     To the extent the allegations of Paragraph 83 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that its customers in the aggregate in the early months of 2008 sent and received more text messages than its customers in the aggregate sent and received in the comparable period in 2007.  AT&T Mobility denies the remaining allegations of Paragraph 83.

84.     During this same period, the per-unit costs of text messages of each Defendant continued to decrease substantially, by at least 35%, and each Defendant's available supply to transmit text messages still far exceeded usage and demand.  Also, during that period, each Defendant decreased its per-unit prices for other wireless services.

**ANSWER:**     To the extent the allegations of Paragraph 84 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

27

belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 84.

85. Moreover, each Defendant selected the exact same, extremely substantial 33.33% increase in its prices. Specifically, each Defendant increased its per-message fee from fifteen cents to twenty cents as outlined below.[5]

| Defendant | Price Increase from 15¢ to 20¢ |
|---|---|
| Sprint Nextel | 4th Q 2007 |
| AT&T | 1st Q 2008 |
| Verizon Wireless | 1st Q 2008 |
| T-Mobile USA | 3rd Q 2008 |

**ANSWER:** AT&T Mobility admits that it increased certain of its prices for text messaging from $0.15 to $0.20 in March 2008. To the extent the allegations of Paragraph 85 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 85.

86. Sprint Nextel was the ringleader in all price increases subsequent to the alignment of all per-unit prices at ten cents. In contrast to the independent conduct after Nextel first tried to increase its rates in 2003, the other Defendants adopted Sprint Nextel's per-text price increases in this instance as part of the conspiracy. Verizon and AT&T did so immediately, in the very next quarter for both increases, and T-Mobile ultimately cooperated and adopted the increase.

**ANSWER:** To the extent the allegations of Paragraph 86 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 86.

---

[5] Verizon acquired Alltel prior to the increase form ten to fifteen cents, and is therefore not included in the chart.

87.     Compared to historical experience, economic theory, Defendants' own contemporaneous pricing of comparable products, Defendants' excess supply, and Defendants' low costs, the prices of text messaging services should have decreased substantially between 2005 and 2008.  Moreover, the alignment and uniform increases evidenced above were a stark departure from Defendants' independent and competitive pricing practices in the preceding time period.

**ANSWER:**     To the extent the allegations of Paragraph 87 relate to persons or entities

other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the

remaining allegations of Paragraph 87.

88.     However, Defendants' collusive behavior subsequently caused a 100% increase in per-unit text messaging prices paid by Plaintiffs at the same times that each Defendant's comparable costs decreased by approximately 65%.  Defendants' supply exceeded demand, and the prices of Defendants' related products decreased.

**ANSWER:**     To the extent the allegations of Paragraph 88 relate to persons or entities

other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that

during the period from 2005 to 2008, its prices for certain wireless services decreased.  AT&T

Mobility denies the remaining allegations of Paragraph 88.

89.     Text messaging per-unit pricing lends itself to collusion in many ways.  This is, in part, because text messaging is a uniquely homogenous form of wireless communication.  The per-text-message price can easily be severed from other service charges, separately observed, and openly communicated among Defendants.  Defendants, in fact, did systematically engage in a highly unusual degree of communication with one another and shared information during 2005 – 2008.  *See infra.*  Defendants' prices for test messaging are even available on the Internet.

**ANSWER:**     To the extent the allegations of Paragraph 89 relate to persons or entities

other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that

certain of its text messaging pricing is available on the Internet. AT&T Mobility denies the remaining allegations of Paragraph 89.

90. Given the circumstances herein and previously alleged, the dramatic, identical rise in the price of text messaging must have resulted from a price fixing conspiracy among the Defendants.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 90.

91. In the alternative, under the circumstances hereinafter and previously alleged, Defendant Sprint-Nextel Corp.'s astonishing price increases constituted offers to the other Defendants to avoid engaging in competition and to extract supra-competitive prices many thousand times each Defendant's costs for text messaging services. The other Defendants accepted Sprint-Nextel's offers when they implemented identical price increases shortly thereafter, thereby consummating illegal agreements among suppliers representing 90% of the text message market to raise and maintain prices.

