**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| **IN RE TEXT MESSAGING** | ) | |
| **ANTITRUST LITIGATION** | ) | **No. 08 C 7082** |
| ——————————————— | ) | **MDL No. 1997** |
| | ) | **Judge Matthew F. Kennelly** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| **ALL ACTIONS** | ) | |
| ——————————————— | ) | |

## THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned counsel, allege as follows upon personal knowledge as to their own conduct, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.      This is an antitrust action charging Defendants with entering into and implementing a continuing contract, combination, and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services sold in the United States.

2.      Plaintiffs bring this action on behalf of themselves and all persons or entities who purchased Text Messaging Services based on a fee per text message in the United States directly from the Carrier Defendants (defined in ¶37 below) or their predecessors, subsidiaries, or affiliates during the period from January 1, 2005 through the present.

3.      The Carrier Defendants control more than 90% of the market for Text Messaging Services.  It costs a fraction of a penny for the Carrier Defendants to transmit a text message because these messages involve very little data and are transmitted on existing cellular network connections. Because the per-unit cost of text messages is very low, reduced pricing would be an easy and affordable way for any one of the Carrier Defendants to distinguish itself from its competitors.

4.     That is, in fact, what the Carrier Defendants traditionally did.  In the 3rd Quarter of 2003, for example, while Nextel (the predecessor to Sprint) and Cingular (the predecessor to AT&T) were charging their customers ten cents per text, T-Mobile charged only five cents.  Alltel (later acquired by Verizon) vacillated between five, eight, and ten cents.  At the same time, Verizon followed a unique pricing model, charging disparate fees of two cents for incoming messages and ten cents for outgoing messages.  When Nextel increased its per-text rate to fifteen cents in the following quarter (the 4th Quarter of 2003), the other Carrier Defendants stood firm, with Cingular and Alltel still charging only ten cents per text, T-Mobile still charging only five cents per-unit, and Verizon continuing to follow the unique pricing structure described above.  Each continued to impose their independent charges for more than a year, with no changes until 2005.  Then in the 1st Quarter of 2005, Sprint Nextel dropped its charge to ten cents per text, while Alltel increased its per-unit charge to eight cents.

5.     Defendants' conspiracy began after this unsuccessful attempt to increase prices independently.  In 2005 and 2006, the Carrier Defendants agreed to adopt a uniform and unprecedented common per-unit price of ten cents for text messaging services.  With Cingular charging ten cents per text, and Sprint Nextel having dropped its per-unit fee to an identical ten cent level, T-Mobile and Alltel increased their per-unit rates to ten cents and Verizon joined them by abandoning its unique pricing model in favor of charging an identical ten cents per-unit for all incoming and outgoing messages.

6.     This was followed by more lockstep price increases.  Sprint Nextel Corporation increased its per text message price by 50% (from ten to fifteen cents) in the 4th Quarter of 2006, and immediately thereafter, in the 1st and 2nd Quarters of 2007, the remaining Carrier Defendants increased prices by the same exact amount (from ten to fifteen cents).

2

7.     Once again, in the 4th Quarter of 2007, Sprint Nextel Corporation increased its per text message price by 33.33% (from fifteen to twenty cents), and immediately thereafter, in the 1st and 3rd Quarters of 2008, the remaining Carrier Defendants increased prices by the same amount (from fifteen to twenty cents).  Not one of the Carrier Defendants attempted to attract additional customers by charging even a penny less per text message.

8.     Such marked shifts in behavior, where there are "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason," support the existence of a conspiracy.  *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 n.4 (2007)).

9.     During the period from 2005 through 2008, as the cost to transmit a text message decreased by 65%, each of the Carrier Defendants first aligned its per-unit price at ten cents, and subsequently increased its per-unit prices by 100% in two identical price increases, to the same exact penny in similar time frames.

10.     As a manager responsible for pricing at T-Mobile admitted,  the Carrier Defendants' price increases were not motivated by higher costs, but were instead "col[l]usive and opportunistic."

11.     Text message pricing naturally lends itself to collusion because it is a uniquely homogenous form of wireless communication and because per-unit text message prices can easily be severed from other service charges.  The Carrier Defendants' current per-unit text message prices are also available on the Internet.  Further, each of the Carrier Defendants belongs to the CTIA – The Wireless Association ("CTIA") and the Groupe Speciale Mobile Association, which provided  the Carrier Defendants with multiple opportunities to collude regarding pricing data from before 2005 to date.

12.     The CTIA was one vehicle for conducting the conspiratorial activity, as revealed in several CTIA press releases and public documents.  The CTIA created the Wireless Internet Caucus ("WIC") Leadership Council consisting of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later renamed T-Mobile])."[1]   The purpose of the WIC Leadership Council was to create "industry-wide approach[es]" to "messaging" and "billing."  Unlike run-of-the-mill annual meetings conducted by various trade associations, the WIC Leadership Council entailed committee meetings narrowly focused on text messaging delivery and pricing, and included the participation of  the Carrier Defendants' high-level executives.

13.     The WIC Leadership Council also attempted to "create industry-wide solutions through 'co-opetition' with each other,"[2] and focused on" build[ing] a shared future in which we can all look forward to profiting together"[3] by placing the interests of the industry above and before the individual companies' individual interests.[4]

14.     It is implausible to think that each of the Carrier Defendants were able to arrive independently at the same exact price increase to the same exact penny within similar time frames considering the extensive exchanges of information engaged in by the Carrier Defendants pertinent to messaging revenue, billing, and delivery.  Each of the Carrier Defendants have millions of

---

[1] Feb. 26, 2002 CTIA Press Release, *CTIA Convenes Wireless Internet Caucus Leadership Council*, available at http://www.ctia.org/media/press/body.cfm/prid/1038 (last visited June 29, 2011).

[2] March 5, 2003 CTIA Press Release, *Wireless Internet Caucus to Expand*, available at http://www.ctia.org/media/press/body.cfm/prid/1228 (emphasis added) (last visited June 29, 2011).

[3] The WIC Manifesto, at 2, available at http://files.ctia.org/pdf/WIC_MANIFESTO.pdf (last visited June 29, 2011).

[4] Feb. 26, 2002 CTIA Press Release, *supra*.

customer accounts and operates nationwide. Each price increase required each of the Carrier Defendants to undertake comprehensive software and other changes to nationwide accounting and billing systems. Each of the Carrier Defendants had to change or adjust print, television, radio and internet advertising and marketing campaigns that are nationwide in scope. Each of the Carrier Defendants had to prepare for and roll out training materials for sales associates and retail store locations and customer service representatives around the nation, if not the globe. Despite the comprehensive and multi-faceted efforts necessary for each of the Carrier Defendants to implement its price increase, each implemented the same exact price increase to the same exact penny within similar timeframes not once, but twice. When Congress subpoenaed the Carrier Defendants concerning the economically irrational price increases for per-unit text message services, the Carrier Defendants largely refrained from addressing their per-unit prices, focusing instead on text message service plans, and failed to deny that their per-text message prices were the result of collusion.

