**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE TEXT MESSAGING ANTITRUST LITIGATION** | ) ) ) ) | **No. 08 C 7082** <br> **MDL No. 1997** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | ) ) ) ) | **Judge Matthew F. Kennelly** <br> REDACTED PUBLIC VERSION |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................1

BACKGROUND ...........................................................................................................5

A. The Competitive Structure of the Wireless Communications Industry ..................5

B. Text Messaging Pricing .........................................................................................6

C. Changes in Text Message Pricing During the Class Period ...................................7

D. Statement of the Case.........................................................................................23

ARGUMENT..............................................................................................................26

I. THERE IS NO DIRECT EVIDENCE OF A CONSPIRACY TO FIX PRICES ......................................................................................................................28

A. There Is No Evidence To Support the Claim That Defendants Conspired During CTIA Meetings.........................................................................29

B. There Is No Other Direct Evidence of Agreement ..............................................31

II. THE RECORD EVIDENCE DOES NOT SUPPORT ANY INFERENCE OF CONPSIRACY ...........................................................................................................35

A. The Evidence Demonstrates That Each Defendant Judged Each of the Challenged Pricing Moves To Be in Its Unilateral Self-Interest .....................37

B. Plaintiffs Have Proffered No Evidence That Tends To Preclude the Possibility That the Defendant Carriers Acted Unilaterally .................................40

1. Plaintiffs' Experts Have Offered No Basis To Conclude That Any Defendant Acted Contrary to Its Unilateral Self-Interest ..................40

2. Plaintiffs' Experts Have Not Offered the Opinion That Defendants Reached Any Agreement To Fix the Price of PPU SMS ...............................................................................................48

C. The Structure of the Wireless Industry Makes Collusion Hard, Not Easy ............51

D. Allegations Concerning CTIA Provide No Basis for Inferring a Conspiracy ..........................................................................................................53

CONCLUSION...........................................................................................................56

## TABLE OF AUTHORITIES

Page

**CASES**

*Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989 (N.D. Ill. 2001)....51

*Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994)....39

*Baby Food Antitrust Litig., In re*, 166 F.3d 112 (3d Cir. 1999)....34, 40

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....24, 26, 27, 35, 48

*Brand Name Prescription Drugs Antitrust Litig., In re*, 186 F.3d 781 (7th Cir. 1999)....3

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)....48

*Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357 (10th Cir. 1989)....42

*Chamberlain Group, Inc. v. Lear Corp.*, 756 F. Supp. 2d 938 (N.D. Ill. 2010)....40

*Citric Acid Litig., In re*, 191 F.3d 1090 (9th Cir. 1999)....30, 42

*City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117 (D.D.C. 2006)....54

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478 (1st Cir. 1988)....31

*First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)....27

*Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008)....31

*High Fructose Corn Syrup Antitrust Litig., In re*, 295 F.3d 651 (7th Cir. 2002)....31, 33, 49, 53

*Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722 (7th Cir. 1986)....4, 37

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775 (7th Cir. 1999)....53

*Late Fee & Over-Limit Fee Litig., In re*, 528 F. Supp. 2d 953 (N.D. Cal. 2007)....54

*Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167 (7th Cir. 1990)....2, 36, 54

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).....................1, 2, 35, 36, 48, 53, 54

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999)........................................................50

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984).......................................28, 35, 36

*Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, 913 F. Supp. 1088 (N.D. Ill. 1995)..........................................................................................................29

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697 (7th Cir. 2011) .................27, 36, 48, 50

*Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195 (7th Cir. 1981)...........................35, 37

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37 (7th Cir. 1992)...................................................................................................42, 48, 51

*Richards v. Neilson Freight Lines*, 810 F.2d 898 (9th Cir. 1987) ................................................34

*Text Messaging Antitrust Litig., In re*:

No. 08 C 7082, 2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) ..........................................24

No. 08 C 7082, 2010 WL 1782006 (N.D. Ill. Apr. 30, 2010)....................................25, 30

630 F.3d 622 (7th Cir. 2010) ...........................................................25, 26, 27, 31, 39, 50

*United States v. Doerr*, 886 F.2d 944 (7th Cir. 1989) ...................................................................35

*United States v. Johnson*, 927 F.2d 999 (7th Cir. 1991)..................................................................35

*United States v. Posner*, 764 F.2d 1535 (11th Cir. 1985)................................................................35

*Urethane Antitrust Litig., In re*, 913 F. Supp. 2d 1145 (D. Kan. 2012)........................................32

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656 (7th Cir. 1987) ..................................42

*Venture Tech, Inc. v. National Fuel Gas Co.*, 685 F.2d 41 (2d Cir. 1982)...................................37

*Walter v. Fiorenzo*, 840 F.2d 427 (7th Cir. 1988) ........................................................................29

*Weit v. Continental Illinois Nat'l Bank & Trust Co.*:

467 F. Supp. 197, 212 (N.D. Ill. 1978), *aff'd*, 641 F.2d 457 (7th Cir. 1981).................................................................................................................51

641 F.2d 457 (7th Cir. 1981) ..................................................................29, 35, 36, 40, 54

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ....................................34

*Winskunas v. Birnbaum*, 23 F.3d 1264 (7th Cir. 1994) ....................................................................34

**STATUTES AND RULES**

15 U.S.C. § 1........................................................................................................................ *passim*

Fed. R. Civ. P. 56(e) ..............................................................................................................23

Fed. R. Evid. 801(d)(2)(E)......................................................................................................23

**OTHER AUTHORITIES**

Class Action Compl., *Cuneo-Leider Mgmt. & Dev. Corp. v. Verizon Wireless*, No. 3:08-cv-04621 (D.N.J. filed Sept. 10, 2008)...............................................23

Letter from Sen. Herb Kohl to Hon. Christine Varney, Ass't Att'y Gen., Antitrust Div., U.S. Dep't of Justice, and Hon. Julius Genachowski, Chairman, FCC (July 6, 2009)...........................................................................23

Amy Schatz & Thomas Catan, *Justice Ends Probe of Texting Rates*, Wall St. J., Jan. 15, 2010, at B6.........................................................................................23

Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655 (1962).....................................................................................................35

## INTRODUCTION

Plaintiffs have compelled the production of millions of pages of documents and taken more than 50 depositions. Yet they have not found a single document or witness to support their allegation that Defendants agreed to fix the price of pay-per-use ("PPU") text messaging. To the contrary, all of the contemporaneous evidence shows that, before each challenged price increase, employees of the Defendant carriers individually analyzed the proposed price increases and determined that the increases were expected to be profitable, regardless of their competitors' reactions. This overwhelming proof that the Defendant carriers acted for unilateral reasons – along with the absence of any direct or circumstantial evidence tending to exclude that unilateral explanation – forecloses Plaintiffs' Section 1 claim.

Plaintiffs allege that, pursuant to a long-running conspiracy, (1) Verizon Wireless (in 2005) and T-Mobile (in 2006) decided to match the $0.10 price then being charged by AT&T and Sprint (which Plaintiffs concede had been set competitively); (2) at various times between October 2006 and June 2007, the four Defendant carriers increased the PPU price to $0.15; and (3) at various times between October 2007 and August 2008, they increased it to $0.20. That pattern of price increases was and is the exclusive basis for Plaintiffs' claim. But "antitrust law limits the range of permissible inferences from ambiguous evidence," and plaintiffs relying on supposedly parallel behavior as proof of a conspiracy must "present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks omitted).

Plaintiffs cannot meet that burden. The extraordinary volume of discovery has established that the Defendant carriers acted independently in making the pricing decisions at issue. In each instance, the Defendant carriers decided to raise PPU prices only after employees

– who are not alleged conspirators – carried out internal financial and strategic analyses which demonstrated that the proposed price increases would increase profits. Those analyses did not reflect or depend on any advance knowledge of competitors' intended pricing moves.

Those analyses and testimony by the individuals who prepared them also explain why the pricing decisions at issue in this case were in the unilateral economic interest of the carriers. The use of text messaging during the class period grew exponentially; with that growth, an increasing proportion of customers purchased text messages not one at a time, but as part of plans that included hundreds, thousands, or an unlimited number of messages. Customers who were heavy users of text messages either had already switched to plans that included text messaging or could easily do so in response to the $0.05/PPU price increase, and the evidence establishes that each carrier preferred having its customers purchase such plans. Each carrier expected the increases in PPU prices to be profitable, regardless of what competitors did, because customers still buying text messages on a PPU basis typically bought only a handful each month – PPU charges constituted only one or two percent of a typical PPU user's monthly bill – and the impact of any increase on PPU users was therefore unlikely to lead to many customer departures. Defendants are thus "entitled to summary judgment" because they have provided a "plausible and justifiable alternative interpretation of [their] conduct that rebuts the alleged conspiracy." *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1174 (7th Cir. 1990) (internal quotation marks omitted).

Plaintiffs, moreover, have no evidence that tends to exclude the possibility that the carriers acted unilaterally, *see Matsushita*, 475 U.S. at 588, much less evidence that could overcome the affirmative evidence of unilateral business conduct that Defendants can proffer here. A plaintiff may seek to prove the existence of an alleged agreement with direct or

circumstantial evidence, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785 (7th Cir. 1999), but Plaintiffs have neither. As for direct evidence, every witness, including current and former employees, denied being aware of – much less participating in – any such agreement. The wireless industry is fiercely competitive and high profile; Defendants' internal pricing decisions were heavily documented; yet no document evidences any agreement or even any discussions among Defendants about text message pricing during the years that the conspiracy supposedly endured. And, even though Plaintiffs saved this case from dismissal in 2010 by alleging that Defendants reached agreements at CTIA meetings, no testimony or documents support those allegations. Plaintiffs have no evidence placing their alleged conspirators in the same room at any CTIA event.

Plaintiffs seek to salvage their case with the opinions of experts, who argue, without any empirical analysis, that the price increases would not have been profitable if other carriers had not also raised their PPU prices. They claim that is so because PPU prices are an important factor in customer choice of a carrier, such that a significant number of customers would have switched carriers in response to a five-cents-per-message price increase. But Plaintiffs' experts concede that the carriers' financial analyses reaching the opposite conclusion were performed in good faith by employees who were not part of the alleged conspiracy; that none of those employees observed that a PPU price increase caused a meaningful number of customers to switch carriers; and that there is no evidence that any carrier observed that charging a lower PPU price gave it any competitive advantage. For purposes of determining whether unilateral business judgment rather than prior agreement explains the price changes, it does not matter whether the analysts were right or wrong; what matters is whether they perceived the price increases to be unilaterally profitable. Because the Defendant carriers' financial analysts *at the*

*time* did not anticipate or observe PPU prices having any material effect on carrier choice, they had no reason to believe that the profitability of an increase would turn on rivals' actions. The assertion of Plaintiffs' experts that the carriers' analyses were flawed does not change this.

Further, although Plaintiffs' experts assert that the economic evidence leads them to conclude that "collusion" is the "most likely" reason for the PPU price increases, JS-Ex. 2, Expert Report of William H. Lehr at 6 (Apr. 15, 2013) ("Lehr Report"); JS-Ex. 18, Expert Report of Roger G. Noll at 3 (Apr. 15, 2013) ("Noll Report"), both have made clear that their definition of "collusion" includes lawful conduct. Dr. Lehr admitted that he did not distinguish between an actual agreement and other types of coordinated conduct leading to price increases. JS-Ex. 8, Deposition Transcript of William H. Lehr at 63:3-64:17, 71:5-9 (June 5, 2013). Professor Noll conceded that he does not contend that Defendants reached any "explicit agreement" rather than simply "announc[ing their] price plans in advance." JS-Ex. 5, Deposition Transcript of Roger G. Noll at 49:22, 50:21 (June 17, 2013). Because Plaintiffs' experts' "collusion" opinions encompass lawful, non-conspiratorial conduct, they supply no evidence that Defendants violated Section 1 of the Sherman Act.

In any event, an expert's opinion cannot substitute for direct or circumstantial evidence of collusion in this case, where detailed contemporaneous evidence reflects independent action.[1] Because there is no need to resort to the "hypothesis of joint action" in order to explain why the increase was in each carrier's own independent interest, *Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 726 (7th Cir. 1986), the Court should grant Defendants' motion.

---

[1] Plaintiffs' experts' opinions will be subject to *Daubert* motions; the Court need not reach the issue of admissibility to grant Defendants' motion for summary judgment.

## BACKGROUND

### A. The Competitive Structure of the Wireless Communications Industry

Defendants are four wireless service providers – AT&T, Sprint, T-Mobile, and Verizon Wireless – and CTIA – The Wireless Association. Competition among the Defendant carriers – and other carriers not named in the complaint – has contributed to unparalleled growth in the U.S. wireless communications industry. *See* 56.1 ¶¶ JS4, JS19-JS24.[2] From 2001 to 2012, wireless subscribership more than doubled, from 129 million subscriber connections to more than 320 million. 56.1 ¶ JS1. For all types of services, output increased dramatically during this period, while prices declined. 56.1 ¶¶ JS19-JS30. Average monthly minutes of use for voice services more than tripled between 2000 and 2007, when voice usage began to decline slowly with the growing popularity of text messaging and other data services. 56.1 ¶ JS20. At the same time, average revenue per voice minute – the price to consumers – has fallen sharply, from 18 cents in 2000 to less than 5 cents in 2011. 56.1 ¶ JS25.

These trends were even more pronounced for data services, and for text messaging in particular. Data services (including text, picture, and video messaging, as well as web browsing; e-mail; video and television; and GPS navigation) generated less than 1 percent of carriers' revenues in 2001 but 38 percent in 2011. 56.1 ¶ JS15. Between 2005 and 2008, the number of text messages sent in the United States increased from 81 billion to more than 1 trillion; in 2011, that number exceeded 2.3 trillion. 56.1 ¶ JS21. Average messages per user per month increased from 29 in the six months ending June 2005 to 388 in the six months ending December 2008, to

[2] As reported to the Court during the October 17, 2013 status hearing, the parties have entered into a stipulation to address the evidentiary foundation for documents submitted in support of, and in opposition to, this summary judgment motion. 56.1 JS-Ex 19.

