**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: TEXT MESSAGING** ) | |
| **ANTITRUST LITIGATION** ) | |
| _____ ) | **No. 08 C 7082** |
| ) | **MDL No. 1997** |
| **THIS ORDER APPLIES TO:** ) | |
| **ALL ACTIONS** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiffs filed this suit on behalf of all those who purchased text-messaging

services on a fee-per-text-message basis directly from four of the five defendants in this

case: AT&T, Sprint, T-Mobile, and Verizon Wireless. Plaintiffs allege that these

national wireless communications service providers, along with defendant CTIA-The

Wireless Association, entered into and implemented a continuing contract, combination,

and conspiracy to fix, raise, maintain, and stabilize prices for Text Messaging Services

sold in the United States in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. 3d

Am. Compl. ¶ 1. The Court dismissed plaintiffs' original complaint. Plaintiffs then

amended their complaint, the Court denied a second motion to dismiss, and the

Seventh Circuit affirmed this Court's order on interlocutory appeal. *See In re Text

Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2011).

Plaintiffs contend that certain defendants engaged in spoliation of evidence, and

they have moved for sanctions and an adverse inference. In addition, defendants have

moved for summary judgment. For the reasons stated below, the Court grants

defendants' motion and denies plaintiffs' motion.[1]

## Background

This case does not directly concern the bundled text messaging plans that many wireless phone users buy, in which they pay a set amount of money for a set (or unlimited) amount of messages.  Rather, the dispute is about whether the four wireless carrier defendants, aided by defendant CTIA, conspired to fix the price of pay-per-use (PPU) text messages, the rate at which users with no bundled plan pay for individual texts.  (Texting is also known as short message service, or SMS.)  Plaintiffs allege a conspiracy in which T-Mobile, Sprint, AT&T, and Verizon agreed to coordinate their PPU SMS pricing—first at ten cents, then at fifteen, and finally at twenty—from 2005 to 2008.  Plaintiffs allege that high-level officers of the carriers devised the increases in concert, using CTIA meetings as a venue for their discussions, and concocted sham internal analyses to justify the pricing moves.  Plaintiffs also present economic evidence to the effect that the structure of the wireless industry, and the carriers' position in it, provided an incentive for the carriers to collude.  In response, the carriers contend that the pricing moves were the product of internal, individual analyses, enacted for self-interested reasons—i.e., to increase profits.  They further argue that the industry structure made collusion difficult, because any carrier easily could have "cheated" to undermine any price-fixing agreement.  Defendants also argue that they do not actually compete on PPU SMS messaging.

The carrier defendants together collect the vast majority of the revenues in the wireless communications market in the United States.  In 2009, that figure was 93.3

---

[1] Plaintiffs have also moved for leave to file a surreply and addendum to their statement of additional material facts.  For reasons stated below, the Court grants the motion.

percent, and in 2011, there were 317 million total wireless subscriber connections in this country. Each carrier offers SMS capability to its wireless customers, a service that has exploded in popularity in the past several years. In 2005, 81 billion texts were sent; in 2008, 1.01 trillion; and in 2011, 2.31 trillion. In 2007, 58 percent of wireless phone customers were SMS users, a number that increased to 72 percent in 2010.

As of this litigation, all four of the carrier defendants charge twenty cents for PPU SMS, whether the message is incoming or outgoing. That was not always so. As of 2005, Sprint and AT&T were both charging ten cents for PPU SMS; Verizon charged two cents for incoming PPU SMS and ten for outgoing, and T-Mobile charged five cents. In August 2005, Verizon increased its incoming PPU SMS price to ten cents, and T-Mobile did the same in March 2006. At that point, all four carriers were charging the same price, ten cents. In October 2006, Sprint increased its price to fifteen cents; the same happened at AT&T in January 2007, at Verizon in March 2007, and at T-Mobile in June 2007. Four months later, in October 2007, Sprint increased its PPU SMS price again, to twenty cents. Verizon made the same increase at the beginning of March 2008, as did AT&T at the end of the same month. T-Mobile increased the PPU SMS price from fifteen to twenty cents in August 2008.

The fact that each of the carrier defendants increased its PPU SMS rates to twenty cents is not disputed, nor is the basic timeline on which the carriers did so. The parties do, however, dispute the companies' motivations for the increases. In addition, plaintiffs attack the validity of the analyses the carriers performed to justify their pricing changes, arguing that the companies failed to account for factors such as customer reaction or the possibility that a rival carrier might not adopt the same price increase.

This, plaintiffs contend, is circumstantial evidence of collusion. Further, the parties dispute whether the structure and economics of the industry itself facilitates collusion, as well as which individuals directed the various price increases. Plaintiffs contend that the moves typically were made at the direction of the top officers at each company; defendants disagree.

This last point of contention is relevant in part because plaintiffs argue that executives from each company had the opportunity to collude at various events and meetings, some held in conjunction with their membership in CTIA. As its full name indicates, CTIA-The Wireless Association is an industry organization with wireless carriers, suppliers, providers, and manufacturers as members. CTIA had a subgroup called the Wireless Internet Caucus (WIC) that was concerned with wireless data services. The WIC had within it a Leadership Council that "was described as intended to 'create industry-wide solutions through co-opetition'" between its members.[2] Defs.' Resp. to Pls.' LR 56.1 Stat. ¶ PCTIA28 (quoting Pls.' Ex. 449). The parties dispute whether individual companies determined to undertake specific price increases soon after specific CTIA meetings. For example, plaintiffs contend that "Sprint began to consider increasing its PPU SMS price" from ten to fifteen cents "shortly after" its chief operating officer, Len Lauer, chaired a CTIA meeting in April 2006; defendants say Lauer did not know about the proposed increase until months after the meeting. *Id.* ¶ PSPR1.

On September 9, 2008, shortly after the last carrier increased its PPU SMS price

---

[2] Plaintiffs cite this same document, a 2003 CTIA press release, as stating the Leadership Council was intended "to further the 'collective vision for the industry.'" Pls.' Resp. at 48; *see also* Pls.' LR 56.1 Stat. ¶ PCTIA28 (both citing Pls.' Ex. 449). The phrase "collective vision for the industry" does not appear in this document.

to twenty cents, Senator Herbert Kohl, chairman of the antitrust subcommittee of the United States Senate Committee on the Judiciary, sent a two-page letter to the chief executive officers of the four carrier defendants.  He wrote the CEOs "to express my concern regarding what appear to be sharply rising rates your companies have charged to wireless phone customers for text messaging."  Pls.' Ex. 414 at VZWTM-517-000061252.  Senator Kohl told the executives that "[s]ome industry experts had opined that the price increases do not appear to be justified by any increases in the costs associated with text messaging services, but may instead be a reflection of a decrease in competition, and an increase in market power of their companies."  *Id.*  The senator noted that the price charged for a text message had increased 100 percent since 2005, highlighting the carriers' most recent increase to twenty cents per message.  Senator Kohl then said that the "alarming" feature of this increase was that "it does not appear to be justified by rising costs in delivering text messages."  *Id.* at VZWTM-517-000061253.  He noted the low cost of processing a single text message, and he stated that the companies' identical price increases at nearly the same time was "hardly consistent with the vigorous price competition we hope to see in a competitive marketplace."  *Id.*  Senator Kohl concluded by asking the CEOs to explain why text messaging rates have dramatically increased in recent years, and he requested data on SMS use since 2005, pricing comparisons, and a statement regarding any differences between their various pricing structures.  *Id.*  He asked the CEOs to respond by October 6, 2008.