**ANSWER:** To the extent the allegations of Paragraph 91 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 91.

92. Under these circumstances, Defendants' pattern of offers and acceptances in and of itself constitutes a price fixing conspiracy.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 92.

## OPPORTUNITY TO CONSPIRE THROUGH TRADE ORGANIZATIONS

93. CTIA-The Wireless Association ("CTIA") is a trade organization based in Washington, D.C. that claims to be an "international association for the wireless telecommunications industry, dedicated to expanding the wireless frontier."

**ANSWER:** To the extent the allegations of Paragraph 93 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility admits that

CTIA is a trade organization based in Washington D.C. AT&T Mobility denies the remaining allegations of Paragraph 93.

94. Defendants are currently members of the CTIA. Defendants have met regularly through the CTIA's biannual conventions since 2002.

**ANSWER:** AT&T Mobility admits that it (or one of its subsidiaries or affiliates) is currently a member of the CTIA and that employees of AT&T Mobility (or its affiliates, subsidiaries, or predecessor entities, or the affiliates or subsidiaries of its predecessor entities) have attended CTIA meetings from time to time between 2002 and the present. To the extent the allegations of Paragraph 94 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 94.

95. In 2001, AT&T launched the first inter-carrier text messaging service, which allowed users to send text messages to customers of other carriers.

**ANSWER:** AT&T Mobility admits that it launched an inter-carrier text messaging service in 2001. AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 95 and therefore denies them.

96. Following on the heels of AT&T's launch, Defendants AT&T, Sprint Nextel and Verizon met through the CTIA on numerous occasions to discuss pricing and text messaging.

**ANSWER:** AT&T Mobility admits that since 2001, some employees of AT&T Mobility have attended one or more CTIA meetings. To the extent the allegations of Paragraph 96 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 96.

97.     For example, shortly thereafter, in early 2002, under CTIA's guidance, the six major national carriers, including Defendants, announced that they had reached agreement on allowing each carrier's service for text messaging to communicate with the others' service.

**ANSWER:**     To the extent the allegations of Paragraph 97 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that it has reached technical agreements with certain other wireless carriers which enable AT&T Mobility customers to communicate with customers of other wireless carriers.  AT&T Mobility denies the remaining allegations of Paragraph 97.

98.     Based on its orchestration of the interoperability agreements in 2002, CTIA has been and remains the driving force behind organizing Defendants and exchanging information about text messaging in the United States.

**ANSWER:**     To the extent the allegations of Paragraph 98 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 98.

99.     In announcing the interoperability agreements and potential massive revenue to carriers, CTIA President and CEO Tom Wheeler was quoted as saying, "Text messages have not only given consumers a brand new way to communicate, it has also given wireless companies around the globe an important new revenue stream.  Last year, the revenue generated by text messages was greater than Hollywood's combined box office receipts, according to the Mobile Data Association in the U.K."

**ANSWER:**     AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 99 and therefore denies them.

100.     The CTIA has expressed concerns that its collection of data could contribute to anti-competitive endeavors, but it has nonetheless continued to track competitive data, and has in fact increased its collection of information on texting.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 100 and therefore denies them.

101. The CTIA created a Wireless Internet Caucus ("WIC"), which is a "core community of CTIA member companies dedicated to growing a large and robust market at the convergence of wireless and Internet technologies, products and services" and that "seek[s] to build a shared vision of this market and an action plan to enable its rapid growth."

**ANSWER:** AT&T Mobility admits the existence of a group sometimes called the "Wireless Internet Caucus" or "WIC." AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 101 and therefore denies them.

102. In February 26, 2002, the CTIA convened the WIC Leadership Council, which "comprises a critical mass of key industry decision makers who work together to create a shared market vision and unified approach to solving problems and challenges faced collectively growing the wireless data marketplace." The Leadership Council was tasked with "launching an *industry-wide* initiative to address the hurdles that face the U.S. market in wireless data . . ."[6]

**ANSWER:** AT&T admits the existence of a group sometimes called the "WIC Leadership Council." AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 102 and therefore denies them.