15.     As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class (defined in ¶43 below) have paid the Carrier Defendants higher prices for Text Messaging Services than they would have paid absent Defendants' antitrust conduct.

## DEFINITIONS

16.     "Class Period" means the period from January 1, 2005 through the present.

17.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

18.     "Text Messaging Services" or "Texting" means the use of a cellular telephone to exchange brief messages with other mobile phones over cellular networks, and may include inter alia person-to-person messaging and message interaction with automated systems to order products and services for mobile phones or to participate in contests.

5

## JURISDICTION & VENUE

19.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover injunctive relief, treble damages, and costs of suit, including attorneys' and expert fees and costs, as a result of Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

20.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

21.     This court has personal jurisdiction over each Defendant because, *inter alia*: (a) each Defendant transacted business throughout the United States, including in this District; (b) each of the Carrier Defendants provided, sold and delivered substantial Text Messaging Services throughout the United States, including in this District; (c) each Defendant had substantial contacts with the United States, including in this District; and (d) each Defendant was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

22.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period each Defendant resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

23.     Venue is also proper in this District because this action was transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

**PLAINTIFFS**

24.     Aircraft Check Services Company is an Illinois corporation that purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

25.     Nicholas Iltsopoulos is a resident of Titusvile, Florida who purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

26.     David Keefer is a resident of Wantagh, New York who purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

27.     Kevin Konkel is a resident of South Milwaukee, Wisconsin who purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

28.     Jim Morris is a resident of Athens, Alabama who purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

29.     Premiere Investment Consulting is a resident of Cudahy, Wisconsin that purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

30.     Melissa Leigh Randolph is a resident of West Palm Beach, Florida who purchased Text Messaging Services from one or more of the Carrier Defendants after January 1, 2005.

**DEFENDANTS**

31.     Verizon Wireless is a joint venture of Verizon Communications (55%) and Vodafone Group PLC (45%) with its principal place of business at 1 Verizon Way, Basking Ridge, New Jersey 07920. By subscribers, Verizon Wireless owns and operates the largest United States wireless telecommunications network with approximately 104 million United States subscribers and an annual revenue of approximately $63.4 billion in 2010.

32.     On or about January 9, 2009, Verizon Wireless acquired Alltel Wireless, the fifth largest United States provider of wireless services, for approximately $28.1 billion.

7

33.     Verizon Communications and Verizon Wireless are referred to in this complaint collectively as "Verizon."

34.     AT&T Mobility L.L.C. ("AT&T Mobility" or "AT&T") is a Delaware corporation with its principal place of business at 5565 Glenridge Connector, Atlanta, Georgia 30342.  It is the second largest United States provider of wireless services with approximately 97 million subscribers and 2010 revenues of approximately $58.5 billion.  Until January 2007, AT&T Mobility was formerly known as Cingular Wireless LLC.

35.     Sprint Nextel Corporation ("Sprint") is a public corporation with its principal place of business at 650 Sprint Parkway, HL-5A STX, Overland Park, Kansas 66251.  It is the third largest United States provider of wireless services with approximately 51 million subscribers and 2010 revenues of approximately $32.6 billion.  Sprint was formed in August 2005 after the acquisition of Nextel Communications by Sprint Corporation.

36.     T-Mobile USA, Inc. ("T-Mobile") is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006.  It is the fourth largest United States provider of wireless services with approximately 34 million subscribers and 2010 revenues of approximately $21.3 billion.

37.     Verizon, AT&T, Sprint, and T-Mobile are referred to collectively as the "Carrier Defendants."

38.     CTIA-The Wireless Association ("CTIA") is a trade organization with its principal place of business at 1400 16th Street, NW, Suite 600, Washington, D.C. 20036.  The Carrier Defendants are all members of the CTIA, and they substantially control its activities.

39.     Each of the Carrier Defendants sold Text Messaging Services in the United States directly or through its affiliates and/or subsidiaries after January 1, 2005.

8

40.     Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CO-CONSPIRATORS

41.     Various others, presently unknown to Plaintiffs, participated as co-conspirators in the violations alleged in this complaint and performed acts and made statements in furtherance thereof.

42.     The acts charged in this complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

## CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2) and (b)(3) on behalf of themselves and the following Class:

> All persons and entities who paid a per-message price for Text Messaging Services in the United States directly to one or more of the Carrier Defendants or their affiliates or subsidiaries at any time from January 1, 2005 to the present.  The Class excludes government entities, Defendants, and Defendants' parents, affiliates, subsidiaries, officers and directors.

44.     Plaintiffs do not know the exact number of Class members because that information is within the exclusive control of the Carrier Defendants, but believe that there are many millions geographically dispersed throughout the United States, such that joinder of all members would be impracticable.

45.     The identities of Class members can be readily determined from records maintained by Defendants and their agents.

46.     Questions of law or fact common to Class members exist and predominate over any questions affecting individual members of the Class, and include:

a.  Whether Defendants engaged in a contract, combination or conspiracy to raise, fix, stabilize or maintain the per-message price for Text Messaging Services in the United States;

b.  Whether each Defendant engaged in the contract, combination or conspiracy, and if so, to what extent;

c.  Whether the contract, combination or conspiracy violates Section 1 of the Sherman Act;

d.  Whether there were any additional co-conspirators to the contract, combination or conspiracy, and if so, their identities;

e.  The duration and extent of the contract, combination or conspiracy;

f.  Whether the conduct of Defendants and their co-conspirators caused the per-message price of Text Messaging Services to be artificially inflated to anti-competitive levels;

g.  Whether Plaintiffs and the Class were injured by the conduct of Defendants and their co-conspirators;

h.  The appropriate classwide measure of damages; and

i.  Whether Plaintiffs and the Class are entitled to injunctive relief.

47.  Plaintiffs have claims that are typical of the claims of the Class, have no interests adverse to or in conflict with the Class, and will fairly and adequately protect the interests of the Class.

48.  Plaintiffs have retained counsel who are experienced in antitrust class actions, have significant knowledge about the antitrust laws, have performed considerable work in identifying and investigating the potential claims in this action, and have already demonstrated that they will prosecute this action vigorously and have committed and will commit significant resources to representing the Class.

49. Separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

50. Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate for the Class.

51. Prosecuting the case as a class action is superior to any other method for fair and efficient adjudication of the controversy because class members do not have an interest in individually controlling the prosecution of separate actions, as individual prosecutions would be uneconomic, would impose heavy burdens on the parties and the courts, and would create a risk of inconsistent adjudications. In addition, all litigation concerning this controversy already has been centralized in this forum and there will not be any significant difficulties in managing this case as a class action.

## **TRADE AND COMMERCE**

52. During the Class Period, the Carrier Defendants and their co-conspirators sold a substantial amount of Text Messaging Services within the continuous and uninterrupted flow of interstate and foreign commerce, and as intended, their actions substantially affected that commerce.

53. The wireless telephone industry has undergone consolidation in the past four years, with the number of major national competitors declining from six to four.

54. The Carrier Defendants are the four largest wireless telecommunications companies in the United States, and with more than 225 million subscribers, they control more than 90 percent of the Text Messaging Services sold in the United States.