594 in the six months ending December 2011. 56.1 ¶ JS22.[3] Between 2005 and 2009, average revenue per text message fell by more than 75 percent, from $0.037 to $0.009. 56.1 ¶ JS26. The Federal Communications Commission ("FCC") has concluded that this decline is primarily attributable to increased adoption of volume-discounted text messaging bundles, which drive down average price per message. *Id.* The price of other data services has also fallen dramatically, even as usage has increased exponentially. 56.1 ¶¶ JS23, JS27. As a result, the average subscriber spent less on wireless service in 2011 than she spent in 2000 even in nominal dollars, despite using such services much more. 56.1 ¶ JS29.

Carriers compete for customers by attempting to offer the most attractive combination of network speed, quality, and coverage; price; service; and devices. 56.1 ¶¶ JS37-JS61. They spend tens of billions of dollars annually – $20.7 billion in 2009, $24.9 billion in 2010, and $25.3 billion in 2011 – to expand their networks' capacity and geographic coverage, and to develop and deploy new infrastructure to improve network speed and quality. 56.1 ¶¶ JS31-JS32.

**B. Text Messaging Pricing**

**1.** Text messaging – also known as Short Message Service ("SMS") – allows users to exchange mobile-to-mobile messages of up to 160 characters. 56.1 ¶ JS7. Inter-carrier text messaging in the United States was originally limited by technical incompatibility among different providers' networks, which employed a variety of digital transmission standards. 56.1 ¶ JS8. The industry, working through CTIA, adopted standards in 2002 that set the stage for ubiquitous interoperability across all devices and networks. *Id.*

[3] That pattern of usage makes obvious why users have increasingly moved into texting plans. Defendant carriers' text messaging volumes have recently begun to decline slowly, a trend attributed to the proliferation of newer messaging technologies – such as Apple's iMessage and "WhatsApp" – that employ the Internet, rather than wireless carriers' networks. 56.1 ¶ JS22.

**2.** Consumers purchase text messaging as one service in a bundle of products and services that may include a wireless device, voice service, and other data services. 56.1 ¶ JS13. Carriers compete by offering an array of bundles that may attract users with different preferences for the services they use. 56.1 ¶ JS14. Because there are wide differences in demand for text messaging across customers, it makes sense for carriers to offer a menu of fixed-rate text messaging plans with increasing message limits. 56.1 ¶ JS11. At the same time, it also makes sense for carriers to offer text messaging on a PPU basis, to allow casual users, whose level of use would not warrant paying even the lowest fixed monthly rate, to use the service. *Id.* That pricing pattern – which applies not only to text messaging, but also to other voice and data services – reflects carriers' incentive to price their services in a way that will maximize revenues while ensuring that they can offer pricing plans that target consumer segments. 56.1 ¶ JS17.

### C. Changes in Text Message Pricing During the Class Period

From the beginning of the class period to the filing of the complaints in this case, all of the carriers enhanced their offerings of service bundles that included a large (or unlimited) number of text message allowances and/or reduced the prices of those bundles. *See* 56.1 ¶¶ JS17, JS18, JS46, ATT6, ATT13-ATT14, SPR9, TM9, TM17, TM39, VZW22, VZW56. Throughout the period, the percentage of users purchasing service bundles that included text messaging increased sharply; for example, while [redacted] percent of T-Mobile subscribers purchased plans in December 2005 (when the PPU rate was $0.05), [redacted] percent purchased plans in December 2008. 56.1 ¶ JS12. As a result, the unit cost to consumers of text messaging fell sharply overall, even as the PPU rate rose. 56.1 ¶ JS27. Plaintiffs do not allege any conspiracy to fix the prices of text message plans.

During the relevant period, all of the carriers, at different times, also increased their PPU rates. 56.1 ¶¶ ATT43, ATT61, SPR13, SPR25, TM18, TM42, TM65, VZW7, VZW50, VZW64. Plaintiffs have alleged that ten separate price increases by Defendants, spaced over three years, were the product of a conspiracy: (a) Verizon Wireless' increase in the incoming message rate in August 2005 from $0.02 to $0.10 and T-Mobile's increase of its PPU rate from $0.05 to $0.10 in March 2006; (b) the four carriers' increases in their PPU rates from $0.10 to $0.15 in the eight months between October 2006 and June 2007; and (c) the four carriers' increases in their PPU rates from $0.15 to $0.20 in the ten months between October 2007 and August 2008. Third Am. Compl. ("TAC") ¶¶ 5-7, 79-84 [Dkt. 302].

With respect to each of these increases, the deposition testimony and the carriers' contemporaneous documents establish that (1) the carriers regularly evaluated the possibility of changes to the PPU rate (as they evaluated potential price changes in other SMS, data, and voice products); (2) each carrier independently evaluated the profitability of potential PPU price increases and the consistency of such increases with strategic goals; (3) each carrier's financial analyses concluded that the contemplated price increase would be in its unilateral self-interest; (4) while carriers monitored competitors' publicly available prices – as one would expect in a competitive market – their analyses did not reflect any advance notice of rivals' future pricing moves; and (5) the individuals who constructed the financial models that concluded that the price increases would be profitable are not alleged to have been involved in or knowledgeable about the alleged price-fixing agreement.[4]

[4] Each of the Defendant carriers provides a more detailed description of the analyses and decisions concerning the challenged price increases in the Statement of Undisputed Material Facts filed together with this Memorandum of Law.

**1. a.** Prior to the class period, AT&T and Sprint charged $0.10 for both incoming and outgoing PPU text messages and had done so for years. 56.1 ¶¶ ATT5 (at least since 2002), SPR1 (since prior to its 2005 merger with Nextel Communications).

Verizon Wireless' decision to increase its incoming message rate from $0.02 to $0.10 in August 2005 – which was already the rate it charged for outgoing messages – was part of a company-wide revenue-raising and cost-cutting initiative. 56.1 ¶ VZW3. Verizon Wireless financial analysts – using the same methods that Verizon Wireless analysts used to estimate the profitability of other proposed pricing changes – estimated that the change would increase revenue by $25 million per month. 56.1 ¶ VZW4. Verizon Wireless' marketing group noted that Cingular, Sprint, and Nextel were already charging $0.10 for incoming text messages and concluded that the change would be "very competitive in the market." 56.1 ¶ VZW5. In addition, Verizon Wireless analysts were aware, based on public information, that Cingular had higher text messaging usage per customer even though it charged a higher PPU rate for incoming messages than Verizon Wireless had been charging. 56.1 ¶ VZW5.

**b.** T-Mobile was the last of the Defendant carriers to increase its PPU rate to $0.10, from $0.05, making that change in March 2006, eight months after Verizon Wireless. 56.1 ¶¶ TM5, TM18. T-Mobile had contemplated a potential change to its PPU SMS rate in spring 2005, as part of its broader efforts to enhance and re-price its messaging bundles, and then later in 2005 as one of several initiatives the company considered to boost revenue and address an anticipated EBITDA shortfall. 56.1 ¶¶ TM2-TM4. After Verizon Wireless announced the increase in its incoming PPU message rate, a member of T-Mobile's messaging team advocated that T-Mobile likewise increase its PPU rates, because its lower rates were not leading it to receive "a more favorable share of the market." 56.1 ¶ TM6. T-Mobile's marketing team put

together a business case to evaluate the proposal and, in September 2005, recommended to senior leadership that T-Mobile increase the PPU rate to $0.10. 56.1 ¶¶ TM8-TM11. T-Mobile proposed applying the change to "overages" – messages bought in excess of the number allotted in a monthly plan – as well as PPU texts. 56.1 ¶ TM21. None of T-Mobile's analysts or lower level executives opposed or recommended against increasing the PPU SMS rate. 56.1 ¶ TM17. In light of the approaching holiday season, which was T-Mobile's "most important quarter," T-Mobile's CEO decided not to implement the price increase in 2005; the increase was approved in November 2005 for implementation in March 2006. 56.1 ¶¶ TM12, TM18.

T-Mobile carried out its PPU price change together with a price increase for 411 directory assistance, and it used the same methodologies and processes to analyze and approve both. 56.1 ¶¶ TM11, TM22. T-Mobile considered whether each change would be profitable based on assumptions about possible churn (i.e., customer deactivations) and decreased usage. 56.1 ¶¶ TM4, TM10, TM15, TM17. T-Mobile determined that the increase in the PPU rate, combined with the increase in the directory assistance charge, would increase 2006-07 revenues by [redacted] million in net present value even assuming that the move would decrease SMS usage by [redacted] percent and lead to [redacted] subscriber deactivations.[5] 56.1 ¶¶ TM15-TM16. T-Mobile also carried out a "sensitivity analysis" based on potentially higher elasticity of demand and higher churn rates, and concluded that the price increase would still be profitable under those assumptions. *Id.* T-Mobile also analyzed the customer impact of the move and concluded that 80 percent of affected subscribers would experience a bill impact of $1.30 or less per month. *Id.* T-Mobile also predicted that an increase in the PPU rate would drive adoption of the company's

[5] T-Mobile assumed that some subscribers would leave not because of the change in PPU SMS pricing per se, but because the change in its terms and conditions would obligate the company to allow subscribers otherwise dissatisfied with their service to switch carriers without paying an early-termination fee. 56.1 ¶ TM10.

messaging bundles, which it believed provided the best value in the industry. 56.1 ¶¶ TM13, TM15, TM17. In short, T-Mobile predicted the move would be highly profitable. And T-Mobile was right – the PPU increase to $0.10 proved "highly successful at driving incremental revenue" and its impact on churn was "very minor." 56.1 ¶ TM19.

**2. a.** Plaintiffs have focused special attention on Sprint's decision in July 2006 to increase its PPU rate from $0.10 to $0.15, effective October 1, 2006. The circumstances and deliberations concerning that increase are thoroughly documented. In August 2005, Sprint merged with Nextel; the $36 billion merger was widely considered to be unsuccessful.[6] 56.1 ¶ SPR1. In April and May 2006, Sprint's regular budget review indicated that it was [redacted] behind on projected revenues. 56.1 ¶¶ SPR2, SPR4. As a result, Sprint's Vice President of Pricing, Scott Wiener, evaluated various options to raise in-year revenues, seeking a package of proposals that would generate an additional [redacted] during the balance of 2006. 56.1 ¶¶ SPR3-SPR4.

From April to June 2006, Sprint's Pricing Group, with the assistance of analysts in the Finance Group, evaluated dozens of revenue-raising initiatives, including raising the prices for PPU text messaging (referred to internally as "casual" text messaging), for the per-message "overage" fee charged to customers who exceeded the limits on text messaging package plans, and for casual data service. 56.1 ¶¶ SPR3, SPR10. Sprint modeled price increases for all three of these products using the same methodology; [redacted] 56.1 ¶ SPR5. [redacted]

[6] In early 2008, Sprint announced a loss of more than $29 billion due to a write-down related to its merger with Nextel. 56.1 ¶ SPR1 n.1.

[redacted] *Id.* None of the individuals in Sprint's Pricing or Finance Groups who were involved in evaluating and modeling these price increases are alleged to have participated in or have had knowledge of the alleged conspiracy to raise the price of PPU SMS.

Not all Sprint employees thought that raising the PPU rate was a good idea. In particular, personnel in the Product Marketing Group expressed concerns that such a rate increase would alienate customers – one middle-manager called the proposed move "greedy and short-sighted." 56.1 ¶ SPR6. In light of this opposition, Scott Wiener agreed to try to find other ways to address the widening revenue shortfalls. 56.1 ¶ SPR7. However, the personnel responsible for pricing did not agree with the "siloed" view that the price change would have a significant negative impact on subscribers, and eventually the Pricing Group concluded that the PPU SMS price increase was a necessary component to close the revenue gap at Sprint. *Id.* [redacted] 56.1 ¶ SPR8. And for all of the remaining subscribers, Sprint's bundled text messaging plans, which Sprint was modifying effective August 2006 to provide greater value, were already a less expensive option than PPU; such customers were therefore either price insensitive or likely to change to a package plan if they were concerned about the price increase in any event. 56.1 ¶ SPR9.

By July 2006, [redacted], Sprint's Pricing Group recommended to senior management that Sprint raise its PPU SMS price from $0.10 to $0.15, effective October 1, 2006. 56.1 ¶ SPR10. This price increase was projected to increase 2006 revenues by [redacted]. *Id.* The Pricing Group also recommended that Sprint raise the price of casual data, from $0.02/kb to $0.03/kb, which was projected to increase 2006 revenues by [redacted]

[redacted]; the overage price increase initiative was not recommended. *Id.* Chief Marketing Officer Mark Schweitzer and President of Customer Management Tim Kelly approved the proposed PPU text message price increase as of July 11, 2006. 56.1 ¶ SPR11. On July 12, 2006, a host of revenue initiatives were presented by Schweitzer and Kelly to Sprint CEO Gary Forsee and COO Len Lauer; among those approved were the PPU SMS price increase and the casual data price increase. 56.1 ¶ SPR12. Sprint customers began receiving notice of the price increase during the August billing cycle. 56.1 ¶ SPR13. The business challenges facing Sprint are highlighted by the fact that COO Lauer's employment at Sprint was terminated in August (before the PPU price increase took effect October 1, 2006). 56.1 ¶ SPR23.