One day after Senator Kohl sent his letter, the Wall Street Journal published an article about it with the headline "Text-Messaging Rates Come Under Scrutiny."  Pls.' Ex. 415; *see also* http://online.wsj.com/news/articles/SB122100918492217655 (last

visited May 15, 2014). That same day at 5:28 a.m., a person named Andrew Davies—presumably a T-Mobile employee, although the parties do not identify him specifically—sent the text of the article via e-mail to several individuals, including T-Mobile employees Adrian Hurditch, then the company's vice president of services and strategic pricing, and Lisa Roddy, then the company's director of marketing planning and analysis. At some point after Davies sent his message, Hurditch and Roddy e-mailed each other about it. Their entire e-mail thread, however, appears no longer to exist. At 6:10 a.m., Roddy's e-mail account sent an out-of-office autoreply to Hurditch; two minutes later, Hurditch replied, stating, "Make sure you delete that last message!" Pls.' Ex. 266 at TMO_TEXT00010081. At 7:50 a.m., Roddy responded to Hurditch, presumably addressing his suggestion to delete the previous message, "I will & u this one!!!" *Id.* at TMO_TEXT00010080. She proceeded to state that she did not know whether she agreed—with what is unsaid—and she asked Hurditch if he agreed that the average SMS cost at T-Mobile was greater now than it was three years prior because of the value in bundles. *Id.* Hurditch responded at 7:55 a.m.:

> We might make less margin on a per message basis driven by revenue but that's not driven by higher cost. At the end of the day we know there is no higher cost associated with messaging. *The move was colusive [sic] and opportunistic.* Clearly get why but it doesn't surprise me why public entities and consumer advocacy groups are starting to groan.

*Id.* (emphasis added). Hurditch followed up four minutes later with another e-mail, telling Roddy it was "[m]ore important [to] go forward" and that they "[n]eed legal to look into the threat and eval further price increases within that context. Don't want to get regulated." *Id.* Roddy responded at 11:04 a.m. that she "agree[s] we should engage with legal," asking Hurditch to "tee up and I can engage when I get back." *Id.*

The parties otherwise have submitted a considerable amount of evidence, consisting of e-mails, PowerPoint presentations, meeting minutes, and expert reports, among other things, on the nuts and bolts of each company's decisions to increase PPU SMS prices, as well as the structure of the wireless industry. In essence, defendants say the carriers' decisions to increase PPU SMS prices were made individually and that the industry's structure discourages collusion; plaintiffs dispute both contentions.

## Discussion

### A.   Plaintiffs' motion for an adverse inference jury instruction and sanctions for spoliation of evidence

In addition to defendants' summary judgment motion, the Court has before it plaintiffs' motion for an adverse inference jury instruction and sanctions. Plaintiffs contend that defendants T-Mobile and CTIA destroyed material and relevant evidence in this litigation. Plaintiffs request an adverse inference and in particular instructions to the jury that the missing evidence would have been unfavorable to defendants T-Mobile and CTIA.[3] Plaintiffs also request attorneys' fees and expenses in connection with the

---

[3] The requested instructions are:

1. CTIA destroyed e-mails created or received by CTIA's Vice President of WID, Mark Desautels, to conceal evidence that would have been unfavorable to CTIA;

2. CTIA destroyed Desautels's laptop profile and documents contained therein to conceal evidence that would have been unfavorable to CTIA;

3. T-Mobile destroyed an e-mail created by employees with responsibility over pricing to conceal evidence that would have been unfavorable to T-Mobile; and

motion.  T-Mobile, CTIA, and the remaining defendants not named in the motion have filed separate responses.  Those latter defendants contend that granting the motion would "severely prejudice[ ]" them.  Resp. of AT&T, Sprint, and Verizon at 1.  Both T-Mobile and CTIA contend that plaintiffs have not established the requisite bad faith.

### 1.    Allegations against defendant T-Mobile

Plaintiffs' motion in reference to T-Mobile involves two issues.  The first concerns the e-mail chain between T-Mobile employees Roddy and Hurditch, described in detail above.  Plaintiffs argue that T-Mobile, "post-Kohl investigation[,] deleted an e-mail that precedes a ***direct admission*** to the PPU text messaging price-fixing conspiracy."  Pls.' Spoliation Mem. at 17.

Second, plaintiffs contend that the "eleventh hour reappearance" of some, but not all, of the notebooks regarding Roddy's daily activities she kept during her employ at T-Mobile warrants imposition of sanctions as well as an adverse inference.  *Id.*  Plaintiff argue that T-Mobile did not produce certain of Roddy's notebooks until three years after plaintiffs asked for them, claiming they were "lost," and then produced them, but only after a Department of Justice investigation into defendants closed and Roddy's deposition had already been taken in the present case.  *Id.* at 17.  The notebooks evidently were found "under a T-Mobile paralegal's desk."  *Id.* at 5.  Plaintiffs further contend that even then, although Roddy said she kept daily notes on her daily activities, notebooks were still missing "for crucial time periods that match the times that the

---

4. T-Mobile destroyed handwritten notebooks created by an employee with responsibility over pricing to conceal evidence unfavorable to T-Mobile.

Pls.' Spoliation Mem. at 32.

carriers, including T-Mobile, were considering PPU price increases." *Id.* at 2. These notebooks, plaintiffs argue, could have contained "notes that may have existed regarding T-Mobile's reactions to competitors' SMS price increases" as well as information regarding T-Mobile's own price increases. *Id.* at 23. Plaintiffs note that Roddy testified during her deposition that she did not recall ceasing her attendance at weekly company meetings during the relevant time periods. *Id.* at 23–24. They argue that this gives rise to a "logical inference" that evidence harmful to defendants is part of what is still missing. *Id.* at 17–18.

In sum, plaintiffs argue, "T-Mobile's failure to explain why the Hurditch email is missing and the eleventh hour reappearance of some, but not all, of the notebooks under a T-Mobile paralegal's desk warrant spoliation sanctions." *Id.* at 18. Plaintiffs argue that T-Mobile breached a duty to preserve these items, which they contend arose on September 9, 2008, when Senator Kohl wrote to the wireless carriers requesting information on SMS pricing. Plaintiffs further say that they have been prejudiced by this breach, because they cannot "deploy[ ]" the evidence in this litigation. *Id.* at 25. Finally, they argue that T-Mobile's failure to preserve and produce this evidence stemmed from T-Mobile's "willfulness, bad faith or fault" and thus warrants imposition of sanctions. *Id.* at 26–29. "Failure to suspend a routine document destruction policy in the face of a litigation 'crosses the line between negligence and bad faith,'" plaintiffs argue. *Id.* at 26 (quoting *Krumwiede v. Brighton Assocs., LLC*, No. 05 C 3003, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006)).

In response, T-Mobile begins by arguing that plaintiffs employ the incorrect standard in determining fault on a spoliation motion. It contends that spoliation

sanctions are proper only when there is "(i) intentional destruction of evidence and (ii) a showing of bad faith." T-Mobile Resp. at 1 (citing *Bracey v. Grondin*, 712 F.3d 1012, 1018–20 (7th Cir. 2013)). T-Mobile further argues that plaintiffs' spoliation arguments amount to asking the court to "*assume* that conspiracy evidence once existed but must have been destroyed," an assumption T-Mobile contends has no basis. *Id.* at 2. T-Mobile contends that it has produced all of Roddy's notebooks that it had after discovering them. It argues that "[w]ithout any evidence—apart from their own speculation—that Roddy had additional notebooks in her possession after this litigation began, plaintiffs cannot demonstrate that T-Mobile breached any duty to preserve them." *Id.* at 5. As for the deleted Hurditch-Roddy e-mail(s), T-Mobile admits that they likely were deleted. It contends, however, that it was not under a duty to preserve them, as litigation was not imminent at the time the e-mails were sent. T-Mobile states that the first class action lawsuit was filed on September 10, "*after* the early morning Hurditch email was sent and presumably deleted." *Id.* at 13. T-Mobile contends that in any event, plaintiffs cannot show bad faith in the alleged destruction of either the notebooks or the e-mail(s).