103. The WIC Leadership Council consisted of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Spring PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[7] Participants in the WIC Leadership Council meetings included: Jim Straight, Vice President Wireless Data & Internet Services, Verizon Wireless; John Quzdepski, VP& GM, Sprintpcs.com, Spring PCS; Andrew Willett, VP, Multimedia Services, AT&T Wireless Services; Carlton Hill, Executive Director Internet Service, Cingular Wireless; Greg Santoro, Vice President, Internet and Wireless Services, Nextel; and Michael Cote, VP Wireless Data Sales & Operations, VoiceStream Wireless [later renamed T-Mobile].

**ANSWER:** AT&T Mobility admits that certain employees of AT&T Mobility (or its affiliates, subsidiaries, or predecessor entities, or the affiliates or subsidiaries of its predecessor

---

[6] Feb. 26, 2002 CTIA Press Release, *supra*.
[7] *Id.*

entities) attended meetings of the WIC Leadership Council, and that Carlton Hill attended at least one WIC-related meeting. To the extent the allegations of Paragraph 103 relate to Mr. Willett or to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 103.

104. The Leadership Council's inaugural meeting in February 2002 was a day-long event in which "executives of the U.S. wireless data industry began mapping out the course for the delivery of high-quality wireless data services," and discussed impediments to success in a variety of areas, including "messaging" services, interoperability, and "billing."[8]

**ANSWER:**    AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 104 and therefore denies them.

105. The CTIA's Vice President of Wireless Internet Development noted that because of the crucial moment in the development of the wireless data marketplace, "[t]he WIC Leadership Council members' efforts to create *industry-wide solutions through 'co-opetition' with each other,* can have a dramatic influence on the pace of that development."[9]

**ANSWER:**    AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 105 and therefore denies them.

106. The CTIA further emphasized that "[a]ll ships rise [together]. . . What's best for one company is not always best for the industry. The time has come to *serve the industry first.*"[10]

**ANSWER:**    AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 106 and therefore denies them.

107. The WIC Leadership Council convenes "bi-annual, face-to-face meetings . . . while conducting quarterly conference calls to keep apprised of the progress made."[11] Additionally, the Leadership Council prepared and disseminated thorough presentations

---

[8] *Id.*
[9] March 5, 2003 CTIA Press Release, *supra* (emphasis added).
[10] Feb. 26, 2002 CTIA Press Release, *supra* (emphasis added).
[11] *Id.*

providing detailed information regarding text messaging revenue, pricing, billing, and delivery. The data in these presentations was provided directly by Defendants. The WIC and its Leadership Council have operated throughout the class period.

**ANSWER:** AT&T Mobility admits that the WIC Leadership Council holds meetings and conference calls from time to time, and that it disseminates information about the wireless industry generally. To the extent the allegations of Paragraph 107 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 107.

108. The WIC also published the "WIC Manifesto," providing for a "commitment to work together to build a shared vision for the industry, and an action roadmap to make that vision a reality." The WIC Manifesto stated that the companies participating in the WIC would "work together to enlist the support and alignment of all key stakeholders in order to implement [win-win][ solutions."[12]

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 108 and therefore denies them.

109. The purpose of such joint efforts through the WIC was "to build a shared future in which we can all look forward to *profiting together.*"[13]

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 109 and therefore denies them.

110. As part of the Manifesto, the WIC specifically established the "Messaging Action Team," led by one of Nextel's executives. The Messaging Action Team devoted itself to "support a common approach to . . . message delivery mechanism, interconnection, billing and settlement." The Messaging Action Team was further designed to "propose billing principles for message transfer between 'message service providers.'"

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 110 and therefore denies them.

---

[12] WIC Manifesto, *supra,* at 1-2.
[13] *Id.* (emphasis added).

111.    The CTIA also formed a Mobile Advertising Metrics Action Team comprised of wireless carriers that work together to agree to minimum standards for reporting metrics, targeting information, advertising inventory and consumer privacy, and to monitor the progress of other industry organizations and collaborate where appropriate.