55.     Thus, together, the Carrier Defendants have great power in the market for Text Messaging Services and are capable of combining to increase the market price for those services to supra-competitive levels.

## TEXT MESSAGE SERVICES AND COSTS

56.     Text messaging involves the use of cellular telephone equipment to send and receive short messages, generally limited to 160 characters per message.

57.     Text messaging constitutes a relevant market, and there are no good substitutes for text messaging.

58.     According to CTIA data, over 2 trillion text messages were sent and received in 2010.

59.     AT&T estimated that approximately two percent of the text messages sent and received on its system were purchased on a per-message basis, while approximately ten percent of T-Mobile's customers' text messaging was conducted on a per-message basis.

60.     Assuming that at least two percent of the 2 trillion text messages that were sent and received in 2010 were purchased on a per-message basis, resulting in 40 billion text messages being sent and received at twenty cents each, the Carrier Defendants' joint per-text-message revenue for the year 2010 alone would have been $6 billion.

61.     While some subscribers purchase text messaging plans that allow them to send or receive a set or unlimited number of text messages for a flat monthly fee, many others pay an individual fee for each text message.

62.     The Carrier Defendants charge fees for outgoing messages and for incoming messages received by the subscriber, resulting in fees being paid to a Carrier Defendant twice for each message – once when the message is sent, and once when it is received.

63.     Text message files are exponentially smaller than voicemail, e-mail and music download files, and it costs exponentially less to transmit them.

64.     For example, 600 text messages contain less data than one minute of a telephone call, making each text messaging file almost insignificant in the world of transmitting electronic data.

65.     The Carrier Defendants' cost to deliver an individual text message is close to zero because it is transmitted on an existing connection between a cell phone and the cell phone system.

66.     Despite these minimal costs, the Carrier Defendants charge huge mark-ups and enjoy high profit margins on Text Messaging Services.  According to technology news source CNET News:  "One can easily assume that the mark-up on a text message is several thousands times what it actually costs carriers to transmit this little bit of data."  (Emphasis added.)

67.     The benefits of competition are lower prices and better services, and with competition, per-unit prices should be closely related to and follow per-unit costs.

68.     Historically, as per-unit costs for an item substantially decrease, per unit prices for such item substantially decrease.

69.     Between 2005 and late 2006 or early 2007, each of the Carrier Defendant's per-unit costs associated with text messages substantially decreased—by approximately 50%.

70.     Absent collusion, the Carrier Defendants' per-unit prices for text messages should have substantially decreased as well.

71.     The Carrier Defendants already had the infrastructure to transmit many more text messages than they were transmitting (and presently do transmit).  Because the supply of text messages was considerably greater than consumers' demand for them, the Carrier Defendants' prices for text messaging should have decreased.  Increasing prices during a period of oversupply is one of the leading indicators of a conspiracy.

13

72.     From 2005 to early 2007, the price of other wireless services provided by the Carrier Defendants actually *decreased*.  However, it is the same infrastructure that enables the Carrier Defendants to transmit those other wireless services that enables them to transmit text messages. The factors that govern the decreasing costs of text messaging also govern the decreasing costs of those other wireless services.  The Carrier Defendants' prices for text messaging should have decreased between 2005 and late 2006 or early 2007.

73.     However, the Carrier Defendants' per-unit prices for text messages did not decrease over this period.  In fact, no Carrier Defendant's price for per-unit text messaging decreased at all.

74.     Prior to the conspiracy, the Carrier Defendants actively competed for per-unit text messaging services and charged distinct prices.  T-Mobile charged five cents for both outgoing and incoming text messages up through April 2006, when it raised its price to ten cents as part of the alleged conspiracy.

75.     Alltel (later Verizon), in contrast, changed its per-unit pricing on several occasions, charging ten cents until the middle of 2005, then dropping its fee to five cents until the end of 2005, subsequently raising its fee to eight cents in January 2006, and finally reaching the ten cent agreed price in October 2006.

76.     Verizon, which previously followed a unique pricing model, charged ten cents for its outgoing text messages up through the start of the conspiracy period, but charged only two cents for incoming messages.  Verizon persisted in this independent pricing until agreeing to set its prices for both incoming and outgoing messages at ten cents as part of the conspiracy towards the end of 2006.

77.     Cingular (later AT&T) never departed from its original price of ten cents, until such time as all of the Carrier Defendants raised their prices as part of the conspiracy.

14

78.     Importantly, before the conspiracy, Nextel (now Sprint) first tried to increase the per-unit price from ten to fifteen cents in the 4th Quarter of 2003.  The other wireless providers refused to follow Nextel's lead, and stood firm at their individual prices.  In this competitive environment, Nextel was forced to return its per-text rate to the earlier ten cents in the 1st Quarter of 2005.

79.     The conspiracy began after this unsuccessful attempt to increase prices independently.   In 2005 and 2006, the Carrier Defendants agreed to charge uniformly an unprecedented common per-unit price of ten cents for text messaging services.  With Cingular charging ten cents per text, and Sprint having dropped its per-unit fee to an identical ten cent level, T-Mobile, Alltel, and Verizon joined them in charging an identical ten cents per-unit for all incoming and outgoing messages.  Each of the Carrier Defendants engaged in the highly unusual conduct of aligning their per unit text messaging prices and then increasing them by identical amounts.

80.     Indeed, each and every one of the Carrier Defendants engaged in the exact same, highly anomalous behavior of doubling its per-unit text messaging prices in a span of barely over a year.

81.     Specifically, by the end of 2006, as part of the conspiracy, each of the Carrier Defendants had aligned its per-unit fee at ten cents per each text message sent or received.  In late 2006 and early 2007, each of the Carrier Defendants increased its per-message fee by 50%, from ten to fifteen cents as outlined in the following chart:

| Defendant | Price Increase from 10¢ to 15¢ |
|---|---|
| Sprint | 4th Q 2006 |
| Alltel | 4th Q 2006 |
| AT&T | 1st Q 2007 |
| Verizon Wireless | 1st Q 2007 |
| T-Mobile USA | 2nd Q 2007 |

82.　　During 2007 and early 2008, the amount of text messages sent by each of the Carrier Defendants' customers increased greatly.

83.　　During this same period, the per-unit costs of text messages of each of the Carrier Defendants continued to decrease substantially, by at least 35%, and each of the Carrier Defendants' available supply to transmit text messages still far exceeded usage and demand. Also, during that period, each of the Carrier Defendants decreased its per-unit prices for other wireless services.

84.　　Moreover, each of the Carrier Defendants selected the exact same, extremely substantial 33.33% increase in its prices. Specifically, each of the Carrier Defendants increased its per-message fee from fifteen cents to twenty cents as outlined below:[5]

| Defendant | Price Increase from 15¢ to 20¢ |
|---|---|
| Sprint | 4th Q 2007 |
| AT&T | 1st Q 2008 |
| Verizon Wireless | 1st Q 2008 |
| T-Mobile USA | 3rd Q 2008 |

85.　　Sprint was the ringleader in all price increases subsequent to the alignment of all per-unit prices at ten cents. In contrast to the independent conduct after Nextel first tried to increase its rates in 2003, the other Carrier Defendants adopted Sprint's per-text price increases in this instance

---

[5] Verizon acquired Alltel prior to the increase from ten to fifteen cents, and Alltel is therefore not included as a separate entity in the chart.

as part of the conspiracy. Verizon and AT&T did so immediately, in the very next quarter for both increases, and T-Mobile ultimately cooperated and adopted the increase.