The price increase was successful: revenues from PPU text messaging jumped increase by approximately [redacted] and remained at that level for the next four quarters. 56.1 ¶ SPR15. At the same time, the number of text messages sent by PPU users stayed roughly the same – confirming the view of analysts who anticipated that demand for PPU text messages would be inelastic. *Id.* Moreover, there is no evidence – statistical or anecdotal –that Sprint lost a significant number of customers in response to the PPU increase.[7] 56.1 ¶ SPR16.

**b.** After Sprint announced its October 2006 price increase, competitors evaluated – anew or for the first time – the possibility of increasing their own PPU text messaging rates.[8] At AT&T, the pricing group analyzed whether to follow Sprint's increase. Only after that analysis

[7] To further ensure that there would be no significant customer churn as a result of the PPU SMS price increase, [redacted] – a step that presumably would not have been necessary had Sprint known that the other carriers had agreed to follow the Sprint price increase. 56.1 ¶ SPR14.

[8] Previously, in June 2004, AT&T had evaluated whether to lower its PPU rates, which at the time were the highest among the carriers, but decided against the decrease because there was no indication that AT&T's higher PPU pricing put it at a competitive disadvantage. 56.1 ¶¶ ATT18-ATT19.

was completed, thoroughly vetted, and received unanimous support from both the pricing group and the product marketing group, was the recommendation made to senior executives, in November 2006, to increase the PPU price to $0.15 in January 2007. 56.1 ¶¶ ATT28-ATT41.

Specifically, after Sprint's increase was publicly reported, a team within AT&T's pricing group led by Joseph Mosele evaluated a potential increase to $0.15, with the financial analyses based on the same financial model and assumptions about customer behavior as it had previously used in evaluating a potential increase to $0.12.[9] 56.1 ¶¶ ATT20-ATT21, ATT23-ATT24. The team applied the $0.05 increase to the PPU text message volume that had been projected for 2007, and then adjusted that increased revenue figure to account for expected customer responses to the increase, as follows:

- Price Elasticity. Estimates of the extent to which the price increase would reduce use by the customers who would continue to purchase text messages on a PPU basis.
- Migration. Estimates of the extent to which existing PPU customers would respond to the price increase by switching – or "migrating" – to text messaging plans or bundled packages that included SMS.
- Feature Churn. Estimates of the extent to which PPU customers would discontinue using text messaging services altogether, i.e., so-called "feature churn."
- Increased Customer Costs. Estimates of incremental costs resulting from the price increase, including increased call center costs, customer credits,[10] and costs associated with greater usage by customers who had migrated to plans.

56.1 ¶ ATT31.

---

[9] In June 2006, AT&T had evaluated a potential PPU increase to $0.12 as one of several possible "revenue initiatives," but put the possibility "on hold" after taking other steps to raise revenue. 56.1 ¶¶ ATT21-ATT22.

[10] [redacted]

Mr. Mosele and his team also considered "customer churn," but concluded that it would not factor in the analysis. 56.1 ¶ ATT32. Past experience with price increases for "features" like PPU text messaging showed that customers do not change carriers on account of such price increases.[11] *Id.* Also, the vast majority (over [redacted] percent) of PPU customers used fewer than [redacted] texts per month, so a $0.05/PPU increase would have a virtually unnoticeable effect on their bills. 56.1 ¶¶ ATT32, ATT38. Moderate-to-heavy PPU users were more likely to respond to the price increase by moving to a text messaging plan than by changing carriers. 56.1 ¶ ATT32. And AT&T believed that encouraging higher-volume PPU customers to migrate to plans was in the company's long term interest for a number of reasons, including increased customer loyalty and a more stable revenue stream. 56.1 ¶¶ ATT8-ATT10, ATT29, ATT30.

The financial analysis took over three weeks to complete; it predicted that an increase to $0.15 would yield [redacted] of incremental operating income in 2007. 56.1 ¶¶ ATT28, ATT30. No AT&T employee senior to Mr. Mosele directed or attempted to influence the conclusions of the analysis, 56.1 ¶¶ ATT73-ATT75, and neither Mr. Mosele nor any member of his team that prepared the analysis are alleged to have participated in, or known about, the alleged conspiracy. After the analysis was done, members of the pricing and product marketing teams met on October 30, 2006, to review the analysis, and all present at that meeting supported a recommendation to adopt the increase. 56.1 ¶ ATT41. The increase was approved on November 13, 2006, and became effective on January 21, 2007. 56.1 ¶¶ ATT43-ATT44. The business rationales for the increase were (1) the increase to operating income in 2007; and (2) an increase in PPU text messaging customers migrating to text messaging plans. 56.1 ¶ ATT44. As it turned out, the analysis was too conservative. A "post-launch" analysis in September 2007

[11] AT&T did not allow customers to terminate their contracts with AT&T in response to the PPU price increase without incurring an early termination fee. 56.1 ¶ ATT32.

found that the price increase had increased operating income by [redacted] in the first six months of 2007 and projected that it would increase operating income by [redacted] for the full year. 56.1 ¶ ATT52. As the pricing team expected, there was no evidence of a "spike" or increase in customer churn following the PPU price increase. 56.1 ¶ ATT46.

**c.** Verizon Wireless began evaluating, in October 2006, whether an increase in the PPU rate (referred to at Verizon Wireless as the "PAYGO" rate) from $0.10 to $0.15 would be profitable, while at the same time considering other changes to its text messaging package plans to increase the message allowance and make them more attractive to consumers. 56.1 ¶¶ VZW15-VZW16, VZW19. Verizon Wireless' goal was to promote customer satisfaction by providing incentives for text messaging customers to move to the appropriate fixed-rate plan. 56.1 ¶ VZW28. Verizon Wireless considered the PPU price to be of little competitive importance. 56.1 ¶ VZW35. By contrast, Verizon Wireless recognized that if heavy users of text messaging were subject to significant "overage" charges because they exceeded the limits on their plans, Verizon Wireless might face a risk of churn. 56.1 ¶ VZW21. To address that risk, Verizon Wireless proposed new prices that sharply increased the allowances of fixed-rate plans. 56.1 ¶ VZW19. For example, Verizon Wireless increased the allowance on its $15 text messaging package from 1,000 messages per month to 1,500, and on its $20 text messaging package from 2,500 messages per month to 5,000. 56.1 ¶ VZW22.

Verizon Wireless also contemplated the possibility of changing the "overage" rate – the fee that customers on text messaging plans paid for messages in excess of their allowance. Verizon Wireless considered increasing the overage rate; it also considered decreasing the overage rate for the largest plans. 56.1 ¶ VZW38. In the end, Verizon Wireless left the overage

rate unchanged – and it is still at $0.10 today. *Id.* By contrast, Sprint and T-Mobile did increase the overage rate during the class period. 56.1 ¶¶ SPR36, TM21, TM46, TM68.

Individuals from the marketing and finance teams reviewed the proposed pricing changes, including Jim Naughton, Teresa Wong, Ann Brodow, Darrell Conn, and Lise Clancy. 56.1 ¶¶ VZW40-VZW41. The marketing team was responsible for coming up with assumptions for the models used to evaluate the prospective changes, while the finance team was responsible for building the financial models used to analyze the prospective pricing changes. *Id.* In evaluating the potential impact of an increase in the PPU rate, Verizon Wireless drew on its own experience from its decision, implemented in August 2005, to increase the PPU rate for incoming messages to match its existing $0.10 rate for outgoing messages. 56.1 ¶ VZW34. It also made note of the absence of customer backlash or negative publicity following Sprint's increase. *Id.* And it calculated that, after excluding customers that were already using more than 50 PPU messages per month – who would already benefit from a switch to a package plan – the price increase would raise the average PPU customers' monthly charges by [redacted] per month. 56.1 ¶ VZW37. Verizon Wireless therefore predicted that the increase would not lead to significant customer churn. 56.1 ¶¶ VZW35-VZW36.[12] Verizon Wireless calculated that the net effect of the rate increase – after accounting for migration of existing PPU customers to package plans – would be to increase revenues by approximately [redacted] for the last ten months of 2007 as compared to the prior plan. 56.1 ¶ VZW25. Following a business review of the full slate of proposed changes to text messaging plans and the PPU rate, Verizon Wireless approved the increase and implemented it in March 2007. 56.1 ¶¶ VZW48-VZW50.

[12] At the time Verizon Wireless began this evaluation and proposed the increase, Sprint was the only national carrier to have increased the PPU rate from $0.10 to $0.15. Before Verizon Wireless completed final approval, AT&T announced its own decision to increase the PPU rate from $0.10 to $0.15.

**d.** T-Mobile began internal deliberations about raising its PPU rate in December 2006, after learning that AT&T (then Cingular) had publicly announced an increase in its PPU rate to $0.15. 56.1 ¶ TM24.[13] After Verizon Wireless publicly announced its PPU price increase in January 2007, T-Mobile's chief marketing officer suggested that it seemed like an obvious move for T-Mobile to match its competitors' increases, given that the increase to $0.10 had been very successful for the company and T-Mobile's pricing strategy was to differentiate itself on things that mattered to consumers, such as bundles, and "pay-per-use text messaging distinctly was not one of" those things. 56.1 ¶ TM27. T-Mobile analysts then evaluated the opportunity and, as with its prior price increase, proposed to apply the change not only to PPU SMS, but also to "overages" for users with text message packages. 56.1 ¶¶ TM29-TM30. Further – unlike any other carrier – T-Mobile proposed coupling a PPU SMS increase with a decrease in the PPU rate it charged for multi-media messaging ("MMS") from $0.25 to $0.15, to simplify and unify the company's PPU pricing structure, create some goodwill with its subscribers, and drive adoption of its messaging bundles. 56.1 ¶¶ TM28-TM30, TM33, TM36.

After conducting two independent analyses of the proposed moves, including a sensitivity analysis that considered the likely profitability of PPU SMS and MMS price changes under a range of churn and usage assumptions, T-Mobile's pricing team recommended the combined move to senior leadership, concluding that it would likely generate an additional [redacted] million in net revenue for 2007 and [redacted] million in net present value for the next 24 months. 56.1 ¶¶ TM29-TM33, TM36-TM39. T-Mobile's CEO requested additional information about the

[13] Plaintiffs contend that T-Mobile entered into a purported conspiracy to raise its PPU SMS rate from $0.10 to $0.15 "on or before April 2006," even though there is no document, testimony, or other evidence suggesting that T-Mobile even discussed such a move before its rivals' moves had been publicly announced some eight months later. *See* TM-Ex. 18, Pls.' Responses to Def. T-Mobile USA's First Set of Interrogatories, Response to Interrogatory No. 1, at 5.

impact of the move on subscribers, and a T-Mobile marketing director noted that the impact would likely be small, based on the lessons of the move to $0.10 and analysis showing that less than 5 percent of affected subscribers would experience a rate increase of greater than $2.50 a month. 56.1 ¶¶ TM40-TM41. T-Mobile approved the PPU SMS/MMS move in February 2007, and again it proved more profitable than expected, increasing revenues by [redacted] percent, rather than the predicted [redacted] percent. 56.1 ¶¶ TM41-TM43. As with the move to $0.10, T-Mobile observed no material impact on customer churn. 56.1 ¶ TM43.

**3. a.** Sprint's financial performance continued to lag in 2007. 56.1 ¶ SPR26. As a result, Sprint evaluated additional revenue raising initiatives, including raising PPU SMS prices from $0.15 to $0.20 and raising SMS overage prices from $0.10 to $0.20. 56.1 ¶¶ SPR25-SPR26, SPR30. Drawing on the experience with the earlier increase, Sprint estimated that the PPU SMS price increase would be worth approximately [redacted] for the remaining three months of 2007, [redacted]. 56.1 ¶ SPR30. Using similar methods, Sprint estimated that an increase in the overage rate from $0.10 to $0.20 would yield an additional [redacted] in revenue for the remainder of the year. *Id.* These price increases were again evaluated and recommended by Sprint's Pricing Group, which was now led by Will Souder. 56.1 ¶¶ SPR25, SPR27, SPR31, SPR34. These price increases were presented to and approved by senior Sprint management, including Sprint CEO Gary Forsee, with numerous other initiatives, on July 24, 2007. 56.1 ¶¶ SPR35-SPR36. Notice of this price increase was provided to customers during the August billing cycle and was implemented on October 1, 2007. 56.1 ¶¶ SPR25, SPR37. As a result of Sprint's continuing financial underperformance, Mr. Forsee was informed in [redacted] that he would be replaced as CEO, and an announcement to this effect was made public in October 2007. 56.1 ¶ SPR43.

**b.** After Sprint's announcement, both Verizon Wireless and AT&T began to assess a comparable increase. In September 2007, in response to a gap in the 2008 data budget, executives in Verizon Wireless' marketing and finance departments began discussing the possibility of raising Verizon Wireless' PayGo rate to $0.20. 56.1 ¶ VZW55. That gap was in part caused by subscribers' shifts to unlimited bundles, offered by Verizon Wireless beginning on April 16, 2007, which caused Effective Rates Per Message ("ERPM") – customers' average per-message messaging costs – to decline. 56.1 ¶ VZW56.

Grace Hwang, an analyst in Verizon Wireless' marketing department, conducted various analyses of the potential revenue boost that would be expected from increasing the PayGo rate; that analysis indicated that increasing PayGo rates to $0.20 would provide up to [redacted] in incremental revenues per year. 56.1 ¶ VZW59. Verizon Wireless calculated that such an increase would be profitable based on experience with the earlier increase in the PPU rate from $0.10 to $0.15 and the absence of negative market reaction to Sprint's increase. 56.1 ¶ VZW60-VZW61.

The price increase was recommended by Ms. Brodow, the most senior finance executive involved with the analysis, and was approved by senior management. 56.1 ¶¶ VZW61, VZW63. In January 2008, Verizon Wireless publicly announced that it would change its price for PayGo text messages from $0.15 to $0.20. 56.1 ¶ VZW64.