Recent Seventh Circuit precedent on the proper standard for determining whether a party destroyed or failed to preserve evidence such that the other party is thus entitled to an adverse inference involves a requirement to show "bad faith." Specifically, to obtain an inference that missing evidence was adverse to the opposing party, a party claiming spoliation must show that the party "intentionally destroyed the documents in bad faith." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). Evidence is considered to have been destroyed in bad faith "if it is destroyed for

the purpose of hiding adverse information." *Id.* (internal quotation marks omitted). *See also, e.g.*, *Bracey*, 712 F.3d at 1019; *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010); *Everett v. Cook Cnty.*, 655 F.3d 723, 727 (7th Cir. 2011). The Seventh Circuit has referred to this standard as "stringent" in comparison to other circuits. *Bracey*, 712 F.3d at 1020.

The Seventh Circuit has not addressed in detail the definition of "adverse information" for purpose of the spoliation analysis. It has, however, discussed the type of information the destruction of which qualifies as spoliation, stating that "bad faith destruction of a document *relevant to proof of an issue at trial* gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001) (emphasis added). The court has also said that information qualifies as adverse for this purpose if it is "adverse to the [non-movant]'s case." *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002).

Although plaintiffs refer to the Seventh Circuit's established standard in their opening brief, if not to the most recent cases on it, *see* Pls.' Spoliation Mem. at 10, they cite with more frequency to district court cases referring to a somewhat different rule, one that requires a finding of "willfulness, bad faith, *or* fault" along with several other factors. *See id.* at 3 (emphasis added); *see also* Pls.' Repl. to T-Mobile at 1. Some of these cases expand on this to impose what appears to be a lesser burden than the above-cited Seventh Circuit cases. For example, plaintiffs quote *Krumwiede*, a 2006 district court case, to argue that "[o]nce a party is on notice that files or documents in their possession are relevant to pending litigation, the failure to prevent the destruction

of relevant documents crosses the line between negligence and bad faith, even where the documents are destroyed according to a routine document retention policy." *Krumwiede*, 2006 WL 1308629, at *8. *Krumwiede* relies on an earlier district court case for this rule; that case, however, does not cite to any law to support the proposition.[4] *See Wiginton v. Ellis*, No. 02 C 6832, 2003 WL 22439865, at *7 (N.D. Ill. Oct. 27, 2003). Elsewhere, the plaintiffs cite *Jones v. Bremen High Sch. Dist. 228*, No. 08 C 3548, 2010 WL 2106640, at *8 (N.D. Ill. May 25, 2010), for the proposition that "[b]ad faith may be inferred when a party disposes of documents in violation of its own polices." *Jones* cites *Park*, a case in which a plaintiff alleged that the EEOC destroyed documents in violation of its own record retention regulation. *Park* does indeed state that "a violation of a record retention regulation creates a presumption that the missing record[s] contained evidence adverse to the violator." *Id.* at 615 (internal quotation marks omitted). In the next sentence, however, *Park* says that "[a]t the same time . . ., we have intimated that, absent bad faith, a violation of 29 C.F.R. § 1602.14, the EEOC record retention regulation, would not automatically trigger an adverse inference." *Id. Faas*, *Park*,

---

[4] Plaintiffs also cite to district court cases that are plainly in conflict with recent Seventh Circuit precedent and cite to out-of-circuit cases to support their contentions. The plaintiffs point to *Adkins v. Mid-America Growers, Inc.*, 141 F.R.D. 466, 473 (N.D. Ill. 1992), which says, "In cases where evidence has been intentionally destroyed, it may be presumed that the materials were relevant." *See* Pls.' Spoliation Mem. at 10 n.10. Yet *Adkins* cites only two 1987 cases for this rule: one from the D.C. Circuit, and another from the Northern District of California. This statement of law is also plainly in conflict with Seventh Circuit law stating that intentional destruction of a document is not enough; the document must have been destroyed for the purpose of eliminating adverse information. *See, e.g.*, *Faas*, 532 F.3d at 644 ("In order to draw an inference that the Leadership Overviews contained information adverse to Sears, we must find that Sears intentionally destroyed the documents in bad faith."). Plaintiffs do cite to *Bracey* and other Seventh Circuit cases in their reply memoranda but proceed after doing so to cite other cases that articulate a different standard. *See, e.g.*, Pls.' Repl. to CTIA at 6–7.

*Bracey*, and other Seventh Circuit cases deciding motions for adverse inferences due to spoliation are consistent in holding that a showing of intentional destruction of evidence for the purpose of concealing adverse information is required before a court may permit such an inference.

Nonetheless, plaintiffs argue in their reply that the Seventh Circuit has only "at times stated that bad faith is required for [an adverse] inference," and that "Seventh Circuit law regarding the culpability standard for sanctions resulting from discovery abuses is hardly clear." Pls.' Repl. to T-Mobile at 1 n.1. The plaintiffs proceed to cite Seventh Circuit cases imposing a standard requirement willfulness, bad faith *or* fault in cases in which a court is considering dismissal or default. *See id.* "This suggests not only that bad faith is not required for an adverse inference instruction, but that an even lesser standard applies where such an instruction is sought," plaintiffs conclude. *Id.* The clear message of Seventh Circuit cases like *Bracey* and others, however, is that a showing of bad faith is required to succeed on a motion requesting an adverse inference based on spoliation. The Seventh Circuit has stated directly that such a showing is required, and it has not suggested otherwise in cases deciding motions like this one. *See, e.g.*, *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) ("[T]he possibility of an adverse inference . . . depends on persuading the court that the evidence was destroyed in 'bad faith.'").

With the correct standard established, it remains for the Court to determine whether plaintiffs have met it with regard to T-Mobile's treatment of the evidence. In this regard, the Court assumes that, as with any other fact, intentional destruction and bad faith may be proved inferentially and with circumstantial evidence. That said, plaintiffs

have not made the requisite showing with regard to Roddy's notebooks. All plaintiffs argue is that "[n]otebooks for critical periods are still missing," Pls.' Repl. to T-Mobile at 10, because Roddy testified in a deposition that she regularly kept notebooks and likely did so during the periods for which T-Mobile has not produced any notebooks. But even if that is true—the Court will assume that it is—plaintiffs have not shown that T-Mobile destroyed the missing notebooks for the purpose of hiding adverse information, or even that any information in the notebooks is likely to have been adverse. Plaintiffs argue that "failing to produce two of the notebooks that Roddy kept is beyond excuse, and should be called bad faith, or at least fault," Pls.' Spoliation Mem. at 29, but that is not the Seventh Circuit's standard on this issue. The circumstances under which the previously unproduced Roddy notebooks were found suggest the non-production resulted from negligence or a slip-up, not intentional concealment of their existence. Plaintiffs have pointed to nothing in the notebooks that were found or anything in particular about the periods for which notebooks were not found that would suggest that those that are still missing contained evidence adverse to T-Mobile.

The question is closer regarding the deletion of the Hurditch-Roddy e-mail(s).[5] The Court agrees that plaintiffs have shown that T-Mobile's employees likely deleted the e-mail(s) intentionally and that they did so for the purpose of concealing the e-mail's contents. Nonetheless, plaintiffs have not shown that the actions of the T-Mobile personnel involved concealment of information that meets the requirement of being "adverse" to T-Mobile. Specifically, the record does not reflect that Hurditch, the sender

---

[5] The parties debate whether and when litigation was reasonably foreseeable vis-à-vis the destruction of the e-mails. The Court will assume for present purposes that litigation was indeed imminent at that point, the standard that plaintiffs advocate.

of the original e-mail that was deleted and the person who called T-Mobile's price increase "collusive," was in a position to have knowledge of or participate in any collusion between the wireless carriers. Thus plaintiffs have not shown that the missing content from the Hurditch-Roddy e-mail exchange would be adverse to T-Mobile, because it is not "relevant to proof of an issue at trial." *Crabtree*, 261 F.3d at 721. The Court therefore declines to order sanctions against T-Mobile for deletion of the e-mail or e-mails.