**ANSWER:**    AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 111 and therefore denies them.

112.    During the variety of CTIA and Messaging Action Team meetings and conversations, Defendants had numerous opportunities to conspire to set pricing for Text Messaging Services.  Sprint Nextel announced a per-unit text message price increase within approximately a month after the mid-year meeting in 2006, and again within approximately a month after the mid-year meeting in 2007, and as described above, the other Defendants followed shortly thereafter with identical price increases.

**ANSWER:**    To the extent the allegations of Paragraph 112 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that some of its employees attended some CTIA meetings from time to time.  AT&T Mobility denies the remaining allegations of Paragraph 112.

## ADDITIONAL JOINT CONDUCT

113.    The CTIA, of which Defendants are members, established and controls the Common Short Code Association (CSCA).  Defendants, working together through the CTIA, collusively use the CSCA to expand the market for texting services, control the prices for texting services, and generate further demand for texting services at the excessive prices established by the Defendants.

**ANSWER:**    To the extent the allegations of Paragraph 113 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that it (or one of its subsidiaries or affiliates) is a member of the CTIA, but denies the remaining allegations of Paragraph 113.

114. Common Short Codes ("CSCs") are five-digit or six-digit numeric codes to which text messages can be addressed from a wireless device. They are easy to remember, compatible across all participating carriers, and can be leased by anyone interested in interacting with over 200 million wireless consumers.

**ANSWER:** AT&T Mobility admits that CSCs are five- or six-digit numeric codes to which text messages can be addressed, and that they are compatible across certain wireless carriers, and that CSCs can be leased. AT&T Mobility denies the remaining allegations of Paragraph 114.

115. Wireless subscribers send text messages to Short Codes to access a wide variety of mobile content for delivery to their wireless devices, such as sweepstakes, tele-voting campaigns, mobile coupons, other promotions, and a wide range of additional interactive wireless services.

**ANSWER:** AT&T Mobility admits that text messages are sent to CSCs to access certain content, including sweepstakes, tele-voting campaigns, mobile coupons, and other promotions. AT&T Mobility denies the remaining allegations of Paragraph 115.

116. Marketers of consumer products and services, as well as business and enterprise customers, are currently using Short Codes to directly interact with and attract various audiences, as Short Codes provide an unprecedented opportunity to engage customers anytime, anywhere.

**ANSWER:** AT&T Mobility admits that some marketers, businesses, and enterprise customers use Common Short Codes in the manner generally but incompletely described in Paragraph 116. AT&T Mobility denies the remaining allegations of Paragraph 116.

117. According to the CSCA, "The potential is enormous. Common Short Codes will enable the continued growth of text messaging and provide a platform upon which new technologies will be able to flourish. Market developments like picture messaging (or MMS) and the continued evolution of Instant Messaging into the wireless medium make text messaging one of the most exciting, yet simple, breakthroughs, since the advent of the telephone itself!"

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 117 and therefore denies them.

118.    The CSCA leases the Short Codes to advertisers, which then negotiate agreements with each carrier to carry their Short Codes.

**ANSWER:**    To the extent the allegations of Paragraph 118 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that it negotiates agreements relating to Common Short Codes.  AT&T Mobility denies the remaining allegations of Paragraph 118.

119    The CSCA admits that its control of the Short Codes is a substantial benefit: "Wireless Services Providers benefits: Drives up text messaging usage and revenues because more applications will be funded."

**ANSWER:**    AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 119 and therefore denies them.

120.    Through the CSCA, CTIA has created the "shared vision" of the WIC by going beyond the bounds of a trade organization into the business of generating and driving profits for its members, including its core members, the named Defendants.

**ANSWER:**    To the extent the allegations of Paragraph 120 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 120.

121.    Short Codes earn money for the Defendants in a number of ways; the Defendants' trade association consortium charges a set fee for the establishment and leasing of Short Codes; then the lessee of the Short Code pays each carrier for the right to carry its codes; and consumers are then charged for using the Short Code, sometimes in multiple ways.

**ANSWER:**    AT&T Mobility admits that some of its revenue is attributable to the use of Short Codes by some of its customers.  To the extent the allegations of Paragraph 121 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information

sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T

Mobility denies the remaining allegations of Paragraph 121.