86. Compared to historical experience, economic theory, the Carrier Defendants' own contemporaneous pricing of comparable products, the Carrier Defendants' excess supply, and the Carrier Defendants' low costs, the prices of Text Messaging Services should have decreased substantially between 2005 and 2008. Moreover, the alignment and uniform increases evidenced above were a stark departure from the Carrier Defendants' independent and competitive pricing practices in the preceding time period.

87. However, Defendants' collusive behavior subsequently caused a 100% increase in per-unit text messaging prices paid by Plaintiffs at the same times that each of the Carrier Defendants' comparable costs decreased by approximately 65%, the Carrier Defendants' supply exceeded demand, and the prices of the Carrier Defendants' related products decreased.

88. Text messaging per-unit pricing lends itself to collusion in many ways. This is, in part, because text messaging is a uniquely homogeneous form of wireless communication. The per-text-message price can easily be severed from other service charges, separately observed, and openly communicated among Defendants. Defendants, in fact, did systematically engage in a highly unusual degree of communication with one another and shared information during 2005–2008. See *infra*. The Carrier Defendants' prices for text messaging are even available on the Internet.

89. Given the circumstances alleged in this complaint, the dramatic, identical rise in the price of text messaging could only have resulted from a price fixing conspiracy among the Defendants.

90. In a September 10, 2008 email, Adrian Hurditch, a manager responsible for pricing at T-Mobile, admitted to Lisa Roddy, who headed T-Mobile's text messaging price increase project

team, that: "At the end of the day we know there is no higher cost associated with messaging. The move was colusive [sic] and opportunistic." Mr. Hurditch sent an email to Ms. Roddy earlier that day that stated: "Make sure you delete that last message!" Ms. Roddy's response was: "I will & u this one!!!" The "last message" that Mr. Hurditch was referring to was apparently deleted and T-Mobile has not recovered the message.

91.     In the alternative, under the circumstances alleged in this complaint, Sprint-Nextel Corp.'s astonishing price increases constituted offers to the other Carrier Defendants to avoid engaging in competition and to extract supra-competitive prices many thousand times each of the Carrier Defendant's costs for text messaging services. The other Carrier Defendants accepted Sprint-Nextel's offers when they implemented identical price increases shortly thereafter, thereby consummating illegal agreements among suppliers representing 90% of the text message market to raise and maintain prices.

92.     Under these circumstances, the Carrier Defendants' pattern of offers and acceptances in and of itself constitutes a price-fixing conspiracy.

## CTIA ACTIVITIES IN FURTHERANCE OF CONSPIRACY

93.     CTIA is a trade organization based in Washington, D.C. that claims to be an "international association for the wireless telecommunications industry, dedicated to expanding the wireless frontier." Its mission is to further the goals of the Carrier Defendants. Throughout the Class Period, the CTIA was a member of the conspiracy alleged.

94.     Upon information and belief, the conspiracy was originally formed at, or was developed and enabled under the auspices of, meetings organized by the CTIA. The CTIA provided a venue for the Carrier Defendants to conspire and actively joined and acted in furtherance of the conspiracy.

18

95.     The CTIA is dominated and controlled by the Carrier Defendants. It receives the vast bulk of its revenues, including 80-90% of its dues revenue, which constitutes the CTIA's largest revenue source, from the Carrier Defendants. Much of its remaining revenue comes from other payments from the Carrier Defendants related to research, lobbying, trade shows and conventions, and other activities.

96.     Representatives from the Carrier Defendants and their predecessors and affiliates actively participated in the management and oversight of WIC. The following individuals have all served on the WIC Leadership Council:

| Name | Position and Company | Years served |
|------|----------------------|--------------|
| Len Barlick | VP, Wireless & Wireline Services - Sprint | 2009-2010 |
| Doug Britt | VP, Mobile Data Services - Virgin Mobile (currently owned by Sprint) | 2009 |
| Cole Brodman | Executive Director Tech Dev. - T-Mobile | 2002 |
| John Burris | VP, Wireless Data, Product Management & Development - Sprint | 2007 |
| Mark Collins | VP, Consumer Data Services, later VP, Voice and Data Products - AT&T Mobility | 2008-2011 |
| Michael Cote | VP Wireless Data Sales & Operations - VoiceStream Wireless (later combined into T-Mobile) | 2002 |
| J. Lee Daniels | Staff VP, Consumer Product Development - Verizon Wireless | 2008 |
| Brad Duea | GM & VP, Communications, Applications & Media - T-Mobile USA | 2011 |
| Jim Grams | SVP Mobile Multimedia Tech - AT&T Wireless Services | 2002-2003 |
| Greg Haller | VP, Consumer Solutions Group - Verizon Wireless | 2011 |
| James Healy | President, later VP Industry Alliances – T-Mobile PCS | 2003, 2006 |
| Carlton Hill | Executive Director Internet Service - Cingular Wireless | 2002-2003 |
| Jack McArtney | Associate Director- Advertising & Content Standards - Verizon Wireless | 2010 |
| Wade McGill | SVP Wireless Product Management - ALLTEL Communications (later acquired by Verizon) | 2006-2008 |
| Ian McKerlick | Dir. Mobile Web & Content Services - T-Mobile USA | 2009 |
| Warren McNeel | SVP, Networks - T-Mobile PCS | 2007-2008 |
| Rob Mechaley | Vice Chairman & Co-Founder – Clearwire (majority owned by Sprint | 2008-2010 |

| Name | Position and Company | Years served |
|---|---|---|
| Kevin Packingham | VP, Product Development - Sprint | 2008 |
| Paul Reddick | VP Business Development – Sprint, later VP Business Dev & Product Innovation - Sprint | 2002-2003, 2006 |
| Tom Roberts | CMO - Dobson Communications Corp. (later acquired by AT&T) | 2007-2008 |
| Jim Ryan | VP Consumer Data Services - Cingular Wireless, later AT&T | 2006-2007 |
| Greg Santoro | Vice President, Internet and Wireless Services – Nextel | 2002-2003 |
| Jim Straight | Vice President Wireless Data & Internet Services - Verizon Wireless | 2002-2003, 2006-2007 |
| Britt Wehrman | VP, Strategic Planning & Operations - T-Mobile USA | 2010 |
| Andrew Willett | VP, Multimedia Services – AT&T Wireless | 2002 |
| Mark Yarkosky | Director, Product Development – Sprint | 2011 |
| John Yuzdepski | VP & GM – Sprint PCS | 2002 |

97.     CTIA provided a mechanism and venue through which the conspiracy was facilitated, implemented and monitored.  The Carrier Defendants have met regularly through the CTIA's sponsored events since at least 2001.