**c.** AT&T's pricing and product marketing teams were uncertain about whether AT&T should increase its PPU price again, wanting to analyze both the earlier increase and the proposed increase, while watching to see if Verizon and other carriers would increase their PPU prices. 56.1 ¶¶ ATT48-ATT50.

In conducting the analysis of the proposed increase to $0.20, Mr. Mosele's team used the same model as it used before, adjusting the assumptions about elasticity, migration, feature churn, and incremental costs to account for AT&T's experience with the prior increase. 56.1 ¶¶ ATT54-ATT55. The analysis was substantially complete by October 2007; it predicted that the increase would add [redacted] to 2008 operating income. 56.1 ¶¶ ATT54-ATT55. Again, no AT&T employee senior to Mr. Mosele directed or attempted to influence the conclusions of the analysis. 56.1 ¶¶ ATT73-ATT75.

After Verizon Wireless publicly announced its increase to $0.20 in early January 2008, members of AT&T's pricing and product marketing teams met to review the final analysis, and all members of both teams supported recommending the price change to $0.20. 56.1 ¶ ATT60. The recommendation was presented to senior executives on January 11, 2008. 56.1 ¶ ATT61. The increase was approved and became effective on March 30, 2008. *Id.* In May 2009, AT&T did a post-launch analysis of the 2008 increase and concluded that it had increased operating income by [redacted], very close to the analysts' projection of [redacted]. 56.1 ¶ ATT64.

**d.** T-Mobile began evaluating a potential increase in its PPU SMS/MMS rate from $0.15 to $0.20 following public announcements by the other Defendant carriers that they were raising their PPU SMS rates. 56.1 ¶¶ TM47-TM48. T-Mobile's financial analysis indicated that the price increase would be profitable using conservative assumptions about churn and reduction in usage – that is, assuming that churn would increase and usage would decrease more than had been observed for the prior PPU price change. 56.1 ¶¶ TM49-TM53. By April 2008, T-Mobile was looking for ways to make up an anticipated EBITDA shortfall for the year and believed that raising the PPU rate and increasing the price of international PPU text messages to $0.25 represented the best options to generate additional revenue, with the combined move expected to

generate an additional [redacted] million in revenue per month. 56.1 ¶¶ TM52, TM54. T-Mobile increased its rates for PPU domestic and international text messages in late August 2008. 56.1 ¶ TM65. As with the prior two PPU price changes, the move to $0.20 performed above expectations – revenue gains were higher than predicted, usage declined less than anticipated, and there was no discernible increase in churn. 56.1 ¶¶ TM65-TM66.

Plaintiffs have focused on the comments of one T-Mobile employee, Adrian Hurditch.[14] 56.1 ¶ TM70. Mr. Hurditch had played a central role as head of T-Mobile's pricing group at the time of the company's move to $0.10, a move that Mr. Hurditch supported. 56.1 ¶¶ TM4, TM13. Mr. Hurditch left his pricing role to move into T-Mobile's prepaid business before the company's moves to $0.15 and $0.20 and those PPU price changes were not within the scope of his responsibilities, 56.1 ¶¶ TM24, TM26, TM34, TM57, TM71, but Mr. Hurditch still voiced his opinion that the later moves were "price gouges" unsupported by an increase in messaging costs, 56.1 ¶¶ TM24, TM57. In May 2008, while T-Mobile's pricing team was analyzing the proposed PPU increase to $0.20, Mr. Hurditch e-mailed them, saying, "I would guess that consumer advocates groups are going to come after us at some point. It's not like we've had an increase in the cost to carry messages to justify this or a drop in our subscription SOC rates? I know the other guys are doing it but that doesn't mean we have to follow." 56.1 ¶¶ TM57-TM58.

In September 2008, after T-Mobile's increase from $0.15 to $0.20 went into effect, and on the heels of media reports indicating that Senator Kohl sent a letter to the major wireless carriers expressing concerns about increases in PPU rates, Mr. Hurditch criticized the increase in

[14] T-Mobile addresses statements made by Mr. Hurditch regarding the PPU price changes in some detail both here and in the 56.1 Statement because Plaintiffs mistakenly believe that a comment made by Mr. Hurditch is evidence of a conspiracy. As discussed further in Part I.B of the Argument – it is not.

an e-mail to his colleague Lisa Roddy, opining that, "[a]t the end of the day we know there is no higher cost associated with messaging. The move was col[l]usive and opportunistic. Clearly get why but it doesn't surprise me why public entities and consumer advocacy groups are starting to groan." 56.1 ¶ TM70. Mr. Hurditch testified that his e-mail reflected his frustration that his warnings about adverse consumer reaction had not been heeded, and that he was not aware of any agreement among the carriers to set PPU text message prices. 56.1 ¶¶ TM71-TM73.

**D. Statement of the Case**

**1. The Complaint:** On September 9, 2008, Senator Herbert Kohl, Chairman of the Antitrust Subcommittee of the Senate Judiciary Committee, sent a letter to the chief executive officers of the four national wireless carriers to "express . . . concern regarding what appear to be sharply rising rates . . . for text messaging." Defs.' Mem. in Supp. of Mot. To Dismiss, Ex. A (filed June 16, 2009) [Dkt. 123].[15] The next day, a complaint was filed on behalf of a putative class of all persons "who purchased text messaging services from defendants at any time from January 1, 2005 to the present."[16] Within weeks, 38 cookie-cutter complaints were filed around the country. The Judicial Panel on Multidistrict Litigation transferred all of the cases to this Court for consolidated pretrial proceedings. Plaintiffs filed their Consolidated Class Action Complaint on April 29, 2009.

[15] After hearings, Senator Kohl wrote that "[t]he cell phone companies testified that they did not coordinate their price increases in any way, and we received no evidence to contradict this testimony." Letter from Sen. Herb Kohl to Hon. Christine Varney, Ass't Att'y Gen., Antitrust Div., U.S. Dep't of Justice, and Hon. Julius Genachowski, Chairman, FCC, at 1 (July 6, 2009) (attached as Ex. 1 to Defs.' Reply Mem. in Supp. of Mot. To Dismiss (filed Aug. 25, 2009) [Dkt. 106]). In addition, the *Wall Street Journal* reported that the Department of Justice initiated an investigation into carriers' text messaging rates at the request of Senator Kohl and that "it has concluded [its] inquiry . . . and has no plans to take action on this issue." Amy Schatz & Thomas Catan, *Justice Ends Probe of Texting Rates*, Wall St. J., Jan. 15, 2010, at B6.

[16] Class Action Compl. at 1, *Cuneo-Leider Mgmt. & Dev. Corp. v. Verizon Wireless*, No. 3:08-cv-04621 (D.N.J. filed Sept. 10, 2008).

The single-count complaint alleged that Defendants had violated Section 1 of the Sherman Act by collusively fixing the price for text messages charged on a PPU basis, beginning "at least as early as January 1, 2005." Compl. ¶ 126 [Dkt. 63].[17] The principal basis for the conspiracy claim was the allegation that Defendants increased their PPU text messaging prices by the same amount within several months of each other. *See id.* ¶¶ 66-74.

**2. Dismissal:** The Court dismissed the complaint without prejudice.[18] It noted that plaintiffs "do not allege in their complaint that there was an express agreement among the defendants, and they offer no 'specific time, place, or person involved in the alleged conspirac[y].'" *In re Text Messaging Antitrust Litig.*, No. 08 C 7082, 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007)) (alteration in original). The Court also concluded that, even assuming for the sake of argument that the pattern of price changes alleged constituted "parallel conduct," Plaintiffs had failed to plead sufficient facts to support an inference that the alleged conduct was the result of a prior agreement.

**3. The Second Amended Complaint ("SAC"):** Plaintiffs moved for leave to file a second amended complaint on January 8, 2010. Plaintiffs argued that the amendments clarified that the alleged conspiracy began at some unspecified date when all of the Defendants agreed to converge on $0.10 PPU price – that is, prior to the PPU price increase from $0.10 to $0.15. They

[17] Although the complaint alleged that Defendants had fixed "pricing for Text Messaging Services," which it defined to include any "use of a cellular telephone to send a character message," Compl. ¶ 11, the complaint elsewhere made clear that the alleged conspiracy involves only text messages that are priced on a PPU basis. *See, e.g.*, *id.* ¶ 129.b ("the per text message price has been and continues to be fixed"); *id.* ¶ 130 (alleging harm "by being unable to purchase text messages on a per message basis, except at a price higher than otherwise would have been paid").

[18] Just prior to the hearing on the motion to dismiss, Plaintiffs filed an amended complaint. It was this first amended complaint that the Court found deficient and dismissed.

also added allegations related to CTIA and the "Wireless Internet Caucus," a CTIA working group that included at least 40 companies not providing text messaging services.

The Court granted Plaintiffs' leave to file the SAC over Defendants' objection that the amendment was futile. It held that Plaintiffs' "allegation that in 2005-06, the defendants 'agreed to uniformly charge an unprecedented common per-unit price of ten cents for text messaging services'" constituted an "allegation of an express agreement." *In re Text Messaging Antitrust Litig.*, No. 08 C 7082, 2010 WL 1782006, at *2 (N.D. Ill. Apr. 30, 2010). The Court further ruled that other allegations from the SAC "provide[ ] additional support . . . that carries plaintiffs over the plausibility threshold," citing in particular allegations related to CTIA and "allegations that the defendants exchanged pricing information" at trade group meetings. *Id.* at *2-3.

**4. Interlocutory Appeal:** The Court granted Defendants' motion to certify the Court's ruling for interlocutory appeal. The Seventh Circuit granted Defendants' petition and affirmed the Court's decision to allow the case to proceed. The Court of Appeals characterized the SAC as alleging a "mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010). It said that the SAC alleged "that all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third"; "that the defendants belonged to a trade association and exchanged price information directly at association meetings" and that the Wireless Internet Caucus Leadership Council's ("WIC Leadership Council") "stated mission was to urge its members to substitute 'co-opetition' for competition"; and "that in the face of steeply falling costs, the defendants increased their prices." *Id.* at 628.

Based on these characterizations, the Court of Appeals affirmed, holding that Plaintiffs had alleged " 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' " than collusion, which could " 'support a plausible inference of conspiracy.' " *Id.* (quoting *Twombly*, 550 U.S. at 556 n.4) (further internal quotation marks omitted).

**5. The Third Amended Complaint:** After the court of appeals ruled, Plaintiffs filed the TAC, adding CTIA as a defendant.

## ARGUMENT

With discovery complete, Plaintiffs cannot support the allegations that allowed them to initiate this massive case. In response to interrogatories that this Court ordered Plaintiffs to answer, Plaintiffs asserted that certain named senior executives of the Defendant carriers had conspired at unidentified CTIA meetings. But there is no evidence to back up that accusation – in fact, Plaintiffs concede that, even after massive discovery, they have no evidence showing when or where any such meeting occurred. For instance, with respect to the price increase to which Plaintiffs' experts have paid particular attention – Sprint's 2006 decision to raise its PPU rate from $0.10 to $0.15 – there is no evidence that the senior Sprint executives identified in Plaintiffs' interrogatory response (CEO Gary Forsee and COO Len Lauer) ever participated in any in-person CTIA meetings around the time that the price increase was approved by Sprint. 56.1 ¶¶ SPR18-SPR21, SPR24. And, among the millions of pages of documents produced and the dozens of depositions taken, there is not a single e-mail or line of testimony that refers to any agreement or understanding among the carriers or that evidences any advance knowledge on the part of any carrier concerning a competitor's intended pricing decisions. To the contrary, the internal analyses of proposed price increases done by Verizon Wireless, AT&T, and T-Mobile

all occurred after Sprint publicly announced its price increase to its customers. 56.1 ¶¶ ATT24, ATT47-ATT51, TM23-TM29, VZW13-VZW16, VZW34, VZW46-VZW49.

The Court of Appeals allowed the case to proceed because Plaintiffs had alleged "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason'" than price-fixing, which could "'support a plausible inference of conspiracy.'" *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007)) (further internal quotation marks omitted). The facts developed in discovery belie such allegations: Defendants did not make complex and historically unprecedented changes in pricing structure; rather, they maintained the existing structure of offering SMS service in plans and on a PPU basis. They did not act at the very same time; rather, the pricing changes at issue in this case occurred over the space of more than three years. And, most important, the pricing changes were made for unilateral business reasons that are clearly discernible from the record evidence. Contemporary documents show that Defendants analyzed their pricing moves and forecasted that the challenged increases in the PPU rate would be profitable, whether or not other carriers followed. These forecasts were prepared in the same manner as those involving myriad price changes not alleged to have been collusive by carrier employees who are not alleged to have participated in or been aware of the alleged conspiracy. This evidence cannot be squared with any claim that Defendants implemented a top-down conspiracy to fix prices.

To survive a motion for summary judgment, a plaintiff alleging price-fixing in violation of Section 1 must produce evidence that "would permit a reasonable jury to conclude that [the defendants] agreed to work together to fix prices," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 707 (7th Cir. 2011) – that is, "direct or circumstantial evidence that reasonably

tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted); *see also First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); Fed. R. Civ. P. 56(e). In the absence of direct evidence of a conspiracy, plaintiffs bear the burden of presenting evidence that "tends to exclude the possibility that the [alleged conspirators] . . . act[ed] independently." *Monsanto*, 465 U.S. at 764. Because Plaintiffs can proffer neither direct nor circumstantial evidence to support their claim that Defendants conspired, the Court should dismiss the complaint.