### 2.    Allegations against defendant CTIA

Plaintiffs contend that CTIA engaged in the "wholesale spoliation of documents connected to the CTIA executive who facilitated the price-fixing conspiracy." Pls.' Spoliation Mem. at 4. They argue that CTIA, in spite of a litigation hold it placed on any destruction of documents and e-mails among its employees, destroyed e-mails and cleared the laptop profile of Mark Desautels, CTIA's head of wireless Internet development. First, they contend, CTIA allowed Desautels's subordinates to access his e-mail account after his death in March 2009 and also did not prevent "routine deletion" of his e-mails after Desautels's death. *Id*. at 12. Plaintiffs also argue that CTIA failed to use proper search terms when searching Desautels's e-mail for discovery while they still existed, in that they failed to include the term "text message" (though they did include "text messaging" and "text messages"), and that the 178-page document of e-mails CTIA produced was "very limited and woefully incomplete." *Id*. at 10, 12, 15. To support this argument, plaintiffs point to an exhibit containing e-mails sent by Desautels to employees of the carrier defendants—apparently produced in discovery by defendants other than CTIA—that should "reasonably have been included" given the

search CTIA performed, but evidently were not produced by CTIA. *Id.* at 12–13 (citing Pls.' Spoliation Ex. 11).

Plaintiffs go on to say that CTIA "***proactively*** destroyed" Desautels's e-mails in July 2009 and his laptop profile "probably on or about April 28, 2009." *Id.* at 8. Plaintiffs contend that they "would certainly have subpoenaed" Desautels and that "[h]is e-mails and electronic documents and meeting minutes were likely to contain highly relevant and potentially 'smoking gun' type evidence." *Id.* at 10. In sum, plaintiffs say, CTIA's actions amounted to willfulness, bad faith or fault.

CTIA counters that plaintiffs have received "at least 4,256 emails to and from Mr. Desautels" and that they have not shown that CTIA's deletions of Desautels's e-mails destroyed relevant evidence. CTIA Resp. at 1–2. CTIA contends that it did preserve potentially relevant evidence, because it instituted a litigation hold and searched Desautels's e-mails for relevant search terms (though it concedes "text message" was not included, so the search could have been more robust). *Id.* at 7. It says that deleting an e-mail inbox was "standard protocol for departing employees" intended "to ensure information security" and that the deletion occurred after the aforementioned search. *Id.* at 9. CTIA contends that it is speculative for plaintiffs to assert that e-mails they did not receive contained adverse information, especially because plaintiffs have already received many of Desautels's e-mails in discovery from other defendants, and those e-mails do not contain information adverse to CTIA or the other defendants. Finally, CTIA argues that plaintiffs cannot show CTIA intentionally destroyed documents in order to hide adverse information, given its self-imposed litigation hold and search of (and production from) Desautels's e-mails, and thus cannot show bad faith on CTIA's part.

Desautels died on March 30, 2009.  It is undisputed that plaintiffs were not able to take his deposition and that CTIA did produce a number of his e-mails (although the parties do not appear to agree on the exact number).  The Court will assume for purposes of this motion that other e-mails existed but were not produced.  Nonetheless, as discussed above, the standard for drawing an adverse inference based on the nonproduction of evidence is not merely that CTIA was at fault for the loss of the evidence.  "The crucial element in a spoliation claim is not the fact that the documents were destroyed but that they were destroyed for the purpose of hiding adverse information."  *Norman-Nunnery*, 625 F.3d at 428.  Although plaintiffs argue that Desautels was "a fulcrum for communications among defendants" and that "[a]ny single e-mail between the Carrier Defendants and Desautels is another potential 'smoking gun,'" Pls.' Repl. to CTIA at 5, they have not provided evidence, not even circumstantial evidence, from which one reasonably could infer that the missing information was adverse.  In fact, available evidence tends to show the opposite.  Plaintiffs themselves provide some of the produced Desautels e-mails as an exhibit to their motion, none of which they argue provides evidence of the alleged conspiracy.  *See* Pls.' Spoliation Ex. 11.  Plaintiffs have included other Desautels e-mails as exhibits to their response to the summary judgment motion; these, too, do not point to concerted activity relating to pricing.  *See, e.g.*, Pls.' Ex. 146 (Desautels distributing minutes of a call about Mobile Instant Messaging Interoperability); Pls.' Ex. 147 (e-mail chain requesting meeting between representatives of carriers to discuss mobile instant messaging ending in Desautels setting up conference call); Pls.' Ex. 224 (e-mail from Desautels agreeing to host a discussion about the Mobile Financial Services space); Pls.' Ex. 335 (e-mail from

Desautels setting up meeting to discuss venture between record companies and wireless carriers); Pls.' Ex. 341 (e-mail thread between Desautels and AT&T employee setting up meeting to discuss interconnecting directly to aggregators). In their reply, plaintiffs argue that some Desautels e-mails were produced "does not negate the fact that just one missing inculpatory e-mail could tilt the case in their favor." Pls.' Repl. to CTIA at 5. This contention is, on its face, speculative. The burden remains on plaintiffs to show that CTIA intentionally destroyed adverse information; without anything permitting a reasonable inference that the unproduced information was adverse, plaintiffs' motion cannot succeed.

Elsewhere in their brief, plaintiffs argue that CTIA breached its duty to preserve the minutes of meetings and phone calls between the carrier defendants. They say the "duty arose when CTIA instituted its antitrust policy," which they contend required CTIA to keep minutes. Pls.' Spoliation Mem. at 7. They base this argument on the fact that there is "only one set of minutes for a particular CTIA retreat among several" and that there are no minutes for "CEO conference calls." *Id.* What is lacking here is any evidence that CTIA destroyed anything; plaintiffs offer nothing indicating that such minutes existed at one point but were discarded. As the Court has discussed, the standard in this circuit for drawing an adverse inference based on spoliation is that the evidence was intentionally destroyed for the purpose of concealing negative information. Plaintiffs have not met their burden in relation to minutes of CTIA's meetings and phone calls, and they do not cite law suggesting the notion that any failure to keep these minutes should influence the Court's decision on other spoliation arguments plaintiffs make.

**B.    Defendants' motion for summary judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact "exists only if there is enough evidence upon which a reasonable jury could return a verdict in" the nonmovant's favor.  *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013).  In considering such a motion, the court must "draw[ ] all reasonable inferences in favor of" the nonmovant.  *Jones v. City of Elkhart*, 737 F.3d 1107, 1112 (7th Cir. 2013).

On a claim alleging a Sherman Act violation, "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).  Accordingly, the Supreme Court has said that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  The Seventh Circuit has said that courts are first to assess whether the plaintiff's "evidence of agreement is ambiguous—that is, whether it is equally consistent with the Defendants' permissible independent interests as it is with improper activity."  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 707 (7th Cir. 2011).  Second, "[i]f we conclude that the evidence could support the conclusion that Defendants were acting independently, we then look for any evidence that tends to exclude the possibility that Defendants were pursuing independent interests."  *Id.*  A plaintiff need not present evidence excluding *all* possibility that defendants were acting independently, but "there must be some evidence which, if believed, would support a finding of concerted behavior."  *Toys "R"*

*Us, Inc. v. FTC*, 221 F.3d 928, 934–35 (7th Cir. 2000).

A plaintiff may prove its price-fixing case through direct or circumstantial evidence. The latter can include "economic evidence suggesting that the defendants were not in fact competing" as well as "noneconomic evidence suggesting that they were not competing because they had agreed not to compete." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002). However, it is insufficient to show behavior that is merely parallel. "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Bell Atl. Corp.*, 550 U.S. at 557. (This type of conduct has been called "conscious parallelism," which is "not in itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).) Although this standard does not mean an antitrust plaintiff "must overcome a heightened burden to defeat summary judgment," it does mean "that 'conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.'" *Omnicare*, 629 F.3d at 707 (quoting *Matsushita*, 475 U.S. at 588).