122.    For example, Major League Baseball has leased the Short Code 65246 "MLBGO" at http://mlb.com/web, which provides the subscriber with sports alerts, ringtones, and wallpaper. One of the options offered is "Team Alerts" where, for $3.99 "plus standard messaging fees," a subscriber can "stay connected" to his or her favorite team.  The fan receives fifteen to twenty alerts per week, including game summaries, home runs, lead changes, breaking news, and video highlights.  Major League Baseball says "To avoid high carrier data charges, an unlimited data plan is strongly recommended."  Defendants receive a share of the monthly fee for alert systems and their charges for the services, and for these types of services and revenues, they need a large group of subscribing customers with unlimited data plans.

**ANSWER:**    AT&T Mobility admits that some of its revenue is attributable to the use

of Short Codes by some of its customers, including those who have subscribed to Major League

Baseball's service.  To the extent the allegations of Paragraph 122 relate to persons or entities

other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the

remaining allegations of Paragraph 122.

123.    The Groupe Speciale Mobile Association ("GSMA") is a worldwide trade group of cellular providers that boasts membership of 750 mobile networks across 219 countries that collectively serve more than 3.4 billion customers totaling 85% of the world's mobile phone users.

**ANSWER:**    AT&T Mobility admits that GSMA is a trade group comprised, in part, of

U.S. and foreign cellular providers.  AT&T Mobility lacks knowledge or information sufficient

to form a belief about the truth of the remaining allegations of Paragraph 123 and therefore

denies them.

124.    One of the GSMA member-only databases includes information such as effective price per minute, total billed for SMS events, and number of SMS messages per user per month.

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 124 and therefore denies them.

125. GSMA recently completed its annual "Mobile World Congress" that was attended by at least leaders from AT&T and Verizon Communication.

**ANSWER:** To the extent the allegations of Paragraph 125 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility admits that some if its employees have attended meetings of the GSMA, including a meeting referred to as the "Mobile World Congress." AT&T Mobility denies the remaining allegations of Paragraph 125.

126. One of the break-out sessions at that "Congress" pertained to "Pricing Strategies for the Unlimited Generation."

**ANSWER:** AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 126 and therefore denies them.

127. Through CTIA and GSMA, the defendants have a forum in which to interact, access relevant utilization and pricing data, and participate in committees to lobby governmental entities, which furthers their collusive efforts.

**ANSWER:** AT&T Mobility admits that some of its employees have attended meetings of the CTIA and GSMA. AT&T Mobility denies the remaining allegations of Paragraph 127.

128. The revenues of Defendants are dependent on encouraging individual users to use and become reliant upon high amounts of data.

**ANSWER:** To the extent the allegations of Paragraph 128 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a

belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 128.

129.    Defendants, individually and acting in concert, have adopted uniform and unreasonably high charges for text messaging in order to encourage their customers to purchase other services.

**ANSWER:**    To the extent the allegations of Paragraph 129 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 129.

130.    Defendants stand to earn significant fees from the use of Short Codes, and if they are to fulfill their potential as a revenue driver, customers need to have unlimited text messaging and related data plans.

**ANSWER**:    AT&T Mobility admits that some of its revenue is attributable to the use of Short Codes by some of its customers. To the extent the allegations of Paragraph 130 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 130.

131.    The larger the group of potential customers equipped with unlimited plans, the more fees Defendants can demand for the right to carry their short codes.

**ANSWER:**    To the extent the allegations of Paragraph 131 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 131.

132.    Consequently, it is necessary for Defendants to enroll as many customers as possible in unlimited data plans.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 132.

133. Defendants, acting jointly, in concert, and individually, also have adopted high single text only plans in order to encourage and force their texting customers to purchase unlimited data plans and other bundled services that the individual consumers may not want, need, or be able to afford.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 133.

## CONGRESSIONAL INVESTIGATION

134. On September 9, 2008, the Senate Antitrust Subcommittee sent a letter to Defendants, questioning the basis for the huge increases in the pay-per-use text messaging price.

**ANSWER:** AT&T Mobility admits that it received a letter dated September 9, 2008 from the Senate Antitrust Subcommittee regarding the rates charged to wireless phone customers for text messaging, which letter speaks for itself. To the extent the allegations of Paragraph 134 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 134.