98.     In 2001, AT&T launched the first inter-carrier text messaging service, which allowed users to send text messages to customers of other carriers.

99.     Following on the heels of AT&T's launch, AT&T, Sprint and Verizon met through the CTIA on numerous occasions to discuss pricing and text messaging in 2001 and early 2002.

100.     Shortly thereafter, in early 2002, under CTIA's guidance, the six major national carriers, including the Carrier Defendants, announced that they had reached agreement on allowing each carrier's service for text messaging to communicate with the others' service.

101.     Based on its orchestration of the interoperability agreements in 2002, CTIA has been and remains the driving force behind organizing the Carrier Defendants and exchanging information about text messaging in the United States.

102.     In announcing the interoperability agreements and potential massive revenue to carriers, CTIA President and CEO Tom Wheeler was quoted as saying, "Text messages have not only given consumers a brand new way to communicate, it has also given wireless companies around the globe an important new revenue stream. Last year, the revenue generated by text messages was greater than Hollywood's combined box office receipts, according to the Mobile Data Association in the U.K."

103.     The CTIA has expressed concerns that its collection of data could contribute to anti-competitive endeavors, but it has nonetheless continued to track competitive data and has, in fact, increased its collection of information on texting and shared that data with the Carrier Defendants.

104.     In 2001, CTIA created a Wireless Internet Caucus ("WIC"), which is a "core community of CTIA member companies dedicated to growing a large and robust market at the convergence of wireless and Internet technologies, products and services" and that "seek[s] to build a shared vision of this market and an action plan to enable its rapid growth."

105.     In February 2002, CTIA convened the WIC Leadership Council, which "comprises a critical mass of key industry decision makers who work together to create a shared market vision and unified approach to solving problems and challenges faced collectively growing the wireless data marketplace." The Leadership Council was tasked with "launching an industry-wide initiative to address the hurdles that face the U.S. market in wireless data. . ." (emphasis added).[6]

106.     The WIC Leadership Council consisted of "the dominant forces in wireless data," including "representatives from the top six wireless carriers (AT&T Wireless Services, Cingular Wireless [later AT&T], Nextel, Sprint PCS, Verizon Wireless and VoiceStream Wireless [later

---

[6] Feb. 26, 2002 CTIA Press Release, supra.

renamed T-Mobile]).["7]  Participants in the WIC Leadership Council meetings included: Jim Straight, Vice President Wireless Data & Internet Services, Verizon Wireless; John Quzdepski, VP & GM, Sprintpcs.com, Sprint PCS; Andrew Willett, VP, Multimedia Services, AT&T Wireless Services; Carlton Hill, Executive Director Internet Service, Cingular Wireless; Greg Santoro, Vice President, Internet and Wireless Services, Nextel; and Michael Cote, VP Wireless Data Sales & Operations, VoiceStream Wireless [later renamed T-Mobile].

107.    The participants in this group did not limit their activities to discussing technical specifications to allow the networks to communicate with each other.  Instead, the Defendants sought to grow the revenue from texting and limit competition between the Carrier Defendants.

108.    The Leadership Council's inaugural meeting in February 2002 was a "no-holds-barred" day-long event in which "executives of the U.S. wireless data industry began mapping out the course for the delivery of high-quality wireless data services," and discussed impediments to success in a variety of areas, including "messaging" services, interoperability, and "billing."[8]

109.    At the first meeting of the WIC Leadership Council, the participants discussed the lack of "sufficient market power to organize the industry in North America" and that "despite the fact that the fundamentals are in place, success is still elusive."  One of the stated purposes of the Leadership Council was to serve as the "organizing force" that would allow the Carrier Defendants to combine their market power.

110.    At the same meeting, Andy Willett, VP of Multimedia Services at AT&T Wireless, complained that "the market is fragmented with high levels of competition, . . . resulting in concerns about pricing."  He added that "[w]hen looking at fundamental carrier economics, especially in this

---

[7] *Id.*

[8] *Id.*

carrier environment, margins are always going to be challenged." Mr. Willett specifically identified text messaging as a potential way for the Carrier Defendants to increase revenue: "In the next couple of years, there's not a whole lot of money to be made unless you look at SMS."

111.    Mark Desautels ("Desautels") served as the CTIA's Vice President of Wireless Internet Development ("WID") from 2001-2009. WID was the division of CTIA that interacted directly with the WIC Action Teams, described below. Desautels oversaw the activities of WIC in this role. Upon information and belief, Desautels led the efforts of the CTIA to promote the conspiracy.

112.    WIC conducted much of its business through "Action Teams" defined by groups of issues, such as the "Messaging Action Team" or the "Mobile Content Action Team." From its inception, CTIA provided staff members to coordinate the work of these Action Teams, whose members are drawn from WIC-member companies, which are dominated by the Carrier Defendants. The WIC Action Teams held frequent conference calls, with an assigned CTIA employee coordinating. The assigned CTIA staff members were the members of the WID, reporting to Desautels directly. As the head of WID, Desautels was the person at WIC best positioned to oversee and understand what went on when the Carrier Defendants' employees met together in the Action Team meetings.

113.    In addition to his supervisory role over WID, Desautels, on information and belief, had for some or all of the Class Period until his death, regular conference calls with the CEOs of the Carrier Defendants.

114.    Desautels noted in 2003 that because of the crucial moment in the development of the wireless data marketplace, "[t]he WIC Leadership Council members' efforts to create industry-wide solutions through 'co-opetition' with each other, can have a dramatic influence on the pace of that

23

development."[9]  Thus, the purpose of the WIC Leadership Council was to substitute "co-opetition" for competition.

115.     As CTIA emphasized, "[a]ll ships rise [together] . . . . What's best for one company is not always best for the industry. The time has come to serve the industry first."[10]

116.     The WIC Leadership Council convenes "bi-annual, face-to-face meetings . . . while conducting quarterly conference calls to keep apprised of the progress made."[11]  Additionally, the Leadership Council prepared and disseminated thorough presentations providing detailed information regarding text messaging revenue, pricing, billing, and delivery.  The data in these presentations was provided directly by Defendants. The WIC and its Leadership Council have operated throughout the class period.

117.     By virtue of their positions as the WIC members who provide the vast majority of CTIA's financing and possess the vast majority of the market share for wireless data services, the Carrier Defendants effectively control the activities of WIC.

118.     The WIC also published the "WIC Manifesto," providing for a "commitment to work together to build a shared vision for the industry, and an action roadmap to make that vision a reality."  The WIC Manifesto stated that the companies participating in the WIC would "focus on three (3) main areas of importance

> "• the convergent technical architecture
>
> "• common core business systems
>
> "• required business models

---

[9] March 5, 2003 CTIA Press Release, *supra* (emphasis added).

[10] Feb. 26, 2002 CTIA Press Release, *supra* (emphasis added).