## I. THERE IS NO DIRECT EVIDENCE OF A CONSPIRACY TO FIX PRICES

The absence of any direct evidence of conspiracy in this case is crippling to Plaintiffs' case. Plaintiffs apparently contend that the most senior executives of the carriers met at unidentified CTIA meetings at unidentified times, agreed to increase PPU text message prices, and then imposed that agreement on unwilling employees. But many individuals were involved with the financial and strategic analyses of the price changes at issue in this case, their deliberations are well documented in the record, and no person and no document attests to the existence of any agreement or even any discussion among the Defendant carriers about the price of PPU text messaging. There is likewise no evidence that staff-level recommendations were overridden by senior executives who attended CTIA meetings or that financial analyses or internal discussions were cut short, no hint in any document or testimony of pressure being exerted by senior executives to alter forecasts to support the PPU price increases, and nothing to suggest that any carrier Defendant knew of another's price change decision before it was publicly announced. There is, instead, a record of ordinary, deliberative decision-making – with

an unremarkable amount of diversity of opinion in some cases – that reflects business as usual, not furtive lawbreaking.

No witness – no disgruntled former employee, no frustrated marketing executive – testified to thinking that there was anything suspicious about their company's respective decisions to raise the PPU price. Dozens of witnesses have denied, under oath, the existence of any conspiracy. 56.1 ¶¶ ATT1, SPR50-SPR51, TM74-TM75, VZW9, VZW52, VZW66. Plaintiffs cannot overcome these unanimous denials and avoid summary judgment simply by asserting that a jury might conclude that dozens of witnesses lied. *See Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) ("[a] motion for summary judgment cannot be defeated," over the movant's production of sworn denials, "merely by an opposing party's incantation of lack of credibility"); *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, 913 F. Supp. 1088, 1107 n.20 (N.D. Ill. 1995) ("Plaintiff cannot establish genuine issues of material fact with credibility arguments.") (vacated in part pursuant to settlement). These denials, by each of the witnesses supposedly in a position to know, imposes on Plaintiffs a much heavier-than-usual burden, which Plaintiffs cannot meet. *Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir. 1981).

### A. There Is No Evidence To Support the Claim That Defendants Conspired During CTIA Meetings

Plaintiffs can proffer no evidence of improper communications occurring during any meeting of CTIA, much less evidence that any agreement was reached under its aegis. The allegations that carried Plaintiffs' "claim of an express agreement . . . over the plausibility threshold," concerned the Wireless Internet Caucus of CTIA ("WIC"), specifically including "allegations that the defendants exchanged pricing information . . . as well as . . . allegations identifying the participants in the meetings and the dates (or approximate dates) of the

meetings." *In re Test Messaging Antitrust Litig.*, No. 08 C 7082, 2010 WL 1782006, at *2-3 (N.D. Ill. Apr. 30, 2010). After years of discovery, Plaintiffs have no evidence to support any of their allegations concerning CTIA or WIC. In particular, there is nothing – not a single document, not a single line of testimony – that provides any support for the claim that CTIA or WIC was the locus of any improper discussions or unlawful agreement.[19]

Plaintiffs have no evidence of any improper communications, any improper exchange of SMS pricing information, or any price fixing agreement at any CTIA meetings or functions. And there is no evidence that the Defendant carriers exchanged pricing information. Rather, the Defendant carriers and many others provided historical information, none of it price information, to a third party hired by the CTIA, which aggregated that data to identify industry trends without revealing individual carrier data to anyone. *See* 56.1 ¶ CTIA8. There is nothing illegal or improper about performing that type of industry analysis through a trade association. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1098-99 (9th Cir. 1999).

CTIA is an industry association that includes not just wireless carriers but also suppliers from all parts of the industry, including providers of data services and related products. 56.1 ¶ CTIA1. Its functions – which are legitimate and pro-competitive – include advocacy, development of interoperability standards, testing and certification programs, and promoting the safe and responsible use of wireless technology. 56.1 ¶ CTIA2; *see also* 56.1 ¶ JS6. CTIA's consistent policy has been that non-public pricing information concerning CTIA's members' services should never be discussed during CTIA meetings or informal or social gatherings. 56.1 ¶ CTIA3. CTIA does not collect non-public information about members' pricing of any service and does not share pricing information or discuss pricing with members. 56.1 ¶ CTIA7.

[19] Plaintiffs do not claim that any individual who represented Sprint at the WIC participated in any price-fixing conspiracy.

Furthermore, the evidence demonstrates that the WIC was engaged in pro-competitive standards-setting efforts throughout the class period. The role of WIC was to provide a forum for industry participants from all levels of the industry – carriers, data service providers, applications developers, and content providers – to promote the growth of wireless data services. 56.1 ¶ CTIA27. Throughout the class period, WIC's activities have included cross-industry efforts to develop interoperability standards applicable across varied industry segments to promote the growth of wireless data and mobile internet products and services and the delivery of high quality wireless services. 56.1 ¶ CTIA28.[20] Such activities promote competition. *See, e.g.*, *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 487 (1st Cir. 1988) (Breyer, J.).

**B. There Is No Other Direct Evidence of Agreement**

Plaintiffs have focused on a single comment in a September 2008 internal T-Mobile e-mail, written after the news that Senator Kohl had questioned Defendants' price increases, that T-Mobile's move to $0.20 was "col[l]usive and opportunistic." But this comment, made by T-Mobile employee Adrian Hurditch – who had no responsibility for the price change at issue – to his colleague Lisa Roddy, is not direct evidence. Direct evidence of a conspiracy in violation of Section 1 is evidence that is "tantamount to an acknowledgment of guilt" or "an outright confession" that is "sufficient in itself to prove a price-fixing conspiracy." *In re High Fructose*

[20] The reference to "co-opetition" in one CTIA document, *see Text Messaging*, 630 F.3d at 629, referred to the WIC objective of facilitating cooperation among disparate firms – including wireless carriers, wireless data service providers, wireless app developers, and content providers – to promote the growth of wireless data services. 56.1 ¶ CTIA35.

*Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002); *see also Omnicare*, 629 F.3d at 706 (referring to direct evidence as a "smoking gun").[21]

The Hurditch e-mail is not "direct evidence" under this standard. The record evidence – including Mr. Hurditch's deposition testimony – forecloses any argument that the statement is sufficient to create a material issue of fact with respect to raising PPU SMS prices to $0.20, let alone the other price changes that Plaintiffs have challenged. In May 2008, when T-Mobile was considering increasing its PPU text messaging price from $0.15 to $0.20, Mr. Hurditch sent an e-mail to the strategic pricing team (including Ms. Roddy) telling them that "my gut says raising messaging pricing again is nothing more than a price gouge . . . consumer advocates groups are going to come after us at some point. . . . I know the other guys are doing it but that doesn't mean we have to follow." 56.1 ¶ TM57. The last sentence of this e-mail demonstrates that Mr. Hurditch did not believe that T-Mobile had reached any agreement to raise its prices as Plaintiffs allege.

In September 2008, just days after T-Mobile implemented its move to $0.20 and the day that the media reported on Senator Kohl's letter, Mr. Hurditch sent Ms. Roddy an e-mail reflecting his frustration that his previously expressed concerns had not been heeded. 56.1 ¶¶ TM69-TM71. The e-mail noted that he was not "surprise[d]" that "public entities and consumer advocacy groups are starting to groan" given that "there is no higher cost associated with messaging," and characterizing the move as "col[l]usive and opportunistic." 56.1 ¶¶ TM69-TM70. Mr. Hurditch testified that his e-mail reflected the fact that he was "upset that some of

[21] *Cf. In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1154 (D. Kan. 2012) (finding testimony that company executive acknowledged on more than ten occasions that he met with competitors and reached agreements to set prices to be "direct evidence of an agreement, in the form of admissions by persons with knowledge of the agreement. No additional inference is necessary to get to the existence of an agreement.").

the risks that I'd stated in the prior e-mail were coming to fruition." 56.1 ¶ TM71. Mr. Hurditch further testified that he was concerned that the sequential PPU price increases could give the "appearance" that competitors were cooperating on the pricing moves. 56.1 ¶ TM72. Mr. Hurditch testified, however, that he was not aware of any agreement between T-Mobile and any other wireless carrier regarding PPU text message prices and that he did not know of anyone at T-Mobile having any non-public information about competitors' plans for text message prices. 56.1 ¶ TM73. Furthermore, Plaintiffs can proffer no evidence that Mr. Hurditch was in a position to know of any supposed discussions among the Defendant carriers concerning the PPU price. Mr. Hurditch never participated in any CTIA meeting or event and there is no evidence that he had any contact or communication with competitors during the relevant timeframe. 56.1 ¶¶ TM74-TM77.

"[A]mbiguous statements" that are subject to alternative explanations do not constitute direct evidence of conspiracy. *See High Fructose Corn Syrup*, 295 F.3d at 661-62. Mr. Hurditch's comment is just such an ambiguous statement – as the testimony of Plaintiffs' own experts illustrates, "collusion" can mean many things, *see infra* pp. 48-50 – and it has been explained through uncontroverted testimony that is corroborated by contemporaneous documents. It is therefore not "direct evidence" of a conspiracy. Indeed, courts of appeals have affirmed the grant of summary judgment for defendants in Section 1 cases despite the existence of ambiguous statements that contain loose or loaded language. For example, in *Omnicare*, the plaintiff alleged that the defendants – insurers planning a merger – had agreed to employ a common strategy in negotiating with the plaintiff, a healthcare provider. The plaintiff proffered an e-mail in which an executive of one of the defendants stated that she was "in agreement" with a counterpart at the other defendant that a "readiness" plan should be put in place and that

"sensitive items" should be discussed over the phone and not in writing; a memo attached to the e-mail proposed using a subsidiary of one of the insurers as a "stalking horse to obtain the best service and contracts" from the plaintiff. The court found that, despite the use of the term "agreement" and the "loaded 'stalking horse' phrase," the memo did not create any issue of fact precluding summary judgment. 629 F.3d at 708. Given alternative explanations for the documents – when considered in context – it did not suffice to create any issue of material fact concerning the existence of an unlawful agreement. *See also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1293 (11th Cir. 2003) (defendant's CEO's statement that he had "no wish to escalate" a price war in the United States did not create an issue of fact despite plaintiffs' argument that the statement was intended to signal a willingness to conspire on price); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 127 (3d Cir. 1999) (internal memorandum referring to a "truce" in effect with a competitor did not create an issue of fact; the evidence was "as consistent with normal business conduct as it is with some alleged conspiracy"); *Richards v. Neilson Freight Lines*, 810 F.2d 898, 903-04 (9th Cir. 1987) (Kennedy, J.) (testimony that defendants had "gentlemen's agreement" insufficient to establish material issue of fact as to existence of horizontal conspiracy where defendants had independent reasons for challenged conduct). As in those cases, the single "loaded" word in Mr. Hurditch's September 2008 e-mail does not provide any basis for denying Defendants' motion.

Furthermore, Mr. Hurditch's e-mail is inadmissible hearsay as to defendants other than T-Mobile and thus "incapable of creating a *genuine* issue of material fact" as to them under any circumstances. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994). The e-mail is not admissible against the other defendants under the co-conspirator exception to the hearsay rule, *see* Fed. R. Evid. 801(d)(2)(E), because the statements in the e-mail were not made "in

furtherance" of any supposed conspiracy. *See United States v. Doerr*, 886 F.2d 944, 951-52 (7th Cir. 1989); *see also United States v. Posner*, 764 F.2d 1535, 1538 (11th Cir. 1985), *cited with approval in United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991).

## II. THE RECORD EVIDENCE DOES NOT SUPPORT ANY INFERENCE OF CONPSIRACY

Plaintiffs likewise have no circumstantial evidence that would allow a reasonable jury to conclude that Defendants increased their PPU prices pursuant to prior agreement rather than based on unilateral business judgment. The "crucial question" in a case under Section 1 is whether the challenged conduct flows from a defendant's independent decision-making or from an agreement with rivals. *Twombly*, 550 U.S. at 553. To show such an agreement in the absence of direct evidence, a plaintiff must proffer sufficient "circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto*, 465 U.S. at 764 (internal quotation marks omitted).

"[A]ntitrust law limits the range of permissible inferences" a jury may make "from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Two such limitations are of particular relevance here. First, mere parallel conduct – for example, the sequential decisions reached by each of the defendant carriers to charge the same fee for PPU text messages – "[w]ithout more, . . . does not suggest conspiracy." *Twombly*, 550 U.S. at 556-57. Different firms in a competitive industry frequently charge similar prices for similar services, and competitors can be expected to alter prices in similar ways in response to changes in supply and demand conditions. *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981); *Weit*, 641 F.2d at 463; *see generally* Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655, 663 (1962) (noting that parallel conduct among rivals

often "involves simply the independent responses of a group of competitors to the same set of economic facts").

Second, conduct that is "as consistent with permissible competition as with illegal conspiracy" cannot support an inference of an illegal agreement. *Matsushita*, 475 U.S. at 588 (citing *Monsanto*, 465 U.S. at 764). Accordingly, "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto*, 465 U.S. at 764). Where an antitrust plaintiff "relies on circumstantial evidence alone, the inference of unlawful agreement rather than individual business judgment must be the compelling, if not exclusive, rational inference." *Weit*, 641 F.2d at 463. "A defendant is entitled to summary judgment when it provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy." *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1174 (7th Cir. 1990) (internal quotation marks omitted).