### 1. The Hurditch e-mail

Defendants argue that plaintiffs have failed to offer any direct evidence of price-fixing collusion in this case. In particular, they say that the previously discussed September 10, 2008 e-mail exchange between T-Mobile employees Hurditch and Roddy, in which Hurditch referred to a price increase as "collusive," is not direct evidence. *See* Pls.' Ex. 266 at TMO_TEXT00010080. Defendants argue that Hurditch

was not involved in the pricing change discussed in the e-mail.  They point to another e-mail in which he said that his "gut" feeling about the increase was that it was "a price gouge" and added that T-Mobile did not need to follow its competitors.  Defs.' Mem. at 32.  Defendants contend that Hurditch could not have known whether there was collusion because he did not participate in CTIA gatherings or have contact with other carriers at the time.  Defendants also seek to downplay the significance of Hurditch's use of the word "collusive," saying that it is an "ambiguous," "loaded" term.  Defs.' Mem. at 33–34.  Finally, defendants contend that the e-mail is inadmissible hearsay under Fed. R. Evid. 801(d)(2)(E) because it was not a communication made in furtherance of the alleged conspiracy.  Defs.' Repl. at 6–7.

Plaintiffs disagree, arguing that the Hurditch e-mail, with its reference to collusion, is a "smoking gun."  Pls.' Resp. at 17.  Plaintiffs say that Hurditch was "well-informed" on the topic of "increasing PPU SMS pricing in 2008" and that his "opinions on pricing" were "well-respected," adding that he won performance awards at T-Mobile.  *Id.* at 19.  They argue that Hurditch's one-time position as vice president of services and strategic pricing gave him knowledge of the collusion in question.  *Id.* at 19.  Plaintiffs say, "Hurditch was in a position to know the price hikes were the result of a collusive agreement, *not* independent unilateral action.  He didn't need to talk to others to figure this out—he knew."  *Id.* at 18–19.  In a footnote, plaintiffs say Hurditch "was in constant touch" with "C-Level employees at T-Mobile that *did* attend meetings with competitors" and could thus effect a conspiracy to fix prices.  *Id.* at 19 n.13.  Plaintiffs also contend that the statement is admissible against all defendants, whether they are referred to in the message or not, under Rule 801(d)(2)(E).

Direct evidence of a conspiracy to fix prices is sufficient for an antitrust plaintiff to withstand summary judgment. Such evidence is "tantamount to an acknowledgment of guilt"; circumstantial evidence, by contrast, is "everything else including ambiguous statements." *High Fructose Corn Syrup*, 295 F.3d at 662. "Because price fixing is a per se violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *Id.* at 654. In the Seventh Circuit's opinion on the motion to dismiss in this case, it noted that direct evidence in price-fixing cases "would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *Text Messaging Antitrust Litig.*, 630 F.3d at 628. The Supreme Court, in *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 765 (1984), noted that direct evidence of price-fixing existed when a manager from the defendant company threatened to withhold supplies from distributors if they failed to maintain a certain resale price. Such evidence, the Court said, "plainly is relevant and persuasive as to a meeting of minds." *Id.*

Assuming for discussion purposes that the Hurditch e-mail is admissible against all four carrier defendants, the e-mail is not direct evidence of the price-fixing conspiracy alleged by plaintiffs. Specifically, the record does not reflect that Hurditch had knowledge or involvement in the pricing decision that prompted his e-mail to Roddy such that his statement constituted "an admission by the defendants that they agreed to fix their prices." *See High Fructose Corn Syrup*, 295 F.3d at 654.

To begin with, Hurditch was not involved in the pricing move that precipitated the e-mail. There is no dispute that Hurditch was involved in T-Mobile's decision to

increase its PPU SMS price to ten cents in 2005 and early 2006 as director of marketing planning and analysis. But he left that position "by January 2007," according to plaintiffs, taking on unspecified "multiple vice president and senior vice president positions," and a "new role in the prepaid business." Pls.' LR 56.1 Stat. ¶ PTM19. Plaintiffs nonetheless argue that Hurditch was well informed and an "active mentor" to Roddy "in her role analyzing the price increases to $0.15 and $0.20." *Id.* This last point, however, highlights the fact that Hurditch was not directly involved with two of the three price increases at T-Mobile that are the subject of this dispute, even if Roddy was. Hurditch's September 2008 e-mail complaining of collusion and opportunism came on the heels of messages about Senator Kohl's letter and a subsequent newspaper article covering it. Both of those items concerned the carriers' move to twenty cents, two price increases and more than a year removed from Hurditch's involvement in pricing activity.

Hurditch's status as well informed within his company and as "an active mentor" to Roddy do not qualify him as having knowledge of a conspiracy. The plaintiffs argue that Hurditch "didn't need to talk to others to figure this out" because "he knew" about it. Pls.' Resp. at 19. But plaintiffs offer no particulars about what knowledge he obtained, and the fact that he frequently spoke to high-level executives within his own company adds nothing significant. (One would expect that of a senior vice president.) Plaintiffs elsewhere cite several e-mails from Hurditch disapproving of pricing moves in which he was not involved, but these are no different from his "collusion" e-mail. Specifically, these e-mails do not suggest his involvement or knowledge, only his reaction. Plaintiffs also argue that Hurditch's "direction to destroy correspondence" supports the status of his e-mail as direct evidence. Pls.' Resp. at 3. Although such an instruction from the

sender of a message may be helpful for purposes of deciding whether the evidence is admissible as a statement in furtherance of a conspiracy, there is no evidence that Hurditch was part of the claimed conspiracy.

It is instructive to sketch out the inferences required to link Hurditch to a conspiracy to increase PPU SMS prices to twenty cents. One would first have to infer that someone like Roddy, to whom Hurditch was allegedly a "mentor," told Hurditch about a price-fixing scheme. That, in turn, would require evidence permitting an inference that Roddy was part of the conspiracy, necessitating the further inference that "C-level" executives at T-Mobile—recall the allegation that pricing moves came from the top—enveloped Roddy into the conspiracy. This further assumes the executives' participation in a conspiracy that involved the four wireless carriers. But there is no evidence of any of this. In the end, there are too many unsupported steps in the logic required to permit a reasonable inference that Hurditch was aware of a conspiracy to collectively move the carriers' PPU SMS prices to twenty cents.

For these reasons, Hurditch's e-mail is not direct evidence of a price-fixing conspiracy. Thus, it is insufficient by itself to create a genuine issue of material fact for trial and permit plaintiffs to avoid summary judgment.

## 2. The circumstantial evidence

Having concluded that the Hurditch e-mail does not qualify as direct evidence of a conspiracy, the Court must consider whether plaintiffs' evidence reasonably tends to rule out the possibility that defendants raised their PPU SMS prices for independent reasons. *See Monsanto*, 465 U.S. at 764. If the evidence presents "conduct that is as consistent with permissible competition as with illegal conspiracy," it "does not, standing

alone, support an inference of antitrust conspiracy." *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 450 (7th Cir. 2007).

Defendants argue that plaintiffs' evidence suggests only "a record of ordinary, deliberative decision-making" on the part of the wireless carriers, indicating "business as usual, not furtive lawbreaking." Defs.' Mem. at 28–29. Defendants contend that "many individuals were involved with the financial and strategic analyses of the price changes at issue in this case," with "well documented" deliberations. *Id.* at 28. "[N]o person and no document attests to the existence of any agreement or even any discussion among the Defendant carriers about the price of PPU text messaging." *Id.* at 28. Plaintiffs counter that the pricing moves themselves were "lockstep raises" that "were historically unprecedented," providing "an inference of conspiracy." Pls.' Resp. at 2. In addition, they say that the increases had "no independent or innocent explanation," arguing that they "cannot be explained by unilateral profit-maximizing decisions." *Id.* at 3. As support, they point to the fact that some carriers made increases after previously deciding not to do so, and they contend that "nearly every lockstep move" was directed by "powers that be," using "superficial" analyses that "gave short shrift to key economic implications." *Id.* at 3–4. Plaintiffs also argue that CTIA meetings were one of the conduits for the carriers' collusion, noting the absence of minutes or agendas for many of the group's meetings. Plaintiffs' experts' reports provide the backdrop for much of this analysis, including economic arguments about how the structure of the wireless industry enables cartels and collusion.