135. The Senate Subcommittee expressed concern about the increases being made at nearly the same time, in identical amounts, when price increases did not appear to be justified by increases in costs, and concluded that "[t]his conduct is hardly consistent with the vigorous price competition we hope to see in a competitive marketplace."

**ANSWER:** AT&T Mobility admits that it received a letter dated September 9, 2008 from the Senate Antitrust Subcommittee regarding the rates charged to wireless phone customers for text messaging. The letter speaks for itself, and AT&T Mobility denies Plaintiffs' characterization of it. To the extent the allegations of Paragraph 135 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 135.

136.    The Senate Subcommittee also requested that each Defendant:

a.    explain the cost, technical or other factors that justify a 100% increase in the cost of Text Messaging Services from 2005 to 2008;

b.    provide data on the use of Text Messaging Services from 2005 to 2008;

c.    provide a comparison of prices charged for Text Messaging Services as compared to other services offered by the company such as prices per minute for voice calling, prices for sending emails, and prices charged for data services such as internet access over wireless devices from 2005 to the present; and

d.    state whether the company's Text Messaging Services pricing structure differs in any significant respect from the pricing of the company's three main competitors.

**ANSWER:**    To the extent the allegations of Paragraph 136 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that it received a letter dated September 9, 2008 from the Senate Antitrust Subcommittee and that in the letter, the Subcommittee asked AT&T Mobility for certain information, but AT&T Mobility states that the letter speaks for itself and denies Plaintiffs' characterization of it.  AT&T Mobility denies the remaining allegations of Paragraph 136.

137.    In response, Defendants provided limited and biased information on the prices for their package plans, including their text message package plans, but failed to (a) specifically address why they increased their per-message prices for text messaging or (b) deny that those increases were the result of collusion.

**ANSWER:**    To the extent the allegations of Paragraph 137 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the allegations of Paragraph 137.

## STRUCTURAL FACTORS FACILITATE COLLUSION

138.    The wireless telephone-provider industry is marked by certain structural and other characteristics that make price fixing feasible, including the heavy concentration of the market share among Defendants.

**ANSWER:**    AT&T Mobility denies the allegations of Paragraph 138.


139.    Price fixing is relatively easy to maintain in a market such as that for Text Messaging Services, which has extremely high barriers to entry because of the high cost of infrastructures, creating a situation where there is virtually no chance that a new competitor will enter the market to challenge artificially high prices.

**ANSWER:**    AT&T Mobility denies the allegations of Paragraph 139.


140.    Collusion among competitors in this market is also easy because Text Messaging Services are homogenous, with no discernable difference between the Text Messaging Services provided by one market participant over another.

**ANSWER:**    AT&T Mobility denies the allegations of Paragraph 140.


141.    Defendants have colluded on the inclusion of other terms in their cellular and text messaging contracts, in relation to early termination fees and mandatory arbitration clauses, leaving consumers with no choice but to accept these terms or forego purchasing cellular and text messaging services.

**ANSWER:**    AT&T Mobility denies the allegations of Paragraph 141.


## COMMON CLASS ARBITRATION WAIVERS

142.    Defendants require that Plaintiffs and other Class Members agree to contracts which require wireless users to arbitrate disputes with service providers and to waive their right to class arbitration.    These common waivers are indicative of additional collusive, anticompetitive conduct and are specifically designed to facilitate Defendants' conspiracy.

**ANSWER:**    To the extent the allegations of Paragraph 142 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility admits that some of its customer contracts have arbitration provisions which speak for themselves, and denies the remaining allegations of Paragraph 142.

44

143.    As Defendants know, due to the high cost of litigation and the comparatively small injury an individual user suffers from their conspiracy, it is only economically feasible for the individual to seek redress by joining a class action.  Common class arbitration waivers constitute an attempt by Defendants to insulate themselves from legal challenge on a class-wide basis, enabling them to reap substantial profits from the collective injury they impose on users.

**ANSWER:**    To the extent the allegations of Paragraph 143 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  AT&T Mobility denies the remaining allegations of Paragraph 143.