[11] *Id.*

"We will seek win-win solutions to potential barriers in these areas, and work together to enlist the support and alignment of all key stakeholders in order to implement these solutions."[12]

119.     The purpose of such joint efforts through the WIC was "to build a shared future in which we can all look forward to profiting together."[13]

120.     As part of the WIC Manifesto, the WIC specifically established the "Messaging Action Team," led by one of Nextel's (now Sprint) executives.  The Messaging Action Team included numerous employees of the Carrier Defendants and was dominated by the Carrier Defendants.  The Messaging Action Team devoted itself to "support a common approach to . . . message delivery mechanisms, interconnection, billing and settlement."  The Messaging Action Team was further designed to "propose billing principles for message transfer between 'message service providers."  Starting in 2002 and throughout the Class Period, the Messaging Action Team (through various iterations) participated in "collaborative calls" to address areas of improvement in the wireless industry and conducted "outreach . . . to regulatory agencies regarding . . . industry self regulation."

121.     CTIA also formed a Mobile Advertising Metrics Action Team comprised of wireless carriers that work together to agree to minimum standards for reporting metrics, targeting information, advertising inventory and consumer privacy, and to monitor the progress of other industry organizations and collaborate where appropriate.

122.     As early as 2006, WIC also formed the Metrics Action Team, which again was dominated by the Carrier Defendants, on which Defendants collaborated to track the number of users

---

[12] WIC Manifesto, *supra*, at 1-2 (emphasis added).

[13] *Id.* (emphasis added).

for various wireless services and the revenues associated with them. This data was shared with all of the Carrier Defendants and enabled them to modify their service offerings to maximize revenue.

123. Throughout the Class Period, the Carrier Defendants met and conferred about a variety of CTIA and WIC issues, including CEO conference calls with Desautels, giving the Carrier Defendants numerous opportunities to conspire to set pricing for Text Messaging Services. Sprint announced a per-unit text message price increase within approximately a month after the mid-year meeting in 2006, and again within approximately a month after the mid-year meeting in 2007, and as described above, the other Carrier Defendants followed shortly thereafter with identical price increases.

124. The Carrier Defendants' interdependence and coordination of their independent business interests through CTIA is remarkable. For example, in 2007, Verizon sought to develop an enhanced messaging product. Rather than introduce the product itself to seek a competitive advantage, Verizon explicitly shared it with its fellow CTIA members and conditioned the further development of the service on approval by the CTIA's board, which included representatives from each of the other Carrier Defendants, even though it had features which were proprietary to Verizon.

125. CTIA also actively participated in the concealment of the conspiracy alleged herein. On June 17, 2009, in response to the U. S. Senate Kohl committee hearings, CTIA issued a press release in which CTIA stated that the wireless industry was "fiercely competitive."

126. On July 9, 2009, in further response to government investigations into competition in the wireless industry, the CTIA sent the FCC a report as part of a submission which was meant to mislead policymakers into concluding that the wireless industry was competitive. The report was dated January 2009, and was prepared using funding from the CTIA (which itself is funded mainly by the Carrier Defendants).

127.     Desautels, the CTIA officer who managed and controlled communications among the Carrier Defendants, and supervised WIC, died on March 30, 2009, on the eve of a CTIA convention. This lawsuit and the Kohl investigation had been pending for over six months at the time of Desautels' death.  Nevertheless, on June 6, 2011, many months after Plaintiffs had first served the CTIA with a subpoena, and after the filing of, and a court hearing on Plaintiffs' motion to compel the CTIA to comply with that subpoena, the CTIA's counsel informed Plaintiffs that the CTIA destroyed Desautels' email mailbox: "Mr. Desautels' electronic mailbox was deleted in 2009, after his death.[14]  The CTIA further stated on June 9, 2011, that "Mr. Desautels' electronic mailbox was deleted in July of 2009," and [t]here are no other sources for the recovery of Mr. Desautels' emails."[15]  While the CTIA's attempt to destroy Mr. Desautels' electronic mailbox may not have been completely effective,[16] it clearly occurred  at the same time as the CTIA's responses to the challenges to competition in text message pricing and, upon information and belief, as part of its efforts to cover up the conspiracy.

128.     CTIA's deletion of. Desautels' emails was deliberate destruction of evidence relevant to this litigation and because the CTIA is dominated and controlled by the Carrier Defendants, each Defendant had, or should have had knowledge of the destruction of the emails and is complicit in such conduct.  Upon information and belief, CTIA should have, and did, implement a litigation hold for documents such as those in Desautels' mailbox during this period.  Despite company-wide

---

[14] Letter from Michael D. McNeely to Mary Jane Fait dated June 6, 2011, at p. 2.

[15] Letter from Michael D. McNeely to Mary Jane Fait dated June 9, 2011, at p. 1.

[16] Letter from Michael D. McNeely to David W. Zoll and Mary Jane Fait dated August 16, 2011, at p. 2 ("We have learned, however, that a copy of Mr. Desautels' electronic mailbox was made, and, as you could have seen from CTIA's document production, we have produced numerous items from that electronic mailbox.")  As of the filing of the motion for leave to file this amended complaint, Plaintiffs do not know the details about this "copy" or what it contains and Plaintiffs do not believe that CTIA's production contains all of the responsive items which Desautels' original mailbox would have contained as of the initiation of the Kohl investigation, the filing of this suit, or Desautels' death.  Moreover, CTIA has not withdrawn its statements that it had destroyed this mailbox.

knowledge of the Kohl investigation and this litigation, and that relevant documents should be preserved, CTIA intentionally deleted Desautels' emails.

129.    These were not the only means CTIA used to hide evidence of the conspiracy after the filing of this suit and the Kohl investigation.  CTIA maintained a policy to destroy documents which are more than one year old.  CTIA purposefully does not track the historical pricing of text messaging services by the Carrier Defendants, citing "antitrust reasons."  CTIA also changed its accounting system so as to make older information difficult to access in late 2006 and early 2007.

130.    In contravention of its own antitrust policy requiring that minutes be kept when competitors meet, CTIA failed to keep minutes of WIC and other meetings attended by the Carrier Defendants.  CTIA's antitrust policy imposed specific record-keeping requirements.  It directed its members that, at CTIA-sponsored meetings, in order to avoid "antitrust problems," they should follow a set of rules, including:

    a.    All meetings must have an agenda created by CTIA;

    b.    Meetings outside of Washington D.C. required approval;

    c.    Informal or unscheduled meetings were disallowed;

    d.    An agenda must be circulated by CTIA in advance and approved by its in-house counsel;

    e.    Minutes must be recorded;

    f.    Deviation from the agenda can only be permitted on good cause shown and the reason therefore noted in the minutes.

131.    Despite CTIA's antitrust policy that "[m]inutes of all committee meetings" shall be recorded, CTIA failed to keep minutes at most, if not all, meetings between the Carrier Defendants. The deliberate failure to keep minutes, much less accurate ones, when competitors were discussing

28

pricing at meetings hosted by CTIA itself demonstrates that CTIA joined the conspiracy, took steps in furtherance of the conspiracy, and sought to cover up the conspiracy.