The evidence developed during discovery makes it impossible for Plaintiffs to meet the governing "tends to exclude" standard. The record demonstrates that each of the challenged pricing moves of each of the Defendant carriers was made following internal deliberations and financial analyses by individuals who were not involved in or knowledgeable about the alleged conspiracy. Those forecasts predicted that the proposed PPU price increases would be in each of the carriers' unilateral self-interest. The record in this case provides exceptionally detailed evidence to demonstrate that Defendants acted for unilateral reasons. The quantity of evidence that Plaintiffs must proffer to "show that the inference of conspiracy is reasonable in light of the competing inference[ ] of independent action," *Matsushita*, 475 U.S. at 588, is correspondingly great. *See also Omnicare*, 629 F.3d at 720 (granting summary judgment for defendants where

evidence was insufficient to "negate" the inference that defendants' conduct was the result of unilateral action); *Quality Auto Body*, 660 F.2d at 1200 (affirming grant of summary judgment on conspiracy claim where "uncontroverted affidavits and deposition testimony . . . establish that each company has unilaterally developed its own claim-handling procedures"); *Venture Tech, Inc. v. National Fuel Gas Co.*, 685 F.2d 41, 48 (2d Cir. 1982) (granting judgment as a matter of law for defendants because, taken as a whole, "the evidence points with at least as much force toward unilateral action by [defendants] as toward conspiracy, and a jury would have to engage in impermissible speculation to reach the latter conclusion"). Far from meeting their burden, Plaintiffs can proffer no evidence to support the competing inference of conspiracy.

**A. The Evidence Demonstrates That Each Defendant Judged Each of the Challenged Pricing Moves To Be in Its Unilateral Self-Interest**

The contemporaneous documents produced in this case and the testimony of the witnesses involved in the relevant pricing decisions for each Defendant demonstrate that each Defendant independently decided to increase its PPU text messaging price because it judged such increases to be in its own unilateral self-interest. Such evidence forecloses Plaintiffs' claim that any Defendant "acted in a way that, but for a hypothesis of joint action, would not be in its own interest." *Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 726 (7th Cir. 1986).

**1.** With regard to each price change, internal financial analyses – performed using the same methods and comparable assumptions to analyses of other pricing changes not alleged to be the product of any improper agreement and made by individuals who Plaintiffs do not allege to have been involved in any conspiracy – demonstrated that the proposed price increase would be profitable.

- Verizon Wireless estimated that an increase in the incoming messaging rate from $0.02 to $0.10 would yield an additional [redacted] per month in revenue. 56.1 ¶ VZW4.

- T-Mobile estimated in November 2005 that an increase in the PPU rate, paired with an increase in the 411 rate, would increase net EBITDA in 2006 by [redacted] million and would have a "net present value" of [redacted] million for 2006-07. 56.1 ¶ TM15.

- Sprint estimated in July 2006 that an increase in the PPU rate from $0.10 to $0.15, would increase revenue by [redacted] for the last quarter of 2006 and by [redacted] in 2007. 56.1 ¶ SPR10.

- AT&T estimated in November 2006 that an increase in the PPU rate from $0.10 to $0.15 would yield [redacted] in additional operating income in 2007. 56.1 ¶ ATT30.

- Verizon Wireless estimated in November 2006 that an increase in the PPU rate from $0.10 to $0.15 would yield [redacted] in additional revenue for 10 months in 2007, after adjusting for customers' shift from PPU to bundles. 56.1 ¶ VZW25.

- T-Mobile estimated in January 2007 that an increase in the PPU rate from $0.10 to [redacted] would yield $88 million in additional revenue in 2007. 56.1 ¶ TM29.

- Sprint estimated in July 2007 that an increase in the PPU rate from $0.15 to $0.20 would yield [redacted] in additional revenue in the fourth quarter of 2007. 56.1 ¶¶ SPR30, SPR34-SPR35.

- Verizon Wireless estimated in November 2007 that an increase in the PPU rate from $0.15 to $0.20 would raise approximately [redacted] in revenues. 56.1 ¶ VZW59.

- AT&T estimated in October 2007 that an increase in the PPU rate from $0.15 to $0.20 would contribute [redacted] to operating income over two years. 56.1 ¶ ATT55.

- T-Mobile estimated in June 2008 that an increase in the PPU rate from $0.15 to $0.20 (also applied to PPU MMS) would yield an increase in revenue of [redacted] million in the last four months of 2008 and a 24-month net present value of [redacted] million. 56.1 ¶ TM63.

Each of the analyses reflects internal analysts' reasonable predictions about the impact of the price change on revenues and the potential impact on strategic goals; none of these analyses was based on any non-public information regarding competitor price moves or assurances that

other competitors would increase prices as well. *See supra* pp. 8-22. Carriers raised PPU prices because their analyses indicated that such increases would be profitable – without regard to what their rivals might do in response. "[T]he absence of action contrary one's economic interest renders consciously parallel business behavior meaningless, and in no way indicates agreement." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994) (internal quotation marks omitted).

**2.** This factual record contradicts the critical allegations that the Court of Appeals relied on in allowing Plaintiffs' complaint to proceed. *First*, although the Court of Appeals relied on Plaintiffs' allegation that the increases in the PPU rate were made "'for no . . . discernible reason,'" *Text Messaging*, 630 F.3d at 628 (internal quotation marks omitted), the record now provides those reasons: each of the carriers acted only after determining, using analyses performed by individuals acting within the course of their ordinary job responsibilities and employing methods they used to evaluate other contemplated pricing moves, that the proposed increase would be profitable for the individual carrier and promote that carrier's business strategy. *Second*, while the Court of Appeals relied on Plaintiffs' allegation that Defendants changed their prices "all at once" and that "[t]he change in the industry's pricing structure was so rapid . . . that it could not have been accomplished without agreement," *id.*, Plaintiffs' expert, after reviewing the record, acknowledge that this is not true. *See* JS-Ex. 8, Lehr Dep. 76:6-8 ("I don't offer an opinion that . . . the only explanation for [the timing of the price increases] could be collusion."). To the contrary, with respect to each of the challenged price increases, each individual carrier acted after documented internal deliberation that spanned months, none of which provides evidence of any advance knowledge of a competitor's future moves.

### B. Plaintiffs Have Proffered No Evidence That Tends To Preclude the Possibility That the Defendant Carriers Acted Unilaterally

Plaintiffs have proffered no evidence that would allow a reasonable fact-finder to determine that the challenged price increases were the product of prior agreement, not unilateral business judgment. In the absence of any documents or testimony suggestive of actual agreement between or among any of the carriers, Plaintiffs will presumably rely primarily on the opinions of economic experts that Defendants' pricing moves would not have been in their unilateral interest absent foreknowledge that rivals would follow. But the mere fact that Plaintiffs have proffered expert testimony does not preclude summary judgment. *See, e.g.*, *Baby Food*, 166 F.3d at 128, 134; *Weit*, 641 F.2d at 460-62; *Chamberlain Group, Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 951 (N.D. Ill. 2010). In this case, Plaintiffs' experts' opinions are based on second-guessing the contemporaneous business judgment of Defendants' employees, in the absence of any data or analysis to support their conclusions. Plaintiffs' experts have not offered any opinion that Defendants entered into an unlawful agreement to fix prices – rather, they have admitted that their use of the term "collusion" could include conduct that does not involve illegal price-fixing and conduct that was never alleged in the complaint.

#### *1. Plaintiffs' Experts Have Offered No Basis To Conclude That Any Defendant Acted Contrary to Its Unilateral Self-Interest*

**a.** The testimony of Plaintiffs' experts provides no basis for a reasonable jury to conclude that Defendants' employees did not reach a good-faith conclusion that each increase in the PPU rate was in their respective company's unilateral best interest. Plaintiffs concede that demand for PPU text messaging among each carrier's own customers was inelastic – that is, an increase in price would not cause a proportionate decrease in usage and would therefore raise revenues. JS-Ex. 2, Lehr Rep. 36. Plaintiffs' experts likewise concede that it was in each carrier's unilateral interest to encourage its own subscribers to purchase text messaging plans,

rather than to continue to use the service on a PPU basis.[22] There is no dispute that both factors tend to render a PPU price increase unilaterally profitable – that is, an increase in PPU price increases revenue from PPU users *and* it promotes adoption of plans by additional users, which is "a cool thing for the company." JS-Ex. 5, Noll Dep. 216:1. Plaintiffs' experts argue, however, that an increase in the PPU rate would tend to drive customers away – that is, increase churn and reduce new activations. They further assert that the loss of customers would more than offset the gains from the price increase unless rivals also increased their prices. For that reason, they argue, the carriers should have concluded that a PPU price increase was *not* in their unilateral interest, at least absent some assurance that rivals would follow. Such speculative assertions – made without any empirical support – provide no basis for denying Defendants' motion.

*First*, the evidence is undisputed that Defendants' internal forecasts, performed by employees who are not alleged to have been involved in or aware of the alleged conspiracy, concluded that an increase in the PPU rate would not lead to significant churn.[23] Plaintiffs have no evidence to support any assertion that, in expressing and acting on that belief, anyone was being dishonest or insincere – whether or not they were objectively correct and whether or not others within the company had a different opinion. Plaintiffs' experts have argued that the Defendant carriers' financial analyses were relatively short-term and failed to consider

[22] *See* JS-Ex. 5, Noll Dep. 215:13-216:1 (agreeing that carriers had an interest in moving customers to bundles); JS-Ex. 2, Lehr Rep. 37 ("Getting customers to switch to bundled plans offered a number of important benefits for operators.").

[23] Most carriers did not include anticipated churn in their financial models. T-Mobile used the assumption that churn would increase by [redacted] percent in the case of the increase from $0.05 to $0.10, and [redacted] percent in the case of the increase to $0.15, based on the absence of any observed impact on customer churn with the prior move. 56.1 ¶¶ TM15, TM29. T-Mobile analysts determined that such an increase in churn – or even higher increases – would not render the proposed increases unprofitable. *Id.* And post-mortem analyses of T-Mobile's PPU price increases reflected that its churn assumptions were in fact overly conservative, since the company saw no material increase in churn after any of the PPU increases. 56.1 ¶¶ TM19, TM43, TM65.

adequately the effect of a PPU price increase both on customers' choice of carriers and on new customer adoption of text messaging services. JS-Ex. 6, Rebuttal Expert Report of William H. Lehr at 23, 26-30 (Sept. 30, 2013) ("Lehr Rebuttal Report"). But, to support an inference of conspiracy, Plaintiffs must show that Defendants acted in a manner that was contrary to their *perceived* unilateral interest. *See Citric Acid*, 191 F.3d at 1101 ("[B]usiness judgments should not be second-guessed even where the evidence concerning the rationality of the challenged activities might be subject to reasonable dispute."); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 49-53 (7th Cir. 1992); *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 662 (7th Cir. 1987); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989). They cannot do so. Indeed, it would make no sense for Defendants to spend months conducting multiple analyses and engaging in extensive deliberations if the decision to increase prices had already been made. Plaintiffs' experts admit that they have no basis to question that the pricing analysts who recommended the price increases genuinely believed in their analyses and the resulting recommendations. *See, e.g.*, JS-Ex. 8, Lehr Dep. 168, 184, 463-64, 522, 525-26, 575-76, 589-90; JS-Ex. 5, Noll Dep. 251, 254, 442, 463. And Plaintiffs' experts do not contend that these analyses and proposals were a "sham" or otherwise intended to disguise unlawful conduct. Yet Plaintiffs' conspiracy theory would require a finder of fact to accept that unsupported and implausible premise.

*Second*, Plaintiffs' experts have pointed to no data or other empirical evidence to support their supposition that Defendants understated the impact of a PPU increase on consumers' choice of carrier. Defendants' employees, in before-the-fact analyses of potential pricing moves, in after-the-fact evaluations of pricing moves, and in deposition testimony in this case, explained their judgment that the PPU rate did not influence carrier choice in any meaningful way and that

an increase in the rate would be unlikely to lead to a significant increase in churn.[24] That was true, among other reasons, because PPU customers represented a decreasing proportion of text messaging users and because PPU charges represented a small part of the average PPU user's overall monthly bill.[25] At the time, Defendants' respective analysts found no evidence that any price increase had contributed to increased churn.[26] And Plaintiffs' experts were unable to find any evidence that the PPU SMS price increases led to any material increased churn at any of the carriers.

---

[24] *See, e.g.*, 56.1 ¶¶ ATT15, ATT33 (ATT-Ex. 5, Lefar Dep. 335-38 (PPU SMS not a "strategic driver of the sales and marketing programs" because PPU "is not the basis on which people were making choices")), ATT32, SPR31, TM27 (T-Mobile's pricing strategy was "to differentiate on pricing on things that really mattered to the consumer, [that] we could promote aggressively and pay-per-go – or pay-per-use text messaging distinctly was not one of them. Bundled messaging was [and] that's what we wanted to promote"); 56.1 ¶ TM27 (noting that PPU SMS was "not a critical axis of competition" and not "a reason for customers to choose" a wireless carrier). Indeed, when T-Mobile had a PPU SMS price below its competitors, it did not believe it was not receiving "credit" from consumers for that lower price. *See also* 56.1 ¶¶ TM6, TM9, TM15, TM17, TM19, TM27, TM29, TM36, TM39, TM41, TM43, TM48, TM63, TM65, VZW6, VZW36, VZW60.

[25] *See, e.g.*, 56.1 ¶¶ ATT15, ATT33 (ATT-Ex. 5, Lefar Dep. 335-38 (PPU SMS a "very minor" aspect of service "for an ever decreasing percentage of your customer base," and because PPU customers are "not the heavy users," "they tend to be price inelastic")); ATT-Ex. 7, Ritcher Dep. 167-68 (AT&T "didn't believe that this price increase would be significant enough in the whole scheme of what our customers pay for their total cellular service to result in any subscriber churn"); VZW-Ex. 15, Deposition Transcript of Ann Brodow at 289:18-22 (Sept. 19, 2012) ("[PPU] rate isn't a decision for a customer as to which carrier to go with . . . it's such a small amount of what a customer is going to pay"); *id.* 293:10-14 ("[PPU] . . . is such a small component of your text messaging usage. It is like [redacted] percent of it. So . . . it just doesn't impact that many customers . . . ."); VZW-Ex. 28, Deposition Transcript of John Stratton at 98:13-23 (Dec. 7, 2012) (characterizing PPU charges as "[c]ompletely incidental" in comparison to overall customer bill); VZW-Ex. 19, Deposition Transcript of Michael Lanman at 242:2-8 ("[W]e did not believe that [PPU] rates would be a significant criteria for churning."); 56.1 ¶¶ TM19 ("Pay as You Go messaging was not growing at that point in time . . . customers were choosing bundles"), TM15 (analysis indicating that 80 percent of subscribers affected by the move to $0.10 would experience a bill impact of $1.30 or less per month).