Plaintiffs allege a conspiracy in the face of evidence that each carrier performed some financial analysis, and experienced some internal debate, before carrying out

each of the ten pricing increases at issue.  Plaintiffs' arguments about deficiencies in these analyses amount to a contention that the inadequacy of these internal forecasts indicates that they were sham justifications for predetermined moves.  Plaintiffs' theory thus requires the inference of a vast, multifaceted, highly coordinated conspiracy dedicated to creating a Potemkin village of seemingly independent analyses to lend paper support to each collusive pricing move.  This inference is unreasonable and unsupported, and no reasonable jury could find in favor of plaintiffs on the basis of the evidence.  Even considered in the light most favorable to plaintiffs, the evidence amounts to no more than a showing of consciously parallel conduct.  Although plaintiffs' arguments about parallel price increases with CTIA as a go-between made their complaint sufficiently plausible to proceed past a motion to dismiss, the evidence collected in discovery is inadequate to sustain a dispute of material fact for trial.

### a.    Opportunities to collude

Plaintiffs contend that defendants facilitated their collusion through communication with each other, which occurred both inside and outside events conducted under the auspices of defendant CTIA.  They argue that CTIA held meetings at which high-level representatives of the four other defendants "were welcomed whether they held a formal position or not" and that a CTIA subgroup, the Wireless Internet Caucus (WIC), made "no significant changes" in common technology but still continued to have meetings.  *Id.* at 4–5.  Plaintiffs say that CTIA and WIC were under the carriers' control and that a series of "meetings, panels, retreats, conferences, teleconferences (including 'ad hoc' conference calls), dinners, cocktail receptions, and other social events . . . provided ample opportunities to collude."  *Id.* at 10, 47.  CTIA

itself, plaintiffs argue, is a "cartel-facilitating factor" because it gave the carriers a setting for meetings and information exchanges. *Id.* at 5. "Permeating these private and personal conversations," plaintiffs argue, "was a bond that linked the Carriers together through a seemingly unbreakable fraternity." *Id.* at 48.

As evidence of this fraternity, plaintiffs outline several separate incidents, including meetings among officers of different carriers, including one CEO's testimony that he "would have a cup of coffee or afterwards have a glass of wine," plus a conversation, with personnel of other carriers "during the CTIA." *Id.* at 49. They further include carrier CEOs' discussion of a joint venture called Project Thor (defined in plaintiffs' statement of facts as a joint venture on mobile financial services), as well as CTIA's collection and publication of carrier revenue data; one CEO's efforts to get another CEO to be more proactive in the CTIA; another joint venture allowing carriers to use each other's networks; and other discussions among executives. These include a T-Mobile employee's notes referencing a phone call with a Verizon executive director about "the topics of SMS and pricing." *Id.* Elsewhere in their brief, plaintiffs refer to an incident in which T-Mobile CEO Robert Dotson "sat on" a recommendation to increase SMS prices, not responding "until the day after a CTIA Executive Committee dinner." *Id.* at 35. They also refer to such events as "a private face-to-face meeting" between Dotson and Verizon CEO Lowell McAdam that took place "between Executive Committee and Audit Committee meetings at a CTIA event in Washington, D.C." *Id.* at 40. Plaintiffs also say that Sprint's chief operating officer "attended an in-person CTIA meeting just prior to Sprint increasing its PPU SMS price to $0.15." *Id.* at 48 n.39. Finally, as discussed above, plaintiffs contend that CTIA should have kept agendas and

minutes of its meetings, but did not, in violation of its own "antitrust primer." *Id.* at 4.

A violation of the Sherman Act requires a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Yet the mere opportunity to collude is insufficient to establish a genuine issue for trial on this question. *See Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 641 F.2d 467, 468–69 (7th Cir. 1981) ("opportunity to conspire" and "ability to conspire" without "evidence of actual conspiracy . . . is not sufficient to create a genuine issue of material fact as to the existence of a conspiracy"). And as noted above, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. The decision by a group of industry players to have a meeting or to talk at a dinner or cocktail reception does not constitute a conspiracy. *See Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir. 1990) ("[I]t is well established that evidence of informal communications among several parties does not unambiguously support an inference of a conspiracy."). Although the Seventh Circuit has warned that plaintiffs need not show evidence that excludes all possibility of independent action on a defendant's part, *see Toys "R" Us*, 221 F.3d at 934–35, there must be at least some evidence supporting a finding that defendants' communications involved collusion regarding prices.

Plaintiffs have not offered evidence from which a reasonable jury could find that defendants' various meetings and communications facilitated an alleged conspiracy to fix the price of PPU SMS in the United States. Plaintiffs allege that "[t]he CTIA provided the Carrier Defendants with a venue to discuss PPU SMS pricing in furtherance of the conspiracy." Pls.' Resp. at 47. As support, plaintiffs point to hundreds of CTIA

meetings that representatives from the carrier defendants attended, "which provided ample opportunities to collude," and argue that notes and/or minutes from these meetings should have been kept but were not. *Id.* Plaintiffs have provided no evidence, however, that any actual collusion occurred at these meetings, or that the conspiracy was formed or advanced at any particular meeting or meetings. Although plaintiffs reference the existence of communications involving defendants that are temporally near some of the pricing changes at issue here, they offer nothing other than speculation about the substance of these talks. This case is not one where there is only "limited" contact between executives of different companies, plaintiffs argue, attempting to distinguish another recent multidistrict antitrust litigation where summary judgment was granted. *See In re Chocolate Confectionary Antitrust Litig.*, No. 1:08-MDL-1935, 2014 WL 722092 (M.D. Pa. Feb. 26, 2014). Yet here, as in that case, plaintiffs are "unable to point to anything beyond [their] own speculation to establish that defendants' executives discussed collusive price increases" at numerous meetings. *Id.* at *24. Taken as a whole, evidence of any concerted action involving CTIA-sponsored contacts is no more suggestive of collusion than of parallel behavior, and thus it does not permit a reasonable inference of a conspiracy. At best, plaintiffs' evidence shows sustained intra-industry communications, but without more such communications show only the opportunity to collude. This is insufficient to give rise to a dispute of material fact on a price-fixing claim.

### b. The pricing timeline

Plaintiffs provide an account of each of the ten price increases for PPU SMS, arguing that "[t]he price moves themselves are evidence of the conspiracy." Pls.' Resp.

at 5.  They describe the increases as "lockstep" and "unprecedented homogenous pricing for PPU SMS."  *Id.* at 23.

As discussed previously, the timeline starts with Verizon and T-Mobile increasing their PPU SMS rate to ten cents, in line with Sprint and AT&T (whose own moves to ten cents, at some unspecified point in the past, were apparently not part of the conspiracy).  Verizon's move to ten cents took effect on August 1, 2005, followed seven months later by T-Mobile's own move to ten cents on March 1, 2006.  The next increases were to fifteen cents at each carrier over a period of eight months:  Sprint on October 1, 2006; AT&T on January 21, 2007; Verizon on March 1, 2007; and T-Mobile on June 1, 2007.  *See* Pls.' LR 56.1 Stat. ¶ PJS15.  The next set of increases occurred over a nearly eleven-month period.  Sprint increased its price from fifteen to twenty cents on October 1, 2007, followed by Verizon on March 2, 2008, AT&T on March 30, 2008, and T-Mobile on August 30, 2008.  *See id.* ¶ PJS16.

Defendants argue that the prices did not actually move in "lockstep," because "there is no dispute that the carriers had ample time to carry out independent evaluations before implementing each of the challenged increases."  Defs.' Repl. at 31 n.33.  Plaintiffs point to the fact that the announcements of the price increases were on a slightly different timeline than the increases themselves, and they focus on the carriers' announcements rather than the actual effective dates of the increases.  Plaintiffs contend that AT&T's announcement of its increase to fifteen cents was "about two and a half months after the effective date of Sprint's move" and that Verizon announced its increase "just weeks after that."  Pls.' Resp. at 46.  "[A]bout three months after Sprint's increase, a reasonable customer considering a move would see that three

of the four major carriers had gone to $0.15 and would at least have to consider the possibility that T-Mobile would do likewise." *Id.* at 46–47.