144.    Plaintiffs and other Class Members who have submitted to class arbitration waivers have done so because it is extremely difficult to function in the current economic and social climate without Text Messaging and wireless services.  In addition, such Plaintiffs and other Class Members have no bargaining power, do not understand the consequences of a class arbitration waiver, and may be unsophisticated.  For the foregoing reasons, the class arbitration waiver is a classic contract of adhesion and is unconscionable and unenforceable.

**ANSWER:**    The last sentence of Paragraph 144 purports to state legal conclusions to which an answer is neither appropriate nor required; to the extent an answer is required, AT&T Mobility denies the allegations in the third sentence of Paragraph 144.  AT&T Mobility denies the remaining allegations of Paragraph 144.

145.    Moreover, Defendants acknowledge that these class arbitration waivers are of questionable validity, as their contracts make provisions for what will happen when a court determines that the waivers are unenforceable or void.  Under those circumstances, the contracts state that the overarching agreement to arbitrate is itself void.  As the class arbitration waivers at issue are unenforceable, and as the overarching agreements to arbitrate are consequently void pursuant to contract, Plaintiffs have properly brought this litigation in this Court on behalf of themselves and the Class.

**ANSWER:**    To the extent the allegations of Paragraph 145 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them.  The allegations in the third sentence of Paragraph 145 purport to state legal conclusions to which an answer is neither

required nor appropriate; to the extent an answer is required, AT&T Mobility denies those allegations. AT&T Mobility denies the remaining allegations of Paragraph 145.

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

146.    Plaintiffs re-allege paragraphs 1 through 145 as if fully restated herein.

**ANSWER:**    AT&T Mobility reincorporates its answers to paragraphs 1 through 145 as if fully restated herein.

147.    Beginning at least as early as January 1, 2005 (the exact date being unknown to Plaintiffs) and continuing until the present, Defendants and their co-conspirators engaged in a contract, combination and conspiracy to artificially raise, fix, maintain and/or stabilize pricing for Text Messaging Services in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**    To the extent the allegations of Paragraph 147 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 147.

148.    Defendants entered into illicit agreements to increase prices of Text Messaging Services at some point prior to and during the period around July-December 2006 (for the increase implemented in Q4 2006 – Q2 2007) and again at some point prior to and during the period around July-December 2007 (for the increase implemented in Q4 2007 – Q3 2008).

**ANSWER:**    To the extent the allegations of Paragraph 148 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 148.

149.    For the purpose of formulating and carrying out the contract, combination and conspiracy, Defendants and their co-conspirators did those things which they conspired to do, as alleged above.

46

**ANSWER:** To the extent the allegations of Paragraph 149 relate to persons or entities other than AT&T Mobility, AT&T Mobility lacks knowledge or information sufficient to form a belief about the truth of those allegations and therefore denies them. AT&T Mobility denies the remaining allegations of Paragraph 149.

150. The contract, combination and conspiracy alleged had the following effects, among others:

      a.      purchasers of Text Messaging Services have been and continue to be deprived of the benefit of free and open competition;

      b.      the per text message price has been and continues to be fixed, raised, maintained and stabilized at artificially high and no-competitive levels; and

      c.      competition between and among Defendants and other co-conspirators in the sale of Text Messaging Services has been and continues to be unreasonably restrained.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 150, including the allegations of sub-sections "a" through "c" of Paragraph 150.

151. Plaintiffs and the other Class members have been injured in their business and property by being unable to purchase text messages on a per-message basis, except at a price higher than otherwise would have been paid in the absence of Defendants' unlawful contract, combination and conspiracy.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 151.

152. The contract, combination, and conspiracy is continuing, and will continue unless the injunctive relief prayed for herein is granted.