132.    CTIA's antitrust policy's recordkeeping requirements bind the Carrier Defendants as members as well as CTIA.  It is the duty of the Carrier Defendants to ensure that CTIA's antitrust policy is adhered to and that minutes of the Carrier Defendants' meetings are kept.  The failure to keep these minutes constitutes an infraction on the part of the Carrier Defendants of the antitrust policy that they adopted and agreed to follow.

133.    In addition to the committee meetings (at which no records were kept), CTIA also arranged "by invitation only" events during evening hours in which representatives of the Carrier Defendants could meet without the involvement of uninvited parties and outside the strictures of CTIA's antitrust policy.

134.    Shortly after the first complaint was filed in this litigation, the Carrier Defendants entered into a joint defense agreement.  The Carrier Defendants have admitted that it is likely that they discussed having CTIA become a party to this joint defense agreement with CTIA in 2010. CTIA joined the agreement soon after a further discussion on May 11, 2011.

135.    These acts demonstrate that CTIA joined the conspiratorial agreement of the Carrier Defendants alleged in Count I and throughout this complaint.

136.    By helping form the agreement, hosting and facilitating conspiratorial meetings, and covering up the existence of the conspiracy, CTIA acted in furtherance of the conspiracy.

## ADDITIONAL JOINT CONDUCT

137.    CTIA, of which the Carrier Defendants are members, established and controls the Common Short Code Association (CSCA).  The Carrier Defendants, working together through

CTIA, collusively use the CSCA to expand the market for texting services, control the prices for texting services, and generate further demand for texting services at the excessive prices established by the Carrier Defendants.

138.     Common Short Codes ("CSCs") are five-digit or six-digit numeric codes to which text messages can be addressed from a wireless device.  They are easy to remember, compatible across all participating carriers, and can be leased by anyone interested in interacting with over 200 million wireless consumers.

139.     Wireless subscribers send text messages to Short Codes to access a wide variety of mobile content for delivery to their wireless devices, such as sweepstakes, tele-voting campaigns, mobile coupons, other promotions, and a wide range of additional interactive wireless services.

140.     Marketers of consumer products and services, as well as business and enterprise customers, are currently using Short Codes to directly interact with and attract various audiences, as Short Codes provide an unprecedented opportunity to engage customers anytime, anywhere.

141.     According to the CSCA, "The potential is enormous.  Common Short Codes will enable the continued growth of text messaging and provide a platform upon which new technologies will be able to flourish.  Market developments like picture messaging (or MMS) and the continued evolution of Instant Messaging into the wireless medium make text messaging one of the most exciting, yet simple, breakthroughs, since the advent of the telephone itself!"

142.     The CSCA leases the Short Codes to advertisers, which then negotiate agreements with each carrier to carry their Short Codes.

143.     The CSCA admits that its control of the Short Codes is a substantial benefit: "Wireless Service Providers benefits: Drives up text messaging usage and revenues because more applications will be funded."

144.     Through the CSCA, CTIA has created the "shared vision" of the WIC by going beyond the bounds of a trade organization into the business of generating and driving profits for its members, including its core members, the named Carrier Defendants.

145.     Short Codes earn money for the Carrier Defendants in a number of ways: the Defendants' trade association consortium charges a set fee for the establishment and leasing of Short Codes; then the lessee of the Short Code pays each carrier for the right to carry its codes; and consumers are then charged for using the Short Code, sometimes in multiple ways.

146.     For example, Major League Baseball has leased the Short Code 65246 "MLBGO" at http://mobile.mlb.com/web, which provides the subscriber with sports alerts, Ringtones, and wallpaper.  One of the options offered is "Team Alerts" where, for $3.99 "plus standard messaging fees," a subscriber can "stay connected" to his or her favorite team.  The fan receives fifteen to twenty alerts per week, including game summaries, home runs, lead changes, breaking news, and video highlights.  Major League Baseball says "To avoid high carrier data charges, an unlimited data plan is strongly recommended."  The Carrier Defendants receive a share of the monthly fee for alert systems and their charges for the services, and for these types of services and revenues, they need a large group of subscribing customers with unlimited data plans.

147.     The Groupe Speciale Mobile Association ("GSMA") is a worldwide trade group of cellular providers that boasts membership of 750 mobile networks across 219 countries that collectively serve more than 3.4 billion customers totaling 85% of the world's mobile phone users.

148.     One of the GSMA member-only databases includes information such as effective price per minute, total billed for SMS events, and number of SMS messages per user per month.

149.     GSMA recently completed its annual "Mobile World Congress" that was attended by at least leaders from AT&T and Verizon Communication.

150. One of the break-out sessions at that "Congress" pertained to "Pricing Strategies for the Unlimited Generation."

151. Through CTIA and GSMA, the Carrier Defendants have a forum in which to interact, access relevant utilization and pricing data, and participate in committees to lobby governmental entities, which furthers their collusive efforts.

152. The revenues of the Carrier Defendants and, in turn, CTIA, are dependent on encouraging individual users to use and become reliant upon high amounts of data.

153. The Carrier Defendants, individually and acting in concert, have adopted uniform and unreasonably high charges for text messaging in order to encourage their customers to purchase other services.

154. The Carrier Defendants stand to earn significant fees from the use of Short Codes, and if they are to fulfill their potential as a revenue driver, customers need to have unlimited text messaging and related data plans.

155. The larger the group of potential customers equipped with unlimited plans, the more fees the Carrier Defendants can demand for the right to carry their short codes.

156. Consequently, it is necessary for Carrier Defendants to enroll as many customers as possible in unlimited data plans.

157. The Carrier Defendants, acting jointly, in concert, and individually, also have adopted high single text only plans in order to encourage and force their texting customers to purchase unlimited data plans and other bundled services that the individual consumers may not want, need, or be able to afford.

## CONGRESSIONAL INVESTIGATION

158.     On September 9, 2008, the Senate Antitrust Subcommittee sent a letter to the Carrier Defendants, questioning the basis for the huge increases in the pay-per-use text messaging price.

159.     The Senate Subcommittee expressed concern about the increases being made at nearly the same time, in identical amounts, when price increases did not appear to be justified by increases in costs, and concluded that "[t]his conduct is hardly consistent with the vigorous price competition we hope to see in a competitive marketplace."

160.     The Senate Subcommittee also requested that each of the Carrier Defendants:

    a.     explain the cost, technical or other factors that justify a 100% increase in the cost of Text Messaging Services from 2005 to 2008;

    b.     provide data on the use of Text Messaging Services from 2005 to 2008;

    c.     provide a comparison of prices charged for Text Messaging Services as compared to other services offered by the company such as prices per minute for voice calling, prices for sending emails, and prices charged for data services such as internet access over wireless devices from 2005 to the present; and

    d.     state whether the company's Text Messaging Services pricing structure differs in any significant respect from the pricing of the company's three main competitors.

161.     In response, the Carrier Defendants provided limited and biased information on the prices for their package plans, including their text message package plans, but failed to (a) specifically address why they increased their per-message prices for text messaging or (b) deny that those increases were the result of collusion.

## STRUCTURAL FACTORS FACILITATE COLLUSION

162.     The wireless telephone-provider industry is marked by certain structural and other characteristics that make price fixing feasible, including the heavy concentration of the market share among the Carrier Defendants.