[26] *See, e.g.*, 56.1 ¶¶ ATT46, ATT64, TM19 (noting that the churn impact from the PPU SMS increase to $0.10 was "very minor").

Plaintiffs' experts have asserted that the reason there is no evidence of churn is that price increases were followed too quickly to observe such churn. JS-Ex. 6, Lehr Rebuttal Report 23-24; JS-Ex. 7, Rebuttal Expert Report of Roger G. Noll at 50 (Sept. 30, 2013) ("Noll Rebuttal Report"). But that speculation is contrary to the evidence. To cite just one example, there was a nine-month lag between Sprint's implementation of the increase in its PPU rate from $0.10 to $0.15 and T-Mobile's corresponding increase; the gap between Sprint's $0.15 to $0.20 increase and T-Mobile's was even longer. Plaintiffs argue that the data are not good enough to rule out the possibility that churn increased. But the best information available to the Defendant carriers indicated that churn was not a material concern, and Plaintiffs experts have no empirical evidence to the contrary. There is nothing in the record – and no after-the-fact data analysis that Plaintiffs' experts were able to perform – that lends any credence to the claim that Defendants misjudged the impact of a PPU price increase on customer churn, much less that they did so deliberately.

**b.** Plaintiffs' experts have also pointed out that certain individual employees of some of the Defendant carriers took issue with or raised concerns about the proposed pricing moves at the time, predicting in some cases that the increases would lead to a loss of customers or other negative customer response. But the presence of disagreement and discussion among Defendants' employees over the possible effects of price increases proves instead that they were engaged in an ordinary, independent decision-making process.

In all organizations, proposals for change routinely prompt both support and opposition, and the existence of opposition does not prove that the organization acted in a manner contrary to its independent self-interest. JS-Ex. 5, Noll Dep. 388:12-19. As described above, the employees responsible for modeling each price increase concluded, based on objective financial analyses,

that each increase would be unilaterally profitable. These employees are not alleged to have been participants in the alleged conspiracy and had no incentive to falsify their analyses. And there is no evidence that senior management insisted on implementing price increases where financial models predicted that the price increases would not be profitable, no evidence that senior management instructed analysts to reach a recommendation in favor of the increases, and no evidence that carrier executives did not in fact rely on the analyses provided in making their independent decisions to increase prices.

**c.** Plaintiffs argue that it is suspicious that Sprint was the first carrier to increase its PPU rate to $0.15 (and then to $0.20), because price increases are, they argue, frequently led by a dominant carrier. But, at the time Sprint raised the PPU rate from $0.10 to $0.15, it was facing significant pressure to increase revenues to deal with a major budget shortfall. 56.1 ¶¶ SPR2, SPR4. Although some marketing personnel were concerned about negative customer reaction to the increase, financial analysis – based on responsible employees' best estimates of the impact of the increase – showed that the increase would be profitable. (And it was.) 56.1 ¶¶ SPR5-SPR6, SPR15-SPR16. The fact that Sprint took greater risk in the face of significant revenue shortfalls is consistent with action in Sprint's unilateral interest, as the contemporaneous evidence shows.

Moreover, Plaintiffs' experts' claim that it was unusual for Sprint to lead a price increase is not true. Sprint twice implemented PPU data price increases that no other carrier had implemented – from $0.01/kb to $0.02/kb in 2005, and from $0.02 to $0.03/kb in 2006 – and increased SMS overage prices from $0.10 to $0.20 in 2007. 56.1 ¶¶ SPR3 & n.3, SPR12, SPR36. The fact that Sprint raised its price first does not present anything unusual or suspicious – indeed, during the alleged pre-conspiracy period, Sprint charged $0.10 for PPU SMS while Verizon Wireless and T-Mobile charged lower prices. 56.1 ¶ SPR1. If Sprint could price PPU

SMS at a higher level during the pre-conspiracy period, there is nothing probative about the fact that Sprint was prepared to charge higher prices during the alleged conspiracy period.

**d.** The fact that T-Mobile was the last carrier to increase its PPU rate in each instance – many months after the other carriers had all done so – is inconsistent with the claim of conspiracy, because T-Mobile would have had no reason to raise its PPU price if, as Plaintiffs claim, it was gaining a competitive advantage by virtue of having a lower PPU rate. Plaintiffs' expert (Noll) posits that T-Mobile raised its PPU rate because it somehow feared competitive retribution, *see* JS-Ex. 5, Noll Dep. 732:3-733:21, but Plaintiffs concede that is pure speculation – there is no evidence that any such retribution was ever threatened or anticipated, *id.* 382:3-4 ("I'm not aware of any evidence of punishment being effected."). T-Mobile's internal documents show that its analysts determined that it was *not* reaping any competitive benefit from charging a lower PPU price, and that it would benefit financially if it raised its PPU price. The evidence thus documents that T-Mobile's action was in its unilateral business interest.

**e.** There is likewise nothing anomalous about PPU SMS prices increasing while the prices of many other wireless services were falling.[27] For example, as noted above, Sprint raised the price of casual data services in December 2005 and again in October 2006. 56.1 ¶¶ SPR3 & n.3, SPR12; T-Mobile raised the price of text message overages in 2006 and 2007, and Sprint did the same in 2007. 56.1 ¶¶ SPR35-SPR36, TM21, TM46. T-Mobile also raised international PPU rates in 2008. 56.1 ¶ TM68.

[27] Each of the carriers raised the price of directory assistance calls during the class period, and there is no allegation that such increases were the result of prior agreement. *See* JS-Ex. 3, Expert Report of Kevin M. Murphy, Ex. 19 (July 3, 2013) ("Murphy Report").

Furthermore, the price of PPU text messages in Canada followed the same pattern as in the United States.[28] *See* JS-Ex. 8, Lehr Dep. 737:16-21 (agreeing that the Canadian pattern followed the U.S. pattern). There is no allegation that the Canadian wireless carriers acted pursuant to any prior agreement; nevertheless, each of them increased the PPU rate (at least twice) at a time when text-messaging volumes were rising and prices of other services were falling – the same pattern that was observed in the United States. *See* JS-Ex. 3, Murphy Report Exs. 17C, 17D, 18; JS-Ex. 17, Expert Report of Robert H. Topel, Ex. 5 (July 3, 2013).

The Canadian wireless industry is "much like" the U.S. industry, JS-Ex. 18, Noll Report 8; "Canadians and Americans . . . have similar demands for services and [are] offered similar services and plans," JS-Ex. 7, Noll Rebuttal Report 38 n.34; *see also* JS-Ex. 8, Lehr Dep. 758:17-20 ("Canada . . . might be the best international comparison you could come up with."). The fact that Canadian wireless carriers – in the absence of any allegation of prior agreement – made similar pricing decisions to their U.S. counterparts further refutes the suggestion that the pricing pattern supports any inference of prior agreement rather than unilateral action.[29]

---

[28] There are three major national wireless service providers in Canada; before August 2008, each of them charged $0.15 for outgoing PPU text messages and nothing for incoming messages. 56.1 ¶ JS57. In August 2008, approximately two weeks apart, two of the carriers began charging $0.15 for incoming messages also, a move that the third carrier followed 11 months later. 56.1 ¶¶ JS58-JS59. In March 2011, one carrier raised its PPU rate to $0.20; five months later, the other two carriers made a similar change. 56.1 ¶ JS59. (Since then, two of the carriers have raised their PPU rate to $0.25, and one remains at $0.20. 56.1 ¶ JS60.)

[29] Plaintiffs' experts assert that the Canadian market is less competitive than the U.S. market, *see* JS-Ex. 7, Noll Rebuttal Report 38-44; JS-Ex. 6, Lehr Rebuttal Report 5-12, but that argument misses the point of the Canadian example. Carriers in Canada – facing analogous demand conditions and with similar service offerings to those that prevailed in the United States – determined it was in their unilateral interest to raise PPU prices, without any alleged prior agreement. Plaintiffs' experts have not offered any explanation as to why it was in the unilateral interest of the Canadian carriers to implement those changes, but not in the unilateral interest of the Defendant carriers.

### *2. Plaintiffs' Experts Have Not Offered the Opinion That Defendants Reached Any Agreement To Fix the Price of PPU SMS*

Although Plaintiffs' two experts assert that "collusion" is the "most likely" explanation for the observed PPU price increases, JS-Ex. 18, Noll Report 3; JS-Ex. 2, Lehr Report 6, both admitted that they have not offered any opinion that the Defendant carriers entered into an agreement to set the prices of PPU text messages. Even accepting Plaintiffs' experts' opinions at face value, their testimony does not tend to exclude the possibility that Defendants' pricing decisions reflect conduct that is "as consistent with permissible competition as with illegal conspiracy." *Matsushita*, 475 U.S. at 588; *see also Omnicare*, 629 F.3d at 712 (holding that expert opinion did not defeat summary judgment where "additional inferences" would be required to find an unlawful agreement).

**a.** Dr. Lehr made clear that when he used the term "collusion," he did not exclude from that definition conscious parallelism – the process whereby "'firms in a concentrated market . . . recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions'" – which is "'not in itself unlawful.'" *Twombly*, 550 U.S. at 553-54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)) (brackets in original); *Reserve Supply*, 971 F.2d at 50. Asked to define the word "collusion" as he had used it in his report, Dr. Lehr testified that he intended to opine merely that Defendants "set prices in a way that resulted in any competitive harm" and that "was dependent on them acting together . . . does not depend on them individually having market power or conclusion of them individually having market power." JS-Ex. 8, Lehr Dep. 61:14-15, 18-22. Asked whether he had "draw[n] a line between tacit coordination and explicit manifested agreement," Dr. Lehr responded, "No." *Id.* 71:7-9. He admitted that he did "not know exactly what the nature of the agreement was between [Defendants] and whether it was explicit or implicit . . . . I'm not

offering an opinion about that." *Id.* 340:2-8; *see also* JS-Ex. 6, Lehr Rebuttal Report 19 ("[W]hether the precise timing or level of final prices set by the cartel was fully determined early on or not is . . . immaterial. It is possible . . . that the cartel members learned and adjusted . . . over time . . . .").

Accordingly, Dr. Lehr's "collusion" opinion – assuming for the sake of argument that it is admissible and taking it at face value – creates no issue of material fact concerning whether the Defendant carriers ever reached an unlawful price-fixing agreement.

**b.** Professor Noll likewise made clear that his use of the term "collusion" was not restricted to the type of "express, manifested agreement" that is subject to condemnation under Section 1, *High Fructose Corn Syrup*, 295 F.3d at 654, but instead could include the lawful exchange of information in the absence of agreement. When asked to "describe . . . specifically the collusion that, in your opinion occurred," Professor Noll stated:

> Discussing pricing issues in meetings of executives of horizontal competitors, and in particular, expectations about future pricing. That strikes me as the nature of the collusion, is sharing information about pricing strategies . . . .
>
> It was discussing SMS pricing, and the strategies includes the idea that part of what's going on is moving people to plans. . . .
>
> I think some of the reasons that executives in their own mind truthfully answer the question they didn't engage in collusion is they don't recognize that announcement of plans and coordination to avoid the prisoner's dilemma in pricing is itself collusion, even if it doesn't have sort of an explicit agreement.

JS-Ex. 5, Noll Dep. 43:22-44:1, 44:14-16, 49:2-8; *see also id*. 133:20-22 ("I don't know what the agreement was. I'm not offering an opinion about what it was.").

Professor Noll's speculation that executives discussed future pricing is just that – speculation – because there is no documentary evidence or testimony to support the claim that Defendants' executives ever discussed text-messaging pricing at a meeting of CTIA or anywhere else; to the contrary. Moreover, the Sprint senior executives who Plaintiffs claim were involved

in the conspiracy (Gary Forsee and Len Lauer) did not have knowledge of the $0.10 to $0.15 PPU SMS price increase proposal until July 2006; there is no evidence of any in-person CTIA meeting involving Mr. Forsee or Mr. Lauer between July 2006, when they learned of the price increase proposal, and October 2006, when it went into effect.[30] 56.1 ¶¶ SPR12, SPR19-SPR21, SPR24. The same was true in 2007. Mr. Forsee approved the price increase in July 2007, but there is no evidence that he attended any CTIA meeting between July 2007 and October 2007. 56.1 ¶¶ SPR35, SPR42. There was no opportunity for any discussions involving Sprint at the supposedly critical times.

Nevertheless, even if Professor Noll had an evidentiary basis for his assertion that Defendants' executives exchanged information about pricing strategies, that would fall far short of an assertion that Defendants agreed to fix the prices of PPU text messages. As the Seventh Circuit noted, the exchange of pricing information is not "illegal in itself." *Text Messaging*, 630 F.3d at 628; *see also Omnicare*, 629 F.3d at 709; *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999). A hypothetical discussion among Defendants' executives about the advantages of moving customers to plans – a discussion for which there is no evidence – still would not establish any unlawful conduct. *See Omnicare*, 629 F.3d at 712.[31]

[30] Mr. Forsee was never a Sprint representative on any CTIA committee, and there is no evidence that he attended any CTIA meetings in 2006 or 2007. 56.1 ¶¶ SPR24, SPR42. Mr. Lauer was the chairman of the CTIA in July 2006; however, there was no in-person meeting of CTIA in July or August 2006, and Mr. Lauer's employment with Sprint ended at the end of August 2006. 56.1 ¶¶ SPR19, SPR23.