Although T-Mobile in fact did raise its price several months later, the pricing moves plaintiffs describe do not suggest a "lockstep" operation. In affirming this Court's denial of defendants' motion to dismiss, the Seventh Circuit noted that the complaint described the carriers "simultaneously jack[ing] up their prices by a third." *Text Messaging Antitrust Litigation*, 630 F.3d at 628. The court continued:

> The change in the industry's pricing structure was so rapid, the complaint suggests, that it could not have been accomplished without agreement on the details of the new structure, the timing of its adoption, and the specific uniform price increase that would ensue on its adoption.

*Id.* However, that is not the picture the evidence that plaintiffs have adduced actually tends to show. It may be true that the smallest window between one carrier implementing its increase and another carrier announcing (but not yet implementing) its own increase was as small as a few weeks. However, the largest window between increases—between Sprint and T-Mobile's increases to twenty cents—is nearly a year, far from "simultaneous," or even "rapid." The calendar here differs from that in *High Fructose Corn Syrup*, where the Seventh Circuit noted that one defendant announced a price increase and the others "quickly followed suit." *High Fructose Corn Syrup*, 295 F.3d at 658. The district court's decision in that case notes how rapidly prices coalesced: the first increase was announced on March 16, 1988, and matching increases followed at other companies on March 21, March 25, and May 2 of the same year. *See In re High Fructose Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017, 1034 (C.D. Ill. 2001).

Plaintiffs attack the internal analyses the carriers conducted to support their

pricing moves, saying that they left out significant factors and did not actually justify the increases from a business standpoint. This, plaintiffs argue, suggests the analyses were made to paper the file and provide ostensible justifications for increases they actually made collusively. But the undisputed evidence of the reports, however inadequate, and of the internal debates within the carriers about the increases, indicates the carriers had a good deal of time to react to competitors' moves and consider their own. These analyses, along with the time elapsed between the increases, are as equally suggestive of independent action as collusion; indeed they are more suggestive of independent action. This evidence does not give rise to a dispute of material fact about the existence of a price-fixing conspiracy, despite the similarity of the price increases.

### c. Expert testimony

The Seventh Circuit has said there are "two types" of circumstantial evidence on which a plaintiff usually relies in a price-fixing case: "economic evidence suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to compete." *See High Fructose Corn Syrup*, 295 F.3d at 655; *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785 (7th Cir. 1999) (noting economic circumstantial evidence as alternative to direct evidence in antitrust cases). Yet this type of evidence still must satisfy the standard for summary judgment in antitrust cases, namely that the evidence must tend to rule out the possibility that defendants were acting independently. *See Bell Atl. Corp.*, 550 U.S. at 554.

The remainder of plaintiffs' evidence is largely dedicated to these two categories.

Plaintiffs' arguments on these factors are intertwined with the reports of their experts,

who have analyzed both the carriers' pricing moves and the economics of the wireless

industry.  Overall, plaintiffs contend, their experts' testimony helps establish the

presence of a number of "plus factors," which serve "as a proxy for direct evidence of an

agreement."  Pls.' Resp. at 7–8 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360

(3d Cir. 2004)).

Plaintiffs' experts are Roger G. Noll, a professor emeritus of economics at

Stanford, and William H. Lehr, a research scientist in the Computer Science and

Artificial Intelligence Laboratory at MIT.  Lehr's summary of his conclusion is as follows:

> Taken together, the underlying economics of SMS and the mobile service
> industry, the pattern of pricing and the inability to explain this pattern as a
> consequence of unilateral competitive action, in combination with the
> ample opportunities to engage in active collusion afforded by the CTIA
> and other forums, lead me to conclude that the most likely explanation is
> that the defendants did indeed collude in the setting of SMS PPU prices
> during the relevant period.

Pls.' Ex. 234 at 6.  Lehr contends that the carriers' PPU SMS price increases ran

counter to the previously "robust competition" in the industry, highlighting the low cost

and increasingly high return to the carriers in providing SMS to customers.  *Id.* at 4–5.

Given the "highly profitable" nature of SMS, Lehr says, a unilateral price increase would

"not [be] rational," given potential customer reaction.  *Id.* at 6, 32–42.  Lehr goes on to

review "the documentary record" of the case by analyzing the carriers' documents and

e-mails about their individual pricing decisions, noting that they show increased pricing

"with the expectation or knowledge that the price increases would be matched."  *Id.* at

42, 43–52.  (Lehr quotes the Hurditch e-mail mentioning "colusion [sic]."  *Id.* at 49.)

Finally, Lehr analyzes the carriers' interactions at and with CTIA, concluding that CTIA

"provided a risky environment that could be abused to support collusion among the defendants," noting particularly CTIA's data collection and "failure to keep minutes." *Id.* at 57, 58.

Like Lehr, Noll concludes that "the most likely cause" of PPU SMS price increases "was collusion by the defendants." Pls.' Ex. 269 at 3. To reach this conclusion, he cites some of the same evidence as Lehr. Noll posits "that the PPU price changes differed from the price trends for both bundled SMS and wireless services more generally," which "cannot be explained by unilateral profit-maximizing decisions by the carriers." *Id.* at 17–18, 30. He also undertakes a survey of various "plus factors" present in the wireless industry, including the small number of players, a homogeneous product, the CTIA as trade association, the ability to monitor competitors, and the companies' announcement of pricing increases. Together, the factors show that the carriers' environment "has features that facilitate price collusion." *Id.* at 41. Like Lehr, Noll proceeds to examine internal documents from each of the carriers concerning each increase, noting that the carriers' forecasts failed to account for elements such as "churn" (customer deactivations) and were otherwise "perfunctory" and subject to internal dissent. *See, e.g.*, *id.* at 44. Those elements, combined with the wireless market structure and the presence of CTIA, lead Noll to conclude that "the evidence does not support the alternative hypothesis that these price increases were in the independent self-interest of each of the carriers." *Id.* at 49. Plaintiffs couple this evidence with arguments that decisions to execute the price increases often came from top officers at the companies over the objections of midlevel employees.

Defendants argue that a reasonable jury could not conclude that the pricing

moves, and the internal analysis supporting them, were not undertaken in good faith. Defendants say that the experts' opinions "are based on second-guessing the contemporaneous business judgment of Defendants' employees" and are not sufficient to preclude summary judgment.  Defs.' Mem. at 40.  They contend that plaintiffs' experts did not conclude that the carriers actually colluded, and they observe that the experts' definition of collusion includes behavior that is lawful under antitrust law.  Defendants also argue that the carriers had a motive to increase prices in their preference to push customers to move away from PPU SMS into bundled SMS plans.  They further contend that the carriers' internal forecasts were not as perfunctory as plaintiffs' experts charge and were undertaken in good faith to serve defendants' perceived unilateral interests.  Internal dissent over the increases, defendants argue, was part of "an ordinary, independent decision-making process," *id.* at 44, adding that the structure of the wireless industry made colluding inadvisable because a carrier could easily "cheat" by lowering its price.  *Id.* at 51.

Plaintiffs, through their experts, offer a great deal of evidence about the carriers' internal reports for each increase that, plaintiffs argue, were simply inadequate.  But outside their bottom-line conclusions, in which they opine that defendants' behavior was "most likely" collusive, the opinions of plaintiffs experts do not *tend to exclude* the possibility that defendants' actions were merely parallel, rather than collusive.  Although the experts' reports may constitute impressive breakdowns of the SMS market, they "do little to demonstrate . . . any sort of agreement."  *Omnicare*, 629 F.3d at 716.  Plaintiffs and their experts extensively criticize the carriers' own analyses, but they cannot overcome the fact that each carrier performed an internal forecast for each pricing

move.  The implication of plaintiffs' argument critiquing these internal reports is that they were phony *ex post* justifications for predetermined moves.  This would necessitate an inference of a complex scheme among the wireless carriers to precisely calibrate ten separate pricing moves, each accompanied by an internal forecast and at times vigorous debate that was all for show, or at least directed by forces behind the curtain. There is no evidence suggesting that sort of an inference would be reasonable.