**ANSWER:** AT&T Mobility denies the allegations of Paragraph 152.

153. Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** To the extent the allegations of Paragraph 153 state a legal conclusion, an answer is neither required nor appropriate. To the extent an answer is required, AT&T Mobility denies the allegations. AT&T Mobility denies the remaining allegations of Paragraph 153.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A. That the Court determine that the Sherman Act claim may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B. That the Court adjudge and decree that Defendants engage in an unlawful contract, combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. ¶ 1);

C. That the Court adjudge and decree that each of the Defendants, its subsidiaries, successors, transferees, assigns, and respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from directly or indirectly continuing, maintaining or renewing the contract, combination and conspiracy alleged herein, and from engaging in any other contract, combination and conspiracy, agreement, understanding or concert of action having a similar purpose or effect;

D. That Plaintiffs and the other Class Members recover threefold the damages that each sustained;

E. That Plaintiffs and the other Class Members recover the costs of the suit, including reasonable attorneys and expert fees and costs;

F. That Plaintiffs and the other Class members be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the initial complaint to the extent provided by law; and

G. That the Court grant such other, further or different relief as may be just.

**ANSWER:** AT&T Mobility denies that the Complaint states a claim or that Plaintiffs are entitled to any relief whatsoever, and denies that this action may be maintained as a class action. AT&T Mobility therefore requests the Court to dismiss the Complaint with prejudice and/or enter judgment in AT&T Mobility's favor and against Plaintiffs, and to award AT&T

Mobility its attorneys' fees, costs, and disbursements, and such other and further relief as the Court may deem just and proper.

## AT&T MOBILITY'S AFFIRMATIVE DEFENSES

In further answer to the Complaint, AT&T Mobility states that Plaintiffs' claims are barred in whole or in part by the following defenses. AT&T Mobility does not assume the burden of proof on any such defenses that would otherwise rest on Plaintiffs. AT&T Mobility has not knowingly or intentionally waived any applicable affirmative or other defenses. AT&T Mobility reserves the right to amend their Answer and/or to assert and rely upon such other defenses as may become available or apparent during discovery in this case.

## FIRST DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, for failure to state a claim on which relief can be granted.

## SECOND DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, by the statute of limitations.

## THIRD DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, because plaintiffs suffered no injuries or damages as a result of the conduct alleged in the complaint.

## FOURTH DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, because they have no standing under the federal antitrust laws to bring some or all of their claims.

## FIFTH DEFENSE

Plaintiffs' claims for monetary relief are barred, in whole or in part, by the holding of *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977).

## SIXTH DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, because their alleged injuries and damages are remote and speculative and are therefore not recoverable.

## SEVENTH DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, by the doctrine of unclean hands, *in pari delicto*, waiver, or estoppels.

## EIGHTH DEFENSE

Plaintiffs' claims and prayers for relief are barred, in whole or in part, because they failed to mitigate their alleged injuries and by the doctrine of avoidable consequences.

## NINTH DEFENSE

Some or all of Plaintiffs' claims are barred because they have not suffered antitrust injury proximately caused by conduct of AT&T Mobility, or have not suffered, and will not suffer, injury of the type the antitrust laws were designed to prevent.

## TENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the conduct of which Plaintiffs complain has not, and will not, unreasonably restrain trade or commerce.

**ELEVENTH DEFENSE**

AT&T Mobility's actions challenged by Plaintiffs were justified, constituted bona fide business competition, and were carried out in furtherance of AT&T Mobility's legitimate business interests.

**TWELFTH DEFENSE**

AT&T Mobility adopts by reference any applicable defense pleaded by any other defendant that is not otherwise expressly set forth in this Answer to the extent such defense is not inconsistent with AT&T Mobility's defenses set forth herein.

Dated: June 4, 2010
      Chicago, Illinois

                                      AT&T MOBILITY LLC

                                       _/s/ John W. Treece_____

                                      David W. Carpenter
                                      John W. Treece
                                      Adrienne B. Pitts
                                      SIDLEY AUSTIN LLP
                                      One South Dearborn Street
                                      Chicago, IL  60603
                                      Telephone:    (312) 853-7000
                                      Email: dcarpenter@sidley.com
                                      Email: jtreece@sidley.com
                                      Email: apitts@sidley.com

                                      *Counsel for AT&T Mobility LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of June 2010, I caused a true and correct copy of the foregoing Answer of Defendant AT&T Mobility LLC to Plaintiffs' Second Amended Consolidated Class Action Complaint to be served, via the Court's ECF system, on all counsel of record registered to receive electronic filings in this case.


_____/s/ John W. Treece_____