163.     Price fixing is relatively easy to maintain in a market such as that for Text Messaging Services, which has extremely high barriers to entry because of the high cost of infrastructures, creating a situation where there is virtually no chance that a new competitor will enter the market to challenge artificially high prices.

164.     Collusion among competitors in this market is also easy because Text Messaging Services are homogenous, with no discernable difference between the Text Messaging Services provided by one market participant over another.

165.     The Carrier Defendants have colluded on the inclusion of other terms in their cellular and text messaging contracts, in relation to early termination fees and mandatory arbitration clauses, leaving consumers with no choice but to accept these terms or forego purchasing cellular and text messaging services.

## COMMON CLASS ARBITRATION WAIVERS

166.     The Carrier Defendants require that Plaintiffs and other Class Members agree to contracts which require wireless users to arbitrate disputes with service providers and to waive their right to class arbitration.   These common waivers are indicative of additional collusive, anticompetitive conduct and are specifically designed to facilitate Defendants' conspiracy.

167.     As the Carrier Defendants know, due to the high cost of litigation and the comparatively small injury an individual user suffers from their conspiracy, it is only economically feasible for the individual to seek redress by joining a class action.  Common class arbitration

34

waivers constitute an attempt by the Carrier Defendants to insulate themselves from legal challenge on a class-wide basis, enabling them to reap substantial profits from the collective injury they impose on users.

168.     Plaintiffs and the Class who have submitted to class arbitration waivers have done so because it is extremely difficult to function in the current economic and social climate without Text Messaging and wireless services.  In addition, such Plaintiffs and the Class have no bargaining power, do not understand the consequences of a class arbitration waiver, and may be unsophisticated.  For the foregoing reasons, the class arbitration waiver is a classic contract of adhesion and is unconscionable and unenforceable.

169.     Moreover, the Carrier Defendants acknowledge that these class arbitration waivers are of questionable validity, as their contracts make provisions for what will happen when a court determines that the waivers are unenforceable or void.  Under those circumstances, the contracts state that the overarching agreement to arbitrate is itself void.  As the class arbitration waivers at issue are unenforceable, and as the overarching agreements to arbitrate are consequently void pursuant to contract, Plaintiffs have properly brought this litigation in this Court on behalf of themselves and the Class.

## **VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

170.     Plaintiffs re-allege paragraphs 1 through 169 as if fully restated herein.

171.     Beginning at least as early as January 1, 2005 (the exact date being unknown to Plaintiffs) and continuing until the present, Defendants and their co-conspirators engaged in a contract, combination and conspiracy to artificially raise, fix, maintain and/or stabilize pricing for Text Messaging Services in unreasonable restraint of trade and commerce in violation of Section 1

of the Sherman Act (15 U.S.C. § 1). As detailed above, the CTIA was a member, and acted in furtherance, of the conspiracy.

172. Defendants entered into illicit agreements to increase prices of Text Messaging Services at some point prior to and during the period around July–December 2006 (for the increase implemented in Q4 2006–Q2 2007) and again at some point prior to and during the period around July–December 2007 (for the increase implemented in Q4 2007–Q3 2008).

173. For the purpose of formulating and carrying out the contract, combination and conspiracy, Defendants and their co-conspirators did those things which they conspired to do, as alleged above.

174. The contract, combination and conspiracy alleged had the following effects, among others:

        a. purchasers of Text Messaging Services have been and continue to be deprived of the benefit of free and open competition;

        b. the per text message price has been and continues to be fixed, raised, maintained and stabilized at artificially high and non-competitive levels; and

        c. competition between and among the Carrier Defendants and other co-conspirators in the sale of Text Messaging Services has been and continues to be unreasonably restrained.

175. Plaintiffs and the Class have been injured in their business and property by being unable to purchase text messages on a per-message basis, except at a price higher than otherwise would have been paid in the absence of Defendants' unlawful contract, combination and conspiracy.

176. The contract, combination, and conspiracy is continuing, and will continue unless the injunctive relief prayed for herein is granted.

177. Plaintiffs and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.      That the Court determine that the Sherman Act claims may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      That the Court adjudge and decree that Defendants engaged in an unlawful contract, combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. ¶ 1);

C.      That the Court adjudge and decree that each of the Defendants, its subsidiaries, successors, transferees, assigns, and respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from directly or indirectly continuing, maintaining or renewing the contract, combination and conspiracy alleged herein, and from engaging in any other contract, combination and conspiracy, agreement, understanding or concert of action having a similar purpose or effect;

D.      That Plaintiffs and the other Class Members recover threefold the damages that each sustained;

E.      That Plaintiffs and the other Class Members recover the costs of the suit, including reasonable attorneys' and expert fees and costs;

F.      That Plaintiffs and the other Class Members be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the initial complaints to the extent provided by law; and

G.      That the Court grant such other, further or different relief as may be just.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated: August 25, 2011                    Respectfully submitted,


                                          __/s/ Mary Jane Fait_____
                                          Mary Jane Fait
                                          **WOLF HALDENSTEIN ADLER**
                                             **FREEMAN & HERZ LLC**
                                          55 W. Monroe Street, Suite 1111
                                          Chicago, Illinois  60603
                                          Telephone:  (312) 984-0000
                                          Facsimile:  (312) 984-0001

                                          *Plaintiffs' Liaison Counsel*

                                          Marvin A. Miller
                                          **MILLER LAW LLC**
                                          115 South LaSalle Street, Suite 2910
                                          Chicago, Illinois  60603
                                          Telephone:  (312) 332-3400
                                          Facsimile:  (312) 676-2676

Christopher Lovell
**LOVELL STEWART HALEBIAN, LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:  (212) 608-1900
Facsimile:  (212) 719-4677

Joe R. Whatley Jr.
**WHATLEY DRAKE & KALLAS**
1540 Broadway, 37th Floor
New York, New York 10036
Telephone:  (212) 447-7070
Facsimile:  (212) 447-7077

Daniel E. Becnel, Jr.
**BECNEL LAW FIRM, LLC**
P.O. Drawer H
106 West Seventh Street
Reserve, Louisiana  70084
Telephone:  (985) 536-1186
Facsimile:  (985) 536-6445

Richard Kilsheimer
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, New York  10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

Dianne M. Nast
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, Pennsylvania  17601
Telephone:  (717) 892-3000
Facsimile:  (717) 892-1200

Bryan Clobes
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania  19103
Telephone:  (215) 864-2800
Facsimile:  (215) 864-2810

Robert M. Foote
**FOOTE, MEYERS, MIELKE &**
   **FLOWERS, LLC**
28 North First Street, Suite 2
Geneva, Illinois  60134
Telephone:  (630) 232-6333
Facsimile:  (630) 845-8982

David W. Zoll
**ZOLL, KRANZ & BORGESS, LLC**
6620 West Central Ave.
Toledo, OH 43617
Telephone:  (419) 841-9623
Facsimile:  (419) 841-9719

*Plaintiffs' Steering Committee*