[31] Professor Noll's price information exchange theory is nowhere alleged in the SAC; nor is it referenced in Plaintiffs' contention interrogatory responses.

### C. The Structure of the Wireless Industry Makes Collusion Hard, Not Easy

Plaintiffs' argument that the structure of the wireless services industry was conducive to collusion – insufficient in any event to create a material issue of fact[32] – is likewise contrary to the evidence. Plaintiffs supported their SAC with the allegation that the structure of the industry facilitates collusion because "the four defendants sell 90 percent of U.S. text messaging services, and it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating.'" *Text Messaging*, 630 F.3d at 628. But the unrebutted evidence is that the nature of competition in the wireless industry would have made "cheating" on any supposed agreement easy and enforcement impracticable.

PPU SMS is sold as part of a bundle of services that may include a device, voice service, Internet access, games, ringtones, and other services. Carriers do not compete to sell customers PPU SMS on its own: there is no evidence that PPU text messaging – as opposed to texting packages – has ever been advertised as a point of competitive differentiation. Rather, the carriers compete to attract customers by offering an array of bundles designed to meet consumer demand. *See* JS-Ex. 3, Murphy Report ¶¶ 12, 66; JS-Ex. 5, Noll Dep. 701:4-13 ("[T]here's no difference between Professor Murphy and me about people making choices across carriers based on the entire structure of prices. . . . I agree with the notion that people look at the entire bundle."). In designing and pricing bundles, each carrier must make multiple judgments about how various customer segments will react to pricing changes in light of competitive alternatives: customers

---

[32] Evidence that a "market is one in which secret price fixing might actually have an effect on price and thus be worth attempting" is necessary to establish an inference that Defendants conspired. *High Fructose Corn Syrup*, 295 F.3d at 656. Such structural evidence, however, is not evidence that collusion occurred. *See Alexander v. Phoenix Bond & Indem. Co.*, 149 F. Supp. 2d 989, 999 (N.D. Ill. 2001) (citing *Reserve Supply*, 971 F.2d at 50); *Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 467 F. Supp. 197, 212 (N.D. Ill. 1978), *aff'd*, 641 F.2d 457 (7th Cir. 1981).

choose a carrier on the basis of the price and quality of all the components of the bundle that the customer wants to purchase.

For this reason, carriers must make trade-offs: carriers attempt to attract customers by pricing more aggressively those elements of the overall bundle that customers care most about. That is illustrated in this case, for example, by the calculation that Verizon Wireless made, in late 2006, when it decided to increase the size of its messaging packages, while increasing the PPU rate, and leaving the overage rate the same. Increasing the size of bundles would lead to reduced revenue from overage charges – and, in some cases, migration to bundles by high-volume PPU users could likewise decrease revenues. But Verizon Wireless anticipated that the increase in the PPU rate would compensate for those revenue reductions. *See* 56.1 ¶¶ VZW24-VZW25. Likewise, in 2007, Verizon Wireless expressly contemplated that the increase in the PPU rate would compensate for lower prices elsewhere. 56.1 ¶¶ VZW55-VZW56. To cite another example, AT&T determined that a higher PPU price would allow AT&T greater flexibility to make more aggressive offerings of text-message packages. 56.1 ¶ ATT12. Similarly, T-Mobile's pricing strategy was to "differentiate on pricing on things that really mattered to the consumer, [that] we could promote aggressively and pay-per-go – or pay-per-use text messaging distinctly was not one of them. Bundled messaging was [and] that's what we wanted to promote." 56.1 ¶ TM27; *see also*, *e.g.*, 56.1 ¶¶ TM6, TM9, TM15, TM17, TM39, TM48, TM63.

The undisputed fact that the Defendant carriers compete on a bundle-to-bundle basis thus undermines the assertion that Defendants had a rational motive to conspire to fix PPU rates. A member of the conspiracy could easily "cheat" by lowering the prices of other components of the bundle; given the variety of pricing plans, Plaintiffs have not explained how such "cheating" could be detected. At the same time, Plaintiffs have suggested no mechanism whereby members

of the conspiracy could enforce it – that is, punish cheaters. As Plaintiffs' own experts concede, the wireless industry in the United States is robustly competitive. *See* JS-Ex. 8, Lehr Dep. 87:12-14 ("[O]ne would see the performance of this industry as being consistent with the conclusion of robust competition."); *id.* 688:16-18, 735:21-24; JS-Ex. 5, Noll Dep. 74:23-75:11; *id.* 661:12-13 (opining that wireless industry "is as competitive as you can imagine it to be given spectrum policies"). Because members of the supposed conspiracy continued to compete just as vigorously with respect to other aspects of wireless service, there is no reason to believe that the industry structure was conducive to fostering a successful conspiracy. That the nature of competition in the industry was not conducive to a successful PPU text message conspiracy is "highly relevant" to the question whether there is a "'genuine issue for trial.'" *Matsushita*, 475 U.S. at 596. "Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596-97; *see also High Fructose Corn Syrup*, 295 F.3d at 661 ("More evidence is required the less plausible the charge of collusive conduct."); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999) (Posner, J.) ("*Matsushita* . . . teaches that an antitrust claim which makes no economic sense can on that ground be dismissed on summary judgment.").

**D. Allegations Concerning CTIA Provide No Basis for Inferring a Conspiracy**

Plaintiffs' claim that Defendants' executives met under the aegis of CTIA – and the assertion of Plaintiffs' experts that, in some cases, notes were not maintained of all meetings – does not support any inference of unlawful conduct, because Plaintiffs have no evidence to

support the assertion that the price of PPU text messaging (or any pricing at all) was ever discussed at such meetings, and no evidence to tie any price increase to any meeting of CTIA.

Discovery has refuted the allegations that Plaintiffs made concerning CTIA and WIC and their supposed role in the alleged conspiracy. Plaintiffs can point to no evidence that WIC, its Leadership Council, or its Action Teams ever did or set out to do anything other than exactly what they were supposed to do: promote common standards across various levels of the wireless industry to permit pro-competitive innovation.

Plaintiffs' claim that CEOs and other high-level executives of the Defendant carriers entered into price fixing agreements during CTIA meetings or during Officers' Calls and Officers' Retreats likewise is pure speculation. Plaintiffs concede that they have no evidence to support these allegations, and are left with the argument that one may infer illegal agreements from an opportunity to conspire. But such a showing would not be enough to defeat a motion for summary judgment, because it is equally consistent with lawful, competitive behavior. *See Matsushita*, 475 U.S. at 588; *Market Force*, 906 F.2d at 1172-73; *see also City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 132 (D.D.C. 2006) ("Evidence of an opportunity to conspire, although relevant, is not enough to sustain an antitrust plaintiff's burden, and, without more, does not create a jury question on the issue of concerted action.") (internal quotation marks omitted); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963-64 (N.D. Cal. 2007). Indeed, in *Weit*, each of the defendant banks set the same interest rate for credit card debt; plaintiffs' expert claimed that the most likely explanation for the identical interest rates was "conscious cooperation" on the part of defendants; and the defendant banks cooperated extensively both to establish a credit card system and to promote legislative goals. 641 F.2d at 459-462. The district court granted summary judgment and the Seventh Circuit affirmed,

holding that "the mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence." *Id.* at 462.

The reality, moreover, is that these meetings presented no realistic opportunities for the discussions of collusion that Plaintiffs allege. At every meeting of the CTIA Board of Directors, Executive Committee, and other Board committees during the period during which Plaintiffs allege the conspiracy occurred, at least one representative of a CTIA member other than the Defendant carriers was present. During that time the roster of CTIA officers who were to participate in those officers' calls and retreats included at least two representatives of CTIA members other than the Defendant carriers. 56.1 ¶ CTIA23. And CTIA's General Counsel, a veteran of the Department of Justice Antitrust Division, participated in each of these Board-related meetings. Plaintiffs' experts concede that, when trade association activities are open to participants that have no shared interest in a collusive agreement, it is less likely that the trade association's activities will lead to collusion. 56.1 ¶ CTIA13. Indeed, Professor Noll testified that, if a representative of a supplier or other firm that did not compete with the Defendant carriers was present at a particular meeting, the probability of open discussions of matters related to collusion at that meeting would "go away." 56.1 ¶ CTIA14.

Likewise, representatives of firms other than the Defendant carriers routinely attended the meetings of the WIC Leadership Council during the period of the alleged conspiracy. 56.1 ¶ CTIA31. Moreover, during the period of the alleged conspiracy, the WIC Leadership Council had only two members whom Plaintiffs have identified as participants in the conspiracy, and those two individuals did not serve on the Leadership Council at the same time. 56.1 ¶ CTIA30. In addition, CTIA's General Counsel was present at every in-person WIC Leadership Council and WIC Action Team meeting. 56.1 ¶ CTIA33.

Given the diverse membership of CTIA's Board and Board committees and WIC Leadership Council, the diverse attendance at meetings of those groups, and the presence of a CTIA antitrust expert at those meetings, there is no basis for inferring that three separate illegal agreements were reached during those meetings, or indeed that any of those meetings presented a realistic opportunity to conspire.

Plaintiffs' other key allegations concerning CTIA are also unsupportable:

- Mark Desautels never held "regular conference calls with the CEOs of the Carrier Defendants," TAC ¶ 113. That allegation was and remains a fabrication that is unsupported by any evidence. 56.1 ¶ CTIA34.

- CTIA's statements concerning WIC's purpose to create industry-wide approaches to "billing" (TAC ¶ 12) refer not to the pricing of SMS or any service, but to the methods the carriers would use to determine inter-carrier compensation for carrying one another's cellular traffic. 56.1 ¶ CTIA36.

- There is no evidence that the meetings of the WIC Leadership Council focused on pricing, as alleged in TAC ¶ 12. 56.1 ¶ CTIA11.

- There is no evidence that "AT&T, Sprint and Verizon met through the CTIA on numerous occasions to discuss pricing in 2001 and early 2002." TAC ¶ 99. 56.1 ¶ CTIA10.

- CTIA's policy and consistent practice was not to collect non-public information about individual members' pricing of any service and not to share pricing information with members. 56.1 ¶ CTIA7.

Finally, although Plaintiffs named CTIA as a defendant, Plaintiffs can proffer no evidence that anyone associated with CTIA ever had a role in any unlawful agreement. Nor is there any evidence of any conduct by CTIA that would permit a fact-finder to infer that CTIA had any such involvement. The claim against CTIA should accordingly be dismissed as well.

## CONCLUSION

The Court should grant Defendants' motion for summary judgment and enter judgment for Defendants.

Dated: November 1, 2013

CELLCO PARTNERSHIP, D/B/A
VERIZON WIRELESS

/s/ Thomas J. Frederick______________
Dan K. Webb
Thomas J. Frederick
John W. Christopher
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Email: dwebb@winston.com
Email: tfrederick@winston.com
Email: jchristopher@winston.com

Of Counsel:
Robert H. Griffen
VERIZON COMMUNICATIONS INC.
1320 N. Courthouse Road
Arlington, VA 22201
Telephone: (703) 351-3900
Email: robert.h.griffen@verizon.com

Michael K. Kellogg
Aaron M. Panner
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
1615 M Street, NW
Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
Email: apanner@khhte.com

*Counsel for Defendant Cellco Partnership, d/b/a Verizon Wireless*

Respectfully submitted,

AT&T MOBILITY LLC

/s/ John W. Treece_(by permission)_____
John W. Treece
Linton J. Childs
Brian A. McAleenan
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago , IL 60603
Telephone: (312) 853-7000
Email: jtreece@sidley.com
Email: lchilds@sidley.com
Email: bmcaleenan@sidley.com

Marc W. F. Galonsky
AT&T MOBILITY LLC
675 W. Peachtree Street, NW
Atlanta, GA 30308
Telephone: (404) 927-2860
E-mail: marc.galonsky@att.com

Kara W. Ong
AT&T MOBILITY LLC
1025 Lenox Park Blvd., NE
Atlanta, GA 30319
Telephone: (404) 986-1074
E-mail: kara.ong@att.com

*Counsel for AT&T Mobility LLC*

T-MOBILE USA

/s/ Christopher B. Hockett (by permission)
Christopher B. Hockett
Sandra West Neukom
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park , CA 94025
Telephone: (650) 752-2009
Email: chris.hockett@davispolk.com
Email: sandra.neukom@davispolk.com

Charles H. R. Peters
SCHIFF HARDIN LLP
233 South Wacker Drive
Chicago , IL 60606
Telephone: (312) 258-5500
Email: cpeters@schiffhardin.com

*Counsel for T-Mobile USA*

CTIA – THE WIRELESS ASSOCIATION

s/ Ruth A. Bahe-Jachna (by permission)
Ruth A. Bahe-Jachna
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email: baher@gtlaw.com

Michael D. McNeely
LAW OFFICES OF MICHAEL D. MCNEELY
3706 Huntington Street, N.W.
Washington, DC 20015
Telephone: (202) 966-1679
Email: mcneelylaw@mac.com

*Counsel for CTIA – The Wireless Association*

SPRINT NEXTEL CORPORATION

/s/ John E. Schmidtlein (by permission)
John E. Schmidtlein
Megan A. Hughes
WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington , DC 20005
Telephone: (202) 434-5000
Email: jschmidtlein@wc.com
Email: mhughes@wc.com

Frederic R. Klein
Kerry D. Nelson
GOLDBERG, KOHN, BELL, BLACK, ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street #3300
Chicago , IL 60603
Telephone: (312) 201-4000
Email: frederic.klein@goldbergkohn.com
Email: kerry.nelson@goldbergkohn.com

*Counsel for Sprint Nextel Corporation*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 1st day of November, 2013, ***Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment*** was served by causing a true and correct copy of same to be delivered to all Filing Users through the Court's ECF system.

/s/ Thomas J. Frederick
Thomas J. Frederick