Plaintiffs contend that, in one instance, the forecast a carrier performed to justify its price increase came after the fact.  If true, this arguably would suggest that the increase had been collusive.  Plaintiffs argue that for T-Mobile's increase to twenty cents, "direction to proceed with the increase to $0.20 came from T-Mobile's 'ELT' (Executive Leadership Team) before any business case was even created."  Pls.' Resp. at 40.  Defendants counter that this is "demonstrably untrue," citing multiple studies performed within T-Mobile prior to the approval of the increase.  Defs.' Repl. at 25. Plaintiffs' argument is based on a May 21, 2008 e-mail from T-Mobile's Roddy with the subject "FW: SMS Price Increase?"  Pls.' Ex. 411 at TMO_TEXT00009978.  An employee named Janet Smith had e-mailed Roddy asking "if another SMS rate increase was being planned."  *Id.*  Roddy responded that the increase "came up as a discussion point when I was on vacation," adding that "both Robert and Brian were gung ho and communicated they didn't know why we wouldn't just move forward."  *Id.* (apparently referring to T-Mobile CEO Robert Dotson and CFO Brian Kirkpatrick).  Roddy said that "the team took that to mean that we are 'good to go' and therefore didn't begin working on the business case," and then asked to borrow a staff member "to run the numbers on this for us," which would use "last year's effort as a model."  *Id.*  Defendants argue,

however, that "significant analysis" of the increase had occurred in March, April, and May, before Roddy's e-mail, culminating in a presentation incorporating the analyses at a May 8, 2008 "SMS/MMS Kickoff" event. Defs.' Repl. at 25. In their response to defendants' statement of facts, plaintiffs appear to acknowledge that these earlier studies existed, though they criticize the studies as "back of the envelope" calculations that "did not take into consideration the impact on churn, usage, product adoption or customer acquisition." Pls.' Resp. Defs.' LR 56.1 Stat. ¶ TM49. Plaintiffs also criticize the studies by quoting other T-Mobile employees' discomfort with the move to twenty cents, including Hurditch, and they cite actions by T-Mobile executives, but these took place after the analyses defendants reference. *See id.* ¶¶ 49–52 (referring to May and June 2008 phone call and meeting, in response to fact statement about March 2008 analyses). As with plaintiffs' responses to the carrier defendants' other internal forecasts, criticism of the studies is not sufficient to permit a reasonable fact finder to determine that the studies were shams or that defendants actually colluded.

Taken alone or with the other evidence, plaintiffs' arguments about the price increases and the analyses behind them, along with the structure of the wireless data industry, inevitably involve some factual disputes. The evidence in this case is, after all, voluminous. However, plaintiffs have not shown that the disputed facts are *material* regarding the central dispute: whether defendants actually colluded to fix prices. Even if the carriers' own forecasts about each move were deficient or involved inadequate analyses, and even if the industry is one where collusion is a possibility, that does not give rise to a reasonable inference that a price-fixing conspiracy was afoot. The same is true of pricing moves directed from high places; even if high-ranking officers ordered

every price change, that (taken alone or with other evidence) does not produce a reasonable inference that they had crossed company lines to do so as a unit. What is missing is evidence that would allow a reasonable jury to find collusion, as opposed to, for example, poor decision making processes or self-interested and independent behavior. Plaintiffs cannot point to cases permitting such an inference from evidence of this sort. Nor can the opinions of their experts establish the existence of a dispute of material fact based on the same underlying evidence. The evidence does not tend to rule out the possibility of independent action; it is "conduct as consistent with permissible competition as with illegal conspiracy," which "does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588.

### d. The evidence as a whole

Although the Court necessarily has discussed each of plaintiffs' categories of evidence in isolation, the Court must assess the evidence in the aggregate. The Seventh Circuit specifically warned in *High Fructose Corn Syrup* that courts must not "suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." 295 F.3d at 655. "The question for the jury in a case such as this," the court said, "would simply be whether, when the evidence was considered as a whole, it was more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices." *Id.* at 655–56. The Seventh Circuit has said in another context that this approach is akin to examining "a mosaic whose individual tiles add up to a complete picture." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013).

Reviewing plaintiffs' evidence in this manner nonetheless produces the

conclusion that a reasonable jury could not find in favor of plaintiffs. Taken together, the evidence plaintiffs have compiled—Hurditch's e-mail, defendants' interactions in and out of CTIA functions, pricing changes that were varying lengths of time apart, two experts opinion on the motivation behind the pricing moves, the industry structure, and the internal analyses each company performed—does not present a question for a jury on whether plaintiffs conspired to fix prices. Plaintiffs' evidence does not "point[ ] toward a meeting of the minds" that takes this case beyond "parallel conduct, even conduct consciously undertaken." *Bell Atl. Corp.*, 550 U.S. at 557. Rather, it shows several wireless carriers who increased their PPU SMS prices at varying times within a certain period, following internal studies and debates about each increase, while occasionally interacting with competitors at meetings of a trade association (or outside those meetings). Adding Hurditch's e-mail to the mix does not change anything, given his lack of knowledge of or participation in any potential conspiracy. Nor does full consideration of plaintiffs' experts' conclusions. Taken as a whole, this is evidence that does not "reasonably tend[ ] to prove" that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. Plaintiffs have not produced evidence that would permit a reasonable jury to find that defendants engaged in a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C.§ 1.

## C.      Motion for leave to file surreply

Plaintiffs have filed a motion with the Court for leave to file a surreply. In the motion, they also ask permission to add to their statement of material facts. The Court grants the motion and has considered the surreply in dealing with the summary

judgment motion.  Both requests by plaintiffs relate to their argument that defendants "overstated" their rationale for the PPU SMS prices increases when they contended the increases were intended to encourage customers to switch to bundled SMS plans.  Pls.' Mem. Supporting Mot. For Leave to File [docket no. 894] at 1.  In their surreply, plaintiffs contend that this justification is "pretextual" because defendants eliminated their lowest-price SMS bundle plans, which "took the rational option to move to a bundle away" from many PPU SMS users.  Pls.' Surrepl. at 1.  This movement, plaintiffs argue, "is further proof of concerted action in furtherance of the conspiracy."  *Id.* at 2.

Even if the Court takes this point at face value, it does not, together with the other evidence, give rise to a genuine dispute about whether defendants conspired to fix prices.  The surreply does not provide any evidence of contacts between defendants pointing to a conspiracy to increase PPU SMS prices.  Plaintiffs' allegation of "pretext" is somewhat conclusory, as they ultimately contend only that one stated rationale for the PPU price increase was "overstated" and that it was not "rational" for PPU users to opt for a bundle plan after the cheapest bundle plans were eliminated.  *Id.* at 1.  Plaintiffs' argument that defendants could have done more to push their customers into bundled plans is similarly unhelpful in this regard.  As the Court has noted, allegations of parallel conduct are insufficient to give rise to a dispute of material fact on the issue of whether defendants conspired to fix prices, and plaintiffs' surreply arguments do not "tend to rule out the possibility that the defendants were acting independently."  *Bell Atl. Corp.*, 550 U.S. at 554.  Rather, taken as true, at most they only weaken one reason defendants have provided for their action.  Plaintiffs' additional arguments do not go further toward showing that a reasonable jury could find for plaintiffs on the issue of conspiracy, even

when considered with the other evidence they have offered.

### Conclusion

For the foregoing reasons, the Court grants plaintiffs' motion for leave to file a surreply [docket no. 843]; denies plaintiffs' motion for an adverse inference and sanctions [docket no. 743]; and grants the defendants' motion for summary judgment [docket no. 739]. The Clerk is directed to enter judgment in favor of defendants.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 19, 2014